# MAREK, GRIFFIN & KNAUPP

DAVID C. GRIFFIN† ⁕
ROBERT E. McKNIGHT, JR.‡

OF COUNSEL
HOWARD R. MAREK
JOHN GRIFFIN, JR⁕◊
LYNN KNAUPP⁑ (retired)

### ATTORNEYS AT LAW
The McFaddin Building
203 N. LIBERTY STREET
VICTORIA, TEXAS 77901
TELEPHONE (361) 573-5500
FAX (361) 573-5040
www.lawmgk.com

† BOARD CERTIFIED · PERSONAL INJURY TRIAL LAW
   TEXAS BOARD OF LEGAL SPECIALIZATION
⁕ BOARD CERTIFIED · CIVIL TRIAL LAW
   NATIONAL BOARD OF TRIAL ADVOCACY
⋆ BOARD CERTIFIED · CIVIL TRIAL LAW
⁑ BOARD CERTIFIED · FAMILY LAW
◊ BOARD CERTIFIED · CONSUMER AND
   COMMERCIAL LAW
‡ ALSO LICENSED IN LOUISIANA

January 23, 2024

Honorable Andrew Edison
United States Magistrate
Judge 601 Rosenberg,
Seventh Floor Galveston,
Texas 77550

RE:   Civil Action No. 3:23-CV-00113; Chad Hurta, Plaintiff vs. OQ Chemicals Corporation, Defendant; United State District Court Southern District of Texas Galveston Division

Dear Judge Edison:

We seek the Court's assistance in discovery issues, and we send this letter pursuant to Local Rule 6(E). There are two discrete but related discovery issues that divide the parties. The first deals with the defendant's duty to comply with this Court's required Discovery Protocols for Employment Cases Alleging Adverse Action. Plaintiff asserts that Defendant has not complied with this duty. Specifically, Plaintiff alleges that Defendant has not complied with its duty to provide "all communications concerning the factual allegations...among or between the parties and among or between "Plaintiff's managers and/or supervisors, and/or Defendants' human resources" personnel. OQ's Rule 30(b)(6) designee has testified that there are emails and other communications that bear upon OQ's claim that it terminated Plaintiff because he ran out of FMLA leave. No records have been produced regarding FMLA or any other form of protected leave.

This failure also implicates Part IV (2)© and (d) of the Protocols, which required OQ to provide Plaintiff's entire personnel file and all of its termination documentation. OQ produced no actual pay records, no copies of checks, no records of protected leave and no documentation of any good faith interactive accommodation process.

OQ was also required to produce "Documents relied upon to make the employment decisions at issue in this lawsuit." Its response directs Plaintiff to Bates 0-166. But none of those evidence any decision making regarding Plaintiff's accommodation requests or its termination of him six days later. OQ's designee testified that there were emails regarding how much leave Plaintiff was entitled to, and emails discussing whether or not to fire Plaintiff. Those have not been produced.

Likewise, OQ answered "None" to the required disclosure of the "Job descriptions for the positions that Plaintiff held." Its designee insisted that OQ has documents that should have been produced but were not. Attached are OQ's response to the mandatory disclosures.

Turning then to the OQ's failure to comply with Rule 30(b)(6), Plaintiff asserts that OQ is not in compliance. *See Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416 (5th Cir. 2006). OQ designated one employee for all the topics. The deposition notice is attached. However, OQ had not prepared the witness to address ten of the topics. She repeatedly claimed that "HR" or "medical" should address those topics. She admitted that OQ had failed to produce documents she needed to be able to address the topics. OQ was unprepared to address topics, 3, 5, 6, 13, 19, 24, 27, 31, 32 and 33. Also attached is the transcript of the Rule 30(b)(6) deposition of OQ, highlighted to illustrate the lack of preparation under the Rule.

Accordingly, Plaintiff seeks the Court to order OQ to fully prepare the witness pursuant to the Rule and *Brazos River Authority,* hold that the corporation must "designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed." 469 F.3d at 433. The witness must be able to state the organization's "position" on each topic. *Id.* Plaintiff also asks the Court to order OQ to fully comply with the Court's protocols within 15 days.

Plaintiff has attempted to confer with lead defense counsel about these issues by email on December 7, 2023, December 8, 2023, January 2, 2024 and January 15, 2024. Copies of these emails are available if the Court deems them important. Finally, counsel conferred in person at the deposition on December 13, 2023. The result of these efforts has been Defendant's promises of compliance and an offer to resume the Rule 30(b)(6) deposition. Plaintiff points out that this discovery is needed in order for Plaintiff to determine any retained experts, and that deadline is January 26, 2024. Defendant is not opposed to extending this deadline, and the parties agree that the scheduling order be so modified.

Sincerely,

/s/ *John W. Griffin, Jr.*

John W. Griffin, Jr.

Sincerely,

/s/ *Yanice Colon-Pol*
Signed by E-mail Permission

Yanice Colon-Pol

JWG/rrm

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS, GALVESTON DIVISION

CHAD HURTA,

      Plaintiff,

v.

OQ CHEMICALS CORPORATION,

      Defendant.

Civil Action No. 3:23-CV-00113

## DEFENDANT'S FIRST AMENDED RESPONSES TO INITIAL DISCOVERY PROTOCOLS FOR EMPLOYMENT CASES ALLEGING ADVERSE ACTION

**To: CHAD HURTA, by and through his attorney of record, John W. Griffin, Jr., MAREK, GRIFFIN & KNAUPP, 203 N. Liberty St., Victoria, TX 77901.**

Pursuant to Honorable Jeffrey V. Brown's Initial Discovery Protocols for Employment Cases Alleging Adverse Action, entered on April 26, 2023, Defendant, OQ Chemicals Corporation, serves their First Amended Response to Initial Disclosures.

Further, Defendant hereby gives notice of the intent to use all documents produced by any party in the discovery process, including documents obtained by deposition upon written questions, authorizations, affidavits, and all documents provided by Plaintiff in response to any discovery requests, at the time of trial.

**I.**

**DOCUMENTS THAT DEFENDANT MUST PRODUCE TO PLAINTIFF**

a) All communications concerning the factual allegations or claims at issue in this lawsuit among or between:

    i.  Plaintiff and Defendant, and

    ii.  Plaintiff's manager(s), and/or supervisor(s), and/or Defendant's human resources representative(s).

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

b) Responses to claims, lawsuits, administrative charges, and complaints by Plaintiff that rely upon any of the same factual allegations or claims as those at issue in this lawsuit.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM 000167 to OQCHEM 000172. Defendant serves the right to supplement this response as necessary.

c) Documents concerning the formation and termination, if any, of the employment relationship at issue in this lawsuit, irrespective of the relevant time period.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

d) The Plaintiff's personnel file, in any form, maintained by Defendant, including files concerning Plaintiff maintained by Plaintiffs supervisor(s), manager(s), or Defendant's human resources representative(s), irrespective of the relevant time period.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

Please see attached Bates stamped documents OQCHEM000173 to OQCHEM 000684. Defendant serves the right to supplement this response as necessary.

e) The Plaintiff's performance evaluations and formal discipline.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

f) Documents relied upon to make the employment decision(s) at issue in this lawsuit.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

g) Workplace policies or guidelines relevant to the adverse action in effect at the time of the adverse action. Depending upon the case, those may include policies or guidelines that address:
   i.   Discipline,
   ii.  Termination of employment,
   iii. Promotion,
   iv.  Discrimination,
   v.   Performance reviews or evaluations,
   vi.  Misconduct,
   vii. Retaliation, and
   viii. Nature of the employment relationship.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

h) The table of contents and index of any employee handbook, code of conduct, or policies and procedures manual in effect at the time of the adverse action.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

i) Job description(s) for the position(s) that Plaintiff held.

**RESPONSE**:

---

**DEFENDANT'S FIRST AMENDED INITIAL DISCLOSURES**                    Page | 3

Currently, there are none. Defendant reserves the right to supplement this response as necessary.

j) Documents showing Plaintiff's compensation and benefits. Those normally include retirement plan benefits, fringe benefits, employee benefit summary plan descriptions, and summaries of compensation.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM 000151 to OQCHEM 000158. Defendant serves the right to supplement this response as necessary.

k) Agreements between Plaintiff and Defendant to waive jury trial rights or to arbitrate disputes.

**RESPONSE**:

Currently, there are none. Defendant reserves the right to supplement this response as necessary.

l) Documents concerning investigation(s) of any complaint(s) about Plaintiff or made by Plaintiff, if relevant to Plaintiff's factual allegations or claims at issue in this lawsuit and not otherwise privileged.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

m) Documents in the possession of Defendant and/or Defendant's agent(s) concerning claims for unemployment benefits unless production is prohibited by applicable law.

**RESPONSE**:

Please see attached Bates stamped documents OQCHEM000001 to OQCHEM 000166. Defendant serves the right to supplement this response as necessary.

n) Any other document(s) upon which the defendant relies to support the defenses, affirmative defenses, and counterclaims, including any other document(s) describing the reasons for the adverse action.

**RESPONSE**:

Currently, there are none. Defendant reserves the right to supplement this response as necessary.

## II.

## INFORMATION THAT DEFENDANT MUST PRODUCE TO PLAINTIFF

a) Identify Plaintiff's supervisor(s) and/or manager(s).

**RESPONSE**:

      I.     Steve Garcia
             On-shift Work Group Lead
             1520 Ave J.
             Bay City, TX 77414
             (979) 943-2102

      II.    Jeremiah Tipps
             Manufacturing Supervisor
             96 Seagull Road
             Sargent, TX 77414
             (979) 241-4024

      III.   Mitch Abshier
             Manufacturing Lead
             P.O. Box 282
             Wadsworth, TX 77483
             (979) 241-4163

      IV.   Kristina Zalman
             Operations Manager
             11710 Casadores Lane
             Needville, TX
             (979) 241-4194

      V.    Kevin Hunt
             Operations Director
             8325 Pocono
             Corpus Christ, TX 78414
             (979) 241-4287

b) Identify person(s) presently known to Defendant who were involved in making the decision to take the adverse action.

**RESPONSE**:

      I.     Jeremiah Tipps
             Manufacturing Supervisor

      96 Seagull Road
      Sargent, TX 77414
      (979) 241-4024

II.    Kristina Zalman
      Operations Manager
      11710 Casadores Lane
      Needville, TX
      (979) 241-4194

c) Identify persons Defendant believes to have knowledge of the facts concerning the claims or defenses at issue in this lawsuit, and a brief description of that knowledge.

**RESPONSE**:

I.    Steve Garcia
      On-shift Work Group Lead
      1520 Ave J.
      Bay City, TX 77414
      (979) 943-2102

II.    Jeremiah Tipps
      Manufacturing Supervisor
      96 Seagull Road
      Sargent, TX 77414
      (979) 241-4024

III.    Mitch Abshier
      Manufacturing Lead
      P.O. Box 282
      Wadsworth, TX 77483
      (979) 241-4163

IV.    Kristina Zalman
      Operations Manager
      11710 Casadores Lane
      Needville, TX
      (979) 241-4194

V.    Kevin Hunt
      Operations Director
      8325 Pocono
      Corpus Christ, TX 78414
      (979) 241-4287

d)  State whether Plaintiff has applied for disability benefits and/or social security disability benefits after the adverse action. State whether Defendant has provided information to any third party concerning the application(s). Identify any documents concerning any such application or any such information provided to a third party.

**RESPONSE**:

Defendant applied for benefits under the Company's Long-Term Disability policy with Hartford. It is Defendant's understanding that in connection with that application, Plaintiff represented that he was and would continue to be unable to perform his job now and into the future. Effective September 3, 2022, Plaintiff was approved for long-term disability benefits based on these representations. Defendant provided Hartford the requested information in response to Plaintiff's application.

DATED: August 01, 2023

MEADERS & ALFARO

YANICE COLON-POL
State Bar No. 24104276
Two Riverway, Suite 845
Houston, Texas 77056
Telephone:  (713) 403-3138
Fax:  (855) 602-8224
Email: Yanice.ColonPol@meaderslaw.com

**ATTORNEYS FOR DEFENDANT**
**OQ CHEMICALS CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing document has been served upon all counsel on the 1st day of August, 2023, via email/eservice in accordance with the Federal Rules of Civil Procedure:

John W. Griffin, Jr.
MAREK, GRIFFIN & KNAUPP
203 N. Liberty St.
Victoria, Texas 77901
Email: jwg@lawmgk.com
*Plaintiff's Attorney-in-Charge*

Yanice Colon-Pol

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| **CHAD W. HURTA,** | **Civil Action No. 3:23-CV-00113** |
| **Plaintiff** | |
| **v.** | |
| **OQ CHEMICALS CORPORATION,** | |
| **Defendant** | |

**Plaintiff's First Amended Notice of Deposition to Defendant OQ Chemicals Corporation**

Please take notice that the Plaintiff intends to take the oral deposition of the Defendant, OQ Chemicals Corporation, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, before a qualified court reporter, Veritext Legal Solutions, authorized to administer oaths, on November 6, 2023. The deposition may also be videotaped by Veritext Legal Solutions. The deposition will take place at the offices of Defendants' attorney, Yanice Colon-Pol, MEADERS & ALFARO Two Riverway, Suite 845, Houston, Texas 77056, at 10:00 A.M. and will continue from day to day thereafter until completed.

The topics for the deposition and the documents requested are listed on the attached Exhibit A.

You are invited to attend and cross-examine.

Respectfully submitted,

/s/ John W. Griffin, Jr.

John W. Griffin, Jr.

TX Bar No. 08460300

jwg@lawmgk.com

Robert E. McKnight, Jr.

TX Bar No. 24051839

Marek, Griffin & Knaupp

203 N. Liberty St.

Victoria, TX 77901

Tel. 361-573-5500

Fax 361-573-5040


Counsel for Plaintiff


## CERTIFICATE OF SERVICE

This is to certify that a true, correct and complete copy of the foregoing instrument has been forwarded to all parties of interest in keeping with Rule 21a of the *Texas Rules of Civil Procedure* on this the 6th day of October, 2023.

Yanice Colon-Pol

MEADERS & ALFARO

2 Riverway, Suite 845

Houston, Texas 77056

Yanice.colonpol@meaderslaw.com


/s/ John W. Griffin, Jr.
John W. Griffin, Jr.

Counsel for Plaintiff

2

**EXHIBIT A**

**Rule 30(b)(6) deposition topics and document requests**

1.  The essential function of Plaintiff's job.

2.  Your policy or policies regarding accommodations for workers with disabilities, on the job injuries or pregancy.

3.  The accommodation process between you and the plaintiff.

4.  Your knowledge of Plaintiff's medical condition and his need for an accommodation.

5.  Your decision making with respect to any request for accommodation by Plaintiff.

6.  Your decision making process for considering an employee's requests for accommodation.

7.  The facts justifying the affirmative defenses you have asserted in your answer.

8.  Plaintiff's ability to perform the essential functions of the job.

9.  Your participation in the EEOC process regarding Plaintiff's charge of discrimination, including the documents provided during the process, and any statements or representations made during the process.

10. The reasonableness of the accommodations suggested by Plaintiff, as well as any alternative accommodations suggested by you.

11. Whether or not the accommodations suggested by the Plaintiff were reasonable or not.

12. Any and all communications between you on the one hand, and any expert in the area of Guillaume Barre Syndrome and its symptoms and duration thereof.

3

13.     Any good faith interactive process that occurred between you on the one hand and Plaintiff, on the other hand, with respect to accommodating the Plaintiff.

14.     Any and all policies, formal or informal, addressing light duty work for employees with physical impairments, whether work related or not, from 2015 to the present.

15.     The factual basis for each of your affirmative defenses included in your Answer to the Plaintiff's Complaint in this lawsuit.

16.     Any acts of dishonesty or insubordination that you contend reflect upon Plaintiff's credibility.

17.     Your position on whether Plaintiff's requests for accommodation were reasonable or not.

18.     Any amendments to or deletion of any policy, formal or informal, regarding light duty work for employees with physical impairments, from 2015 to the present.

19.     Any workers who you allowed light duty work after physical impairments were brought to your attention.

20.     The communications between you and the plaintiff regarding his Guillaume Barre Syndrome and any good faith interactive process that occurred between you and the plaintiff.

21.     Your explanation for why you declined to grant any accommodation to Plaintiff.

22.     Your explanation for why you terminated the plaintiff.

23.     Any alternatives to termination that you considered before terminating Plaintiff.

24.     Your experience with the following workers who needed modification of job duties due to physical impairment: Chris Vasek, Val Chavez, Eddie Milton, Mark Svatek, Jonthen Times, and John Wilson.

25.    The essential and the marginal functions of your operator positions in your Bay City plant, including Area 1 and Area 2.

26.    Your role in any short term or long term disability insurance applied for or granted to the plaintiff.

27.    The salary and benefits that Plaintiff would have earned had you not terminated him when you did.

28.    Your position on whether or not reinstatement of Plaintiff is feasible.

29.    The essential and marginal functions of operator positions in both Area 1 and Area 2 at the location where you employed Plaintiff, from 2018 to the present.

30.    Operators you hired or fired at the plant where Plaintiff worked, from 2019 to the present, including Area 1 and Area 2.

31.    Workers you have hired (from 2017 to the present) to train operators for Area 1 or Area 2.

32.    Position descriptions for the following jobs at your Bay City plant (including Area 1 and 2): Operators, Operator Supervisors.

33.    The personnel file of Andy Rojas, your employment of Mr. Rojas, the essential functions of his job or jobs with OQ and his ability to perform the essential and marginal functions of his job or jobs with OQ and any accommodations proposed or granted to him.

1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF TEXAS

3             GALVESTON DIVISION

4   ———————————————————————

5   CHAD W. HURTA,

6         Plaintiff,

7     v.                Civil Action No.

8   OQ CHEMICALS CORPORATION,      3:23-cv-00113

9         Defendant.

10  ———————————————————————

11              DEPOSITION OF

12  KRISTINA ZALMAN AS 30(b)(6) CORPORATE REPRESENTATIVE

13         FOR OQ CHEMICALS CORPORATION

14  DATE:        Wednesday, December 13, 2023

15  TIME:        10:02 a.m.

16  LOCATION:     Meaders & Alfaro

17              2 Riverway, Suite 845

18              Houston, TX 77056

19  REPORTED BY:  Kimberly Holton

20  JOB NO.:      6304447

21

22

23

24

25

                                            Page 1

APPEARANCES

ON BEHALF OF PLAINTIFF CHAD W. HURTA:
JOHN W. GRIFFIN JR, ESQUIRE
Marek, Griffin & Knaupp
203 North Liberty Street
Victoria, TX 77901
jwg@lawmgk.com
361-573-5500

ON BEHALF OF DEFENDANT OQ CHEMICALS CORPORATION:
YANICE COLON-POL, ESQUIRE
Meaders & Alfaro
2 Riverway, Suite 845
Houston, TX 77056
yanice.colonpol@meaderslaw.com
832-993-6630

ALSO PRESENT:
Chad W. Hurta, Plaintiff
Dan Lapeyrouse, Videographer

INDEX

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Griffin | 9 |
| By Ms. Colon-Pol | 225 |
| By Mr. Griffin | 228 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiff's First Amended Notice of Deposition | 27 |
| Exhibit 2 | Defendant's Responses Initial Discovery | 51 |
| Exhibit 3 | Termination Letter for Mr. Hurta | 56 |
| Exhibit 4 | Disability Claim | 56 |
| Exhibit 5 | Job Evaluation for Mr. Hurta | 197 |
| Exhibit 6 | Approval for FMLA Leave | 197 |
| Exhibit 7 | FMLA Leave paperwork with communication from Sean Wenglar | 198 |
| Exhibit 8 | Documents concerning special assignment number 1 | 199 |
| Exhibit 9 | Documents concerning special assignment number 2 | 199 |
| Exhibit 10 | Documents concerning special assignment number 3 | 199 |

EXHIBITS (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Regarding Respondents Position Statement | 199 |
| Exhibit 12 | Declarations Page for OQ Insurance | 199 |
| Exhibit 13 | Organizational Chart Bay City Area 2 Ops Team | 199 |
| Exhibit 14 | Document reflecting open position for an operator in February 2022 | 200 |
| Exhibit 15 | Policies and Procedures | N/A |
| Exhibit 16 | Teams Meeting Communication | N/A |
| Exhibit 17 | Return to Work Procedure | N/A |
| Exhibit 18 | Document concerning service award for Mr. Hurta | 201 |
| Exhibit 19 | Privilege Log | 226 |
| Exhibit 20 | Notice from EEOC with OQ's response | 171 |
| Exhibit 21 | Text string originated by Mr. Hurta informing OQ of diagnosis | 87 |
| Exhibit 22 | Defendants Answers to Plaintiff's Interrogatories | 218 |
| Exhibit 23 | FMLA Policy - OXEA | N/A |
| Exhibit 24 | Defendant's Answer to Plaintiff's Original Complaint | 219 |

EXHIBITS (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 25 | Responses to production | N/A |
| Exhibit 26 | Letter 6/30/22 | N/A |
| Exhibit 27 | Mr. Hurta's Training Certifications | 197 |
| Exhibit 28 | Answers to Requests for Admission | N/A |
| Exhibit 29 | Payroll | N/A |
| Exhibit 30 | Communication between Ms. Zalman and Windy Morgan | 94 |
| Exhibit 31 | Communication 3/10/22 | N/A |
| Exhibit 32 | Communication with Marissa Galvez | N/A |
| Exhibit 33 | Employee Termination Discussion 1/18/22 | N/A |
| Exhibit 34 | Communication Bates number 716 | N/A |
| Exhibit 35 | Communication between Mr. Hurta and Jeremiah Tipps | N/A |
| Exhibit 36 | Communication regarding restricted duty | N/A |
| Exhibit 37 | Pay Summary | 189 |

INDEX (Cont'd)

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
| --- | --- |
| 220 | 14 |
| 220 | 22 |
| 221 | 25 |

Page 6

1  this proceeding:
2    - is intended for all uses permitted
3      under applicable procedural and
4      evidentiary rules and laws in the
5      same manner as a deposition taken by
6      stenographic means; and
7    - shall constitute written stipulation
8      of such.
9      At this time will everyone in
10 attendance please identify yourself for the record,
11 beginning with noticing counsel?
12      MR. GRIFFIN:  Good morning.  I'm
13 John Griffin, along with Chad Hurta.  I'm the attorney
14 for the plaintiff, and Mr. Hurta is the plaintiff.
15      MS. COLON-POL:  Good morning.  My name
16 is Yanice Colon-Pol.  I'm attorney for Defendant OQ
17 Chemicals Corporation.
18      THE REPORTER:  Thank you.  Thank you.
19 After hearing no objections, I will now swear in the
20 witness.
21      Okay.  Ms. Zalman, would you please --
22 Zalman -- am I pronouncing it right?  I'm sorry,
23 ma'am.
24      MS. ZALMAN:  Zalman.
25      THE REPORTER:  Zalman?

Page 8

1        PROCEEDINGS
2      THE VIDEOGRAPHER:  We're on the record.
3  Will the reporter please make their statement?
4      THE REPORTER:  Good morning.  My name
5  is Kimberly Holton; I'm the reporter assigned by
6  Veritext to take the record of this proceeding.  The
7  time now is 10:02 a.m.  Today's date is December 13,
8  2023.
9      This is the deposition of
10 Kristina Zalman taken in the matter of Chad W. Hurta
11 vs. OQ Chemicals Corporation.  This case is in the
12 United States District Court for the Southern District
13 of Texas, Galveston Division, Civil Action Number
14 3:23-cv-00113.
15      This proceeding is being held at
16 Meaders & Alfaro, 2 Riverway, Suite 845, Houston,
17 Texas 77056.
18      This proceeding is also being video
19 recorded by Dan Lapeyrouse, also with Veritext.
20      I am a notary authorized to administer
21 oaths in the State of Texas.
22      Additionally, absent an objection on
23 the record before the witness is sworn, all parties
24 and the witness understand and agree that any
25 certified transcript produced from the recording of

Page 7

1      MS. ZALMAN:  Yes, ma'am.
2      THE REPORTER:  Thank you.
3      Ms. Zalman, would you please raise your
4  right hand?
5  WHEREUPON,
6      KRISTINA ZALMAN,
7  called as a witness and having been first duly sworn
8  to tell the truth, the whole truth, and nothing but
9  the truth, was examined and testified as follows:
10      THE REPORTER:  Thank you.
11      Counsel, you may proceed with your
12 examination.
13      EXAMINATION
14 BY MR. GRIFFIN:
15   Q   Good morning.  Would you please state your
16 full name?
17   A   My full name is Kristina Marie Zalman.
18   Q   All right.  And what's your date of birth,
19 ma'am?
20   A   October 12, 1986.
21   Q   All right.  And how are you employed?
22   A   I am currently employed by OQ Chemicals as
23 the operations director.
24   Q   All right.  And let's talk about what we're
25 going to be doing today, just for a few minutes.  I'll

Page 9

3 (Pages 6 - 9)

1  be asking questions to you, and you'll be answering
2  them.  And there's some sort of etiquette that makes
3  things work better, and I want to sort of be on the
4  same page with you about that.
5       First, the court reporter to my left is
6  taking down everything that we're saying, and so it'll
7  be necessary, even when the question is a yes or no
8  question, for you to give an audible answer as opposed
9  to a shaking of the head or a nodding of the head
10  because she wants to get that down in a good record.
11  So will you endeavor to do that the best you can?
12     A  Yes, sir.
13     Q  Okay.  And second, there may be times when
14  you know what my question is before I'm finished with
15  it or attempted to answer it before I'm finished.
16  Likewise, lawyers sometimes know what the answer is
17  and will start another question before your answer is
18  complete.  I'm going to endeavor to let you finish
19  your answer before asking the next question.  And I'll
20  ask you if you'll endeavor to let me finish with the
21  question before you start answering it so we don't
22  drive our court reporter crazy.  Is that okay with
23  you?
24     A  That works for me.
25     Q  Okay.  And last of all, this is not an

Page 10

1  Where were you born and raised?
2     A  I was born in Ohio.  My family moved down to
3  Lumberton, Texas, when I was approximately a year old.
4  I stayed there for the duration of my childhood, where
5  I graduated high school.  After high school, I went to
6  college at Texas A&M University in College Station.  I
7  did four and a half years there.
8       And then, once I graduated, I was offered an
9  employment opportunity with OQ Chemicals.  And I took
10  that on in February of 2010, where I started out as a
11  technical resource with OQ Chemicals as a chemist.
12     Q  Thank you for that.  And what year did you
13  graduate from high school?
14     A  2005.
15     Q  And what high school was that?
16     A  Lumberton High School.
17     Q  Lumberton?
18     A  Lumberton.
19     Q  Okay.  Great.  And you were A&M class of
20  what year?
21     A  2009.
22     Q  Okay.  And the following year, you went to
23  work at OQ?
24     A  I graduated in December, so in February.
25  That's correct.

Page 12

1  endurance contest.  Any time after you've answered a
2  question, you'd like to take a break for any reason,
3  feel free to do so because we all have our own
4  situations and needs.  So if you'd like to do that,
5  you're certainly welcome to.
6       And the last thing I'll ask you is if I ask
7  a question that doesn't make any sense to you, will
8  you tell me that so that I can go at it another way so
9  we can communicate?  Is that okay with you?
10     A  That works for me.
11     Q  And you'll let me know if there are
12  questions I ask you that you need rephrasing?
13     A  Yes.
14     Q  Perfect.  Okay.  Great.  Tell us a little
15  bit about your background.  Where were you born and
16  raised?
17       MS. COLON-POL:  Counsel, before you
18  start your questions, the deponent has told me that
19  she has a hard stop of four p.m.
20       THE WITNESS:  I do.
21       MS. COLON-POL:  So she can go back to
22  Needville to pick up her kids.  Just letting you know.
23       MR. GRIFFIN:  Thank you for that.
24  BY MR. GRIFFIN:
25     Q  Tell us a little bit about your background.

Page 11

1     Q  Okay.  And what was your degree at A&M in?
2     A  Bachelor's in Chemistry.
3     Q  Okay.  And I think you shared with us that
4  you started at OQ Chemical in 2010 as a chemist?
5     A  That's correct.
6     Q  And tell us a little bit about the job of
7  chemist?
8     A  So I was a support function to operations.
9  I was part of the technical group.  It's comprised of
10  the engineers and other, like, science disciplines.  I
11  was one of two chemists on site.  I was assigned to
12  one of the two operational areas.  The facility itself
13  is divided into what we call Area 1 and Area 2.  Area
14  1 is primarily the -- the production in terms of
15  volumes.
16       So there's three units that I was supporting
17  at that time.  We had the butanol unit, propanol one
18  unit, and the esters unit.  My function was to monitor
19  data.  Engage in operations to try to improve
20  efficiencies.  If there was projects that needed
21  support, of course, day-to-day troubleshooting should
22  issues arise.
23       I also worked on some projects that were,
24  like, new product developments or different grades of
25  chemicals.  And I was housed out of the lab in what we

Page 13

4 (Pages 10 - 13)

1  call the admin building because we have a separate
2  building where the laboratory and all the associate
3  equipment is. And I performed that role for
4  approximately four years.
5     Q    All right. And we'll resume your career in,
6  I guess, 2014 in a moment, but share with us a little
7  bit. Put a little meat on the bones. You were
8  describing areas, Area 1 and Area 2. Describe, in
9  general, the facility that OQ Chemicals has in Bay
10 City.
11    A    So we are a world-scale facility. We make
12 oxo chemicals and derivatives. These go into paints,
13 coatings, solvents, flavoring agents. A big part of
14 our business is to go into, like, the ink printing.
15 We provide the solvents to them. Basically, whenever
16 you print on, example, this Coke can, our chemicals go
17 into that to make sure you have a nice, clean image
18 whenever it's done.
19        So there's two areas in this facility. You
20 have Area 1, which we call it the intermediates area.
21 It's again, butanol, propanol, and esters. And then
22 you have Area 2. Area 2 has two separate control
23 rooms. They have a utilities control room that does
24 all of the domestic water, the -- the boilers, the
25 cooling water, wastewater treatments. They also

Page 14

1  process the organic waste from the systems themselves,
2  so they supply the -- all of these services.
3        In the other control room, we have the
4  synthetic fatty acids unit. That's our derivatives
5  unit. And then, we also have a POX unit that makes a
6  syngas that's used for downstream consumption. And we
7  have a hydrogen unit as well, also downstream
8  consumption.
9     Q    And does OQ stand for anything, or is it
10 just OQ as letters as the name of the company?
11    A    So we were rebranded in 2020, and whenever
12 they announced it, it was kind of a tribute or a
13 salute to the -- this, let me say, the Sultan, at the
14 time, of -- of Oman. So like I said, it's been like a
15 caboose OQ. But also, a lot of the other umbrella
16 companies underneath the parent organization started
17 with an O.
18    Q    Okay.
19    A    So we used to be previously OXEA.
20    Q    O-X-E-A?
21    A    That's correct.
22    Q    And what's the relationship with OQ and the
23 country of Oman?
24    A    They are our shareholder, so they own us.
25 We are an independent company that reports up our

Page 15

1  metrics and profitability into them. But we are a
2  standalone company. They did try to integrate us in
3  2020 and then later we were -- we were, as I say,
4  severed, but we didn't integrate quite as well with
5  all the other oil and gas refinery businesses.
6     Q    So it's managed by OQ people. But the
7  larger shareholder is the country of Oman or interests
8  in Oman?
9     A    Yes. So we are a -- really a drone-based
10 company. That's where the bulk of our population is.
11 So we have a CEO and then the C suite underneath that.
12 Our CEO reports into a -- a shareholder committee or a
13 board. That board is comprised of some Oman
14 employees, also, that's been appointed by them. And
15 then there's also the Oman board that, at times,
16 depending on what is being reported, gets reported to
17 that as well.
18    Q    Okay. And is OQ -- where does OQ have
19 facilities?
20    A    OQ, so we're global. So we have facilities
21 in Nanjing, we have in Amsterdam, Marl, Oberhausen.
22 That's all Europe. And then we have the Bay City
23 site, which is the largest US production site that we
24 have. And we also have a smaller facility in which we
25 have one production unit down in Bishop, Texas.

Page 16

1     Q    Okay. So then you said Bay City is the
2  largest --
3     A    US.
4     Q    US site. It's the largest in North America?
5     A    That's true.
6     Q    Okay. And how many folks work at the Bay
7  City OQ? Should we call it plant? Is that a good
8  word for it? Or should we use the word facility?
9  What do you call it?
10    A    Either one's fine with me. Whatever you
11 prefer, I can accommodate.
12    Q    Okay. And if I slip up and use facility or
13 plant, we'll both agree it means the same thing when
14 we're talking about the OQ Bay City location?
15    A    Yes, that works for me.
16    Q    Sounds great. How many employees are there
17 at the Bay City facility?
18    A    There's approximately 190 OQ employees on
19 site.
20    Q    And are there also contractors working at
21 the site?
22    A    There are also contractors working on-site
23 that we employ through Turner. In addition, we have
24 Celanese as a site partner that has their own
25 staffing, both contract and directly Celanese. And

Page 17

Veritext Legal Solutions
800-336-4000

1 then we are in the process of integrating Rohem onto
2 the site. So they have their own personnel and their
3 own contractors as well.
4    Q    So is the thought that some of these
5 contractors will be implemented into OQ employees, or
6 will they remain as contracted employees?
7    A    I don't think I was clear. I apologize if
8 that wasn't clear. So we have the contract employees,
9 and these are the ones that are employed through
10 Turner.
11    Q    Right.
12    A    So it's like a contract service that we
13 utilize for maintenance needs. Now, as we have
14 positions that come available in which these personnel
15 are qualified for, they're more than welcome and --
16 and able to apply to any positions that they would
17 like for consideration for employment. But there's no
18 permanent process in which we are staffing these
19 employees to -- to migrate them into the organization.
20    Q    And if we -- I don't need a exact number,
21 but approximately how many contractor employees are
22 there out there? In other words, that are not direct
23 employees of OQ?
24    A    There's approximately 65.
25    Q    Okay. Understood. Now, let's go back to
Page 18

1    Q    And is he located at the Bay City facility?
2    A    He is located at the Bay City facility.
3    Q    Okay.
4    A    He does spend some additional time once a
5 week down in Bishop. He's responsible for North
6 America operations.
7    Q    And are there other plants other than Bishop
8 and Bay City within North America?
9    A    Not that he's responsible for, no.
10    Q    Okay. Are there plants that he's not
11 responsible for in North America besides -- you know,
12 are there other locations OQ has in North America that
13 Mr. Gaytan is not responsible for?
14    A    There's business offices that house the
15 commercial people. There's an office down in Mexico
16 City and then the -- the Houston office. He's not
17 responsible for the employees there.
18    Q    Okay. Understood. So after -- this was a
19 promotion, I would assume? Your change in employment
20 in 2014?
21    A    Yes.
22    Q    Okay. What was the next change in roles
23 that you had with OQ?
24    A    After the 2014?
25    Q    Yes, ma'am.
Page 20

1 your job transition from chemist approximately four
2 years after you started. What was your next role at
3 the company?
4    A    There had been some transition in operations
5 in which the production engineer position had become
6 available for the same area in which I was supporting.
7 So that would be on the intermediate side. I applied
8 for the position. I interviewed for the position and
9 was ultimately selected as the best candidate for the
10 role. So I transitioned into that sometime Q3/Q4 of
11 2014.
12    Q    All right. And who was in charge of the
13 selection?
14    A    The hiring manager was Eric Wright. He
15 ultimately would have had the -- the ultimate say in
16 deciding.
17    Q    And is Eric Wright a person who's at the Bay
18 City location?
19    A    He is.
20    Q    Okay. And in terms of the chain of command
21 at that location, can you share with us who is the top
22 management person at that location?
23    A    We have a VP of operations. He's
24 responsible for everything that does or doesn't happen
25 at the facility. His name is Fred Gaytan.
Page 19

1    A    After 2014, I worked that role for
2 approximately three years. We had transitioned
3 operations managers. A new one had come in or taken
4 responsibility for Area 1 in addition to Area 2. His
5 name was Tim Allen, and he came into my office to let
6 me know that he had an opportunity for me and that I
7 would be transferring from the Area 1 production
8 engineer role to the Area 2 POX/SFA hydrogen
9 production role. And that occurred in 2017, I
10 believe, early in October.
11    Q    And what was the title of that job that you
12 took in 2017?
13    A    Area 2 production engineer.
14    Q    Area 2 production engineer. Now, when we
15 talk about Area 1 and Area 2, describe in laypeople's
16 terms what Area 1 and what Area 2 means?
17    A    It's just a physical severance of the plant
18 to distinguish ownership between the different
19 production units.
20    Q    Okay. All right. And what was the next
21 change in your responsibilities at OQ after 2017?
22    A    I don't remember the exact time. It's
23 2018 -- it had to be 2018. I assumed responsibility
24 for two employees. I now had a leadership position.
25 I was now responsible for utilities operations, the
Page 21

6 (Pages 18 - 21)

**Page 22**

1  specialist for that area -- utility specialist now
2  reported into me, and I also assumed responsibility
3  for the POX/SFA hydrogen specialist as well.
4      Q   Okay.
5          THE REPORTER:  I'm sorry, POX?  What
6  was that after that?
7          THE WITNESS:  SFA hydrogen.
8          THE REPORTER:  Thank you.
9  BY MR. GRIFFIN:
10     Q   So that takes us into '18 or '19?
11     A   We're in '18 now.
12     Q   Okay.  And have there been any other changes
13  in your responsibilities since then?
14     A   Yes.
15     Q   And describe those if you would, please?
16     A   Would you like me to include interim roles?
17     Q   Sure.
18     A   In 2019, Tim Allen, the operations manager,
19  has taken an opportunity in our commercial realm.  So
20  the -- Fred Gaytan puts myself and the other
21  equivalents to me in the other area in interim roles
22  as operations managers.  We do that stint for
23  approximately six months.  The position later gets
24  filled by Senthil Kumar.
25          So I'm now the -- back to being the lead

**Page 23**

1  again.  So after that, in 2020, the operations manager
2  position becomes open again.  I apply for the
3  position.  I'm selected for it.  And I did that role
4  until 2022, fall time frame.  There's currently a
5  project that's still ongoing today to look at
6  expansions, specifically in terms of some of our
7  internal raw materials.  So one of the directors
8  needed to have more availability and time in order to
9  focus on that project.
10         I was asked to step up as the operations and
11 maintenance director for an interim role.  I did that
12 for approximately two months during the turnaround in
13 2022 last year, and -- and then resumed my operations
14 manager position November 2022, probably, time frame.
15 And then the most recent is, in March of this year, I
16 was given the opportunity to be the operations
17 director.
18     Q   What's the difference between the operations
19 manager and the operations director?
20     A   Operations director is overall responsible
21 for all of operations.  There's a lot more strategy,
22 vision, interaction with commercial projects that come
23 along, allocation of resources, and honestly, it's a
24 developmental opportunity.
25     Q   And in terms of --

**Page 24**

1      A   Succession planning.  I'm sorry to cut you
2  off.
3      Q   No, you were fine.
4          The chain of command as it exists,
5  Mr. Gaytan would be at the top of the chain of
6  command?
7      A   That's true.  He'd be the highest authority
8  on site.
9      Q   And who are direct reports to him?
10     A   He has several direct reports.  So I report
11 into Fred Gaytan as the operations director.
12 Kevin Hunt reports into Fred Gaytan.  He is the -- you
13 want every personnel listed?
14     Q   Yes.  In terms of chain of command, the
15 direct level under Mr. Gaytan.
16     A   I am.  You need names as well, or just
17 titles?
18     Q   Sure.
19     A   Okay.  So Kevin Hunt, he is the maintenance
20 and technical director.  The laboratory manager
21 reports into Fred.  So does the HSE manager.
22     Q   And HSC stands for what?
23     A   Health, safety, and environmental.
24     Q   HSE.  Thank you.  I misunderstood that.
25 Continue.

**Page 25**

1      A   And then also the Bishop site director
2  reports into -- into him.
3      Q   Okay.  And I think we got the names for --
4  for you, obviously, and Mr. Hunt.  I don't think we
5  got the names yet for the lab manager, the HSE person,
6  and the Bishop site manager?
7      A   Bishop site manager is Raymond Sweeney.  HSE
8  manager is Dee Taylor.  And then the laboratory
9  manager is Kyle Gross.
10     Q   Okay.  Great.  Thank you for that.  And so
11 your position in March of '22 was what precisely?
12     A   In March?
13     Q   March of '22.
14     A   I was the operations manager at the time.
15     Q   Okay.  And you have since returned to that?
16     A   No, sir.  I'm the operations director.
17     Q   That's right.  And the director is higher in
18 authority than the manager?
19     A   That's correct.
20     Q   Okay.  Got it.  And I appreciate you helping
21 me with that.  Now, let me ask you this.  Are you
22 married?
23     A   I am.
24     Q   And to whom are you married?
25     A   Kyle Zalman.

1    Q   Is your husband related to the Zalmans at
2  the bank, Prosperity Bank?
3    A   He is.
4    Q   Okay. Good. I just don't know any Zalmans
5  but the El Campo Zalmans at Prosperity. Okay. Great.
6  And how is -- oh, you told me that.
7        How long have you been married?
8    A   We have been married for six years.
9    Q   All right. And you have children?
10   A   We do.
11   Q   And what are their ages?
12   A   Three and five.
13   Q   All right. Do both you and your husband
14  still have your parents?
15   A   No, both of our fathers have passed away.
16   Q   Okay. All right. I'm sorry to that. But
17  your kids have grandmothers?
18   A   That's correct.
19   Q   Okay. Good. Congratulations, at least on
20  that, for sure.
21       And you understand you have been designated
22  by OQ Chemical to testify on the company's behalf
23  regarding the topics we see on Exhibit 1. And I want
24  to ask you, is that your understanding?
25  //

Page 26

1       (Exhibit 1 was marked for
2         identification.)
3    A   Yes, sir.
4    Q   All right. So I'm going to ask you a little
5  bit about how you prepared to address the topics in
6  the deposition this morning. First, let me ask you,
7  who selected you to be the person to sit in the chair
8  and speak for OQ today?
9    A   Fred.
10   Q   And that would be Mr.?
11   A   Gaytan.
12   Q   Okay. Great. And how were you informed of
13  that?
14   A   I was contacted by legal and Fred to let me
15  know that I'd been selected to represent the company
16   Q   Okay. And approximately when did that
17  occur?
18   A   I honestly can't answer that. It's --
19  recollection, a couple months ago. I don't know
20  specific timing.
21   Q   Okay. That's fair enough. And you're doing
22  a good job of saying that -- you're giving me a
23  ballpark or an approximate date. Those are perfectly
24  fine. So anytime during the deposition you know a
25  date, I want you to tell me. But if you don't, it's

Page 27

1  perfectly all) right to say plus or minus, or I think
2  it was this month. And even if you're not sure, just
3  let me know that. That'll be fine. Is that okay with
4  you?
5    A   Sure.
6    Q   Okay. Do you remember whether you were
7  informed by e-mail, telephone, or otherwise?
8    A   Both. I know that Fred came down and talked
9  to me about my role, and then I know that Dave
10  confirmed in writing. Actually, too, Yanice, so that
11  would be the corporate rep.
12   Q   Okay. Well, let me share this with you.
13  I'm going to try to avoid asking you any questions
14  about any conversations you've had with either Yanice
15  or Mr. Davis; did you say?
16   A   Yes. And now Virginia.
17   Q   Pardon?
18   A   And now Virginia.
19   Q   And who's Virginia?
20   A   Virginia is our counsel.
21   Q   Okay. Now, that's a name I hadn't heard
22  before, so share with us the first and last name of
23  Virginia?
24   A   Virginia Ramirez.
25   Q   Okay. And what is her connection to OQ?

Page 28

1    A   She has assumed the responsibility of legal
2  counsel for OQ Chemicals to replace Dave Davis.
3    Q   Okay. And as of when?
4    A   Approximately, if memory serves me, about a
5  month ago.
6    Q   Okay. And why did Mr. Davis depart?
7    A   I don't have the details of his departure.
8    Q   Are you aware of whether he resigned or was
9  asked to leave?
10   A   He was -- I know that he was asked to leave.
11   Q   Okay. So that being said, then what I'm
12  going to try to avoid is asking you about any
13  communications that you've had with Mr. Davis, his
14  successor, or anybody in Yanice's office. But I do
15  want you to tell me what Mr. Fred Gaytan shared with
16  you about what your role would be?
17   A   Sure. So he let me know that I would be
18  doing the -- the corporate representative, that I
19  would be expected to give a deposition. We kind of
20  talked about it making sense since I was, you know,
21  directly involved in the case and had supplied some
22  information at various points in this, that with me
23  having most of the knowledge, that I would be the best
24  representative.
25   Q   All right. And at or about that time, were

Page 29

8 (Pages 26 - 29)

**Page 30**

1  you provided the topics that you would be expected to
2  address in the deposition today?
3      A   I have seen -- let me make sure.
4      Yes, I have seen this document.
5      Q   And approximately, when did you first have a
6  chance to review the topics?
7      A   So we originally had my deposition planned
8  for the first or second week of November.  So I had
9  already had an opportunity to review these topics and
10  had had some discussions around them internally, and
11  then that was later rescheduled.  So again, another
12  follow up refresher prior to this deposition.
13     Q   Fair to say that you had the topics a few
14  weeks before the deposition was originally set?
15     A   I would say that's true.
16     Q   Okay.  And do you feel that you've had an
17  adequate time to review the topics?
18     A   Yes.
19     Q   Okay.  Tell the jury in general how you
20  prepared to address the topics in Exhibit 1?
21     A   So in order to review, we had -- won't --
22  won't talk about content, but we had some meetings
23  with internal and external counsel.  Personally, I
24  also reviewed the EEOC position statement, and I
25  reviewed the information as relevant as to what was

**Page 31**

1  supplied in the first set of discovery.
2      Q   Okay.  And I'll follow up on -- so one thing
3  you did was review documents?
4      A   I reviewed e-mails in this document, and
5  then -- yes.  Yes.  That's a true statement.
6      Q   And so we're going to talk about the
7  written documents that you have reviewed in a moment.
8  But did you have any communications -- well, let me
9  rephrase that question.
10     Apart from reviewing documents, did you have
11  communications with OQ people or others to help you
12  address the topics today?
13     A   I had two conversations, yes.
14     Q   Okay.  And with whom?
15     A   I had a conversation with our HR generalist
16  in regards to -- there's a question in this about
17  earnings, and I needed to get information or
18  confirmation on what the merit or cost of living
19  increases were.  So she supplied me with that
20  information.
21     There's another question in here that talks
22  about terminations of employees.  And so, I wanted to
23  confirm that the information that I had within my
24  records was correct.  So I consulted with the person
25  who was previously directly under me as the operations

**Page 32**

1  manager.
2      Q   So the HR generalist, what's his or her
3  name?
4      A   Her name is Marissa Galvez.
5      Q   Okay.  And the other person you spoke with?
6      A   Mitch Abshier.
7      Q   And what's his role at the organization?
8      A   He's the manufacturing lead responsible for
9  Area 2 operations.
10     Q   Is he a subordinate of yours?
11     A   He's below the operations manager.  So he's
12  two -- two levels below, now, as -- as the director.
13     Q   And Mr. Abshier, has his job changed over
14  the last couple of years?
15     A   Last time it changed was 2020.  So now he's
16  been in the same capacity for the last three years.
17     Q   And did you say he was a lead?
18     A   He is.
19     Q   Okay.  And what is the relationship between
20  his position and process operators?
21     A   So the manufacturing lead has the
22  manufacturing supervisor report into him.  The
23  manufacturing supervisor is responsible for the work
24  group leads.  The work group leads are responsible for
25  all the process operators.

**Page 33**

1      Q   So if I get people straight, Mr. Abshier
2  would be above Mr. Tipps?
3      A   That's correct.
4      Q   As a supervisor.  And below Mr. Tipps, are
5  the actual operators?
6      A   The work group leads.  And then below the
7  work group leads, shift supervisor if you will, are
8  the operators.
9      Q   Okay.  Great.  Were your visits with
10  Mr. Abshier and Ms. Galvez -- did I say that right?
11  Galvez?
12     A   Yes.
13     Q   Were they in person or on the phone?
14     A   Mitch Abshier was on the phone, and Marissa
15  was in person.
16     Q   Okay.
17     A   And through Teams communication.  But she
18  quickly came to my office with the answers.
19     Q   Did they provide any answers to you in
20  writing?
21     A   She provided confirmation of the merit
22  increases on Teams.
23     Q   Okay.  And what about Mr. Abshier?
24     A   Verbal conversation.
25     Q   Okay.  In other words, he didn't provide you

9 (Pages 30 - 33)

1  anything in writing?
2      A  No.
3      Q  Okay.  And you talked in general about
4  e-mails and the EEOC position statement that was
5  prepared by OQ.  You reviewed those?
6      A  I reviewed them in preparation for today.
7      Q  That's what I mean, yes.
8          Were there any other documents that you
9  reviewed in order to address the topics?
10     A  A few of the e-mails that I reviewed were in
11 response to discoveries.  It was things that I had
12 sent.  There were some attachments on those that I did
13 open and review.
14     Q  That you did open and review?
15     A  Yes.
16     Q  Okay.  In preparation for your deposition,
17 have you reviewed all of the documents that OQ has
18 produced in discovery in this case?
19     A  No, not in preparation for today.
20     Q  Okay.  All right.  And have you reviewed
21 documents that were produced by Mr. Hurta in this
22 case?
23     A  I have not seen anything produced by
24 Mr. Hurta or your -- yourself.
25     Q  Okay.  Were there any documents that you

Page 34

1  get more information?
2      A  That's true.
3      Q  And you got those from Mr. Abshier and
4  Ms. Galvez; right?
5      A  True.
6      Q  And what I'm asking you, and maybe I'm not
7  doing it as a hillbilly here, but was there anything
8  that you didn't get that you thought you needed?
9      A  As I understand your question, my response
10 is no.
11     Q  Okay.  And there was nothing else you asked
12 for that wasn't provided for you?
13     A  I did not request anything and not receive
14 it, no.
15     Q  Okay.  Great.  So OQ is fully prepared to
16 address the topics today?
17     A  Yes.
18     Q  Okay.  Now, let me start with Chad.  Now
19 he's in the room with us.  But let me first ask you,
20 when did you first get introduced to Chad?
21     A  Chad and I were first introduced when I
22 transferred over to the POX/SFA hydrogen control room
23 as the production engineer.  He was a shift operator.
24 And then we started -- and that would be my first
25 introduction.  October time frame.

Page 36

1  felt you needed to review in order to address the
2  topics that are in Exhibit Number 1?
3      A  Yes.  I mean, I needed additional
4  information on the -- the potential earnings question.
5  And then the position statement, I wanted to review
6  that for this.  And then the other things that I
7  reviewed was for -- more for time stamps.  So I looked
8  whenever Chad had informed, example, myself and the
9  other supervisors, of -- of his illness to make sure I
10 had the dates right.
11     Q  Okay.  Was there anything that you felt you
12 needed to address the topics for today that you were
13 not able to get?
14     A  I don't think I understand the question.
15 You've asked it two times, but it's the same question.
16     Q  Well, thank you for letting me know that.
17 I'll rephrase.
18         Was there anything missing that you felt
19 that you needed to have in order to address these
20 topics?
21     A  I mean, I feel like I have the information
22 to respond to all of your questions.
23     Q  Maybe go at it this way.
24         When you first saw the topics, there were
25 some things you felt you needed to talk to people to

Page 35

1      Q  Of what year?
2      A  2017.
3      Q  So you had worked at OQ for seven years
4  before you first met Chad?
5      A  I have no doubt that I've seen Chad before
6  previously, but in terms of really getting to know
7  Chad, I would not say prior to 2017.
8      Q  Okay.  Then, describe in your own words the
9  interface you had or relationship you had with him
10 between 2017 and when he was terminated in March of
11 2022?
12     A  So from my standpoint, when I came in, over
13 time, him and I got to know each other a little bit
14 better.  I routinely would stay there for shift
15 changes to interact with the personnel.  I tried to do
16 that at least once a week.  Chad was always very vocal
17 in those meetings, more of the spokesperson for those
18 personnel.
19         Over time, I got to know things about his
20 family, Mindy, and the -- the girls.  Vice versa,
21 whenever I had my kid, my child, he also was, you
22 know, engaged there and, you know, wished us well.
23 That really was -- I guess, we had a -- some side
24 conversations that were personal, but for the most
25 part, it was business.

Page 37

10 (Pages 34 - 37)

| | |
|---|---|
| 1   Chad would come and bring things of concern<br>2   to address. Or periodically, Chad would come into my<br>3   office and let me know that, you know, this situation<br>4   was going on and -- and kind of requesting, asking<br>5   guidance on how to handle it or what he should do<br>6   here. Kind of a coaching, mentoring relationship at<br>7   times where it was needed.<br>8      Q   Would you say that, from your perspective,<br>9   that you got along well with Chad?<br>10     A   I got along with Chad for most of the time.<br>11  There was periods of instances where Chad would get a<br>12  response or an answer that he didn't like, and he<br>13  would exhibit adverse behavior, if you will. He would<br>14  become disgruntled, and he would kind of isolate<br>15  himself. And he showed similar amongst the shifts.<br>16     So there was times where he would cause some<br>17  discord. And example, whenever he was the work group<br>18  lead, we got a lot of feedback about his performance<br>19  and ability to lead the team. And we had quite a few<br>20  people that were not happy that he was in that<br>21  position and stated that if we didn't do something,<br>22  that they would potentially start looking for other<br>23  opportunities.<br>24     I personally have instances where, you know,<br>25  he would get a response from, example, Jeremiah.<br><div align="right">Page 38</div> | 1      Q   I did not.<br>2      A   True.<br>3      Q   I asked you a question: was he assertive in<br>4   what he wanted? And you answered it by saying --<br>5   using the word insubordinate?<br>6      A   True.<br>7      Q   Okay. My question to you is, whatever you<br>8   were talking about, when he really, really wanted --<br>9   what did you describe it that he wanted the day off<br>10  for?<br>11     A   He had requested emergency vacation, and the<br>12  plant was in a inclement weather situation, and we<br>13  needed to staff the units. And so we weren't able to<br>14  grant it per policy.<br>15     Q   Right. And my question with you: did he<br>16  comply with your directive and show up to work even<br>17  though he'd done his best to persuade you all to allow<br>18  him emergency vacation? Did he show up for OQ and do<br>19  the shift that you wanted? Perform the shift that you<br>20  wanted him to perform?<br>21     A   I understand your point. Ultimately, yes,<br>22  he came to work because that was a requirement of --<br>23  of his position. The piece that I'm referencing is,<br>24  you know, you -- you ask your supervisor, and you want<br>25  A, B, or C, whatever -- whatever that request might<br><div align="right">Page 40</div> |
| 1   Mitch would give him the same response. And then he<br>2   would escalate to HR, to me, even though he had<br>3   already received the response, it's just not the<br>4   response that he wanted.<br>5      The example for that comes to mind was -- it<br>6   was he was trying to call off for emergency vacation.<br>7   And due to inclement weather and staffing needs for<br>8   the unit, we couldn't grant that, and that was already<br>9   a done deal, but he kept escalating it, trying to get<br>10  a different response.<br>11     Q   So he was assertive?<br>12     A   I wouldn't call it assertive. I would call<br>13  it almost more insubordinate.<br>14     Q   Well, let's be clear here. Are you accusing<br>15  him of not complying with your directive that he come<br>16  into work on days he wanted off?<br>17     A   I'm not accusing Chad of anything. You<br>18  asked me if I felt like he was being assertive. And<br>19  There's a difference between being assertive and then<br>20  continuing to escalate things, trying to get a<br>21  different response whenever you already have from your<br>22  supervisor what that outcome is.<br>23     Q   Ms. Zalman, you used the word insubordinate;<br>24  correct?<br>25     A   True.<br><div align="right">Page 39</div> | 1   be. You get a response. If you truly feel that it's<br>2   wrong or that it's unsafe or insert another reason,<br>3   and you escalate it to the next level, no real issue<br>4   with that.<br>5      If you get the same response again and<br>6   there's nothing wrong with the directions that are<br>7   being given, or if it's in line, there's not a need or<br>8   requirement to continue to keep escalating it because<br>9   you're trying to get your way on something.<br>10     Q   Well, as I understand that, he had escalated<br>11  it to the highest authority at OQ and was told, "No,<br>12  you need to come to work," and so he did; correct?<br>13     A   Ultimately.<br>14     Q   Okay. When you say "ultimately," he came to<br>15  work on time, did he not?<br>16     A   My question back is, is that process really<br>17  necessarily required on something that didn't really<br>18  warrant that? And this isn't an isolated case.<br>19     Q   Well, from the company's perspective, they<br>20  may not warrant it. But from a person who needs<br>21  emergency vacation, you can understand a worker might<br>22  feel that they really needed --<br>23     A   I understand.<br>24     Q   Okay.<br>25     A   And we have began policies and procedures<br><div align="right">Page 41</div> |

<div align="right">11 (Pages 38 - 41)</div>

1  that we were following, and these weren't new to him,
2  so it's not something that he didn't already know
3  potentially the outcome.
4      Q   Either way, this incident over the emergency
5  leave is not something that violated any policy at OQ;
6  did it?
7      A   We have a system in place in which we always
8  try to resolve all issues at the lowest level of the
9  organization as much as possible -- or a practice,
10  let's call it a practice.  And we encourage that.  We
11  should handle disputes or issues and get them
12  resolved.  Not everything needs to be funneled up to
13  the top, but we empower our leaders to do such.
14          MR. GRIFFIN:  Let me object as not
15  being responsive.
16  BY MR. GRIFFIN:
17      Q   And there'll be times when lawyers make
18  objections, pay no attention to them.  We have to
19  preserve the record.
20          But my question was, can you identify any
21  policy that was violated by Chad asking for that
22  emergency vacation?
23      A   I would have to review it if it's covered in
24  the code of conduct policy.
25      Q   So you don't know?

Page 42

1      A   I can't definitively say without reviewing
2  the policy.
3      Q   Okay.  And you've not done that?
4      A   No.
5      Q   Okay.  Then let me ask you this.  Does his
6  personnel file that you've produced for us reveal any
7  discipline or reprimand for his request for emergency
8  vacation when it was ultimately denied?
9      A   I have not reviewed his personnel file.  HR
10  supplied that information.  It's not something that I
11  went through in detail.
12      Q   Okay.  As OQ's designated representative, he
13  was not terminated for whatever happened over the
14  emergency vacation; was he?
15      A   That's true.
16      Q   Okay.  In other words, OQ doesn't say it
17  fired Chad for being dishonest; does it?
18      A   No.
19      Q   And it doesn't say he's being fired for
20  insubordination; does it?
21      A   No.
22      Q   Okay.  And it's true, isn't it, that the
23  letter that was sent to him by OQ terminating him
24  actually says that OQ appreciates Chad's many
25  contributions over his career with OQ; doesn't it?

Page 43

1      A   Yes.
2      Q   Okay.  And that's not the kind of language
3  that OQ would use with someone who'd been dishonest or
4  insubordinate; is it?
5          MS. COLON-POL:  Objection to form.
6          You can answer.
7          THE WITNESS:  I think all employees are
8  given grace and not expected to be perfect.  Do I
9  think that Chad had instances where he had issues and
10  performance problems?  Of course.  Do I think that
11  that's a 20-year stint?  Of course not.  He would not
12  have been employed for that long.
13          MR. GRIFFIN:  Let me object to the
14  responsiveness.
15  BY MR. GRIFFIN:
16      Q   I was just asking whether OQ places language
17  like that of appreciation to workers they think are
18  insubordinate or dishonest --
19          MS. COLON-POL:  Same objection.
20  BY MR. GRIFFIN:
21      Q   -- at the time of termination?
22          MS. COLON-POL:  I apologize.  Same
23  objection.
24          You can answer.
25          THE WITNESS:  I have only reviewed and

Page 44

1  personally issued a handful of termination letters.
2  And in the other examples I've been exposed to, no, it
3  does not have that language in there.
4  BY MR. GRIFFIN:
5      Q   Okay.  Does OQ say that it was a true
6  statement, that OQ does appreciate Chad's many
7  contributions over his career with OQ?
8      A   Chad did give quite a few contributions to
9  the organizations.  That's undeniable.
10      Q   Okay.  And at the time he was terminated,
11  how senior was he in terms of the process operators at
12  the plant?
13      A   Most senior.  We have some examples where we
14  have 30, 35 years, but Chad was among the top, I'm
15  going to say, 25 percent.  And that's an estimate on
16  tenure.
17      Q   Were there any operators with more
18  experience with OQ than Chad on the day he was fired?
19      A   Yes.
20      Q   And who's more senior than Chad?
21      A   It would be Chris -- I would like to ask you
22  to make sure I'm clear on the scope of the question.
23  Are you asking specific to the control in which he was
24  qualified for as a process operator?  Or is this a
25  general question about operations?

Page 45

12 (Pages 42 - 45)

Page 46

1    Q    Thank you for asking me that question.
2    First, how many operators, process operators are at
3    the plant?
4    A    We have approximately 80.
5    Q    And has that number changed since you guys
6    terminated Chad?
7    A    Yes.
8    Q    And how many did you have, say on March the
9    14th, 2022, the date of termination?
10    A    I know that we were short-staffed.  We were
11    running one below specifically on his shift because
12    every time that he was out, we were covering it with
13    an overtime.  So in terms of staffing for that control
14    room, there's four manned positions that we have to
15    cover in addition to the work group lead.  So we would
16    have had 19, but I would need to confirm that number.
17    Q    Okay.  I --
18    A    It also could have been due -- apologize for
19    cutting off.  It also could have been due to not
20    having qualified operators to work his position.
21         MR. GRIFFIN:  Okay.  Let me object to
22    the non-responsive answer.
23    BY MR. GRIFFIN:
24    Q    My question was, if you have 80 now, how
25    many operators were at the plant in March of 2022?

Page 47

1    A    I do not know that number off the top of my
2    head.  So we have a budgeted headcount.  We're
3    currently budgeted for that number.  At that time, I
4    would have to go pull HR's files.  I don't -- I don't
5    keep a month-by-month tally of --
6    Q    Thank you for that.  But in terms of
7    ballpark, have there been substantial increases or
8    decreases in the number of operators at the plants
9    since March of '22?
10    A    That's more clear.  I appreciate that.
11         So we are actively trying to increase our
12    headcount in operations, albeit temporary.  So
13    example, in Area 2, we are running or trying to get to
14    a staffing of 7 over budgeted headcount.  Budgeted
15    headcount is 40.  I'm trying to get to a temporary
16    number of 47.
17         The reason for that is because the
18    population in control room six and the utilities
19    control room, they're a little bit more tenure, and we
20    have quite a few attritions coming up due to
21    retirements.  It takes me roughly three years to get a
22    qualified, fully qualified operator.  So I'm
23    attempting to have some overlay there.  That way, we
24    have business continuity.
25    Q    And you mentioned the 40 plus 7.  Was that

Page 48

1    in one of the areas?
2    A    That's in one.
3    Q    Area 1.  Okay.
4    A    No.  I'm sorry, that's in one area in Area
5    2.
6    Q    That's in Area 2?
7    A    Correct.
8    Q    Okay.  And what about Area 1 operators?
9    A    Area 1, we have a budgeted headcount of 36.
10    We're currently running plus four.  So the reason for
11    that one is not due to retirements, but we're going
12    through a pretty major restructuring in that area.
13    Q    Are you guys looking for qualified operators
14    in both areas?
15    A    We currently have a couple of vacancies in
16    one of the areas, yes.
17    Q    And those vacancies are in Area 1 or Area 2?
18    A    Area 2.
19    Q    Okay.  Any vacancies in Area 1?
20    A    They're fully staffed as of last week.
21    Q    Okay.  As of last week?
22    A    Or two weeks ago.  I lose time.  Within the
23    last couple weeks, they've become fully staffed.
24    Q    And tell us what you mean when you said "36
25    plus 4"?

Page 49

1    A    Sure.
2    Q    What are the significance of those numbers?
3    A    So I have an approved budgeted headcount of
4    36 operations personnel.  I don't have approval to
5    permanently move the headcount to add these additional
6    4, but we foresee that we might have some attritions
7    coming up due to the restructuring in Area 1
8    specifically.  So we are temporarily increasing that
9    headcount to incorporate four additional personnel.
10    So for the next 1 to potentially 2, 3 years, I will
11    ideally run at 44 personnel.
12    Q    All right.  And approximately how many
13    operators have you guys hired since terminating Chad
14    in March of '22?
15    A    I mean, for Chad's specific position and
16    backfill, that took place in -- in August of 2022.  We
17    had two employees that came in -- into his control
18    room.  So one of those two directly backfilled him.
19    We've added these eleven.  We've had some attritions
20    from both control rooms due to personal decisions to
21    leave the organization as well as terminations.
22    Ballpark number?  I would say probably 15.  Ten to
23    fifteen.
24    Q    Okay.  And that's Area 1 and Area 2
25    combined?

13 (Pages 46 - 49)

1    A    That encompasses, yes.

2    Q    Okay.  Is it fair to say that OQ is

3  constantly vigilant to identify qualified operators?

4    A    Are you referencing in terms of recruitment?

5    Q    Mm-hmm.

6    A    We are -- yes, we would like to have a fully

7  staffed operations department for the process

8  operator, and we ideally would have a will-hire list

9  in the event that somebody leaves the organization,

10  that we have a viable backfill for them.

11    Q    And in terms of the operator position,

12  you're aware, I guess, as the OQ representative, that

13  OQ has shared with the judge and us that there is no

14  position description for process operator at the OQ

15  Bay City plant.  Are you aware of that?

16    A    I'm not sure I understand.  We have a job

17  description that we post whenever we are looking for

18  recruits.

19    Q    I'm going to show you Exhibit Number 2 and

20  ask you to take a look at -- well, let me share with

21  you what this is in case you -- I'll ask you if you've

22  seen it in a moment, but in fact, you can follow

23  along.

24        Exhibit Number 2 are some answers to

25  questions that the judge requires parties to answer in

Page 50

1  cases involving employers and employees.  And there

2  are some of those required documents and required

3  questions.  One of them, you'll see.  And there's two

4  sets because OQ has answered them and then amended

5  them.  But one of the things that's supposed to be

6  produced is item number I on page 3 -- I'm looking at

7  the amended disclosures -- the job description for the

8  position that plaintiff held, and OQ has written

9  "None."  Do you see that?

10        (Exhibit 2 was marked for

11         identification.)

12    A    Mm-hmm.

13    Q    Why is that?  Why is there no written job

14  description for process operator?

15    A    You asked me a bunch of questions.  I'm

16  trying to answer them as you sequenced them.  I have

17  not seen this document before.  In terms of job

18  descriptions, we have a overarching job description

19  for the process operator.  We have that that's managed

20  through HR, and it gets posted whenever we're

21  recruiting.

22        More specifically, we have individual job

23  descriptions for each one of the staff positions as

24  they go through, we call them the progressions.  It

25  goes through what the requirements and expectations

Page 51

1  are for those roles.  I can't -- I can't answer this.

2        MR. GRIFFIN:  Let me object to a

3  responsiveness.

4  BY MR. GRIFFIN:

5    Q    Is it true what OQ is telling the judge and

6  us here, that there is not a job description for the

7  job that plaintiff Chad Hurta had?

8    A    My question is, and what I don't know, is I

9  don't know what stamped documents 0001 and 00166 are.

10  So this is asking or talking about these.  I don't

11  know what those documents are.  It's hard for me to

12  answer that.

13    Q    Well, thank you for sharing with me.  Pay no

14  attention to the numbers you see that you read from

15  because that's a response to a different question;

16  okay?  The judge's question that's I is the response

17  that's below.

18    A    Okay.

19    Q    So I'm asking you, as the OQ corporate

20  representative today, is what OQ said in answer to

21  that true that there is none?  There is no job

22  description for the position that plaintiff held?

23    A    There is a job description for the position

24  of the process operator.

25    Q    Okay.  Then why does it say there is none

Page 52

1  here?

2        MS. COLON-POL:  Objection to form.

3  Asked and answered.

4    A    I can't answer that.  I didn't supply

5  information, and I didn't respond to whatever this

6  discovery set is.  I don't know where this information

7  came from.

8    Q    So then your answer to that question is you

9  don't know why none is put here?

10    A    I do not know why none is put there.  We do

11  have a job description for the process operator

12  position.

13    Q    And where would you go to find it if you

14  were looking for it?

15    A    So it's a HR-managed process, all the job

16  descriptions.  So HR, the request would go to them,

17  and they would supply that information.

18        The documents that I'm referencing are very

19  specific to.  In operations for the different

20  positions that are held, it talks about what the --

21  the roles and responsibilities are if it's specific

22  to, like, POX/SFA hydrogen, these.  So you have an

23  overarching for the process operator, which is what

24  this is in reference to.  And then the positions is

25  the one that I believe is operations referenced.

Page 53

14 (Pages 50 - 53)

1          MR. GRIFFIN: Okay. Let me object to
2   the non-responsive portion of the answer.
3   BY MR. GRIFFIN:
4      Q   But what is the title of the documents that
5   would be the job description for process operator?
6   What are the name of those documents?
7      A   It'll be job description, process operator.
8          THE REPORTER: What is that? I'm
9   sorry.
10         THE WITNESS: Job description, process
11  operator.
12         THE REPORTER: Thank you.
13  BY MR. GRIFFIN:
14     Q   There is such a document that exists?
15     A   We have job descriptions for all positions
16  within OQ.
17     Q   So that would be, yes; correct?
18     A   Yes. I'm not trying to be non-responsive.
19  Yes, we have job descriptions. We have one for the
20  process operator.
21     Q   Okay. And are there more than one job
22  description for process operator, depending on where
23  they are in the plant?
24     A   No, there's one HR job description that
25  covers the process operator position. It's more

Page 54

1   global in nature to encompass. And as you get
2   specifics to the different staffed positions, there's
3   a document that says what they're responsible for in
4   that capacity.
5      Q   And what's that document called?
6      A   It would be outside -- POX/SFA outside --
7   that's -- POX hydrogen outside operator job
8   description.
9      Q   And you think there's a document that's
10  entitled that?
11     A   I don't think. I know that we possess
12  these.
13     Q   Okay. And who possesses them?
14     A   HR owns the, again, the global one that they
15  pose to recruit candidates. And then, we operations,
16  own the internal ones to our department for the
17  different units 'cause not every operator mans or
18  functions on the same equipment; right?
19     Q   And do these documents, to your knowledge,
20  list the essential and the marginal functions of the
21  job of process operator at your Bay City plant?
22     A   To my knowledge, yes. It has very specific
23  statements about what the overarching requirements
24  are.
25     Q   Okay. And take a look at Exhibit -- and you

Page 55

1   can turn that back if you'd want. If you just try to
2   keep them in order so we can find them later if you
3   need it.
4          But I'm now going to show you Exhibit 3 and
5   Exhibit 4 and ask if you can identify Exhibit 3 is the
6   letter confirming Chad's termination by OQ?
7          (Exhibit 3 and Exhibit 4 were marked
8               for identification.)
9      A   Yes, I can identify this document.
10     Q   And that is what this Exhibit 3 is, is the
11  letter of termination; is it not?
12     A   Let me read it. It looks like it.
13     Q   And it --
14     A   Normally, they're signed.
15     Q   It may be on the back.
16     A   It's not. I don't have a second page.
17     Q   Oh.
18         MS. COLON-POL: I do.
19         THE WITNESS: Okay. Can I look at one
20  of your copies?
21  BY MR. GRIFFIN:
22     Q   Yeah. Yeah. You can look at mine. That's
23  fine. In fact, I'm going to substitute that, if
24  that's okay because it has the second page. This one
25  did not. Thank you for that.

Page 56

1      A   Yes, this -- I can now confirm that this
2   would be the termination letter in the books. I'm not
3   sure why it's not signed and dated, but this looks
4   like the termination letter, yes.
5      Q   And turning to Exhibit 4.
6          Oh, and the person who signed it,
7   Windy Morgan, what was her job title?
8      A   I don't see that she actually signed it.
9      Q   Well --
10     A   Oh, that counts? Okay.
11         MR. GRIFFIN: Let me object to the
12  non-responsive.
13  BY MR. GRIFFIN:
14     Q   My question is not whether she signed it.
15  My question was, what was Windy Morgan's title when
16  that letter was sent to Chad?
17     A   I honestly don't remember. She was a -- she
18  was a human resources lead. But then that same year,
19  she was the manager, and then she left the
20  organization. I don't know when she became the
21  manager.
22     Q   Okay. But she sent the letter?
23     A   She would've been responsible to send this
24  letter.
25     Q   Okay. And she was authorized to send the

Page 57

15 (Pages 54 - 57)

1  letter?

2  A  Yes.

3  Q  Okay.  Look at Exhibit Number 4.  And can

4  you share with the jury who is Betsy Ryan?

5  A  Can you give me a second?  I don't know what

6  this document is.

7  Okay.  I'm ready.

8  Q  And --

9  A  Betsy Ryan, to your question, was previously

10  the HR manager for the US and Mexico.  She had

11  retired.  I don't remember the year.  And then we were

12  without an HR manager, so we requested for her to come

13  back into the organization and provide some support to

14  us a little after the new year of 2023.  And she did

15  that function for three to four months -- I don't know

16  the exact time frame -- until we were able to onboard

17  another human resources manager to take over.

18  Q  Okay.  So and Betsy Ryan is the person who

19  signed this form; correct?

20  A  That's correct.

21  Q  And she describes her role at that time as

22  interim HR director?

23  A  That's correct.  So she was the director

24  whenever she retired.  I said manager, but she was the

25  director.

Page 58

1  Q  And at that time, she was also authorized to

2  sign and date this form with respect to Chad Hurta?

3  A  Yes.

4  Q  And from OQ's perspective is her answer to

5  the question of whether or not an employee is -- or

6  provide the reason why the employee left.  In question

7  number 9, does OQ agree that Ms. Ryan has precisely

8  and truthfully answered the question "Exhaustion of

9  qualified absence and FMLA"?  Is that a accurate

10  answer as to why it terminated Chad?

11  A  That is one of the reasons, yes.

12  Q  Were there other reasons other than what she

13  lists here?

14  A  We didn't have any alternative light-duty

15  role available to place them in.

16  Q  Okay.  In any event -- well, let me ask you

17  this.  Is what she said here substantially the same as

18  what you all wrote to Chad on March the 14th about why

19  you terminated him?

20  A  I mean, yes.  She's covered the same thing

21  about exhausting FMLA.  The termination letter goes

22  into more specifics about the necessity of the role in

23  the organization and that there was no -- that his

24  leave was open-ended and there was no end date to it.

25  MR. GRIFFIN:  Okay.  Let me object to

Page 59

1  the non-responsiveness.

2  BY MR. GRIFFIN:

3  Q  My question was -- I think it was a yes or

4  no.  I was trying to get you to agree or disagree that

5  what Betsy Ryan says is the reason for the termination

6  is substantially the same as the reasons y'all wrote

7  to Chad in the termination letter?

8  A  I would agree that they're in line with each

9  other.

10  Q  Okay.  Does the letter accurately reflect

11  the reasons why OQ terminated him?

12  MS. COLON-POL:  Objection to form.

13  A  Yes.  So he didn't have any additional

14  protected leave.  It's a critical role with the --

15  within the organization.  There was no -- his leave

16  was open-ended.  We didn't have a definitive end date

17  when that would happen.  The organization was

18  incurring additional overtime expense, and we needed

19  to fill the role in order for business continuity.

20  MR. GRIFFIN:  And let me object to the

21  non-responsiveness.

22  BY MR. GRIFFIN:

23  Q  I just asked you whether or not Exhibit 3

24  accurately recites the reasoning for OQ's terminating

25  him?

Page 60

1  A  I think it's a concise representation of

2  why.

3  Q  Okay.  No inaccuracies are in here about the

4  reasoning.

5  A  I think that it's a concise representation.

6  Q  And an accurate one?

7  A  I think.  Yes.

8  Q  Okay.  Now, let's talk about the chronology,

9  if we might.  Isn't it true that Chad had already run

10  out of FMLA leave months before his diagnosis with

11  Guillain-Barre syndrome?

12  A  That would not be accurate.  So he had, to

13  your point, previously run out of FMLA.  He was a

14  couple of days unprotected, and then he was medically

15  released fully to come back to work.

16  MR. GRIFFIN:  Okay.  Let me object to

17  non-responsive.

18  BY MR. GRIFFIN:

19  Q  My question was, isn't it true that he'd run

20  out of FMLA months before he was diagnosed with GBS?

21  A  He had exhausted FMLA in January/February.

22  I don't know the exact date.

23  Q  Exactly.  That would be, if it's January, a

24  couple of months; right?

25  A  Yes.

Page 61

16 (Pages 58 - 61)

1    Q   And if it's February, a month early.
2        And does OQ understand the reason why he was
3    restricted on heavy lifting and extended climbing was
4    due to his back issues?
5    A   We don't always get insight on what the
6    employee's medical issues are.  If there's
7    restrictions that need to be reviewed or evaluated,
8    those get shared with us.
9    Q   Well, I'm asking you if those were shared
10   with you -- and is it Sean Wenglar; is that right?
11   A   Sean.
12   Q   Yeah.  In other words, OQ is aware that
13   Mr. Hurta had a previous back surgery injury and
14   recurrent back problems after his surgery.  OQ knows
15   that because he was off work because of that injury;
16   correct?
17   A   He was out on protected leave.  Yes, he was
18   off work.
19   Q   Okay.  And is OQ hesitant to tell us that
20   that back injury caused him to use up all of his FMLA
21   by January of 2022?
22   A   I'm not hesitant to tell you anything.  It's
23   the way it was stated.  But yes, I understand that in
24   sometime January/February, that he'd exhausted his
25   FMLA leave.  I'm not sure I understand what you're --

Page 62

1    what you're asking me.
2    Q   No, you have confirmed that in January 2022,
3    Chad had already run out of FMLA leave.
4    A   He had exhausted it, and then subsequently,
5    a couple of days later, he was relieved or released to
6    come back to full duty with no restrictions.  And then
7    he had accrued some additional days because it's on a
8    rolling twelve.
9    Q   Okay.  Help me with dates that you're
10   referring to now.  You mentioned something that
11   happened a couple of days after another date.  What
12   date does OQ say that his FMLA was used up due to his
13   back problems?
14   A   I honestly don't have that date memorized.
15   I -- I know that I have it in writing because Sean had
16   confirmed to me that he had exhausted his FMLA.  But
17   I -- I don't know the exact timestamps from memory.
18       And then I do know that the sequence of
19   events that I recall from memory is he had exhausted
20   his FMLA.  I had confirmation he had exhausted his
21   FMLA.  And then subsequently, within -- if memory
22   serves me -- a couple of days, he was medically
23   released to return back to work full time, no
24   restrictions.  And then he works until this -- this
25   March time frame.

Page 63

1        MR. GRIFFIN:  Let me object to the
2    non-responsive portion of the answer.
3    BY MR. GRIFFIN:
4    Q   Why are you not prepared to give us those
5    dates?
6    A   I didn't find them in the prep time period,
7    and I didn't find them to be relevant.  And I wouldn't
8    say it's not because I'm not prepared.  It's not like
9    I'm withholding them from you intentionally.
10   Q   Right.  But I'm asking you to address the
11   date that Chad ran out of FMLA.  I mean, that's the
12   stated reason that you fired him.  And so, I'm asking,
13   what date did he run out of FMLA leave?
14   A   So your scope has expanded beyond the March;
15   right?  You're asking me about something that occurred
16   back in January/February.  And so, yes, he exhausted
17   it in January/February at some point in time.  And
18   then, come March, he exhausted again.
19       We get confirmation, I believe it was on a
20   Monday, and then I have all those dates when Chad lets
21   us know about the -- his disorder that he has, and
22   then about the -- the termination date.  And then I
23   have the date that Chad and I talked on the phone.  I
24   have all those dates around the GBS syndrome.
25       MR. GRIFFIN:  Let me object as

Page 64

1    non-responsive.
2    BY MR. GRIFFIN:
3    Q   I just want to get a clear record.  OQ is
4    not prepared to tell us today when Chad ran out of
5    FMLA leave in 2022?
6    A   I don't have that date memorized.
7    Q   And you don't know it?
8    A   I have it in an e-mail.  It's something that
9    can be retrieved, yes.
10   Q   What e-mail are you referring to that would
11   tell you the date that Chad had exhausted all of his
12   FMLA leave?
13   A   I have the -- so from January/February one,
14   I have one from Sean stating he had exhausted his
15   FMLA.  And then for the GBS, I have an e-mail either
16   from Brittany [ph] or Sean stating that his FMLA had
17   been exhausted.
18   Q   Now, does OQ say that he was eligible for
19   more FMLA between January 22 and March the 14th 2022?
20   A   That would be a true statement.  So he
21   didn't run unprotected for the duration of the first
22   incidents to the second.  So we track on a rolling
23   twelve months.  So dependent on when Chad did or
24   didn't take his FMLA, he would potentially be
25   gained -- which he did gain days back as he moves

Page 65

17 (Pages 62 - 65)

1 along throughout the calendar year. It's on a rolling
2 twelve. It's not a calendar twelve.
3    Q  So okay. I'm trying to understand this.
4 When you use the word "unprotected," what does that
5 mean?
6    A  It would be an internal verbiage that we
7 use. It just means that he's no longer FMLA-covered.
8    Q  Okay. So does OQ claim that Chad was
9 unprotected in January 2022?
10    A  He was for a couple of days.
11    Q  For a couple of days? Which days?
12    A  I understand. You keep asking me for the
13 date. Without getting my computer and pulling that, I
14 can't -- I can't answer that from memory.
15    Q  Would that be something during a break you
16 could --
17    A  Yes. Yes, I have my computer.
18    Q   -- easily get the dates?
19    A  Yes, I have my computer.
20    Q  Okay. Good. Good. Good.
21      Now, after this -- and we'll talk about this
22 more once you've got these answers. But a couple of
23 days later, how many FMLA days did he get granted back
24 to him?
25    A  That I cannot answer. So that is housed by
Page 66

1 you know, the hospitalization occurred and days off of
2 work occurred due to the -- the illness GBS, then
3 those days start coming back off. That's the process.
4    Q  What records would -- as the company rep, if
5 you were going to prepare yourself to address that
6 topic about the reasons for termination and that sort
7 of thing, where would you look to see how many days
8 you guys -- well, let me rephrase that.
9      Where would you look and have us look to
10 find out the date he got more FMLA leave granted to
11 him and dates that such leave was sought and granted
12 by the company?
13    A  Sure. So that would be an HR medical
14 governed process. They're the ones that would be the
15 repository for those -- that information. I don't
16 have direct access to look at all of the employees'
17 medical histories in terms of how much FMLA they've
18 taken. I don't have access to those records.
19    Q  Why not as the company representative for
20 this deposition?
21    A  I wasn't prepared, based on what you had put
22 into the agenda, that I was going to be asked
23 specifically in regards to the FMLA dates, duration,
24 and timestamps.
25    Q  So during the lunch break or during a break,
Page 68

1 Sean. He keeps track of the FMLA and the timestamps
2 and when employees have a certain amount of days and
3 reports that to management. I -- I don't have access
4 to that.
5    Q  Okay.
6    A  I get an e-mail stating he's exhausted it,
7 again in January timeframe. And I get another e-mail
8 or confirmation sometime in March that it's exhausted.
9    Q  Okay. What does OQ say happened to his
10 additional FMLA days that he was allowed in January
11 and February of '22? In other words, help me make
12 sure the jury understands. He had run out of his FMLA
13 because of his back problems; right?
14    A  Yes.
15    Q  But then a couple of days later, on the
16 rolling basis, he got some more days granted back to
17 him?
18    A  As I've been communicated by medical codes,
19 correct.
20    Q  Okay. Were those days ever taken?
21    A  Yes.
22    Q  And how would they be documented if they
23 were taken? In other words, if Chad got more FMLA
24 after he'd run out?
25    A  Again, Sean keeps track of that. And once,
Page 67

1 you will not be able, probably, to provide that
2 information?
3    A  I can definitely e-mail a request or make a
4 call to our HR and tell them that we need that as a
5 priority.
6    Q  Okay.
7    A  I -- I can't guarantee they'll be able to
8 pull that.
9    Q  No problem. But you'll --
10    A  But we will certainly try.
11    Q  You can let us know how successful you are
12 with respect to that, and thank you for that.
13      But your understanding, not having any
14 documents in front of you, is that A, he had the back
15 problems, B, he used up all the FMLA he had in January
16 of 2022; right?
17    A  True.
18    Q  A couple of days later, he got some more
19 FMLA in the bank, if you will, for him to be able to
20 use?
21    A  True.
22    Q  And your understanding is that he applied
23 for and was granted those days of FMLA?
24    A  Until exhausted. That is my understanding.
25    Q  Okay. So he exhausted leave twice is OQ's
Page 69

18 (Pages 66 - 69)

**Page 70**

1  version of events?  First for the back and then later;
2  correct?
3      A    That's correct.
4      Q    Okay.  Do you have any idea as we sit here,
5  does OQ have any idea as we sit here, when those days
6  were used?  The FMLA days that were put back into his
7  bank, if you will, in January of 2022?
8      A    Without getting the information the records
9  from medical and HR, I would not be able to answer.  I
10  would just be speculating.
11     Q    So but your thought as we're sitting here,
12  as the representative, is that he was only unprotected
13  for a couple of days?
14     A    Back in the first instances.  I keep calling
15  it January.  That's what my memory serves me as.  In
16  January, it was only a couple of days because there
17  was initiating conversations about Chad exhausting his
18  FMLA.  And pretty rapidly after that -- I remember it
19  to be a couple of days -- that Sean says that he's
20  been fully released to return to work.
21     Q    So from your perspective, it's a coincidence
22  that the FMLA days are put back into his account, and
23  he comes back to work.  Did you say without
24  restrictions?
25     A    He was released without restrictions, yes.

**Page 71**

1      Q    Okay.  But it's a coincidence those two both
2  happened a couple of days after he originally ran out
3  of the FMLA because of the back issue?
4      A    I view that question to be speculative.  I
5  don't view it to be a coincidence.  Chad was sick.  He
6  was using a company benefit.  He was medically
7  released.  I -- I don't understand the coincidence
8  question.
9      Q    Well, you use the word couple of days in two
10  different answers.  One was it was a couple of days
11  after he ran out of the FMLA leave due to the back
12  issue, and a couple of days later, he had more leave
13  put back into his account so that he became protected
14  again; correct?
15     A    He had -- what I've communicated is that he
16  had exhausted his FMLA.  A couple days later, as
17  memory serves me, he returned back to work.  And then
18  he continues to work until the -- the March time
19  frame.  During -- during that time frame, he's
20  enabled, and he starts to gain back, as I understand
21  it, additional days per Sean.
22          So once he goes out with this
23  hospitalization and the GBS stuff, the days that he
24  had accrued -- would be a good word for these -- are
25  now starting to be taken back off.  And without having

**Page 72**

1  the information from medical and Sean, I -- I can't
2  adequately give you timestamps that you keep asking me
3  for.
4          MR. GRIFFIN:  Let me object to the
5  non-responsiveness.
6  BY MR. GRIFFIN:
7      Q    I want to make sure we were communicating
8  earlier that you had shared with us that a couple of
9  days after he ran out of FMLA, days were put back into
10  an account or he accrued some more.  A couple of days?
11  I thought that was the word you used about when that
12  happened; is that what you shared?
13     A    As -- as previously stated, he exhausted his
14  FMLA.  He, a couple days later, is medically released.
15  He's returned to work.  And as he's returned to work,
16  he starts to accrue additional protected FMLA days.
17          MR. GRIFFIN:  Let me object to the
18  responsiveness.
19  BY MR. GRIFFIN:
20     Q    You keep talking about a different event;
21  okay?  I'm asking you about the timing of when his
22  FMLA ran out and when he accrued more FMLA.  I thought
23  you told the jury that it was a couple of days after
24  he ran out that he began to accrue more days of FMLA?
25     A    That would be true 'cause he's back at work.

**Page 73**

1      Q    Okay.  But you're thinking, as we sit here
2  without the documents and not prepared to really
3  address it, is that the days that he accrued for FMLA
4  when he was protected were somehow used before he was
5  fired?
6      A    Yes.  As I'm able to serve from memory, yes.
7      Q    Okay.  Does OQ have an explanation for why,
8  if that's the case, and nowhere in the 800-plus pages
9  of documents OQ has produced is there any evidence
10  that he took any FMLA leave after January 2022?
11     A    I don't have access to those records.  I
12  wasn't exposed to them, and it wasn't part of this
13  deposition prep nor part of my discovery that I
14  searched for.
15     Q    Okay.  Let's talk about other kinds of
16  leave.  At the time, for example, in January of 2022,
17  when Chad had used all the FMLA he had, he still had
18  vacation leave; didn't he?  Accrued?
19     A    Yes.
20     Q    Okay.  In other words, employees can take
21  vacation leave as well as FMLA leave; can't they?
22     A    They can choose to take vacation in order to
23  get paid 'cause FMLA -- he would have been on STD, but
24  yes.  The answer's yes.
25     Q    Okay.  And it is not a violation of any OQ

19 (Pages 70 - 73)

1 policy to utilize all your FMLA leave. That's not a
2 firing offense?
3    A. No.
4    Q. Okay. Now, the chronology here -- and I'm
5 just going to ask OQ to confirm of the events. That
6 Chad was on vacation leave for the stock show?
7    A. [No audible response.]
8    Q. For the stock show at the time he was
9 diagnosed with GBS. That he was on vacation leave
10 when diagnosed?
11   A. Okay. If that was in his statement, yes.
12   Q. Yeah. I need you to say yes or no.
13   A. Okay.
14   Q. Okay. And OQ agrees he was not violating
15 any policy by being on vacation leave when he happened
16 to be diagnosed with Guillain-Barre syndrome? That
17 didn't violate any policy?
18   A. No.
19   Q. Okay. And OQ agrees that on March the 7th
20 2022, the day he was diagnosed, he informs OQ folks of
21 the bad luck he'd had in being diagnosed with this
22 neurological syndrome; correct?
23   A. That's true. Chad informs me directly in --
24 on a group text chain that he had been diagnosed with
25 this GBS.

Page 74

1    A. Yes.
2    Q. Okay. Is she a person that you felt is
3 honest and forthright?
4    A. I do respect Betsy a lot, yes.
5    Q. Okay. And the other HR person,
6 Windy Morgan, she no longer is at OQ either?
7    A. No.
8    Q. Okay. Did she resign, or was she
9 terminated?
10   A. She resigned.
11   Q. Okay. The same question for her. Did you
12 find her to be honest and forthright?
13   A. Yes.
14   Q. Okay. And before we change the tape, does
15 OQ agree that -- Windy Morgan; right? I said that
16 right? That's her name, Windy Morgan?
17   A. Yes.
18   Q. Okay. Then, let me ask this last question.
19 Does OQ agree that Windy Morgan opposed OQ terminating
20 Chad in March of 2022?
21       MS. COLON-POL: Objection to form.
22   A. I mean, ultimately, she drafted the -- the
23 letter. She had expressed that she had -- she had
24 expressed that she had a couple of concerns.
25   Q. Okay.

Page 76

1    Q. Okay.
2    A. And that he had gone previously to the ER
3 'cause he had tingles and numbing in his extremities.
4    Q. And this is happening when he's on vacation
5 leave; right?
6    A. As I understand what you've communicated,
7 yes.
8    Q. Okay. We've got five minutes before the
9 videographer is going to change tapes or change
10 drives. But I want to just make sure that I get this
11 last section out of the way here.
12       This period of time, this one-week period of
13 time after he's diagnosed, you yourself had
14 conversations with Chad about his employment?
15   A. On March 10th, yes, Chad and I had a phone
16 conversation.
17   Q. And OQ understands that he had conversations
18 with the HR person, Windy Morgan?
19   A. Yes.
20   Q. And let me ask, does Ms. Ryan, Betsy Ryan --
21 I know she retired? Came back? Is she still there or
22 retired?
23   A. She's no longer with the organization. So
24 she's back in retirement.
25   Q. Did she leave on good terms?

Page 75

1       MR. GRIFFIN: Then we can change the
2 tape and go off the record for five or ten minutes for
3 people to get drinks, go to the bathroom, anything
4 anyone needs to do.
5       MS. COLON-POL: Okay.
6       THE VIDEOGRAPHER: This is now the end
7 of video one of Kristina Zalman. Off the record. The
8 time is approximately 11:31.
9       (Off the record.)
10      THE VIDEOGRAPHER: We're now back on
11 the record. Video two of Kristina Zalman. The time
12 is approximately 11:52.
13 BY MR. GRIFFIN:
14   Q. Ms. Zalman, you were able to retrieve some
15 information to help establish some of the time periods
16 about Chad's FMLA; is that right?
17   A. That's true.
18   Q. Okay. So do the records help OQ to tell us
19 when it says that Chad Hurta had exhausted all of his
20 FMLA in January '22?
21      THE WITNESS: Yanice, do you want me to
22 hand this out?
23      MS. COLON-POL: There's --
24 BY MR. GRIFFIN:
25   Q. You can, but what I'd really like you to do

Page 77

20 (Pages 74 - 77)

1  is just tell the jury what that date is. That's what
2  I'm trying to get you to tell us.
3      A    Sure. So on the 13th, I'd asked Sean,
4  that's our medical, for an update on the status of
5  Chad's FMLA status. And he let me know on the same
6  day, on the 13th, that Chad has run out in the
7  beginning of the week. So that would have been
8  three/four days prior.
9      Q    Okay. So we still don't have a precise date
10  of when his FMLA expired or ran out?
11      A    Based on this communication, that would have
12  been January 10th.
13      Q    So the assumption that you're reading from
14  this e-mail is that at some point, it ran out, number
15  one. Number two, that Sean would know that?
16      A    Sean keeps a record, yes, of the employees
17  when they take them, and then how much they
18  accrued as they work and their status.
19      Q    Okay.
20      A    Which is what Sean is digging up now. I
21  told him it was an urgent request, and he was going to
22  try to get it as soon as possible.
23          MR. GRIFFIN: Okay. Let me object to
24  that as non-responsive.
25  //

Page 78

1  BY MR. GRIFFIN:
2      Q    But what I'm trying to make sure with the
3  chronology, one, he ran out of FMLA leave; right?
4  He'd exhausted it all?
5      A    In January, yes.
6      Q    Yes.
7      A    On the 10th.
8      Q    And two, you are basing your answer of the
9  10th based on an e-mail from Sean Wenglar to you on
10  the 13th?
11      A    Yes.
12      Q    Well, let me just ask it in this way.
13  Doesn't OQ, aren't they required to keep records of
14  when FMLA is sought? When it's granted? When it's
15  denied? When it's accrued? Isn't OQ supposed to keep
16  those records?
17      A    All that's true and all that's being done.
18  That is -- the responsible party is currently
19  Sean Wenglar in medical.
20      Q    Why does OQ say that none of that has been
21  produced yet?
22      A    To my knowledge, at least on the discovery
23  set that I've seen and what was supplied, I feel like
24  we've responded to those adequately.
25          MR. GRIFFIN: Let me object to the

Page 79

1  non-responsiveness.
2  BY MR. GRIFFIN:
3      Q    We've established that there is no record of
4  the 865 pages of documents that OQ has produced in
5  this litigation that has anything about FMLA leave
6  after it had been exhausted in January of 2022. You
7  have shared with us that he had some that was a couple
8  days later put back into the account. That he'd
9  accrued some more, and that that was used and that
10  that was run out, and then he was terminated. That's
11  what you shared with us before the break; right?
12      A    That's also still all true.
13      Q    Okay. Where are any documents in the 865
14  pages that describe how many days he was accrued, how
15  many days he used, and when the additional accrued
16  FMLA days were actually used up?
17      A    Sure. So again, prior to the break, we
18  established that we didn't have those documents
19  available currently and that Sean was going to dig up
20  all of the information to answer the questions that
21  you've presented. In terms --
22      Q    Okay. Is OQ -- sorry, go ahead.
23      A    In terms of my role, I get notified whenever
24  an employee has exhausted or is coming close, and that
25  way more for awareness as the manager, as do the other

Page 80

1  team. I don't have access, nor do I monitor, nor am I
2  responsible to keep track of the things that you've
3  mentioned. We have systems in place where that's
4  handled through medical.
5          MR. GRIFFIN: Okay. Let me object to
6  the responsiveness.
7  BY MR. GRIFFIN:
8      Q    If you don't know, it's okay. It's okay if
9  OQ doesn't know. My question is, why do we not have
10  those records already?
11          MS. COLON-POL: Objection. Asked and
12  answered.
13          THE WITNESS: I don't know what that
14  means. Oh, asked and answered?
15          MS. COLON-POL: Mm-hmm.
16          THE WITNESS: I think we've already
17  established that one, they hadn't been supplied. I
18  can't answer that. We're working on getting the
19  records.
20  BY MR. GRIFFIN:
21      Q    You're talking too fast. I couldn't
22  understand what you said.
23      A    Yes, I understand that you don't have them.
24  We're working on getting the records.
25      Q    I understand. But my question is -- I

Page 81

21 (Pages 78 - 81)

Page 82

1 appreciate that very much. My question is, do you
2 know how it's come to this point where we're taking
3 this deposition on these topics, and we don't have
4 these records yet?
5    A  I can't explain or answer what was
6 disseminated from our legal department to other areas.
7    Q  All right.
8    A  Everything that was requested from
9 operations, I'm responsible for.
10   Q  Okay. Let's go back then. Well, let me ask
11 you, from your standpoint, was there anything more you
12 learned from the documents that you brought with you
13 after the break?
14   A  Other than the date, the timestamps that I
15 couldn't give you specifics on.
16   Q  Okay. And the timestamps that you referred
17 to are the dates we talked about, the date of the
18 e-mail from Mr. Wenglar to you, and extrapolating
19 backwards to the beginning of the week?
20   A  Yes. Based on the communication.
21   Q  Okay. All right. Let's go back to
22 Windy Morgan. When we broke, before the break, you
23 had shared that Windy Morgan had opposition to OQ
24 firing Chad; right?
25   A  Yes. She had a concern.

Page 83

1    Q  Okay. And can you articulate for the jury,
2 as the OQ representative, why did she object to y'all
3 firing him?
4    A  She had a concern, and she felt that there
5 was an instance in December in which Chad had come and
6 worked the console board whenever he was on light or
7 restricted duty. And she didn't know how that would
8 be interpreted should it come to some form of
9 escalation or -- or legal type situation.
10   Q  Well, in March of '22, after he had been
11 diagnosed with GBS and Windy'd had conversations with
12 Chad about that, what does the control board in
13 December of 2021 have to do with terminating Chad in
14 March of '22?
15   A  So the position that was open in December
16 was the -- the control board and it was around the
17 holidays. It's a pretty tight staffing situation. A
18 lot of people out either, you know, due to illness or
19 scheduled vacations, etcetera. And the position that
20 was open was one of the DCS positions in the control
21 room, which he was housed out of. So Chad came in and
22 worked that board for, as memory serves me, one, maybe
23 two shifts, and then that was the extent of -- of that
24 duration.
25   Q  So to help the ladies and gentlemen of the

Page 84

1 jury, Windy pointed out that Chad was allowed to work
2 the control board when he had lifting and climbing
3 restrictions?
4    A  Yes. She voiced the concern about the light
5 duty that we had enabled back in December.
6    Q  Right. And she advocated for light duty for
7 him in March after his GBS; didn't she?
8       MS. COLON-POL:  Objection to form.
9    A  To my knowledge, no, she didn't come with
10 that. We internally discussed why it was open ended.
11 He hadn't been medically released to return to work.
12 We didn't know what those restrictions were going to
13 be. In addition, we have a bunch of process operators
14 that are in training or recently signed off, and for,
15 you know, to ensure proficiency and -- and qualified
16 staffing, we can't have somebody indefinitely on -- on
17 a process board restricting the ability to continue to
18 grow and develop our staff.
19       MR. GRIFFIN:  Let me object to the
20 non-responsiveness.
21 BY MR. GRIFFIN:
22   Q  My question was on one subject. Didn't
23 Windy Morgan advocate for allowing Chad to work the
24 board as he recovered from GBS?
25   A  I have no record of that. No.

Page 85

1    Q  Okay. You don't have any recollection of
2 it?
3    A  To my knowledge, I don't remember Windy
4 advocating for him to work the board.
5    Q  But you remember her advocating against
6 firing him?
7    A  I have a e-mail when she says that she has
8 her concerns because of the light-duty assignment in
9 December.
10   Q  I'm not talking about e-mails necessarily,
11 but --
12   A  You're asking me for records -- apologize, I
13 cut you --
14   Q  No. No, I'm not asking about records. I'm
15 talking about communications.
16   A  That is a communication.
17   Q  Whether it's -- you're going to have to let
18 me finish my question.
19   A  Understand.
20   Q  Communications can be e-mails? Phone calls?
21 In-person meetings? We agree on that; don't we?
22   A  Yes.
23   Q  Isn't it true that Windy Morgan told you
24 that she was opposed to OQ firing him in March of
25 2022?

22 (Pages 82 - 85)

1     A    Windy Morgan did not use those phrases in
2   her e-mail communications to me. She said that she
3   had concern due to the light duty. That was not a
4   strong opposition as I interpreted her e-mail.
5         MR. GRIFFIN: Let me object to the
6   responsiveness.
7   BY MR. GRIFFIN:
8     Q    In oral conversations with Windy Morgan, she
9   told you she was opposed to OQ firing him; didn't she?
10    A    I don't remember having oral conversations
11  with Windy when she says we should not fire. Windy
12  participated in conversations. We had scheduled
13  meetings -- these would be protected -- with counsel
14  to review the status of Chad's medical case, FMLA, and
15  to develop a path forward.
16    Q    Is it OQ's position that the Teams meetings,
17  all of the Microsoft Teams meetings about Chad, are
18  protected because there were lawyers present?
19    A    The Teams meetings would have had our
20  counsel on it, and as I understand it, that those
21  would be all protected.
22    Q    Do you deny that you had oral conversations
23  with Windy Morgan at or about the time of Chad's
24  termination, after he'd been diagnosed with GBS?
25    A    Windy and I had conversations, yes. And she

Page 86

1   let me know that she had a couple of conversations
2   with Chad.
3     Q    Okay. And we agree on the chronology, and
4   you could see from Exhibit Number 21 that you should
5   have before you. Exhibit Number 21: those are the
6   text strings that you referred to earlier that confirm
7   that Chad notified OQ of the unfortunate situation
8   that he was in the hospital and had been diagnosed
9   with the Guillain-Barre syndrome?
10          (Exhibit 21 was marked for
11          identification.)
12    A    I need a little more context. So on -- on
13  this text chain, I do not know. This has to be from
14  Sean. Sean supplied this.
15    Q    My question is, are these the text that you
16  were referring to before the break in which you
17  confirmed that Chad had notified OQ of his unfortunate
18  diagnosis of GBS on March the 7th 2022?
19    A    That's true.
20    Q    Okay.
21    A    The last page, I think you've labeled it 724
22  and 723.
23    Q    Yes. They go from -- the reason I wrote
24  these down here is because the Bates numbers that the
25  lawyers put on here are so small nobody can read them

Page 87

1   without a microscope. So I've written in longhand on
2   the bottom right-hand corner the Bates number, the OQ
3   Bates numbers, and they should go from 718 to 724.
4         And I'll just ask you if you will confirm
5   that those are text messages among folks at OQ and
6   Chad regarding his situation at the hospital with GBS?
7     A    Yes.
8     Q    Okay. And I would like you to confirm that
9   the first page of Exhibit Number 21 are texts between
10  Sean and Chad?
11    A    That's true.
12    Q    Okay. Now we go to the second. And does OQ
13  have any issue with anything that's said on this page
14  by either Sean or Chad?
15    A    I need to read --
16    Q    Okay. And we can go one page at a time if
17  that's okay?
18    A    No, I'm good.
19    Q    Are you on the second page yet or the third?
20    A    Third.
21    Q    Okay. Well, let's stay with the second page
22  for a bit.
23    A    Okay.
24    Q    And on the first page, was there anything
25  that OQ has a problem with on the first page?

Page 88

1     A    The only one I'm not sure of is it seems
2   like this is the timestamp up top, starting with Chad.
3   No.
4     Q    Okay. Then, going to the second page, can
5   OQ confirm that on that same day, Chad has sent the
6   actual name of the condition that he had been
7   diagnosed with in the hospital?
8     A    That's true.
9     Q    Okay. And does it appear to OQ that this
10  string that we're seeing here is between Sean and
11  Chad?
12    A    I mean, I can't -- I mean, I know it's from
13  Sean 'cause I saw whenever he produced it, but there's
14  nothing on this document that tells me it's Sean. It
15  just says Chad.
16    Q    Well, is that your belief that it's Sean?
17    A    Yes, I believe, yes, it's Sean.
18    Q    Okay. All right. And Sean is a nurse?
19    A    Sean is site medical. He is not a nurse.
20    Q    Okay.
21    A    He is a paramedic by training.
22    Q    Is he a person that employees are authorized
23  to talk to about their disabilities and illnesses?
24    A    Yes. He's site medical.
25    Q    Okay. And we can see, on March the 10th,

Page 89

23 (Pages 86 - 89)

1  Chad's asking when will he have some more FMLA?
2    A   You're on the fourth page now?
3    Q   Yes.
4    A   I'm sorry.  Can you repeat that question?
5    Q   Yeah.  Going to the fourth, it appears that
6  Chad is asking when he will get some more FMLA.  And
7  then it looks to me like records are being sent to OQ
8  by Chad or his family on or about March the 10th,
9  three days later; correct?
10   A   Correct.
11   Q   Okay.  Anything wrong with Chad sending
12 those records and communicating with Sean about his
13 situation?
14   A   He is supposed to do that, no.
15   Q   Okay.  Then, we see some other initials on
16 the top of the Bates stamp number 723.  And it appears
17 that on this string, on March the 7th, at 1:15 p.m.
18 same day, there's a CH, an MA, and a JT.  And I would
19 like for you to confirm that the three on this string
20 are Chad Hurta, Jeremiah Tipps, and who's the third
21 one?  Mitch Abshier?
22   A   Mitch Abshier.
23   Q   Okay.  Are those appropriate people for Chad
24 to be communicating with about his situation in the
25 hospital?

Page 90

1  does not have to tell us that.  His -- he doesn't have
2  to tell us exactly what's wrong with him.  Typically,
3  what the protocol has to be is they have to go through
4  medical and tell them, "Here's what's going on.
5  Here's when I can expect to return to work."  Those
6  type things.  No employee is required to inform me of
7  their medical conditions.
8         MR. GRIFFIN:  Let me object to the
9  non-responsiveness.
10 BY MR. GRIFFIN:
11   Q   Do you recall what my question was?
12   A   You asked me if it's appropriate, and I -- I
13 viewed that to be -- I felt like that required my
14 response.
15   Q   That what was appropriate?
16   A   That he would be communicating his disease
17 and illness and -- and those things.
18   Q   So yes, appropriate for him to be
19 communicating with you, or no, not appropriate?
20   A   It's allowed if he chooses to do that.  It
21 has to be the employee's choice is what I'm trying to
22 emphasize here.
23   Q   Okay.  Okay.
24   A   He does not have to do this.  But yes, it's
25 appropriate should he want to, and he chose to.

Page 92

1    A   I would like to clarify one point.  There's
2  actually four people on this chain.  I am the fourth.
3  This is my screenshot that I took.
4    Q   Well, thank you for that.  No, I appreciate
5  that.
6         So there are four people on this group text.
7  And so the four on this text, who are on this text,
8  the three of them from OQ, these are people
9  appropriate for Chad to be communicating with about
10 what's going on in Houston?
11   A   Yes.
12   Q   Okay.  And on this string, it appears that
13 the diagnosis is on the sheet that we see as Bates
14 number 723; right?
15   A   That was a statement.  You want me to agree?
16   Q   No, I don't want you to agree.  I want you
17 to tell me whether it's accurate that 723, that text
18 string that began on March 7th, also includes the
19 diagnosis of his disease?
20   A   Yes.  He's communicating to the operations
21 leadership that he has this GBS syndrome.
22   Q   And then, if I asked you this, I apologize.
23 But it's appropriate for him to be communicating with
24 all three of you guys about this?
25   A   In terms of what he's required to do, no, he

Page 91

1    Q   Okay.  You don't have any beef with him
2  wanting to do that?
3    A   Not at all.
4    Q   Okay.
5    A   He doesn't have to.
6    Q   So he did more than what was required?
7    A   Fair.
8    Q   Okay.  And I'm seeing initials by some of
9  these.  Do I take it that since you had captured this
10 text string that the blue is something you said?
11   A   It's true.
12   Q   Let me ask you this, and I don't mean to put
13 you on any kind of spot, but did you consider yourself
14 a friend of Chad's?
15   A   I would help any employee in their time of
16 need.  I liked Chad.  We worked well together.
17   Q   Okay.
18   A   And I did care about his well-being.
19   Q   Okay.
20   A   Still do.
21   Q   Thank you.
22         So in terms of the -- let's then go to
23 Exhibit Number 30.  And I would like you, if you
24 would, to tell the jury what that is?
25 //

Page 93

24 (Pages 90 - 93)

1         (Exhibit 30 was marked for
2         identification.)
3     A   So this is a communication from Windy Morgan
4  to, I believe, myself. I produced this as I remember.
5     Q   Okay. Then, going back to the chronology,
6  who at OQ did Chad talk with on the phone first about
7  his situation at work?
8     A   If memory serves me, Windy. And then, him
9  and I had a conversation later that day on the 10th.
10    Q   Well, let's first talk about conversations
11 with Windy?
12    A   Okay.
13    Q   How did you learn what was said between
14 Windy on the one hand and Chad on the other when Chad
15 first spoke with her on the phone about his situation
16 with GBS and his job?
17    A   So Windy had let me know that she had a
18 conversation with Chad. As I recall, she let me know
19 that he had exhausted his FMLA and that he wasn't
20 granted additional FMLA time. He also hadn't been
21 medically released, and it was open-ended if and when
22 he would be able to return to work. And then she let
23 me know he would likely be reaching out to me as well.
24    Q   How was that communicated to you, on the
25 phone, in person, or by e-mail?

Page 94

1     A   I do not remember. Windy's office was right
2  next door to mine. She likely got up out of her chair
3  and came to my office.
4     Q   Did she report to you that Chad had
5  specifically asked her if he could work the board?
6  Work light duty?
7     A   I don't recall that conversation. I don't
8  recall -- because I remember our conversation.
9     Q   Right. But does OQ deny that Windy told him
10 that she would have to check on whether or not he
11 would be granted light duty or not and that she
12 confirmed to him later that he was not allowed to work
13 light duty?
14    A   I'm -- I'm speculating. I have no doubt
15 that that type conversation took place.
16    Q   Okay. And that Windy was -- I don't want to
17 say directed, but Windy was authorized to tell Chad we
18 are not going to be able to accommodate your request
19 to work the board or light duty. She was authorized
20 to tell him that?
21    A   That would be appropriate. HR. Medical.
22 Yes.
23    Q   Okay. And OQ understands that's what
24 happened, that Windy told him, we're not going to
25 allow you to do light duty or work the board?

Page 95

1     A   Yes. After internal discussions, yes.
2     Q   Okay. All right. And she also shared with
3  you that the subject then turned to job-protected
4  leave; correct?
5     A   Yes.
6     Q   Okay. And does OQ say that Windy did not
7  authorize him to utilize vacation leave and unpaid
8  leave for six days after he got out of the hospital?
9     A   I know that she had the conversation. I
10 know that she informed me of it. I don't recall the
11 duration.
12    Q   Okay. All right. Was she authorized to
13 tell him that you can use your vacation leave while
14 you're recovering, and you can use unpaid leave while
15 you're recovering?
16    A   Yes, she's authorized to do that.
17    Q   Okay. All right. But whatever the
18 duration, six days, which I think it was, but forget
19 about the duration. But in any case, four days after
20 her conversations with Chad authorizing him to use his
21 vacation leave and unpaid leave, he was actually
22 terminated; correct? On the 14th?
23    A   That's true.
24    Q   Okay. In other words, it was exactly seven
25 days between when he's admitted to the hospital and

Page 96

1  diagnosed with GBS and when he's fired? Seven days?
2     A   Okay.
3     Q   Is that true?
4     A   That's true. The 7th to the 14th. That's
5  true.
6     Q   Okay. Was Windy correct about Chad being
7  eligible for using his unpaid leave or vacation
8  accrual while he was recovering?
9     A   Well, truly unpaid leave would have to be
10 approved by additional levels in the organization.
11 I'm talking about Fred. Vacation, the employee is
12 welcome to take at their discretion. And as memory
13 serves me, there was some conversation feedback from
14 Windy that he didn't want to use that vacation. I
15 think he wanted to save it, as I remember.
16    Q   Is that something you claim Windy said?
17    A   Yes.
18    Q   And how would we see -- are you relying on
19 memory, or is there a document that says so?
20    A   Memory.
21    Q   Okay. Let me ask you this. As part of your
22 preparation for the deposition today, did you
23 interview or speak with Windy Morgan or Betsy --
24         MR. HURTA: Ryan.
25         MR. GRIFFIN: Ryan. Thank you.

Page 97

25 (Pages 94 - 97)

1          THE WITNESS: I have not talked to
2  Windy for four to six months. No, the answer's no.
3  BY MR. GRIFFIN:
4      Q   Okay.
5      A   And I haven't talked to Betsy since --
6  probably two, three months.
7      Q   Okay. OQ should have records of vacation
8  days for each employee; right?
9      A   Yes, that's true.
10     Q   Okay. And OQ also should have records about
11 which process operators are actually working the board
12 at any given time or at any given date?
13     A   Also true.
14     Q   And for incidences when operators working in
15 an area swap roles, that is, somebody would normally
16 be working outside swaps with somebody working inside,
17 that too would be documented; wouldn't it?
18     A   They're not authorized to just swap. That
19 needs to be approved by the supervisor. So yes, it
20 should be documented.
21         MR. GRIFFIN: Okay. Let me object to
22 the non-responsive answer.
23 BY MR. GRIFFIN:
24     Q   I just want to make sure that when operators
25 who would normally be outside or working the board,

Page 98

1  that would be -- OQ should have documentation of that?
2      A   I'm not clear on your statement, but I would
3  like to answer it.
4      Q   Let's say you got an operator that actually
5  has got a heart problem, shoulder problem, knee
6  problem that's having trouble being outside and wants
7  to work the board. And nobody complains. It's all
8  approved by whoever needs to approve it, and it's
9  done. OQ has records that would show that; wouldn't
10 it?
11     A   Those are requests for accommodations, yes.
12 There's records, and there's an approval process.
13 It's documented.
14     Q   And so, whoever is on the board is
15 documented? OQ is required to keep records of who is
16 on the control board at all times; correct?
17     A   Yes. We keep track of who's working what
18 positions.
19     Q   And I wanted to make sure you had engaged in
20 an answer a few minutes ago that says -- let me make
21 sure I wrote this down -- that he was terminated
22 before any restrictions could be proposed or before
23 there were -- that it was terminated before we got any
24 restrictions on him?
25     A   That's true. We had no formal restrictions

Page 99

1  provided to review.
2      Q   Okay. Now, what does -- oh, on the Exhibit
3  you got there, that's the text from Windy to you. Is
4  what she said correct here, that "Chad is eligible for
5  unpaid leave or taking an accrual"? Do you see that?
6      A   Windy would have done an evaluation based on
7  the HR processes, and she would agree with that. So
8  she's informing me that's what he's eligible for.
9      Q   Okay. And she informed you that that's what
10 she told Chad?
11     A   Yes. If memory serves me, yes, she let me
12 know that.
13     Q   Okay. And the accrual we're talking about
14 here is vacation? Accrued vacation?
15     A   Yes. 'Cause you don't get your full out
16 allotment at the beginning of the year. You have to
17 accrue it.
18     Q   Right. And we agree that Chad had a
19 substantial bank of vacation days accrued; hadn't he?
20     A   Based on his tenure, I would expect him to
21 have, yes.
22     Q   Okay. And then, as he reports, that Chad
23 was unhappy. That he felt that "OQ was not taking
24 care for the employees and that it wasn't what it used
25 to be." Do you see that?

Page 100

1      A   Mm-hmm.
2      Q   You understood from talking to Windy that
3  was his reaction to being told that he could not work
4  the board or work light duty; correct?
5      A   I'm not sure about the context of the
6  statements. She's just letting me know that he's
7  disgruntled.
8      Q   Right. But he's not going to be disgruntled
9  because his leave was approved; right?
10     A   Well, as I understand it, there was
11 conversations here with Windy. She let me know that,
12 yes, he was unhappy about it. She let me know that,
13 yes, we did not have -- about the light duty. We
14 obviously had internal discussions about that, and
15 there was no special assignment available for him to
16 return to. And I do know that, yes, he was quite
17 upset about that later piece.
18         MR. GRIFFIN: Let me object to the
19 non-responsive portion.
20 BY MR. GRIFFIN:
21     Q   But Windy shared with you the first thing he
22 asked for was to be able to work light duty because of
23 his climbing -- extended climbing issues and because
24 he had a inability to do prolonged heavy lifting.
25 Didn't she share with you he wanted to work the board?

Page 101

26 (Pages 98 - 101)

Page 102

```
 1     A   So even working the board is physically
 2  intensive labor.  To get down to the control room, you
 3  have to walk -- walk half a mile to three-quarters of
 4  a mile.  There's a flight of stairs you have to climb.
 5  And we were not able to accommodate an open-ended
 6  board job due to the operators in progression, the
 7  recently signed-off operators, and requirements to
 8  rotate inside/outside.  We don't have designated board
 9  jobs.
10         MR. GRIFFIN:  Let me object to the
11  non-responsive answer.
12  BY MR. GRIFFIN:
13     Q   Didn't Windy share with you that his first
14  request for accommodation was to work light duty or
15  the board?
16         MS. COLON-POL:  Objection to form.
17  BY MR. GRIFFIN:
18     Q   Isn't that what Windy told you?
19     A   So his first request, as I understand it,
20  was to resume a special assignment that was no longer
21  available, which still was not a light-duty
22  assignment.
23     Q   So your recollection of talking to Windy is
24  the first thing he asked for was for a special
25  assignment?
```

Page 103

```
 1     A   Yes.
 2     Q   Okay.  Was the second -- does OQ agree that
 3  the second thing he proposed was working light duty or
 4  the board?
 5     A   That's true.  Yes.  Both -- both requests
 6  came.  You were asking about the sequence.
 7     Q   Okay.  Yes, I was.  And I wanted to make
 8  sure.  OQ says under oath that they think the first
 9  thing that was discussed was the special project and
10  not light-duty control board?
11     A   I do believe that because it was a daylight
12  position that he previously housed.
13     Q   Okay.  It was a what?
14     A   Daylight position that he previously housed
15  as a special assignment.
16     Q   Well, he'd also been a board operator when
17  he was on restrictions, too; right?
18     A   You asked me to clarify, so I'm clarifying
19  as I remember it.
20         MR. GRIFFIN:  Let me object to
21  non-responsive.
22  BY MR. GRIFFIN:
23     Q   It's true also that he had worked as a board
24  operator when he was on medical restrictions?
25     A   Historically, I -- I'm sure.  I don't have
```

Page 104

```
 1  records in what I dug up.  No.
 2     Q   Well, you and I discussed that this morning;
 3  right?
 4     A   You're talking about -- yes.  December.
 5  Yes.
 6     Q   Okay.  All right.
 7     A   Whenever he worked the position.
 8     Q   And OQ knows other operators who have
 9  physical issues have been allowed to work the board?
10         MS. COLON-POL:  Objection to form.
11     A   Yes.  So we have records of employees up
12  until midway of 2018 that were unable to work light
13  duty on the boards.
14     Q   Okay.  There is no written policy anywhere
15  in any of the OQ documents that say that it is
16  inappropriate to allow a worker with a disability to
17  work the control board if they're otherwise qualified
18  to work the control board?
19     A   I think that's an individual -- I think
20  that's an individual assessment that's always
21  performed based on what they are or aren't
22  restrictions against the essential functions of the
23  position.  It's not a blanket coverall that we have
24  for all positions like -- like what you're describing.
25     Q   Right.  But you all fired him before you got
```

Page 105

```
 1  any restrictions; right?  True?
 2     A   We fired him before receiving any formal
 3  restrictions.  It was open, and there was no timeline
 4  for him to return to work.
 5     Q   No, it was closed-ended.  It was seven days.
 6  You got the diagnosis on March the 7th.  A week later,
 7  he's fired; right?
 8     A   You're referencing this.  This piece is
 9  true.  Yes.  But there was no from medical from his
10  side of when he would be released to return to work.
11     Q   That's because you fired him seven days
12  after he got out of the -- I mean, four days after he
13  got out of the hospital; right?
14     A   We did fire him four days after the
15  hospital.
16     Q   Okay.  All right.  And it was okay for Windy
17  to tell Chad that it was his choice on whether to use
18  vacation leave or unpaid leave; correct?
19     A   Yes.  That's within her roles and
20  responsibilities, yes.
21     Q   And I think you said you didn't remember, OQ
22  doesn't remember, that Chad wanted the six days to
23  start out with so he could go to the doctor and get a
24  report, and that he would use three of vacation and
25  three of unpaid leave; right?
```

27 (Pages 102 - 105)

1  A  I know that that conversation took place. I
2  can't vet the number of days. I do not remember.
3  Q  Okay. But she was authorized to agree to
4  grant that?
5  A  She -- yes. Yes.
6  Q  Okay.
7  A  She's within her role and authority to do
8  that.
9  Q  Why does OQ say it fired him during the
10 middle of that six days of approved leave so he could
11 go to the doctor?
12 A  From our perspective, we didn't have any
13 kind of information on when he would be able to return
14 to work. It's a critical position within the
15 organization. We needed qualified, competent staff to
16 run both the inside and outside jobs.
17     And every time that Chad was out on -- on
18 leave, due to short staffing within the unit, we were
19 incurring overtime, which was also taxing on the
20 existing population who already had the previous year,
21 and into that year, quite a bit of overtime.
22 Q  Is that OQ's best answer to the question of
23 why it felt the need to fire him during the middle of
24 the six days of approved leave that he was granted to
25 go see the doctor and gather documentation for OQ?

Page 106

1  A  I mean, from our standpoint, we evaluated.
2  There was no light duty available. The special
3  assignment was in light duty, and it was open ended on
4  when he'd be able to return.
5     MR. GRIFFIN: Let me object to
6  non-responsiveness.
7  BY MR. GRIFFIN:
8  Q  Was your answer before that one OQ's best
9  answer to why it felt the need to fire him during the
10 middle of the six days of approved leave that he had
11 been granted?
12     MS. COLON-POL: Objection. Asked and
13 answered.
14 A  Due to business needs, yes, we terminated
15 him.
16 Q  Right. But was that the best answer to that
17 question?
18 A  Yes.
19 Q  Is there anything else you'd like to add?
20 A  As I responded, yes.
21 Q  Okay. All right. Now, isn't it true that
22 Windy -- well, let me ask it this way.
23     Windy was overruled; right? Other people
24 higher than her in the organization decided they were
25 going to fire Chad; right?

Page 107

1  A  We had a large group of people at various
2  levels of the organization that came together and made
3  the decision to move forward with termination.
4  Q  And speaking of Windy, let me ask you this.
5  Did she share with you that she'd had a conversation
6  with Chad about the large bonus he had just received
7  and that it was fortunate for Chad that he'd received
8  that large bonus so that he could afford to take
9  unpaid leave if he had to?
10 A  That was not communicated to me.
11 Q  Does OQ deny that he was paid a bonus of
12 more than ten; right? More than 10,000 the month
13 before he was fired?
14 A  All employees participate in the profit
15 sharing, so every employee would have received a
16 bonus.
17     MR. GRIFFIN: Let me object to that
18 non-responsiveness.
19 BY MR. GRIFFIN:
20 Q  Does OQ deny that it extended a bonus of
21 more than $10,000 to Chad Hurta in the month before he
22 was fired?
23 A  I don't know the valuation of this bonus,
24 but I know he was extended one.
25 Q  Okay. Did Windy report back that Chad

Page 108

1  wanted the week of leave in order to go visit with the
2  doctor to report back to OQ on his future prognosis?
3     THE WITNESS: I don't -- we -- we had
4  that discussion whenever we had Dave present when we
5  were discussing. Am I required to answer this?
6  BY MR. GRIFFIN:
7  Q  I'm not talking about what you said to Dave
8  or what Dave said to you, but I'm talking about
9  factually what happened. I want to make sure that the
10 jury understands that Windy shared that fact with you
11 at or about the time that Chad was fresh out of the
12 hospital.
13 A  Windy shared the fact and told him she had
14 talked to me. I know that her and I had a
15 conversation, and this was, again, discussed whenever
16 we had the multiple levels of leadership, legal, and
17 HR come together.
18 Q  Okay. Well, we're going to talk about that
19 decision-making in a moment.
20 A  Okay.
21 Q  But if I understood what you had said before
22 that you theorized that Chad didn't want to use his
23 vacation leave, so therefore, since he didn't use his
24 vacation leave and he was out of FMLA leave, he was
25 out of luck and would be fired; right?

Page 109

28 (Pages 106 - 109)

1   A   I don't agree with your statement. I didn't
2   theorize. I said, as I remember from conversations
3   with Windy, he didn't want to take his vacation
4   because he wanted to save it.
5   Q   Right. And you had shared with us candidly
6   before the break if he taken his vacation leave, this
7   wouldn't be an issue; right?
8   A   He could --
9   Q   Because he was entitled to take his vacation
10  leave?
11  A   He could have used his vacation. That's a
12  true statement.
13  Q   All right. Okay. But when he took his
14  vacation days, for the six days -- well, he was fired
15  while he was on vacation leave, accrued vacation
16  leave. You guys fired him when he was out on approved
17  leave; correct?
18        MS. COLON-POL: Objection to form.
19  A   I -- I'm not clear if he took unpaid leave
20  or if he took vacation during those time periods, but
21  yes, we did term him in -- four days after we were
22  made aware.
23  Q   Okay. Now, we've looked at the texts and
24  all that.
25  A   Okay.
                                    Page 110

1   Q   But OQ knows the reason why he wasn't at
2   work on the day he was fired was because of GBS,
3   Guillain-Barre syndrome; right?
4   A   We knew that he was out, yes, and that he
5   had not been medically released to return.
6   Q   Okay. It wasn't his back in this occasion;
7   was it?
8   A   No.
9   Q   Okay. So that the jury understands, from
10  OQ, when it fired Chad, he had Guillain-Barre
11  syndrome; correct?
12  A   Yes. He had -- he had shared that
13  diagnosis.
14  Q   And had been hospitalized?
15  A   Yes.
16  Q   And was in treatment?
17  A   That's an assumption. Yes. I assume that
18  he'd be treated. Yes.
19  Q   Well, it's not an assumption because we've
20  seen the medical records.
21  A   I hear what you're communicating. As the
22  corporate rep, yes, medical knew that he was being
23  treated.
24  Q   Okay. And OQ admits that Chad had a
25  disability, GBS; correct?
                                    Page 111

1         MS. COLON-POL: Objection to form.
2   A   Yes.
3   Q   Okay. Let me check off some of these. I
4   think we've established that OQ admits that Chad had
5   informed OQ about his GBS while he was still in the
6   hospital?
7   A   Yes.
8   Q   And it was because of that that Chad asked
9   for light-duty accommodation; yes?
10  A   Yes. He had discussed options.
11  Q   Yeah. Light duty accommodation, one. Going
12  back to the special assignment, number two; right?
13  A   The order -- I remember the first one being
14  the special assignment, but yes, I won't contest that
15  there was discussions about both.
16  Q   And then third, the issue of protected
17  leave, either unpaid leave or vacation leave?
18  A   Yes. With Windy.
19  Q   And for OQ, all those names or all those
20  types of leave, unpaid leave, FMLA leave, vacation
21  leave, they're all varieties of protected leave; are
22  they not?
23  A   They're all benefit, yes, that's extended to
24  employees.
25  Q   Okay. Where are the board records? I'm
                                    Page 112

1   talking about the control board. Where are the
2   records for who's working the control board out there,
3   for example, 2020 to 2023?
4   A   So it's captured in a couple of places, but
5   I would say the shift relief log, specifically the
6   workgroup lead log, tells you who's working what
7   position. We also have a scheduling and distribution
8   where it highlights, you know, who's qualified and
9   working, and then they rotate. The supervisor has
10  those records.
11  Q   Okay. If I asked you this, I apologize. OQ
12  agrees that his disability, GBS, was the reason Chad
13  asked for all three types of accommodations?
14  A   As I understand, yes.
15  Q   Okay. And to two of them -- I'm talking
16  about the light duty working the board accommodation
17  and the special assignment -- OQ agrees that OQ told
18  him, "No, we're not doing either one of those for
19  you"?
20  A   That's very specific. Yes, we made an
21  assessment about those options. And yes, also we
22  decided that we were -- we're not going to move
23  forward with either one and couldn't.
24  Q   Okay. Let's talk about light-duty
25  accommodations. OQ says that they have not allowed
                                    Page 113

1  any light-duty accommodations for operators since
2  2018?
3      A   I wouldn't say "not allowed". We -- I don't
4  have any records of any requests for accommodations
5  nor any formal approvals for accommodations. The
6  last --
7      Q   Is that -- oh, excuse me. You go ahead.
8  I'm sorry.
9      A   The last records that I have are mid to late
10 2018.
11     Q   Has there been any change of official policy
12 at OQ as it relates to when operators will be able to
13 work the control board, when they're having any
14 physical issues, whether it be pregnancy, heart
15 problems, knee problems, back problems, or other
16 physical issues?
17     A   So that's an HR governed policy. I'm not an
18 HR generalist. I became, again, responsible for
19 personnel in 2018 time frame. To my knowledge, those
20 policies have not been altered in terms of operations
21 and our processes and how we review them, no.
22     Q   Okay. But as OQ's designee on this topic of
23 light duty policies, you can confirm that there are no
24 changes in policies as it relates to when operators
25 will be able to work the control board?

Page 114

1      A   I can validate that there's an assessment
2  done based on those restrictions, and then we evaluate
3  what those are against the essential functions and if
4  we can or can't grant them.
5          MR. GRIFFIN: Let me object to
6  non-responsiveness.
7          Do you mind reading that question back?
8          THE REPORTER: Sure. Just one second.
9          (The reporter read the record as
10         requested.)
11 BY MR. GRIFFIN:
12     Q   So having heard the question about whether
13 there's been any change in official policy, can you
14 please answer that question?
15     A   The HR policy has not been changed.
16     Q   Okay. Does OQ have any explanation for why
17 it has produced documents to us that say that the
18 policy about light duty for operators on the control
19 board was changed in 2018?
20     A   There's no record of any employees who have
21 either requested -- don't have a request for
22 accommodations since 2018 in either operational area.
23 So whenever we went digging through records from
24 medical and HR, we weren't able to find any instances
25 where there's been a request from an employee.

Page 115

1          MR. GRIFFIN: Let me object as
2  non-responsive.
3  BY MR. GRIFFIN:
4      Q   My question was, do you know why OQ says
5  there was a change in policy?
6      A   I can speculate based on some of the records
7  that I found.
8      Q   I just need to know what OQ says about why
9  it once stated that there was a change in OQ's
10 policies as it relates to when workers with physical
11 issues were allowed to work the control board when
12 they needed to?
13     A   So there's not been a change in policy.
14 Now, in terms of the assessment -- so, we went over it
15 earlier about the distance of the control room. They
16 still have to climb flights of stairs. Even when
17 they're working the board, there's a possibility that
18 an incident could occur. This would require them to
19 evacuate the control room. And any kind of physical
20 impairment could potentially create a secondary safety
21 incident or even a rescue operation.
22         MR. GRIFFIN: Let me object to the
23 non-responsive portion of the answer.
24 BY MR. GRIFFIN:
25     Q   Let's talk about -- OQ knows now that

Page 116

1  several operators with physical issues have been
2  allowed to work light duty when their physical issues
3  causes them to be able to be limited in some issue
4  with the full array of job functions that an operator
5  has; right? OQ knows this?
6      A   There's records of -- yes. In 2018 and
7  previously that that had occurred, that's true.
8      Q   And later, between 2018 and when the date
9  Chad was fired, too; right?
10     A   Chad had worked the board in December, yes.
11     Q   Okay. What other operators does OQ say
12 worked the board when they had physical issues working
13 outside?
14     A   I do not have a record of any formal request
15 or grants for accommodations.
16     Q   Okay. Don't have any information on that?
17     A   I didn't become responsible for the
18 operators until 2019, and I never had a -- something
19 come my way to review or approve. And Sean -- excuse
20 me -- medical and HR were also unable to produce or
21 find records prior to this 2018 and in this isolated
22 December.
23     Q   In any of the occasions, forget how many
24 over the years, Chad or any other operator who worked
25 the board in lieu of working outside, does OQ have any

Page 117

30 (Pages 114 - 117)

## Page 118

```
 1   documents showing any problems presented when those
 2   operators worked the board as opposed to working?
 3       A   Yes.
 4           THE REPORTER:  I'm sorry, did you
 5   answer his question?
 6           THE WITNESS:  I interrupted him, and I
 7   said yes.  That was my bad.
 8           THE REPORTER:  Okay.
 9   BY MR. GRIFFIN:
10       Q   Let me go back to start that question again.
11           Is there any documentation of any problems
12   created at the plant because a worker had been
13   accommodated with light-duty work on the board?
14       A   Yes.
15       Q   And where would we see those?
16       A   There was records that was produced to
17   Yanice and her team.  An operator had been previously
18   granted light duty, and then he was subsequently
19   removed off of light duty and went back out on
20   STD/FMLA coverage because he had cognitive issues
21   being able to focus and work the board, which created
22   a safety incident.
23       Q   Okay.  So in other words, an operator was
24   granted an accommodation?
25       A   This is true.
```

## Page 119

```
 1       Q   But was unable to even work the board
 2   appropriately?
 3       A   He was put on light duty.  He started, and
 4   then a secondary assessment engagement with the
 5   employee not able to perform the essential functions.
 6   And then he was removed.  Put back on STD/LTD until he
 7   was fully able to return to work.
 8       Q   And what's the name of that worker?
 9       A   It's Chris Thiemer or Chris Vasek.  But it's
10   been produced, the record.
11       Q   Okay.  I'm just trying to make sure I'm
12   linking up the right person.  Is Chris Vasek still an
13   operator at the plant?
14       A   He is.
15       Q   Okay.
16       A   And so is Chris Thiemer.
17       Q   Okay.  Good.  Thank you.
18       A   I just don't remember which Chris it is, but
19   it's one of the Chris-es.
20       Q   No, thank you for that.  I appreciate that.
21   Are there any records of any individual assessment of
22   Chad's request to work the board as he recovered from
23   GBS?
24       A   Please repeat it.
25       Q   Yes.  Is there any documentation of any kind
```

## Page 120

```
 1   of individualized assessment of the pros and cons of
 2   allowing him to work the board as he regained his
 3   strength for climbing, extensive climbing, and heavy
 4   lifting -- of that request?
 5           In other words, is there anywhere we can see
 6   documentation of a discussion of what would be good
 7   about that?  What would be bad about that?  What
 8   information do we need about how well he can do the
 9   board job?  If we're concerned he can't do that job as
10   well?  Is there any documentation of any kind of
11   decision-making like that on the part of OQ?
12       A   So we had a couple of meetings where we
13   discussed this, and then there is an e-mail trail
14   where we go around about light duty for the process
15   operator position, and then the -- the outcome of
16   that.  There's not --
17       Q   Do you think there's an e-mail string about
18   that in March of 2022?
19       A   It's not the discussion topics that you're
20   looking for 'cause we have met several times to just
21   talk about this.
22           MR. GRIFFIN:  Okay.  Let me object to
23   non-responsive.
24   BY MR. GRIFFIN:
25       Q   I'm just trying to make sure that the jury
```

## Page 121

```
 1   can see nowhere to find all documentation of that
 2   subject of an individualized assessment of whether it
 3   would have been appropriate or not for OQ to authorize
 4   him to work the board as he recovered from GBS?
 5       A   There is no -- no.  The answer's no.
 6       Q   Okay.
 7       A   Nothing documented.  Nothing to produce.
 8       Q   Okay.  Okay.  And we agree that he was fired
 9   even before restrictions could be written by the
10   doctors; correct?
11       A   Yes.  We terminated him with no information
12   on when and if he would be able to return to work.
13       Q   Okay.  Now, let me ask this at this point.
14   What does OQ say an accommodation is?
15       A   You're delving into HR's realm.  So my
16   perception/interpretation in how we implement in
17   operations is medical receives this employee has these
18   restrictions through, you know, this date, or, you
19   know, just these restrictions against the essential
20   functions of that position, are you able to
21   accommodate?
22           So if it's a process operator, which is
23   where we're at, we review, you know, what are they
24   actually responsible for and can we enable this with
25   these restrictions?  Yes or no.  That process involves
```

1  our legal, HR, and the management team of the owning
2  department.
3      Q   I'm not fussing at you, but --
4          MR. GRIFFIN: Let me object to
5  responsiveness.
6  BY MR. GRIFFIN:
7      Q   I'm just asking you for OQ's definition of
8  what an accommodation is, not how it works in real
9  life or how it's effectuated, but what is an
10  accommodation?
11     A   I apologize. I view that as a response to
12  that.
13         So essentially, "I can't lift this for the
14  next whatever amount of time. If that's known, am I
15  able to still work?" "Okay. Well, that's not really
16  an essential. We have an alternative or somebody else
17  who can -- who couldn't do that." Rough example.
18     Q   Maybe try a third time, and if it's all OQ
19  can offer me, I'll accept it. But what is OQ's
20  definition of the term accommodation?
21     A   An accommodation is evaluation against the
22  job function, and if we need to either re-task the job
23  function to somebody else or is there certain portions
24  of their job that can do that are acceptable, we make
25  that. And in some cases, you have to buy additional
                                              Page 122

1  successful on the job?
2      A   That's true.
3      Q   Okay. And I'm not asking you whether it was
4  right, wrong, or indifferent to refuse him those
5  accommodations. But the accommodations that he
6  requested, the light duty board job, the approved
7  leave, and the return to the administrative job --
8  what's the right word for it?
9      A   It was a special assignment.
10     Q   Special assignment. Thank you for that.
11  All three of those -- not arguing whether you should
12  or shouldn't have granted them or denied them, but all
13  three of those are types of accommodations that ought
14  to be considered fairly?
15     A   That's true. There are types of
16  accommodations.
17     Q   An OQ knows there's supposed to be a good
18  faith interactive process to talk about accommodations
19  that would work for the worker and for the employer?
20         MS. COLON-POL: Objection to form.
21  BY MR. GRIFFIN:
22     Q   Correct?
23     A   That's true. We're aware.
24     Q   Okay. The accommodations, those three types
25  of accommodations, one of them, that is the request to
                                              Page 124

1  equipment or -- to accommodate the employee to enable
2  them to do their function.
3      Q   Okay. What does OQ say accommodations are
4  supposed to do? What's the purpose of an
5  accommodation?
6      A   Enable an employee to return to work.
7      Q   Okay. And OQ understands that there are
8  lots of different types of accommodations; correct?
9      A   Yes.
10     Q   Leave is one accommodation; right?
11     A   Yes. Leave is --
12     Q   Light duty work?
13     A   Yes.
14     Q   Okay. You mentioned some --
15     A   Alternative position.
16         I'm sorry I cut you off.
17     Q   No. No problem.
18         Sometimes, people need different equipment.
19  Hearing assistive devices? Anything like that; right?
20     A   Sure.
21     Q   Those are all types of accommodations people
22  could need?
23     A   Correct.
24     Q   Okay. And we agree that accommodations are
25  designed to facilitate a worker being able to be
                                              Page 123

1  work the border light duty, that's the only one of
2  the -- well, let me ask it in this way.
3         Did Windy share with you that Chad would
4  rather be at work than at home on leave? That he
5  wanted to go back to work light duty on the board as
6  his first choice? As between leave and work, he
7  wanted to actually be at the plant working; didn't he?
8      A   Windy, if she shared that with me, I do not
9  recollect that -- that conversation. No.
10     Q   Does OQ agree that's what he wanted? He
11  wanted to work, not be at home on leave.
12     A   I can't validate that.
13     Q   Okay. But can't dispute it either?
14     A   I have no way to know what the conversation
15  between Windy and Chad was. I can't validate that.
16     Q   Right. But we agreed -- Windy, you said you
17  can't comment on that. But Windy could; right?
18     A   Windy could absolutely tell you about the
19  conversation she's had with Chad.
20     Q   And so far as you know, she's a trustworthy
21  person?
22     A   Yes, I trust Windy.
23     Q   All right. Why wasn't there a dialogue
24  between OQ on the one hand and Chad on the other about
25  the pros and cons of him working light duty?
                                              Page 125

32 (Pages 122 - 125)

1        MS. COLON-POL: Objection to form.
2     A   We made our assessment, and then we had
3  informed him that these weren't viable options for him
4  to pursue, and then Windy had offered him his unpaid
5  leave or accrual. I can't answer everything that
6  Windy and Chad did or didn't talk about. I --
7     Q   But you can answer the decision-making on
8  termination; right? Let's talk about -- you said that
9  this was -- several members of management were
10 involved in this process of firing him on the 14th of
11 March. Where did the buck stop on the firing?
12    A   You didn't let me finish my first statement,
13 the first question. I'd like to go back and answer
14 that.
15       I can answer that Chad and I had a
16 conversation about the special assignment that
17 occurred on the 10th. Him and I did talk about that
18 and reasons why that wasn't a viable option for us to
19 be able to engage it.
20       To your second question, where did the buck
21 stop: we had legal, human resources, we had the
22 supervisor, lead, ops manager, director, and VP
23 participate in the decision.
24    Q   I want to go back to something you alluded
25 to about your conversation.
                                          Page 126

1        MR. GRIFFIN: You're -- sorry. Let me
2  object as non-responsive.
3  BY MR. GRIFFIN:
4     Q   Either you remember discussing this with
5  Chad, or you don't?
6     A   I remember talking about the special
7  assignment 'cause he -- he had asked about it, and due
8  to business needs, we weren't able to reinstate that,
9  and he knew that.
10       MR. GRIFFIN: And let me object to the
11 non-responsive portion of the answer.
12 BY MR. GRIFFIN:
13    Q   But I thought you said that you didn't
14 recollect whether you also reiterated to him that --
15 or not reiterated -- that you shared with him that the
16 company was not going to allow him to work light duty?
17    A   I don't remember if we talked about that. I
18 know; apparently, he says that Windy or myself did
19 that. It's possible it was me too. Truly don't
20 remember.
21    Q   But had that been said, that was, in fact,
22 OQ's position that it would not allow him to work
23 light duty?
24    A   We didn't have light duty available, yes,
25 for the process operator position.
                                          Page 128

1     A   Sure.
2     Q   You mentioned that you talked about the
3  administrative assignment. And I understand, and I
4  think maybe both of you align that you told him that
5  was not going to happen; right?
6     A   That's true.
7     Q   Okay. But do you deny that you talked with
8  him also about the issue of light-duty work?
9     A   I do not recall talking about light duty
10 with Chad. It's possible that we did. I do not
11 recall it.
12    Q   But if you had told him the company is not
13 going to approve you working any light duty, that
14 would have been true; correct? Management had decided
15 that?
16    A   On the 10th, I don't think that -- that
17 decision had been made because on -- on the 14th is
18 the day that we actually terminated him. Somewhere in
19 between there, yes, the -- the conversations are
20 taking place.
21    Q   Right. But had you informed him they're not
22 going to let you work light duty?
23    A   I don't think I can answer that. You're
24 asking me to remember conversation from a year ago. I
25 don't --
                                          Page 127

1     Q   Well, when you say light duty available,
2  there always has to be an operator on the board;
3  right?
4     A   That's true.
5     Q   Okay. So 24/7, every day the plant's
6  running, except on a shutdown, they got to have an
7  operator in the chair; right?
8     A   There's still operators on shutdown. Yes.
9     Q   Okay. And so when you say not available, OQ
10 admits that operators, the operators who are working
11 outside in his area, they are competent to work the
12 board; right?
13    A   Yes. They have to rotate inside/outside.
14    Q   Okay. So I just want to make sure the jury
15 understands. OQ had determined sometime between March
16 7th and March 14th that it was not going to allow him
17 to work light duty; right?
18    A   That's true.
19    Q   Okay. At any point in any conversations
20 between OQ people on the one hand and Chad on the
21 other, did OQ recommend any alternative or suggested
22 accommodations that would protect him?
23    A   Outside of what Windy with the vacation and
24 the accrual, there was no other alternative positions
25 for him to go to. We didn't have anything open.
                                          Page 129

33 (Pages 126 - 129)

1    Q   So the answer is no; right?
2    A   We didn't have anything available. That's
3  true. No.
4         MR. GRIFFIN:  Let me object to
5  non-responsive.
6  BY MR. GRIFFIN:
7    Q   I'm not talking about what's available. I'm
8  talking about what was suggested. Alternatives?
9  Other ways of solving the problem other than firing
10 him? What other alternatives did you guys explore,
11 anybody on OQ side on the one hand and Chad on the
12 other, about potential accommodations?
13   A   We evaluated the accommodations that we
14 normally implement for this position.
15   Q   I understand you evaluated everything he
16 asked you. I'm now asking you what suggestion did OQ
17 give to him to address the issue?
18   A   We hadn't received any formal requests for
19 accommodations. We didn't know what restrictions he
20 had. There was nothing for us to review or to even
21 consider in terms of alternatives outside of the
22 normals.
23   Q   Well, perhaps you misspoke about the
24 accommodations. We've been talking for two hours
25 about the accommodations he asked for and the
                                        Page 130

1  accommodations you guys denied; right?
2    A   When I'm talking about on -- on my side,
3  typically, we get the "Here's the formal restrictions
4  from the doctor. Here's what they are." And I
5  understand that we received from medical a certain
6  list, but we didn't have anything that came up through
7  HR in the normal process for us to review.
8    Q   Right. And that's because he was fired
9  seven days after diagnosis; right?
10   A   He was terminated. Yes. Seven days.
11   Q   Okay. So it's true to say that OQ offered
12 no suggested accommodations of its own to Chad?
13   A   Not outside of what we've talked about, no.
14   Q   Well, we haven't talked about any of those,
15 have we?
16   A   There was no additional --
17   Q   I'm not trying to argue, but I'm just trying
18 to make sure. He has accommodations he asked for.
19 They're denied. I get that. And I just want to make
20 sure the jury understands that OQ did not offer any
21 suggestions of its own?
22   A   That's true. We did not propose any
23 alternatives to Chad.
24   Q   Okay. Now, there are a number of records --
25        MS. COLON-POL:  Counsel, excuse me.
                                        Page 131

1  How much longer do you have?
2         MR. GRIFFIN:  I think it's a good time
3  for lunch.
4         MS. COLON-POL:  Okay.
5         MR. GRIFFIN:  I think it's a great time
6  for lunch, and we can go off the record and talk about
7  where to go and when to come back if that works --
8         THE VIDEOGRAPHER:  This is now the end
9  of video two of Kristina Zalman. We're off the
10 record. The time is approximately 1:02.
11        (Off the record.)
12        THE VIDEOGRAPHER:  We're now back on
13 the record. Video three of Kristina Zalman. The time
14 is approximately 1:51.
15 BY MR. GRIFFIN:
16   Q   And, Ms. Zalman, were you able to get any
17 kind of idea of the FMLA accrual after January 2022
18 for Chad?
19   A   I have not received the records from Sean
20 yet.
21   Q   No problem. Well, then, let's go through
22 those who were involved in OQ's decision to terminate
23 him on March the 14th and what role they played. And
24 I believe that -- or let me add -- if I already asked
25 you this, I apologize. Who was the decision maker?
                                        Page 132

1  The final decision maker?
2    A   I mean, it was a group consensus to move
3  forward with the termination.
4    Q   Well, that's not true because we know that
5  the HR person, Windy Morgan, opposed it?
6    A   But when you asked me the question, I'm
7  thinking in terms of operations leadership. So it
8  all --
9    Q   -- to my question. My question were names
10 of people involved and who was the decision maker?
11 Who had the final say?
12   A   Fred Gaytan is ultimately responsible for
13 everything that happens.
14   Q   Okay. So he participated?
15   A   Yes.
16   Q   Okay. Who were other people who
17 participated?
18   A   Sure. So in that discussion, we had legal
19 presence, myself, Kevin Hunt, who's the -- who was the
20 director at the time, Mitch, and Jeremiah.
21   Q   Let's go through them one at a time. You
22 mentioned Fred, you, you said legal, but I don't think
23 you associated a name with that?
24   A   Dave was on the call.
25   Q   This would be the now-fired Dave Davis?
                                        Page 133

34 (Pages 130 - 133)

1     A    That would be the -- yes, he was in the
2    counsel at the time.
3     Q    Okay. Who else did you mention beside those
4    three or four folks?
5     A    We had operations leadership. The people I
6    named. Dave Davis. And then Windy was in the room.
7     Q    Okay. So let me count them. The lawyer;
8    right?
9     A    Yes.
10     Q    Fred?
11     A    Yes.
12     Q    You?
13     A    Yes.
14     Q    Windy?
15     A    Yes.
16     Q    Did I miss anybody?
17     A    Who participated in the decision-making?
18     Q    Yes.
19     A    Yes. Kevin Hunt.
20     Q    Kevin Hunt. He was in the room?
21     A    He was part of the decision-making process.
22     Q    Okay.
23     A    Mitch Abshier.
24     Q    Mitch Abshier. Okay. Six.
25     A    And Jeremiah Tipps.

Page 134

1     Q    Jeremiah Tipps. Seven. Okay. So is that
2    decision making document anywhere?
3     A    Yes.
4     Q    Where?
5     A    In the e-mail communications.
6     Q    And are those the e-mail communications that
7    have been withheld due to privilege?
8     A    Dave would have been on those
9    communications. I can't answer all of them.
10     Q    Does OQ say that any of the decision-making
11    process from that group of people has been
12    communicated to us?
13     A    I don't know if they've been produced. I
14    believe that I've previously produced those. I
15    believe that I previously produced those documents
16    about the approvals from these e-mail communications.
17     Q    When you say "approvals," what's that mean?
18     A    Essentially, like Jeremiah and Mitch,
19    there's an e-mail from Mitch saying that they are in
20    line and recommend to move forward with termination.
21    And then there's a communication supporting that, and
22    then there's subsequent meetings. So you asked about
23    the decision-making process and who was involved in
24    the terminations.
25     Q    Well, I'll represent to you that I did see

Page 135

1    some e-mails in January when there was a thought that
2    he might be terminated when he was unable to work due
3    to the restrictions and he'd run out of FMLA?
4     A    Yes. Thank you for that. So we had the
5    discussion then, and then we realigned again prior to
6    the termination in March.
7     Q    Well, that's what I'm getting at. I see
8    what transpired in January because I've seen it, but
9    there are no such e-mails or any kind of documentation
10    about any decision-making process in March?
11     A    Yeah, we came back together, and I know that
12    we met in Fred's office, and we had legal on -- on the
13    phone call.
14     Q    Why do we not have any documentation of that
15    decision-making process?
16          MS. COLON-POL:  Objection to form.
17     A    We didn't -- we didn't document it.
18     Q    Okay. Why was it documented in January when
19    you thought about firing him? I mean, not thought
20    about, shouldn't say -- when it was considered to
21    terminate him due to his back problems and his
22    inability to have any more FMLA. Why is that whole
23    process documented in a quarter-inch-thick set of
24    documents and none for the decision-making process in
25    March of 2022?

Page 136

1     A    I can't answer why it wasn't documented. I
2    know that we had verbal discussions on it, and we
3    don't document every meeting that we have.
4     Q    Right. But why document it in January when
5    you didn't fire him? Why document it for that process
6    when you didn't fire and fail to document the process
7    when you did fire?
8          MS. COLON-POL:  Objection to form.
9     A    So there were some communications where I
10    get about the FMLA had been exhausted. And then, I
11    reached out to guidance from HR in January about what
12    has done -- what has been done previously to get some
13    guidance on the path forward.
14     Q    Okay -- sorry.
15     A    And then nothing had really changed between
16    January and March.
17          MR. GRIFFIN:  Let me object to
18    non-responsiveness.
19    BY MR. GRIFFIN:
20     Q    My question was, why do we see a
21    documentation of the decision making not to fire him
22    in January, but no documentation of the
23    decision-making process that OQ had amongst its six
24    folks in March of 2022?
25     A    I can't answer if Dave documented the

Page 137

35 (Pages 134 - 137)

**Page 138**

1  meeting minutes or not.
2      Q    Okay.
3      A    And/or if Windy has those records. I
4  personally did not take any meeting minutes, nor did I
5  send out any communications on the outcome of that
6  meeting.
7      Q    Okay. So what we have to go on about that
8  meeting is your recollection about it; right?
9      A    That's true.
10     Q    Okay. And you recollect that Windy was
11  opposed?
12     A    Not from that meeting. Her original
13  opposition was back in January 'cause she puts it in
14  writing.
15     Q    Is your argument that she withdrew her
16  opposition at some point?
17     A    I can't and won't speak for Windy. And I
18  don't recall her having strong either one way or the
19  other. I know the outcome of the meeting was we all
20  agreed to move forward.
21     Q    But I didn't ask you anything about strong
22  feelings. My --
23     A    You asked me for perception of Windy's --
24     Q    No, ma'am. I didn't ask you a perception.
25  I asked you if Windy had withdrawn her opposition to

**Page 139**

1  y'all firing him. Did she ever withdraw her
2  objections to OQ firing this gentleman?
3      A    From my standpoint, I honestly don't
4  remember Windy's feedback during that meeting, and I
5  would be speculating.
6      Q    Okay. So the jury will be left for the six
7  people who are involves own memory of what occurred
8  during that meeting since there's no documentation of
9  it; right?
10     A    We have no records. That's true.
11     Q    Okay. All right. Now, as I understand it,
12  the January flurry of activity about FMLA that at the
13  end of the day, he ran out of his FMLA leave. But
14  then, after OQ shared with him that he needed a
15  release to go to work full duty, he was given an
16  opportunity to and did present OQ with a release to
17  full duty; correct?
18     A    He -- yes, came back with a full release to
19  come back to work.
20     Q    And he did come back to work?
21     A    That's true.
22     Q    Okay. All right. So the issues that were
23  in January about firing him because of his
24  restrictions was made ended up moot because he ended
25  up presenting you a release that said he could work

**Page 140**

1  without restrictions?
2      A    He had returned to work. That's true.
3      Q    Okay. All right. And I think you answered
4  this this morning. He was not fired for anything that
5  happened in January 2022; was he?
6      A    No.
7      Q    Okay. And in January 2022, when he'd run
8  out of FMLA, he had accrued vacation leave then;
9  right?
10     A    Some amount, yes.
11     Q    And again in March, when he got hospitalized
12  and diagnosed on March the 7th 2022 with GBS, he also
13  had a large bank of vacation leave?
14     A    You say large, I don't know. Yes, he had
15  some level of vacation. I knew that.
16     Q    Right. And I can't remember if I asked you.
17  I thought I did, but maybe I didn't. OQ understands
18  that Chad was on vacation leave at the time he was
19  diagnosed with his GBS?
20     A    Without looking at the records, I'm not sure
21  if he was on vacation or on this unpaid leave that
22  Windy had extended. I can't answer that. But yes, he
23  was on some level of leave.
24          MR. GRIFFIN: Let me object to the
25  non-responsiveness.

**Page 141**

1  BY MR. GRIFFIN:
2      Q    I don't think you really meant that because
3  Windy had not approved him for --
4      A    Are you saying on the 6th or the 7th?
5      Q    Yes.
6      A    Understand.
7      Q    Yes. In other words, I thought I'd asked
8  you this, but forgive me if I ask it again. He was
9  actually on vacation leave at the time he was
10  diagnosed with GBS?
11     A    You had told me that, yes.
12     Q    Yes? Okay. And the OQ doesn't dispute
13  that?
14     A    If that's a fact, no.
15     Q    Okay. All right. But in March, he is fired
16  at a time when he was on approved leave; right?
17     A    Based on what Windy had granted him, yes.
18     Q    Okay. And at a time when he had accrued
19  vacation leave that he could take?
20     A    Yes. He had that option.
21     Q    Okay. And today, it seems like, and tell me
22  if I'm not understanding this right, but that OQ
23  thinks that there was a conversation between Windy and
24  Chad where he said, I don't want to use vacation leave
25  while I'm recovering from GBS?

36 (Pages 138 - 141)

1    A   As I recall, he said he didn't want to use
2  his vacation.  He wanted to save it.  And that wasn't
3  a conversation with me.  That was between him and
4  Windy.
5    Q   But we agree that would be pretty illogical
6  to try to save vacation and get fired?  That wouldn't
7  be very smart, would it, if that happened?
8    A   I can't answer for why the statement was
9  made.
10   Q   All right.  But going back to this issue of
11  the -- Windy granting him the job protected leave and
12  him being fired during that period of leave.  If
13  you've answered this, just tell me so.  Why not just
14  wait until his approved leave is finished before
15  making a decision on termination?  Why do it in the
16  middle of the leave?
17   A   We had made the decision, and we didn't have
18  any kind of insight on when or how long he was going
19  to be out.  And due to all the overtime that was being
20  accrued in the area, we needed to backfill the
21  position.  And due to him exhausting his FMLA, we
22  moved -- moved forward with the termination.
23   Q   Is that the best answer as to why you didn't
24  wait till he sees the doctor during his six days of
25  leave?

Page 142

1    A   It's the same answer I've given you
2  previously.
3    Q   Okay.  All right.  Would there be any harm
4  in waiting to fire him after his leave was over?
5    A   There was --
6        MS. COLON-POL:  Objection to form.
7        THE WITNESS:  There was no
8  communication on when exactly that leave would be over
9  or if it would be extended.
10  BY MR. GRIFFIN:
11   Q   Six days.
12   A   But that's not a release in order to return
13  to work.  And there was no communication on how long
14  we were potentially looking at.
15   Q   Right.  But what's the purpose of firing him
16  when he's going to the doctor during the six days of
17  leave to get the doctor's notes on what he can do and
18  what he can't?  Why not wait for that process to
19  happen before you fire him?
20   A   We did not wait for that process to finish
21  before we moved forward.
22   Q   All right.  Has OQ ever fired any other
23  worker while they are on approved medical or vacation
24  leave?
25   A   I had requested guidance from human

Page 143

1  resources on what we've done in a similar situation
2  where an employee has exhausted FML leave -- FMLA
3  leave, and I was informed that we have terminated in
4  the past.
5        MR. GRIFFIN:  Okay.  Let me object to
6  non-responsive.
7  BY MR. GRIFFIN:
8    Q   I'm not talking about FMLA.  I'm asking
9  about has there ever been a situation that OQ can tell
10  the jury about where they've ever fired another worker
11  after they have already been granted an accommodation
12  of medical or vacation leave?
13       MS. COLON-POL:  Objection to form.
14   A   I understand your question now, and I can't
15  answer that.  I'm not human resources.  My experience
16  in management, I have not been exposed to a similar
17  occurrence.
18   Q   But I'm asking you, as OQ, as the designee
19  of the company, if there's any other worker that has
20  been fired while they are in the middle of leave as an
21  accommodation?  I want to know about it.  The jury
22  wants to know about it.
23   A   I understand that.  I can't -- I'm not human
24  resources.  I cannot answer that question.
25   Q   OQ cannot answer that question today?

Page 144

1    A   Human -- I'm not human resources.  I cannot
2  answer that question.
3    Q   Well, let me just ask you a few general
4  questions.  Did OQ hold it against Chad that he had
5  fully utilized all of his FMLA leave because of his
6  back problems?
7    A   No.  Not at all.
8    Q   Okay.  There was no retaliation against him
9  for using all that leave; right?
10   A   No.
11   Q   Okay.  And in January, while he was out and
12  when his FMLA was running out, y'all told him he
13  needed to get a doctor's release to let him go back to
14  work; right?
15   A   Yes.  He exhausted -- exhausted his FMLA,
16  and, yes, we needed a doctor's note for him to return
17  to work.
18   Q   And the doctor --
19   A   If he was able to produce one.
20   Q   And the doctor signed one, and he brought it
21  to you?
22   A   He brought one.  Yes.  Back.
23   Q   Okay.  Why was he not given that opportunity
24  in March, when he was days out of the hospital, to get
25  the doctor's note to bring it to you guys so he could

Page 145

37 (Pages 142 - 145)

1  go back to work?
2       MS. COLON-POL:  Objection.  Asked and
3  answered.  She's answered the same question, like,
4  five times already.
5       MR. GRIFFIN:  Object to the sidebar.
6  BY MR. GRIFFIN:
7    Q   You can answer.
8    A   Thank you.
9        As previously stated, we made a decision to
10  move forward for the business reasons I've previously
11  outlined.
12    Q   No, I know they did it, but the timing of
13  it.  The question is: why, if you asked him for the
14  medical report from the doctor over his back in
15  January before acting on termination or not, why did
16  you not ask for that information from Chad about when
17  he could work full duty, when he could work light
18  duty, or what his situation was?  Why didn't you all
19  ask for that before you fired him?
20    A   I mean, after we went through the assessment
21  on the light duty, the no availability for the special
22  assignment 'cause it wasn't an active function, and
23  for the previous business reasons, we chose to move
24  forward with termination.
25    Q   And that's the decision making for which we
                                                    Page 146

1  to perform that job task for them?
2    A   We, of course, have what we call stop work
3  authority.  So if anybody feels that they can't do
4  something safely, for whatever reason, whether it's a
5  physical limitation or they're not able to, we don't
6  encourage them to do that.  We also expect, if you're
7  talking about long term, which is as I'm interpreting
8  it, that they would communicate that up through
9  medical and leadership.
10       MR. GRIFFIN:  Okay.  Let me object to
11  the responsiveness.
12  BY MR. GRIFFIN:
13    Q   I'm just asking about the policies.  Is
14  there anything in the policies that keeps operators
15  from cooperating with each other on the job when one
16  operator is more proficient at climbing or heavy
17  lifting than another?
18    A   They can assist each other as necessary.
19    Q   Okay.  And let's also move that also to the
20  board.  If an operator says to the other operators on
21  shift, my knee is bothering me today, or my hip is
22  bothering me today, or I've been injured in some way
23  that doesn't keep me from being an operator, but it
24  might affect my ability to do heavy lifting or
25  extensive climbing, is there any policy in writing
                                                    Page 148

1  have no documentation; right?
2    A   There's no documented record.
3    Q   Okay.  But we can rule out that OQ held it
4  against Chad, any of his FMLA, or the issues that were
5  presented in January of '22 with respect to his back
6  injury?
7    A   Nobody holds anything against Chad for any
8  previous medical leave.
9    Q   Okay.  Good.  Now, we talked a little bit
10  before about rules or policies.  Is it true that some
11  operators in Chad's area work in pairs outside?
12    A   During turnarounds, yes.  We'll specifically
13  pair them up, or if there's somebody in training,
14  they'll be paired up with a more senior operator.
15    Q   And how do they work, for example, on
16  non-turnarounds?
17    A   There's four staff positions, and they're
18  each assigned to one.  Undoubtedly, if they're
19  qualified in that area, they will assist each other
20  when needed.  Example, on product swaps.
21    Q   Okay.  And is there any written rule
22  anywhere at OQ for operators to swap, for example,
23  some heavy lifting or extensive climbing?  If one
24  operator feels limited in the ability to do that,
25  having another operator they're working with on shift
                                                    Page 147

1  that says that operator cannot switch with one of the
2  other operators who would otherwise work the board and
3  instead would work outside in the place of the
4  operator that would normally be scheduled to work
5  outside?  You follow my question?
6    A   I do.
7    Q   Okay.
8    A   And we don't condone that for -- if they
9  have to rotate through all the inside and outside
10  positions.  They work sets on the same job.  So this
11  would prevent an operator from working, example, one
12  of the inside jobs for an entire month, which has
13  adverse consequences to the organization.
14       MR. GRIFFIN:  Let me object to the
15  responsiveness.
16  BY MR. GRIFFIN:
17    Q   I wasn't asking about anybody condoning
18  anything; okay?  My question is about the policies,
19  the written policies.  Is there anything the jury
20  could see that would share with the jury that it is
21  inappropriate or against the rules for operators to
22  work as a team so that an operator who's normally
23  scheduled to work outside would work on the board when
24  there's a need to do so because of an injury, a
25  disability, or a pregnancy?
                                                    Page 149

38 (Pages 146 - 149)

Page 150

```
 1    A   We don't have an existing operations policy
 2  and existing practice mandates.  That's approved by
 3  leadership.
 4    Q   Right.  And let's assume there was a policy.
 5  There's a rule that says all operators have to rotate
 6  through the outside and the board.  OQ understands
 7  that accommodations are requests to modify those
 8  policies to allow a person with a disability to
 9  continue to work; right?
10    A   We understand that we have to review the
11  accommodations against the essential functions of the
12  job.  Yes, we understand that.
13    Q   Okay.  And the light duty, going back, we've
14  established there's no written rule against operators
15  doing that.  We've established that that's happened.
16  That operators who were scheduled to work outside were
17  allowed to work the board when they had physical
18  issues that were interfering with their ability to do
19  every single task on the job; right?
20    A   Yes, we have records of that.
21    Q   Okay.  All right.  And in the months or
22  the -- excuse me.  Rephrase.
23        When Chad had his back issue, and he was on
24  FMLA leave for his back, he'd asked then to work light
25  duty on the board; right?
```

Page 151

```
 1    A   Yes.  There's a request that came through in
 2  December.
 3    Q   And it was partially denied.  But on the
 4  other hand, for at least on one occasion, he was
 5  allowed to work the board, even though he had a
 6  restriction on heavy lifting and extensive climbing;
 7  right?  That happened?
 8    A   He had come in to work the board one or two
 9  days in December.
10    Q   Right.  And did Windy share with you that
11  she had at first shared with Chad that we don't grant
12  light duty anymore by working the board, but that Chad
13  said that people had called him and wanted him to come
14  in and work the board?  And that she then worked her
15  way up to management, who said, yeah, he can work the
16  board, get him in here, and that that, in fact,
17  happened?
18    A   I recollect that when he contacted me, he
19  asked me if I was aware.  The rest of that I can't --
20  it's speculation.
21    Q   Was there any issue with his performance on
22  the board when he was allowed to work the board, when
23  he had restrictions because of his back?
24    A   The open position was the, I believe, SFA
25  board, and he came, and he worked that board job.  And
```

Page 152

```
 1  no.
 2    Q   Okay.  I'm not following you.
 3        MR. GRIFFIN:  Let me object as
 4  non-responsive.
 5  BY MR. GRIFFIN:
 6    Q   My only question was, was there any issue
 7  with his performance working the board when he was
 8  granted that accommodation for his back injury for one
 9  day?
10    A   No, not that was communicated to me.
11    Q   For example, you've known him, I guess,
12  since '17, so let's not go back any further than that.
13  But for OQ, has he been deficient running the board
14  with his back injury at any point after his back
15  injury?
16    A   I can't answer that.  I didn't assume
17  responsibility for Chad until '19, and I don't have --
18    Q   But I'm just asking what OQ's aware of.  If
19  they're not aware, it's okay.  But is OQ aware of any
20  performance issue when he's working the board after
21  his back surgery?
22    A   I'm not aware of any performance issues that
23  were communicated to me in relation to this case
24  around his back injury.
25    Q   Okay.  All right.  You had mentioned another
```

Page 153

```
 1  operator that was allowed to work the board, but then
 2  once they got on the board, OQ figured out that he's not
 3  able to even work the board; right?
 4    A   True.
 5    Q   And was that Chris Thiemer?
 6    A   I don't remember which Chris.  So if you
 7  recall from my previous statements, it's either
 8  Chris Thiemer or Chris Vasek.  That record has been
 9  produced.
10    Q   Let's see if OQ can confirm that
11  Chris Thiemer actually had an injury to his dominant
12  hand that actually prevented him from operating the
13  plant's machinery from the board?  That he had an
14  injury to the very hand he needs to be an effective
15  process operator on the board; is that true?
16    A   I can't answer that.
17    Q   Okay.  Well, who removed him, and for what
18  purpose?
19    A   Is this in 2018?
20    Q   I don't know when it was.  You had mentioned
21  it.  I'd asked you a question whether any operator who
22  was working the board as an accommodation for a
23  physical injury or pregnancy, was there ever an issue
24  with it?  And you came up with one.  You said one
25  time, we accommodated somebody, we put them on the
```

39 (Pages 150 - 153)

1  board, and then we figured out that they couldn't even
2  do the board work.
3      A    That's a true statement.  So in getting
4  production request accomplished, we were able to find
5  a record of this.  That record doesn't tell me what
6  the personnel's diagnosis or issue is.  That's not
7  communicated from medical to us.
8      Q    Okay.
9      A    But --
10     Q    I just want to go through a few names with
11 you, then, about workers who were accommodated by
12 light duty work, working the board when they had
13 issues with some function of their job, whether it's
14 an essential function or a marginal function, but some
15 function of their job.
16         Chris Vasek, following a knee issue, was he
17 allowed to work the board as an accommodation when he
18 was not able to perform the full array of tasks?
19     A    If that -- I'm not aware of that record
20 if -- unless I pulled it.
21     Q    Okay.  OQ is unaware of that today?
22     A    Everything that I pulled was 2017/'18, and
23 there was nothing past that.  In my experience with
24 Chris Vasek, I don't have any record of him asking for
25 accommodations during my tenure.
                                              Page 154

1      Q    So hear my question.  OQ cannot affirm or
2  not affirm whether Chris Vasek was ever allowed
3  light-duty accommodation by working the board because
4  of physical issues?
5      A    We can certainly dig into his record files.
6  Without having the records that I previously produced,
7  I can't comment on if he was included in that pool of
8  personnel.
9      Q    You can't confirm or deny that today?
10     A    I'm not saying I can't confirm or deny.  I'm
11 telling you that whatever was produced is what -- the
12 records that I was able to find.
13     Q    Well, I'm not talking about records.  I'm
14 talking about you as the designated designee on these
15 other workers who were allowed light duty.  I just
16 need to know OQ's position on whether or not it did
17 accommodate Chris Vasek by allowing him to work the
18 board when he had physical problems?
19     A    I would defer that to HR and medical to find
20 the record.
21     Q    Okay.  Brad Vasek?
22     A    He was one of the ones that we produced, I
23 believe.
24     Q    I'm not asking you what you produced; okay?
25 I'm asking OQ as the company who has designated you,
                                              Page 155

1  and I'm not criticizing you if you and the company
2  don't know, but if the company is not able to answer a
3  question, I want you to tell me that.  Don't guess.
4  But I need to know whether the company can confirm
5  that it allowed Brad Vasek an accommodation to work
6  the board when he had physical issues?
7      A    So I'm not HR, and I'm not medical.  I am
8  aware that we have made accommodations for process
9  operators to work light duty.  I don't have any
10 experience or exposure to these personnel until I take
11 authority around 2018/2019 time frame.  In my records,
12 I don't have anything where I'm asked to review
13 requests for accommodations.
14     Q    I'm going to -- sorry.
15     A    Without deferring to HR or medical, I cannot
16 answer that.
17     Q    Okay.  So I asked OQ about whether -- same
18 question for Rob Geffert [ph].  Same answer?
19     A    Prior to my time.  I'm -- I'm not cognitive
20 or aware.  I defer that to HR and medical.
21     Q    But you understand, as the designee, none of
22 those topics are related to your resume or your
23 progression at all.  They're for the company to
24 address these topics.  And so, I just need to make
25 sure that the company's same answer for the two
                                              Page 156

1  Mr. Vaseks that -- the same answer the company is
2  giving for Mr. Geffert [ph]?
3      A    My answer and response is that we have
4  granted accommodations for process operators.  We have
5  records of them that have been produced.  I'm not HR
6  or medical.  I'm not able to go back in time and give
7  you every employee that's been granted one.
8      Q    Okay.  I'm not asking about everyone.  I'm
9  asking you whether they can confirm or deny that these
10 people have been given light duty on the board when
11 they've had physical issues.  And so, you've given me
12 the answer that they're not able to do that for
13 Mr. Vasek.  Is the company able to do that for
14 Mr. Geffert [ph]?
15     A    HR medical would give you that response.
16     Q    Okay.  Val Chavez; same?
17     A    Same.
18     Q    Jonthen Times?
19     A    Same.
20     Q    Now, I want to ask you a little bit about
21 Mitch Abshier.  Now, Mitch, as I understand it, and
22 you tell me if OQ agrees, that he has had actual
23 open-heart surgery?
24     A    He has.
25     Q    Okay.  And he's also had an injury to his leg
                                              Page 157

40 (Pages 154 - 157)

1  requiring him to be in a boot for some time?
2      A   Vaguely remember that, yes.
3      Q   Okay. And was he ever -- or let me ask you
4  this. What accommodations, if any, were afforded to
5  Mr. Abshier because of his heart surgery and his
6  injury to his foot, requiring him to be in a boot?
7      A   So on his boot, can't answer that. I would
8  defer to HR or medical. On the heart surgery, I was
9  over him. That was during COVID time. He was out for
10  the duration, and he did log on to his computer and
11  work remotely. And we were all home during COVID
12  during that time period.
13      Q   So my question: what accommodations were
14  made to him because of his heart surgery or the injury
15  that required him to wear a boot?
16      A   In preparation for him going into surgery to
17  make sure he didn't contract COVID and wouldn't risk
18  his surgery, we enabled him to work from home
19  full-time for, I believe, seven to ten days. He went
20  through his surgery, and I do not recall any other
21  requests for accommodations on the backside of that.
22  At that point in time, we were working one or two days
23  from -- from the site.
24      Q   Does it refresh your memory that with
25  respect to the boot, he was allowed to use the boot
Page 158

1  on-premises, even though it would conceivably
2  interfere with PPE donning and doffing?
3      A   He wasn't -- my recollection when he had
4  that boot was he was the -- the specialist and that he
5  wasn't a process operator. So his position doesn't
6  require him to respond at the same level as a process
7  operator.
8      Q   Okay. My question is not whether he's an
9  operator. I know he's not an operator. My question
10  was, was he allowed to wear his boot in areas of the
11  plant that otherwise normally would not have been
12  permitted?
13      A   He had his boot in the control room, and as
14  long as he stayed on the walkways and it was
15  closed-toed, he would have been able to do that.
16      Q   With the boot?
17      A   As long as it's closed-toe.
18      Q   But if he wasn't restricted -- well, that's
19  what I'm asking. The medical boot, as I understand
20  it, is not closed-toe. But if I'm wrong, just tell me
21  I'm wrong. But as I understood it, he was allowed to
22  utilize the boot, whereas other workers who didn't
23  have an injury were required to have a closed-toed
24  boot. Is that true or not?
25      A   You have to have a closed toe to go out into
Page 159

1  the plant. I remember him having the boot. I wasn't
2  responsible for him at that time, as -- as memory
3  serves me. And he'd have to have his closed-toe steel
4  toe to go into the process areas to answer your second
5  question.
6      Q   Okay. But does OQ agree that he was
7  accommodated by not requiring him to comply with that
8  rule while he was recovering from his foot?
9      A   I don't know what type of -- he had. He's
10  at work. He has a -- I have no doubt that an
11  accommodation was made.
12      Q   Okay. And same question for John Wilson?
13      A   I am trying to find discovery request. I
14  have no -- myself, HR, and medical were not able to
15  find any records of an accommodation for Wilson.
16      Q   Okay. And Eddie Milton?
17      A   HR and medical, I would defer to them.
18      Q   Okay. All right. And how was the decision
19  to fire Chad documented amongst the six people who
20  participated? Was there a vote? Was there a piece of
21  paper? Was there a show of hands? How was the
22  decision effectuated if you can remember, and if you
23  can't, that's okay.
24      A   We had a Teams call because Dave was
25  participating remotely. I believe a few of the
Page 160

1  operations people were participating remotely. Myself
2  and Hunt and Fred were in his office, and it was an
3  open discussion and decision to move forward.
4      Q   Are those Microsoft Teams meetings recorded?
5      A   No. You have to choose to record them.
6      Q   Were they recorded in this instance with
7  respect to a Team's meeting involving the six of you?
8      A   No.
9      Q   Okay. And I think we established a few
10  minutes ago that OQ has no written rule against
11  worker-swapping duties that allow the injured worker
12  to work inside; right? No written policy against
13  that?
14      A   There's no policy.
15      Q   Okay. And in fact, I think you had agreed
16  with us earlier today that when operators swap duties,
17  that's teamwork?
18      A   I had stated that if they need to assist
19  each other on their responsibilities, they're able to.
20  The expectation is if they're going to fully swap
21  roles, that that has to be approved by leadership.
22      Q   Right. But working the board -- well, let
23  me just ask you, you've been at the plant some time,
24  so let me just ask you this. Is the control board the
25  nerve center of operations within a unit?
Page 161

41 (Pages 158 - 161)

1  A   You can't have one function without the
2  other. They're both required.
3      MR. GRIFFIN: Okay.  Let me object to
4  the responsiveness.
5  BY MR. GRIFFIN:
6      Q   I'm not arguing what other things are
7  required. I'm just saying the control board is
8  important; isn't it?
9      A   Yes, both positions are.
10      MR. GRIFFIN: Okay. Let me object to
11  the non-responsiveness.
12      THE WITNESS: I'd like to answer
13  because you asked me, you know, is it the control
14  center. Not everything that we have is fully
15  automated. So you can't control everything from the
16  board. That's the approach that I'm taking this
17  question.
18  BY MR. GRIFFIN:
19      Q   Okay. I did not ask you about a control
20  center. I never used the word control center. I
21  said, isn't the control board the nerve center of
22  operations at the plant?
23      A   Same response. So yes, we don't have
24  everything that's fully automated, but yes, you
25  primarily control and monitor from the board, and then
Page 162

1  there's an outside position that's doing their own
2  controlling and monitoring.
3      Q   Is OQ hesitant to tell us that the position
4  of board operator is not a safety-sensitive, important
5  facet of being a process operator?
6      A   Of course it is.
7      Q   And you want your best people on that board;
8  don't you?
9      A   Yes, we want knowledgeable, proficient
10  employees.
11      Q   People cannot walk in off the street and
12  operate a control board at a petrochemical plant; can
13  they?
14      A   No. We established it takes, previously,
15  three years to get to a qualified operator who --
16      Q   Sure.
17      A   -- covers the board.
18      Q   But a person who's physically fit with no
19  training at all can carry around a 50-pound sack of
20  concrete; can't they?
21      A   I find that statement -- I -- I don't think
22  I understand the point of the question.
23      Q   You don't have to have training and special
24  experience to be able to carry around a sack of
25  concrete?
Page 163

1      A   Yes, but that's not what we do at the site.
2  I'm confused by the question.
3      Q   Okay. What's confusing about the question
4  of whether it takes more training to be an operator
5  than a person who carries around heavy objects?
6  What's complicated about that --
7      A   I'll wait -- I'll wait for your second
8  question. So it's not a thought-invoking process to
9  carry something heavy around.
10      Q   Right. For example, a worker outside, an
11  operator who's working outside, the one who's got the
12  knee problem, or the one who had the shoulder problem.
13  I think we established that for the heavy lifting and
14  the extensive climbing, it's teamwork for them to work
15  together to have the most fit operators doing those
16  kinds of jobs because anybody can do them; right?
17      A   I disagree. There's still a cognitive
18  requirement for that position, and they still have to
19  have the effective troubleshooting capabilities. So
20  there's not a, as you were trying -- I won't put words
21  in your mouth. It's not a full physical only role,
22  and not anybody can come off the street and do it.
23      MR. GRIFFIN: Let me object to the
24  responsiveness.
25  //
Page 164

1  BY MR. GRIFFIN:
2      Q   But I want to make sure that I understand
3  your apparent inconsistency because I want to make
4  sure we stay on the same page. If somebody has to
5  turn a valve that takes 75 pounds of strength or 50
6  pounds of strength, and somebody's got a bad shoulder,
7  that one operator can turn the valve and apply 50
8  pounds of strength to do it. Turning the valve takes
9  physical strength; right?
10      A   They also have to cognitively know their
11  lineup, and it's not as simple as just go turn this
12  valve. There's quite a bit involved in order to learn
13  the outside position.
14      Q   Precisely. So when an operator says, can
15  you turn that valve for me because I got an injured
16  shoulder, that's not violating any rule; is it?
17      A   There is an undue risk there because they're
18  working with an injury, and they haven't reported it.
19  So now it's potentially going to be a secondary event
20  for that individual or the company.
21      MR. GRIFFIN: Objection.
22  Non-responsive
23  BY MR. GRIFFIN:
24      Q   So does OQ now say it would not be teamwork
25  and would not be approved -- I mean, and would violate
Page 165

42 (Pages 162 - 165)

1   company policy for an operator with a shoulder or hip
2   or knee issue to ask another operator to do heavy
3   lifting?
4     A  If they're unable to physically do their
5   job, we do have an exception -- expectation for
6   reporting that. You asked me previously if it's okay
7   and acceptable for the operators to assist each other,
8   and I directly referenced that, yes, example would be
9   a product swap. And as long as they're qualified in
10   that respective area, yes, they can help each other
11   and have teamwork.
12     Q  So the answer to my question is yes, it is
13   teamwork for them to do that? You gave me a lot of
14   words, but I want to make sure that at the end of the
15   day, the answer is yes, it is teamwork and common
16   sense for operators to be able to swap duties while
17   they're at work working together?
18     A  And I want to be clear because this is,
19   like, this is what we call conduct of operations.
20     Q  What you call what?
21     A  It's called conduct of operations.
22     THE REPORTER: What is it?
23     THE WITNESS: But if I -- conduct of
24   operations.
25     THE REPORTER: Thank you.

Page 166

1   they have gauges out there?
2     A  They do.
3     Q  Okay. And sometimes you have to go up a
4   couple of flights of stairs to look at them sometimes?
5     A  Yes, in some cases, quite a few.
6     Q  Okay. Same question. An operator says,
7   "Look, my knee hurts when I go up and down stairs.
8   Can you check that gauge for me on the second floor or
9   the third floor?" Any rule or policy at OQ says that
10   that's not reasonable?
11     A  They're still -- they're still required and
12   responsible to go and do that role. So that's --
13   that's, to me, breaching from teamwork to now you're
14   trying to task off or reassign your position and your
15   responsibilities to somebody else.
16     MR. GRIFFIN: Let me object as
17   non-responsive.
18   BY MR. GRIFFIN:
19     Q  Is your answer to the question about
20   climbing up to look at a gauge different than your
21   answer for turning the valve?
22     A  You were talking about assigning a -- a role
23   that you are directly responsible for. He has no
24   capability as the person on the ground level to
25   validate whatever that employee has actually monitored

Page 168

1     THE WITNESS: Where if I'm responsible
2   for the SFA outside position, you can certainly help
3   me, but I can't task something off to you totally. To
4   be responsible, I have to make sure that it's done,
5   completed, and that, yes, it can be teamwork, but I
6   can't just pawn off that job to somebody else. And
7   the way that you stated it was a little confusing to
8   me.
9   BY MR. GRIFFIN:
10     Q  Going to do my best.
11     The situation where somebody has to turn a
12   valve, do they turn valves ever?
13     A  They do.
14     Q  Okay. And somebody that doesn't have the
15   stamina to turn the valve -- let's say it's take 50
16   pounds of effort or whatever, and the torque of it or
17   whatever is harmful to a shoulder or a knee or
18   whatever it is. So yes, it's okay for Joe Espericueta
19   and Chad to have Joe do it instead of Chad if Chad's
20   got a shoulder injury or vice versa, against the
21   policies and rules or not?
22     A  They're able to assist each other, yes.
23     Q  Okay.
24     A  As needed.
25     Q  And same thing, to go look at a gauge. Do

Page 167

1   or written down. And so from that standpoint, he --
2   he's still accountable and responsible for that, but
3   he's not the one actually doing the work.
4     Q  You don't trust your operators to properly
5   document what they see on a valve?
6     A  That's not what my statement was.
7     Q  You just said how would the other operator
8   be able to verify what the other operator sees?
9     A  That's true. He's directly responsible for
10   the role, and he's tasked to do that.
11     Q  So OQ's position is when they have to check
12   a reading on a gauge, that it takes two operators to
13   do that and not one?
14     A  What I would like to be clear on is if
15   you're responsible for the outside position, you're
16   responsible to be able to physically do all of the
17   requirements of that. This valve situation which
18   you're talking about, if they can't operate it, the
19   expectation is be that they would write it up. That
20   maintenance would come, look at it, and replace it.
21     On a one-off instance that you are asking
22   somebody to assist you with a product swap,
23   maneuvering of a valve, more -- more one-off, and what
24   you're talking about, teamwork, yes. If you're saying
25   that they can't climb and go up to the top of a tower

Page 169

43 (Pages 166 - 169)

1   for six months or something along that line, six
2   weeks, six days, the expectation is that that's
3   reported up because that is what I would classify as
4   a -- a limitation that we would need to review.
5     Q   Where is any of that documented, that long
6   answer you just gave? Where would we see that in any
7   OQ policies?
8     A   We're working on it. It would be a fit for
9   duties, what you're talking about.
10     Q   Okay. Now, in any event, OQ recognizes that
11   accommodations can be modifications to existing
12   policies and rules that allow a worker with a
13   disability to succeed on the job; right?
14     A   It's a review of the restrictions to see if
15   a -- if a appropriate accommodation can be made, yes.
16     Q   Right. And OQ understood from the very
17   beginning it has a duty to accommodate workers with
18   disabilities and pregnancy; right?
19     A   Yes.
20     Q   Okay. Now, what is the EEOC?
21     A   Equal Employment Opportunity.
22     Q   You've told me the names of what the letters
23   mean, the Equal Employment Opportunity Commission.
24   What is it?
25     A   So they're there to ensure that businesses

Page 170

1   and corporations are adhering to equal employment, and
2   part of that covers accommodations.
3     Q   For people with disabilities and pregnancy;
4   right?
5     A   Yes, that's true.
6     Q   Okay. And OQ agrees that it was required to
7   respond truthfully to the EEOC when it investigated
8   the issue of Chad's termination after he was diagnosed
9   with GBS; right?
10     A   Of course. Yes.
11     Q   Okay. And take a look at Exhibit Number 20.
12   And I will hand it to you and ask if you can confirm
13   that Exhibit Number 20 is the notice from the EEOC to
14   OQ to respond and also contains OQ's response, or what
15   sometimes we call a position statement. Can you
16   confirm that that's what Exhibit Number 20 is?
17         (Exhibit 20 was marked for
18         identification.)
19     A   Yes.
20     Q   Okay. And this is, is it not, the entire
21   response that OQ submitted to the EEOC?
22     A   This -- yes. This is the document that OQ
23   submitted.
24     Q   Did OQ ever correct or add anything to what
25   it submitted in Exhibit 20?

Page 171

1     A   Not to my knowledge, no.
2     Q   Okay. OQ was given a full opportunity to
3   submit anything and everything it wanted to include to
4   the EEOC?
5     A   Yes, we had an opportunity to respond.
6     Q   And does OQ stand behind the statements that
7   are made to the EEOC about its termination of Chad?
8     A   Yes.
9     Q   Okay. I think you answered this before, and
10   I apologize if I asked you. Does OQ understand and
11   appreciate that an employer has a duty when a worker
12   with a disability asks for an accommodation to engage
13   in a good faith interactive process to identify
14   potential accommodations?
15     A   Yes.
16     Q   Okay. And OQ Chemical says here in the
17   document, in the letter, OQ actually hired legal
18   counsel to submit its position statement to the EEOC;
19   did it not? Mr. Muskat?
20     A   Yes. We employed third-party counsel.
21     Q   Okay. It says in here that OQ "Engaged in
22   the interactive process with Mr. Hurta by discussing
23   whether reasonable accommodations for a condition were
24   available, including light duty work and job-protected
25   leave"; right?

Page 172

1     A   Yes.
2     Q   Okay. That's true; isn't it?
3     A   It's true.
4     Q   Okay. Because Chad talked with you about
5   some of those and talked to Windy about all of them;
6   right?
7     A   Yes.
8     Q   And in the categories of job protected
9   leave, you got FMLA, you have unpaid medical leave,
10   you have vacation leave. Those are categories of
11   protected leave; right?
12     A   Yes.
13     Q   Okay. Was there anything that Windy or you,
14   or anyone else at OQ asked from Chad during that seven
15   days between diagnosis and termination that you asked
16   for him that he did not provide you?
17     A   I can't discuss or comment on what Windy
18   asked or didn't ask. I have no insider clue onto
19   that. I did -- I did not ask anything of Chad on the
20   conversation that we had on the 10th.
21     Q   What I'm asking as the company rep here,
22   though, is this factual question. Is there anything
23   OQ asked him to do during that seven days that he
24   failed to comply?
25     A   Not to my knowledge, no.

Page 173

44 (Pages 170 - 173)

1    Q   Okay.  Now, at the time of the seven-day
2   period, what did OQ know about GBS?
3    A   We had been informed of what GBS was in the
4   text message that Chad had provided to us.  He had
5   said he had some numbing and tingling in his
6   extremities.  At that point, I Googled what was GBS.
7   So I got a little quick Wikipedia of what was going
8   on, and that was the extent of.
9    Q   Okay.  Did anybody at OQ consult with any
10  experts in the field who could shed some light on what
11  GBS is and what its prognosis is in most patients?
12   A   No.
13   Q   Okay.  Is that something OQ could have done
14  if it wanted to?
15   A   Yes, we could have researched.
16   Q   Okay.  What does OQ know today that it
17  didn't know then about GBS?  I'm not talking about
18  Chad specifically, just the neurological condition
19  that afflicts a very small group of patients every
20  year.
21   A   We don't have any additional information on
22  the condition.
23   Q   Okay.  When you did your own Wikipedia look
24  at GBS, did you learn that GPS is largely a curable
25  condition?  That most patients respond well to therapy

Page 174

1   over time?
2    A   I read that it was possible for people to
3   recover from GBS.
4    Q   Okay.  In other words, unlike -- I shouldn't
5   say even pancreatic cancer because some pancreatic
6   cancer survivors and I -- well, I would want to be
7   one of them.  But unlike terminal cancer, GBS is not
8   known as a life-ending or an illness that will
9   progress, rather inevitably, toward a bad conclusion?
10          MS. COLON-POL:  Objection to form.
11   A   As I just stated and what I recall from
12  reading was that it causes numbness and tingling in
13  extremities, and that over time, it was possible that
14  it would get better or less severe in terms of the
15  symptoms.
16   Q   Okay.  Did you review that patients can take
17  sometimes a matter of months and perhaps as long as 2
18  years to make 100 percent recovery from the disease?
19   A   It was open ended in terms of -- I shouldn't
20  say open ended.  It was a wide range in terms of what
21  that time frame was.
22   Q   Right.  Some patients will be able to come
23  back to 100 percent earlier than others; right?
24   A   Based on what I read.
25   Q   Okay.  Now, let's talk a little bit about

Page 175

1   heavy lifting.
2    A   Sure.
3    Q   What objects does OQ say that operators have
4   to carry around that are, say, more than 25 or 50
5   pounds?
6    A   In some instances, removing drones, some of
7   the hoses would be pretty heavy.  The run guns
8   themselves are pretty heavy.  We do enable them to
9   change out smaller valves.  They wouldn't be no 50
10  pounds, not like what you're talking about.
11   Q   You mentioned drones, valve; did you say
12  cable?
13   A   Steam-like hoses.
14   Q   Hoses.
15   A   Connection hoses.
16   Q   Okay.
17   A   And those are stainless steel braided.  Some
18  are rubber.  They're different types but have
19  different weights associated with them.
20   Q   Now, when it comes to drums and hoses and
21  swapping out changing valves, is that something done
22  on a daily basis for operators?  Do they do that every
23  day?  Is that during shutdowns, or how does that work?
24   A   Frequency, definitely around shutdowns, is
25  more.  But yes, they also are still moving hoses

Page 176

1   around as needed if they need to steam something if
2   they're clearing the slab.  It -- it depends on the
3   tasks and what work is -- is present.
4    Q   What is the highest area in Chad's area?
5   The highest spot that operators go work?
6    A   Excluding the towers, you would have to
7   climb four or five flights of stairs.
8    Q   Okay.  In which area is there four or five
9   flights?
10   A   Actually, that's in POX.  On the other side,
11  there's several decks, but it's probably still -- it's
12  probably five, six flights, worst case, over there.
13   Q   And where would we find a place where
14  operators go in Chad's unit that involve five or six
15  flights of stairs?
16   A   I'm thinking, on SFA.
17   Q   SFA, okay.
18   A   Like up by the flasher or up on the -- the
19  purification side.
20   Q   Now, this may be a dumb question also, but
21  do all the stairs have handrails?
22   A   They do.  And they're not all the same in
23  terms of, like, length.  I'm counting what I would
24  consider a normal flight.  There's one that's like two
25  levels going up.

Page 177

45 (Pages 174 - 177)

1    Q   Now, you were gesturing as an incline as
2  opposed to steps?
3    A   No, it's steps with the incline.  Yeah.
4    Q   So if I'm understanding what you're saying,
5  not all steps are the same?  Not all your stairs are
6  the same?
7    A   Not the same, like, length.
8    Q   Right.  But what I'm talking about -- I just
9  want to make sure the jury understands that all the
10 places where you have workers going up and downstairs,
11 there's handrails?
12   A   That's true, yes.
13   Q   Okay.  Now, does OQ consider the board job
14 as light duty?
15   A   It would be a form of light duty if it was
16 granted.
17   Q   Okay.  Now, out at the plant in Bay City,
18 the -- I get my areas mixed up.  Chad was in Area?
19   A   Two.
20   Q   Two.  But as I understand it, your process
21 operators -- you have process operators in Area 1 and
22 Area 2?
23   A   That's correct.
24   Q   But as I understand it, in Area 1, your
25 operators can either work inside all the time on the

*Page 178*

1  through the script here, is that during all of that
2  period of time, you had process operators in Area 1
3  who could, if they wanted, work the board all the
4  time?
5    A   That's true.
6    Q   Okay.  But as I'm hearing you this year, I
7  guess in the midst of this suit, you're going to have
8  your Area 1 operators rotate out into the field to
9  work outside?
10   A   We have made a restructuring irrelevant to
11 this lawsuit.
12   Q   But would that be a yes that the board
13 operators in Area 1 will now be expected to work
14 outside some?
15   A   Your second way of phrasing it is true, yes.
16   Q   Okay.  All right.  Now, the way it happened
17 as I understand it, at the time you all fired him, you
18 needed operators; right?
19   A   True.
20   Q   And you all knew the most experienced
21 operator in Area 2 could work the board; right?
22   A   We knew that Chad was able to work the
23 board.  That's true.
24   Q   Okay.  If you -- since you -- I shouldn't
25 say if you.  Since you fired him, OQ fired him,

*Page 180*

1  board, or they can work outside all the time if they
2  choose?
3    A   That was true.  As of this year, that's no
4  longer true.
5    Q   Okay.  But at all times relevant to this, in
6  other words, from the day you got there until Chad was
7  fired, the Area 1 operators could work exclusively on
8  the board if that's what they wanted to do?
9    A   Not true.
10   Q   True or not true?
11   A   Not true.
12   Q   Okay.  So you're telling the jury that you
13 don't distinguish outside operators and board
14 operators in Area 1?  You didn't at this period of
15 time between 2018 and 2022?
16   A   You said from the time I got there.  So in
17 2010, when I got there, they full rotated, and
18 everyone, all the inside and outside jobs, whenever
19 the propanol-two process came along, they went to
20 designated inside/outside jobs, which is circa
21 2017/2018, when it's fully operational.  And until
22 this year, they maintained inside/outside jobs.
23   Q   Stay with me.  Remember, we were talking
24 about the time period between 2007/'18 until he was
25 terminated.  And my question was, just trying to get

*Page 179*

1  they're going to have to replace him; right?
2    A   True.
3    Q   They're going to have to find somebody and
4  train them to work as a board operator; right?
5    A   We would have to onboard somebody.  Yes.
6    Q   Right.  And for example, if you
7  determined -- if OQ ever decided he was damaged goods
8  forever, he would be the type of person who could
9  train a young operator how to work the board; right?
10   A   He was previously in a training function.
11 Does Chad have the capability to train?  Yes.
12   Q   Okay.  In other words, he probably knows as
13 much about operating the board as any operator out
14 there; right?
15   A   He's qualified on the boards.
16   Q   Okay.  But not only is he qualified, he's
17 been doing it longer in his area than anybody else;
18 right?
19   A   That's not true.  No.  There's people that
20 have more tenure than he does.
21   Q   In his area?
22   A   Yes.
23   Q   And which one is it, did you say?
24   A   Vasek would have been one of them.
25   Q   Which Vasek?

*Page 181*

46 (Pages 178 - 181)

1     A    Chris.
2     Q    Okay.  Anybody else?
3     A    Bobby's -- Bobby Zemanek [ph].  He's a
4  30-year operator.
5          THE REPORTER:  What was his last name
6  again, ma'am?
7          THE WITNESS:  Zemanek [ph].
8          MR. GRIFFIN:  Zemanek [ph].
9          THE WITNESS:  But yes, Chad has
10  experience.
11  BY MR. GRIFFIN:
12     Q    Okay.
13     A    He has quite a tenure with the organization.
14  I will not contest that.
15     Q    Okay.  Now, was there ever a discussion
16  amongst the six folks, decision-makers, of relocating
17  Chad to the other area to be a board operator?
18     A    No.
19     Q    Okay.  But as I understand it, OQ has no
20  written distinction between the process operators in
21  Area 1 and the process operators in Area 2; right?
22     A    We have a general HR job description when
23  you get into the specific units that talks about what
24  that role is doing.
25          MR. GRIFFIN:  Okay.  Let me object to

Page 182

1  the responsiveness.
2  BY MR. GRIFFIN:
3     Q    I'm just going to just make sure that
4  there's the exact same job description for the
5  operators in Area 2 as Area 1?
6     A    In human resources, that's true.
7     Q    Okay.  And when you say in human resources,
8  that's just added information?  That's where the job
9  description is kept?
10     A    No.  Previously, we had covered it this
11  morning that when we get to the actual what's the
12  roles and responsibilities of, example, the outside
13  SFA operator, there's a job description that outlines
14  what they are responsible for and what they do.  It's
15  detailed to that staffed position.  It starts becoming
16  unit-specific versus the global HR, which is why I
17  differentiated this morning and again now.
18          MR. GRIFFIN:  Let me object to the
19  non-responsive portion of the answer.
20  BY MR. GRIFFIN:
21     Q    I'm not fussing at you.  No problem.
22          In any event, at your plant in Bay City,
23  you've got process operators working inside only,
24  process operators working outside only, and some
25  operators who do a combination of both; right?

Page 183

1     A    That's true.
2     Q    Okay.  And the same process operator job
3  description applies to both of them?
4     A    It's all-encompassing.  Yes.
5     Q    Okay.  Who at the meeting or who anywhere --
6  let me rephrase that.
7          Who argued against Windy's opposition to
8  firing Chad?  In other words, who answered her
9  concern, as you put it, about hesitating to fire him
10  or whatever you want to call it, opposition concern?
11  Who answered that or attempted to answer that, if any,
12  if you can recall?
13     A    Dave and Fred.
14     Q    What documents did the six of you review in
15  those seven days between Chad's diagnosis and Windy's
16  phone call to Chad telling him that management had
17  decided to fire him?
18     A    I don't remember which meeting it was.  I
19  don't know if it was a meeting with the six of us or a
20  smaller group, but I know that we had pulled the STD
21  policy where we still practice the 26 weeks of pay
22  'cause we went through that extensively with Dave.  I
23  do remember that.
24     Q    Twenty-six weeks of?
25     A    STD, short-term disability.

Page 184

1     Q    Okay.  Who had decided among the six that
2  y'all wanted to put him on STD?
3     A    Windy was talking a lot.  Dave was talking a
4  lot.  On that, I would say those two, Dave and Windy.
5     Q    Okay.  But going back to the question then,
6  what, beyond your STD policy, was reviewed in
7  connection with the decision-making to terminate him?
8     A    We had had confirmation from medical that
9  there was no protected FMLA leave, and then we had
10  this discussion about the STD policy and then the
11  implemented practice.  Those would be the two
12  documents that I recall.
13     Q    And you may have answered this.  I don't
14  think so.  But with respect to that seven day, that
15  window of time between knowledge of his GBS in the
16  hospital and firing, why do we not see any e-mail like
17  that that says Chad is out of FMLA?  Why do we not see
18  any e-mail to or from Sean inquiring of whether he has
19  or doesn't have FMLA?
20     A    Our site's pretty big practice on getting
21  together.  Having meetings.  Discussing it.
22     Q    Right --
23     A    We don't always keep meeting minutes, which
24  is why we don't have any records.
25     Q    That's a different question, meeting

Page 185

47 (Pages 182 - 185)

1  minutes. You had shared that it's important with FMLA
2  to check and do e-mails and communicate with Sean
3  because he is the person who keeps track of FMLA; is
4  that fair?
5      A   Sean is responsible. That's correct.
6      Q   Okay. And you have taken pains to tell me
7  that you want to confirm that before you send out a
8  letter saying he doesn't have FMLA, that that's
9  accurate. And I saw such an e-mail like that in
10  January when you all thought he was out of FMLA for
11  the back injury?
12     A   True.
13     Q   But in the production, there's no such
14  e-mails about FMLA at all on or about March the 14th.
15  And I'm wondering if OQ can explain why there is no
16  evidence of any communication between Sean on the one
17  hand and the decision makers on the other about firing
18  him on March the 14th?
19     A   We're a small facility. And I'm next -- was
20  next door to the HR manager. A lot of things over our
21  history with her and I together were verbally done.
22     Q   Okay.
23     A   We -- we don't have documentation for
24  everything.
25     Q   Now, as of now, you have not yet heard from

Page 186

1  Sean?
2      A   I haven't checked my e-mail since --
3      Q   No, that's okay. I'm not harping on you.
4  Not criticizing you by any stretch. But what we can
5  agree on is that we've seen no written communication
6  of any kind between the decision makers on the one
7  hand and Sean on the other about how much, if any,
8  FMLA leave Chad had in the bank on the date he was
9  fired?
10     A   That's true. We have no records around
11  that.
12     Q   Okay. I guess this -- and just try to put
13  this in a simple way. OQ did not honor the protected
14  leave that it had granted him with Windy, the six
15  days; did it?
16         MS. COLON-POL:  Objection to form.
17     A   We've confirmed that we termed him prior to
18  that.
19     Q   Okay. You can confirm?
20     A   We've confirmed that previously.
21     Q   Okay. Excuse me. These may seem like dumb
22  questions, but OQ allows workers to use their vacation
23  leave without firing them; don't they?
24     A   Yes.
25     Q   Okay. In other words, OQ doesn't give

Page 187

1  employees vacation leave and then fire them because
2  they don't have FMLA leave left; does it? OQ doesn't
3  do that?
4          MS. COLON-POL:  Objection to form.
5      A   Say -- say the question again?
6      Q   Yeah. An employee who's got plenty of
7  vacation, who's on vacation leave, the company's not
8  going to fire that person because they don't also have
9  FMLA leave in addition?
10     A   The employee is eligible to take vacation.
11     Q   Okay. And that's job-protected leave?
12     A   Yes. Yes, it's a form.
13     Q   Okay. In other words, it wouldn't make any
14  sense to grant an employee vacation leave and then
15  fired them for being off work on vacation?
16         MS. COLON-POL:  Objection to form.
17     A   Yes, we would not do that.
18     Q   Okay. Now, I want to talk about the
19  vacation hours that he did have. The letter that we
20  looked at earlier says 80 or 60 or something like
21  that. But the paycheck in June or July pays him for
22  approximately 250 vacation hours. And we're going to
23  go through those records here in a minute, but how
24  many vacation days of leave did Chad have when he was
25  terminated?

Page 188

1      A   I would base it off on what the termination
2  order says. Sounds like it's 60 hours, which would be
3  five days.
4      Q   Right. But what is the best way to get the
5  right answer if we know that's the wrong answer?
6  Because we know they paid him for 250 hours. But what
7  records does OQ have? And maybe it's on the records
8  that were maybe produced this morning. I haven't seen
9  those yet. But I'm just trying to figure out how we
10  can determine the vacation. You're welcome to look at
11  one of these, too, and we can have this marked.
12     A   I mean, I haven't seen these.
13     Q   And I can promise you neither have I. But
14  we'll ask that these be marked as Exhibit Number 37.
15  Thank you.
16         (Exhibit 37 was marked for
17          identification.)
18         What are we looking at here in Exhibit
19  Number 37?
20     A   As I understand it, these are records that
21  were pulled out of our payroll system by human
22  resources and produced for this case.
23     Q   Okay. Then I'll represent to you that I'm
24  seeing these for the first time today too. But where
25  do we find the number of vacation days he had accrued

Page 189

48 (Pages 186 - 189)

1 in his vacation bank of accrued leave on the date of
2 termination?
3    A   I'm going to say I don't know how to
4 interpret this form 'cause the only place I see is it
5 says gross pay.  It says STD paid field three.
6 There's a rate, and there's hours.
7    Q   Right.  But --
8    A   I don't see, to your point, a secondary
9 vacation.  Now, you had mentioned -- May, I believe,
10 is whenever the hours were paid out.
11    Q   No, I'm seeing some of it right here on the
12 first page.  It says 6/6/22: pay period beginning.
13 Pay period ending: 6/19/22.  The pay date is July 1st
14 of '22.  These are all a couple or three months after
15 you all fired them.
16       But it's got on here overtime pay.  Yeah.
17 Overtime, $7000, and regular pay, $4000.  Now, I get
18 the four might be some sort of salary for short term
19 disability.  I get that.  But I'm not understanding
20 how he could be working overtime when he's been fired?
21    A   My belief is they would've tried to keep him
22 whole.  I would defer this to HR to respond on how
23 they actually coded his time, but they get paid
24 biweekly.  They have a set schedule.  And the system,
25 they -- they would have had to plug it in as overtime.

Page 190

1 I can't answer that --
2    Q   Plug what in?
3    A   It's actually -- you have to physically go
4 into the timecard, and you actually have to populate
5 it.
6    Q   Right.  But --
7    A   Payroll would have populated this timecard
8 based on guidance from Windy at the time.
9    Q   So is there any explanation that OQ has for
10 why it says he worked $7000 -- $6974.69 of overtime
11 between June the 6th and June the 19th, a time period
12 after he'd been fired for several months?
13    A   I can speculate, but I can't answer that.
14 I'm not human resources or payroll.
15    Q   Well, if we do the math on his basic hourly
16 rate, the $6974 comes up to about 250 hours, which is
17 the approximate amount of his vacation in the bank.
18 So where would OQ point the jury to explain what this
19 $7000 is?
20    A   I would defer our HR department to answer
21 how that was coded and why and why was it paid out as
22 overtime.
23    Q   But you did not check with them before you
24 testified today about this?
25    A   No.  Not at all.

Page 191

1    Q   Okay.
2    A   Nor am I a payroll or HR generalist or
3 specialist.
4    Q   No.  But you understand you were the
5 designee on this topic today?
6    A   I do understand that.
7    Q   Okay.
8    A   Unfortunately, this is also my first time
9 seeing these documents.
10    Q   Okay.  All right.
11    A   And how they've been coded and paid out.
12    Q   So I don't want to belabor this, but will
13 these documents, do they tell us the amount of
14 vacation that he had accrued and could have taken on
15 the date he was fired?
16    A   From my standpoint and my layman
17 interpretation of it, I don't see, you know, the
18 hours.
19    Q   Okay.  Let's talk a little bit about process
20 operator.  Would you say there is -- well, let me ask
21 you.  If you were to give a one-sentence description
22 of the job, what would it be?
23    A   Safe, efficient operation of the site.
24    Q   Okay.  And of all the things that an
25 operator does, what would you categorize as the most

Page 192

1 important and safety-sensitive facets of the job?
2    A   Adherence to policies and procedures to
3 ensure compliance.
4    Q   Well, everybody wants to follow all the
5 rules, but I'm talking about which part of the daily
6 grind of the job, which facets of it, and if none are
7 more important than another, then you can tell me
8 that.  I just want to know OQ's position on what are
9 the most important facets of the job?
10    A   So besides following policies and
11 procedures, effective monitoring of the system and
12 correction of deviations as they're discovered,
13 whether that's inside or outside.
14    Q   And how high on the safety scale would you
15 say working the board is?
16    A   It's high.
17    Q   Okay.
18    A   We have shutdown systems in place, but
19 they're still responsible for a lot.
20    Q   Okay.  My next question is: even during a
21 shutdown, you still have to have process operators on
22 the board?
23    A   Absolutely.
24    Q   Okay.  Where would a jury look to determine
25 which job tasks of a process operator are essential

Page 193

49 (Pages 190 - 193)

1  functions and which are marginal functions?
2      A   I mean, by each position, we have what we
3  call a progression book, which kind of goes through
4  the different tasks and responsibilities that they're
5  required to know and execute.
6      Q   So what documents would the jury look at
7  that would describe the facets of the job that are
8  essential functions and the facets of the job that are
9  marginal functions?
10      A   They're definitely commingled, but I would
11  point them in the direction of, one, the job
12  description.  It gives a high-level overview of here's
13  everything this person's executing, and then it gets
14  more specific by task in the progression guides.
15      Q   And are job tasks assigned or labeled as
16  essential or marginal in OQ's documentation?
17      A   We have critical procedures.  That basically
18  means they have to have it in hand as they follow it.
19  So that would be what I would consider, you know, of
20  the utmost criticality that's followed to a T.
21      Q   Okay.  All right.  If there are any, where
22  would we look to see whether or not OQ contends or
23  believes that the ability to lift 75 pounds is an
24  essential function?
25      A   I mean, it goes through into what -- what

Page 194

1  the requirements are in some of the job description
2  pieces that outline some of the expectations for
3  climbing, the physical requirements, the mental
4  requirements.
5      Q   Right.  But I thought that you had said that
6  those documents are not going to say which of those
7  job tasks are marginal and which are essential?
8      A   They're not labeled that way.
9      Q   Okay.  Let me ask you this.  Does OQ have
10  any data that you know of to show how much time
11  operators spend, for example, lifting objects of 50
12  pounds or more?  How often that's done?
13      A   To my knowledge, that assessment hasn't been
14  done.  We might have previous archived things from
15  Celanese, but to my knowledge, no.
16      Q   Same question for 25 pounds?
17      A   Not aware of -- of any.
18      Q   Okay.  And what about data to show how often
19  process operators must climb multiple levels of
20  staircases?
21      A   No formal data.
22      Q   And what about --
23      A   But either realms, it's -- it's not
24  explicitly spelled out.
25      Q   Okay.  Well, let me just ask it in a general

Page 195

1  way.  Do process operators ever climb towers?
2      A   Yes.
3      Q   For what purpose?
4      A   Product swaps.  Might have to change feed
5  locations.  If there's something going on that they
6  need to go monitor a gauge, or maybe there's an
7  abnormal condition going on, like a leak or something,
8  they need to go check it out.
9      Q   And we talked earlier today about whether or
10  not it's a good idea or advisable or permitted for
11  operators to allow one of their partners or coworkers
12  to climb the tower instead if their balance is
13  affected at great heights; right?  We've talked about
14  that scenario?
15      A   We've -- we've covered this.
16      Q   Okay.  Take a look at Exhibit Number 27, and
17  I'll ask if you can confirm that these are
18  certifications.  If I put too many, I may have mixed
19  two exhibits together.  If you don't mind, Ms. Zalman,
20  make sure the last page -- I think I commingled --
21  yeah, 28 and 29, maybe.  That's 29.  Is 28 back there
22  too?  My bad.  Thank you for handing that back.
23          Can you confirm to the jury that these are
24  many of the certifications that Chad had achieved as
25  an operator for OQ?

Page 196

1          (Exhibit 27 was marked for
2          identification.)
3      A   Yes.  These are training certifications.
4      Q   Okay.  Now I'm going to show you Exhibit 5
5  and ask if OQ will confirm that that is the most
6  current job evaluation given for Chad for his last
7  full year of employment there?
8          (Exhibit 5 was marked for
9          identification.)
10      A   Yes.
11      Q   Okay.  And is Exhibit 6, Ms. Zalman, an
12  example of the paperwork you guys do when Chad would
13  be approved for FMLA Leave?
14          (Exhibit 6 was marked for
15          identification.)
16      A   I'm sorry.  I was not listening.
17      Q   That's okay.
18      A   You have one exhibit tied to the next.
19      Q   It's not part of that?
20      A   It's 0160.  This is 01666.
21      Q   It should not be there.  And with Yanice's
22  permission, we can take that out.  Okay.
23      A   Sorry.  I got confused --
24      Q   No.  No, I don't mind.
25          Going back to Exhibit 6.  Is that the kind

Page 197

50 (Pages 194 - 197)

1  of paperwork that OQ generates to document FMLA leave
2  for Chad?
3      A   Yes.
4      Q   No problem.  And is Exhibit 7, is that also
5  an example of when that happens?
6          (Exhibit 7 was marked for
7          identification.)
8      A   Yes.
9      I -- I have a fundamental question, though.
10     Q   Sure.
11     A   This is an e-mail sent from Sean.  I'm not
12  sure it's -- it's to somebody because the timestamp
13  and date on it is July 26, 2023.
14     Q   You read my mind.  I was going to ask you,
15  as the OQ designee, why do we see 2023 on the dates of
16  this e-mail when the leave being referenced is back in
17  2020?  I don't know why it's like that, but I thought
18  you, as the corporate rep, might know.
19     A   Well, what I can answer is that John Ford
20  was no longer with the organization, even in 2022.  So
21  I -- this -- this is an old -- I can't explain the
22  discrepancy in the timestamps, but I can tell you that
23  John Ford wasn't employed today or at the time of
24  Chad's termination.
25     Q   So your belief and OQ's belief is there's a

Page 198

1  date wrong on that e-mail?
2      A   I 100 percent believe there's a date wrong.
3      Q   Okay.  All right.  Then I'll just ask you
4  about Exhibits 8, 9, and 10 as a group that concerns
5  the special assignment that Chad was working on in the
6  past?
7          (Exhibit 8, Exhibit 9, and Exhibit 10
8          were marked for identification.)
9      A   Mm-hmm.
10     Q   Okay.  Exhibit 11 we've covered.
11     And just confirm, if you would, that Exhibit
12  12 is at least the declarations page of OQ insurance,
13  with respect that it may be liable to pay part or all
14  of a judgment in this case?
15         (Exhibit 11 and Exhibit 12 were marked
16         for identification.)
17     A   Yes, I was exposed to this.  Yes.
18     Q   Okay.  And is Exhibit 13 a true and correct
19  copy of at least the operational team, as applicable
20  to Chad's area?
21         (Exhibit 13 was marked for
22         identification.)
23     A   Yes.
24     Q   And does Exhibit 14 accurately reflect that
25  there was an open position for a operator in February

Page 199

1  of 2022?
2          (Exhibit 14 was marked for
3          identification.)
4      A   There was a open position, yes.
5      Q   Do we know which area?
6      A   Not without digging into it.
7      Q   Okay.  And I think you answered this before,
8  but I want to make sure that --
9      A   I -- I actually can from memory.  I gave it
10  some additional thought, but I know that in December,
11  we had Robert Milton [ph] leave around Christmas from
12  Area 1, so I know that we were trying to backfill him.
13  And I also know that Otto Atkins [ph] had expressed
14  his retirement that was going to come up in March.
15  And so I know that we were trying to backfill him also
16  from Area 1.  If there was additional ones, from
17  memory, I don't -- I can't recall.
18     Q   So you think that that opening was in Area
19  1?
20     A   I know that at least there was an opening in
21  Area 1.  I -- I don't remember if there's also one in
22  Area 2.
23     Q   Okay.  Either way, I think you confirmed
24  that those kind of new hires or trainees are the type
25  of people that could be trained by Chad?

Page 200

1      A   If we had a special assignment open,
2  potentially.  We also have designated trainers in both
3  units that handle the primary onboarding.
4      Q   And that's something Chad has done in his
5  career has been that kind of trainer?
6      A   He was on the special assignment, yes, for a
7  period of time.
8          THE VIDEOGRAPHER:  Excuse me, counsel.
9  I need to change the video.  May we go off the record?
10         MR. GRIFFIN:  It's a perfect time.
11         THE VIDEOGRAPHER:  Thank you.
12         This is now the end of video three of
13  Kristina Zalman.  We're off the record at 3:22.
14         (Off the record.)
15         THE VIDEOGRAPHER:  We're now back on
16  record.  Video four of Kristina Zalman.  The time is
17  approximately 3:24.
18  BY MR. GRIFFIN:
19     Q   Ms. Zalman, I'd like you to confirm that
20  Exhibit 18 is concerning an award for Chad for
21  above-and-beyond-service in the rescue of a coworker
22  out at the plant?
23         (Exhibit 18 was marked for
24         identification.)
25     A   This is, yes, a recognition for a

Page 201

51 (Pages 198 - 201)

1  contractor. Yes.
2      Q   In other words, I should ask the question
3  this way. That exhibit concerns an award or
4  commendation for Chad for going above and beyond in
5  the rescue of a contractor's employee at the plant in
6  Bay City?
7      A   Him and the other's named did do an
8  exceptional job.
9      Q   Yes. Does OQ have a -- let me just retract
10 that question for a second.
11         Does OQ have any explanation for why it was
12 reasonable for Chad to be accommodated for his back
13 and allowed to work the board when he was on heavy
14 lifting and extensive climbing restrictions in January
15 '22?
16     A   I believe it was December of '21.
17     Q   Okay.
18     A   And the position that was open was the board
19 operator position, so we didn't have to disturb any
20 population or hinder anybody's exposure experience on
21 the board to enable Chad to work the board job for
22 SFA.
23     Q   Okay. I'm not understanding. Help me to
24 understand why. I'm not understanding what made it
25 reasonable from OQ's perspective to accommodate his

Page 202

1  request to work the board on that occasion and not
2  other occasions?
3      A   So it was the position that was open. It
4  was not requiring us to shift around the personnel.
5  We already talked about it. We don't have a
6  documented policy, but we have a practice where we
7  have them rotate to ensure they stay proficient and
8  exposed to the boards. The position that was open in
9  December was, to my recollection, the SFA board, and
10 Chad came in and worked that and was able to do such.
11     Q   And help the jury understand why if it was
12 beneficial for OQ to have him work the board, then
13 would it not have been equally beneficial for him to
14 work the board as he recovered from GBS in the spring
15 of 2022?
16     A   So at the time of his termination, he hadn't
17 been medically released from the doctor at that point
18 in time, and there was really no insight on when or if
19 he would be able to resume the essential functions of
20 the entire process operator job.
21     Q   But do we agree that's sort of the chicken
22 and the egg because he was terminated before he could
23 give you any restrictions?
24         MS. COLON-POL: Objection to form.
25 BY MR. GRIFFIN:

Page 203

1      Q   Isn't that true?
2      A   I understand we terminated him.
3      Q   Okay. I guess, and if I asked this
4  question, I apologize. But why give him the
5  opportunity to get the doctor's notes and restrictions
6  in January but not March?
7          MS. COLON-POL: Objection. Asked and
8  answered.
9      A   So to -- to my recollection, we didn't chase
10 Chad in January is kind of what you're referencing.
11 He was out. We started having the discussions, and
12 then he supplies information to Sean. I don't recall
13 it being a "Chad, I need these records from you."
14     Q   Well, does OQ deny that Sean told him,
15 "You're running out of FMLA leave. You better get a
16 doctor's report"?
17     A   As I understand it, Sean communicated to him
18 that, yes, he was out of FMLA as of this date. If he
19 let him know we needed the additional paperwork, I'm
20 sure some level of that conversation took place.
21     Q   And that makes sense; doesn't it?
22     A   I'm speculating, but I'm -- I'm sure they
23 had that conversation.
24     Q   Okay. All right. Is there a policy at OQ
25 that workers who have physical issues or pregnancy are

Page 204

1  accommodated with light duty working the board as long
2  as it's value added to OQ?
3      A   Say that again?
4      Q   Yeah. Does OQ accommodate workers with
5  disabilities and who are pregnant with light duty work
6  on the board only when it's value added to OQ?
7          MS. COLON-POL: Objection to form.
8      A   So the existing process is whenever an
9  employee's restricted with duties, those are submitted
10 to medical, and then the owning department comes
11 together with HR to review those restrictions to see
12 what accommodations can be made.
13     Q   What does "value added" mean to OQ?
14     A   That's a pretty broad question.
15     Q   Is there any -- is the company -- because I
16 saw it in some e-mails that we give overtime to
17 disabled employees with disabilities when it's "value
18 added," and I'm wondering if the company can explain
19 what that means?
20     A   I mean, from that standpoint, we would
21 evaluate if there's an existing function of the role
22 that they can do. Is there an alternative assignment
23 that they could potentially do that's available? Are
24 there open positions that they could transfer to that
25 they qualified for?

Page 205

52 (Pages 202 - 205)

1    Q.  Okay.  Does OQ concede that it did not
2  discuss with Chad any potential other assignments that
3  he might be assigned to while he treats his GBS?
4    A.  Outside of our discussion around the special
5  assignment, there was no additional discussions with
6  him regarding what you're talking about as transfer
7  opportunities.
8    Q.  Does OQ agree or disagree that it jumped the
9  gun in the sense that it fired Chad even before he'd
10  run out of his job-protected leave?
11        MS. COLON-POL:  Objection to form.
12    A.  From our standpoint, we needed to fill the
13  position.  We were short-staffed.  For business needs
14  with no end in sight, we chose to move forward with
15  termination.
16        MR. GRIFFIN:  Okay.  Let me object to
17  responsiveness.
18  BY MR. GRIFFIN:
19    Q.  If it doesn't feel like it jumped the gun,
20  you can tell me that.  If it feels that, in
21  retrospect, it did jump the gun, I want you to tell me
22  that, but I just want to know yes or no.  Does OQ
23  agree that it jumped the gun in the sense that it
24  fired him even before he'd run out of his
25  job-protected leave?
                                                    Page 206

1    A.  We chose to terminate him prior to
2  completion of that.
3    Q.  And does OQ agree that it jumped the gun in
4  the sense that it fired him even before he could
5  produce any doctor's information about his condition
6  or his prognosis?
7    A.  At that time, he hadn't been medically
8  released, and so we didn't have anything to review
9  there.
10    Q.  So yes, jumped the gun?  No, didn't jump the
11  gun in firing him before it got any medical
12  information about his condition?
13    A.  I mean, "feels" is a subjective word.  We
14  made a business decision for business reasons to
15  terminate them.
16    Q.  Right.  But are you hesitant to tell me
17  whether the company's thought is perhaps they jumped
18  the gun in doing these things prematurely?
19    A.  I wouldn't say that we jumped the gun.
20    Q.  Okay.
21    A.  I said that we did an evaluation.  We made
22  an assessment.  We made a decision to move forward.
23    Q.  Does GBS [sic] say that it discussed the
24  board operator position for Chad during the week after
25  he was diagnosed with GBS?  In other words, does OQ
                                                    Page 207

1  say it consulted with any leads or other operators
2  about whether it would have created difficulties or
3  problems if Chad were to be able to rotate working in
4  the board for a fixed period of time while his
5  coworkers, who would otherwise work the board, work
6  outside?
7    A.  We did not consult anybody outside of the --
8  the pool of people I've already named.
9    Q.  Okay.  In other words, nobody from the
10  leadership team went to any of the operators or the
11  leads and said, how would this work if Chad worked the
12  board for a period of time?  The doctor said 30 days.
13  His doctor said 60 days.  Whatever it was, that
14  conversation just didn't happen?
15    A.  That conversation wouldn't happen.  So we
16  wouldn't have a conversation with a individual
17  contributor about another employee's medical condition
18  and accommodations that we could do.  That would
19  always be constrained to supervisors.
20        MR. GRIFFIN:  Okay.  Let me object to
21  responsiveness.
22  BY MR. GRIFFIN:
23    Q.  But I want to follow up on something.  So
24  the jury can take it to the bank that not only did OQ
25  not discuss the feasibility of him working the board
                                                    Page 208

1  with coworkers, that they would not ever do that?
2    A.  No, you're -- you're twisting my words.  We
3  would not discuss medical conditions of another
4  employee with a population of people.
5    Q.  But you're -- we --
6    A.  -- assessment -- I'm not complete.
7    Q.  I'm sorry, go ahead.
8    A.  The assessment that we completed was at the
9  leadership levels, and Jeremiah is -- is well versed
10  to be able to make a decision about the staffing and
11  the implications of that with his population.
12        MR. GRIFFIN:  Let me object to the
13  responsiveness.
14  BY MR. GRIFFIN:
15    Q.  My only question was whether or not you had
16  said we would -- when you said never, you talked about
17  medical conditions.  But my question wasn't about
18  medical conditions.  My question was about whether
19  anybody from the leadership team ever talked to any
20  leads or operators about the feasibility of an
21  operator being reassigned to work the board when that
22  operator would otherwise be expected to work outside?
23    A.  So you've rephrased your question.  You
24  previously had communicated around the GBS and the
25  symptoms of it.
                                                    Page 209

53 (Pages 206 - 209)

1    Q.   Okay.
2    A.   So as stated in the second sentence, no, we
3  did not communicate with the board operators about the
4  feasibility or the outside operators.  Those
5  discussions stopped with the manufacturing supervisor.
6    Q.   See, you're arguing with me, but I'd like
7  you to focus on my question on -- not what you think
8  my previous question was because we can't solve those
9  arguments ourselves because she's written down
10  faithfully everything that I've asked you, and you've
11  responded.
12        So I'm going to ask you, if you can, for the
13  few minutes we have left, just listen to my question.
14  Don't fault me for questions that I asked earlier in
15  the day.  Just try to answer the ones that I've got in
16  front of you.  And do you think that OQ jumped the gun
17  in the sense that it terminated Chad without having
18  any discussion with operators or leads about the
19  feasibility of Chad working the control board as he
20  recovered from GBS?
21    A.   As stated, we did not consult the work group
22  leads or the process operators for their input.
23    Q.   Okay.
24    A.   We engaged operations leadership from the
25  manufacturing supervisor up.

Page 210

1    A.   So a lot of people from memory.  We have
2  Jory Plunkett, Adam Anderson, Madeline Pitts -- I
3  would really need to get the full repository from
4  human resources of hiring.
5    Q.   Okay.  We --
6    A.   'Cause a lot of that staffing was also
7  'cause we've increased by the, you know, plus we're
8  trying to increase by that plus eleven.
9    Q.   This topic is something that you probably
10  can address at some point; right?
11    A.   Absolutely.  Yeah.
12    Q.   Okay.  Same thing for topic number 30 -- or
13  same thing for workers fired, operators who were fired
14  in that same time period?  That's something that --
15  you could address that?
16    A.   Absolutely.  Yes
17    Q.   Likewise, I think I get the same answer for
18  32.  Position descriptions for the following
19  positions: operators and operator supervisors.  And I
20  think you've said there exists one for the process
21  operators.  But what about operator supervisors?
22    A.   So as you say operator supervisors, I'm
23  assuming that you mean the shift supervisor?  The
24  workgroup lead?
25    Q.   I have come to -- workers have told me that

Page 212

1    Q.   We've covered the topic as much as OQ can
2  tell us about its experience with workers who needed
3  modification of job duties due to physical
4  impairments.  Chris Vasek, Val Chavez, Eddie Milton,
5  Mark Svatek, Jonthen Times, and John Wilson; right?
6    A.   Yes, we've already covered that.
7    Q.   I want to address topic 30, the operators
8  that have been hired and fired at the Bay City plant
9  from 2019 to the present.  Who are the operators that
10  have been hired from 2019 to the present?
11    A.   So we covered that one around Chad, the --
12  the two employees.  They both hired in on the same
13  date, that would have backfilled him.  That was
14  Jackson Luder [ph] and Benjamin Cockrell.
15    Q.   So are those two names the only two
16  operators that have been hired since 2019 to the
17  present at the Bay City plant?
18    A.   No, there's -- no, I previously covered
19  that.  There's been at least 10 to 15.
20    Q.   Right.
21    A.   Potentially more.
22    Q.   I just need you to address the topic, to
23  tell me who those people are.  If they're 25, I need
24  all their names, all the operators that have been
25  hired from 2019 to the present?

Page 211

1  Jeremiah Tipps is a supervisor.
2    A.   Okay.  So that's the manufacturing
3  supervisor.  And yes, he also has a job description.
4    Q.   Okay.  All right.  And the personnel file of
5  Andy Rojas.  "His job and his ability to perform the
6  essential and marginal function of the job and any
7  accommodation proposed or granted to him."  Who is
8  Andy Rojas?
9    A.   Andy Rojas was an operator that was hired in
10  for Area 1.  He was employed with OQ Chemicals for a
11  short duration.
12    Q.   Okay.  Not to criticize or in any way demean
13  him in any way, but was he morbidly obese?
14    A.   Andy Rojas was extremely tall.  He was 6
15  foot 8, and he weighed 480 pounds.
16    Q.   And is it OQ's position that being -- what
17  did you say?  Six foot?
18    A.   Six foot eight.
19    Q.   Six foot eight, almost five hundred pounds,
20  that he was able to do extensive climbing?
21    A.   We had onboarded him, and once it came time
22  to get him -- secure him the proper PPE for -- for
23  working on elevated surfaces, after an extensive
24  search with support even from the vendors, we were not
25  able to find or procure a harness that would

Page 213

54 (Pages 210 - 213)

accommodate his height and weight. So it's not --
Q For -- oh, sorry, go ahead.
A It's not produced on the market. So we weren't able to get him the required PPE for him to perform the -- his role as a process operator.
MR. GRIFFIN: Let me object to non-responsiveness.
BY MR. GRIFFIN:
Q But when he was hired, he was hired at a time when OQ believed he was able to perform all of the essential and marginal functions of the job; right?
A Once he onboarded, the PPE restriction was -- was discovered. We onboarded him without knowing that there was that restriction.
MR. GRIFFIN: Let me object to non-responsive.
BY MR. GRIFFIN:
Q I'm just saying, at the time he was hired and allowed to go to work?
A We cleared him.
Q Yeah. Cleared him even though he was 6 foot 8 and weighed almost 500 pounds?
A That's true.
Q Okay. Now, does OQ admit that

Jeremiah Tipps has shared that he is fine with operators switching tasks out to help workers out with injuries and disabilities?
A Jeremiah has not communicated that to me.
Q Has anyone else communicated that Jeremiah has actually said, "As long as the operators are fine with it themselves, I don't have a problem with it"?
A This is the first time I'm hearing this.
Q Okay. Has any OQ operator or supervisor ever been reprimanded or otherwise punished for allowing operators to switch tasks when one operator has a physical issue that prevents full performance of all duties?
A Not to my knowledge.
Q Has OQ ever made an effort to identify which functions of the process operator position are essential and which are marginal?
A We haven't clearly defined them.
Q Okay.
A I guess to back up to that, we have them defined in terms of what the requirements are, but they haven't been classified.
Q Say that again? What you have done?
A Well, we have them on the job descriptions; right? What their actual requirements are, and what

their duties entail. But to your question, they're not classified. We haven't said this is marginal. This is essential. This is marginal. We haven't --
Q You haven't done an analysis of that yet?
A That's correct. We covered that earlier.
Q Okay. Good. Good. Good. At the time that Chad was authorized the six days of protected leave when he talked to Windy, if the doctor had come back and said, you're going to need another three months, two months to get you where you could perform all of your job. Not just the essential functions, but the marginal functions. He's going to take several months.
Assuming -- you don't have to agree with me, assuming he had about 250 hours of vacation, and that would be about 5, at least 5 weeks; right? Yeah. Five weeks. Forty hours a weeks. Yeah. So that would have been an option for him had OQ not fired him on March 14th?
MS. COLON-POL: Objection to form.
A He would have been able and eligible to use his vacation that he had accrued to that point.
Q Okay. And it is literally true that Chad was fired before the end of his permitted leave?
A We've established that we termed him.

Q And has there been any analysis by OQ of how that could happen when its policies say that people will not be fired until they have failed to return to work after their approved leave?
A There's been no follow-up up, to my knowledge. If HR and legal had one, I'm not aware.
Q But we agree in this case that this particular provision that says "The employee will be terminated automatically from employment if he or she has not returned to work at the end of the maximum leave period." In this particular case, he was fired before that; wasn't he?
A Yes.
Q Okay. Let me ask you this. I don't need to go in detail, but I'll represent to you Exhibit Number 22 is answers to questions under oath that were sent under the rules, and you've signed this one.
And I just want you to tell us in your own words why it's repeatedly stated that Chad never asked for any accommodations for his GBS when you and I have discussed for hours this afternoon the communications that he had about the three different kinds of accommodations that were discussed between Chad and Windy and in some cases with you? Why are those sworn interrogatory answers, why do they say he never

1  requested any accommodations?  Why does it say that?
2        (Exhibit 22 was marked for
3        identification.)
4    A   Because we have no formal request for an
5  accommodation.
6    Q   So you're adding the word formal as the
7  basis for saying there were none?
8    A   Well, I don't have any records to produce
9  around that.  Nor is there a formal request from Chad
10  stating, "I have this going on.  Here's the
11  restrictions."  He wasn't medically released to -- to
12  come back to work, and -- and to my knowledge, you
13  know, got on STD, and then eventually went to LTD.
14    Q   Well, and that's the chicken and egg we've
15  talked about before.  He didn't have restrictions
16  because he was fired before he could get to the
17  doctor; right?
18    A   My understanding was that he's still on LTD
19  to this day.
20    Q   Okay.  But that is, in fairness, that's what
21  OQ told him to do; right?  Y'all told him to go on STD
22  and LTD?
23    A   Yes, he was on STD.
24    Q   Okay.
25    A   On -- on LTD, I know that he applied for it.

Page 218

1    MR. GRIFFIN:  Well, I'm going to object
2  to the sidebar.  When I'm finished with the question,
3  if you want to instruct the witness not to answer the
4  question, so instruct them.
5    MS. COLON-POL:  Okay.
6    MR. GRIFFIN:  But let me finish with
7  the questions first.
8  BY MR. GRIFFIN:
9    Q   It says here that number six, that
10  "Plaintiff's alleged damages may be limited or barred
11  because he failed to mitigate his alleged damages."
12  What is the basis, the factual basis for OQ claiming
13  that Chad hasn't properly mitigated his damages?
14    MS. COLON-POL:  I instruct the witness
15  not to answer that based on attorney-client privilege.
16  BY MR. GRIFFIN:
17    Q   The statement is made also that "Twelve:
18  some or all of plaintiff's claims are barred by accord
19  and satisfaction, settlement and or payment and
20  release."  I'll ask the same question.  What is the
21  factual basis for OQ's affirmative defense?
22    MS. COLON-POL:  I'll instruct the
23  witness not to answer that question based on
24  attorney-client privilege.
25  //

Page 220

1  I can't answer the process or collaboration with HR.
2    Q   Right.  But you're not blaming him for going
3  on LTD when you all fired him?
4    A   I don't blame Chad for anything.
5    Q   Okay.  Okay.  Good.  I need to finish up by
6  asking you, at least for this afternoon, the basis --
7  look at Exhibit Number 24.  There's a number of what
8  the law calls affirmative defenses, which plaintiffs
9  have claims and defendants have defenses.
10        (Exhibit 24 was marked for
11        identification.)
12    MS. COLON-POL:  I will instruct my
13  client not to answer any of those questions on the
14  basis of attorney-client privilege.
15    MR. GRIFFIN:  Okay.
16    MS. COLON-POL:  Any questions regarding
17  affirmative defenses.
18    MR. GRIFFIN:  Object to the sidebar.
19  BY MR. GRIFFIN:
20    Q   I'd like to ask you, start with -- there's a
21  section in the answer called affirmative defenses, and
22  I'm going to ask you about the factual basis for some
23  of these defenses.
24    MS. COLON-POL:  Again, do not answer
25  those questions.

Page 219

1  BY MR. GRIFFIN:
2    Q   And what is meant here in number 13 where it
3  says "Actions taken by defendant were supported by
4  legitimate business reasons"?  What is the factual
5  basis behind that affirmative defense?
6    MS. COLON-POL:  You can answer that
7  question.
8    THE WITNESS:  So we've been over that.
9  We were short-staffed in the unit and every time Chad
10  was out, we were incurring overtime.  His leave was
11  open ended.  There was no date in which he would be
12  able to -- or able to return to work to perform the
13  essential functions of his job.  The operator position
14  was critical, and due to business needs, we made the
15  decision to terminate and then subsequently backfill
16  the position.
17  BY MR. GRIFFIN:
18    Q   Well, that's all that's meant by that?  What
19  you just said?
20    A   Yes, sir.
21    Q   Okay.  All right.  Let's see.  Number five
22  is "Affirmative defense of the applicable statutes of
23  limitation or other time bars."  What's the factual
24  basis of this affirmative defense?
25    MS. COLON-POL:  I'll tell my client not

Page 221

56 (Pages 218 - 221)

**Page 222**

```
 1  to answer that question based on attorney-client
 2  privilege.
 3  BY MR. GRIFFIN:
 4      Q   And what is meant here?  What's the factual
 5  basis for number three?  It says "All decisions, all
 6  employment decisions with respect to plaintiff, would
 7  have been taken irrespective of plaintiff's alleged
 8  protected category."  What's the factual basis for
 9  that statement?
10      MS. COLON-POL:  You can answer.
11      THE WITNESS:  So we had already been
12  going down a path based on Chad's history and some of
13  the issues that we previously discussed about
14  termination of the employee, and we were going down
15  that trail.
16  BY MR. GRIFFIN:
17      Q   What does that mean?
18      A   To terminate him for performance.
19      Q   So is what -- I know it's 8 minutes until 4,
20  and you got kids to go pick up, but are we hearing at
21  3:52 that -- if I'm putting words in your mouth, tell
22  me.  But that the real reason for termination were
23  things other than what are stated in the letter?
24      A   No.
25      Q   Or it's your position that even if he'd have
```

**Page 223**

```
 1  gotten a release for full duty on March the 13th,
 2  2023, were you all going to fire him anyway?
 3      A   Chad had exhibited issues with his
 4  performance.  It's documented in his performance
 5  review.  We talked about chain of command.  We talked
 6  about earlier how he didn't always get along with the
 7  team and that he would exhibit non-ideal
 8  characteristics, especially when he didn't get his
 9  way.  He would talk bad about leadership management in
10  the company.  Windy also documents it that he's
11  talking bad about the organization.  And yes, we were
12  going down a path of performance management.
13      MR. GRIFFIN:  Objection.
14  Non-responsive.
15  BY MR. GRIFFIN:
16      Q   My only question was, is it OQ's position
17  that they were going to fire him on March the 14th,
18  2022 -- if they hadn't fired him for the reason stated
19  in the letter, that they were going to fire him for
20  other reasons?
21      A   We fired for him for the reasons stated in
22  the letter.  In addition, he had also other
23  performance issues that we were working towards.
24      Q   Right.  But you told us earlier today they
25  played no role in his termination?
```

**Page 224**

```
 1      A   Not in this -- this case, no.
 2      Q   All right.
 3      A   But we'd already made the decision back in
 4  January.  And when we talked about going into it --
 5  it's documented between Fred and I, and I know that
 6  you have it.  It talks about here's the reasons also
 7  behind to support it.
 8      Q   Right.  I'm not going to pick a fight where
 9  there isn't.  You all weren't going to fire him --
10      A   I'm not picking a fight.
11      Q   No.  No, I don't want to do that.  I wanted
12  to ask you, on March the 14th, had he not had GBS and
13  been off work, you all would not have fired him?
14      A   He still would have been employed, and we
15  would have been going down a trail of performance
16  management with him.
17      Q   Okay.  In other words, you were speculating
18  that you could have set goals for him and then maybe,
19  in the future, fired him for doing something wrong if
20  he had; right?
21      A   Well, that's part of the performance
22  management; right?  You have his performance review
23  that talks about things he needs to work on.  The
24  expectation is he would continue to improve.
25      Q   Sure.
```

**Page 225**

```
 1      A   And should he improve, of course, then there
 2  wouldn't be that decision.
 3      Q   I understand.
 4      A   -- asked me a targeted question around that.
 5      Q   Right.  But the lawyers read it one way.  And I
 6  But I wanted to make sure how you read it.  And I
 7  think we've established that he was not arguing they
 8  were going to fire him on March the 14th, even if he
 9  hadn't had GBS and even if he was not on approved
10  leave?
11      A   If Chad was working and employed, the answer
12  to that was no.  We would have went down performance
13  management.
14      Q   And he would have just continued to work?
15      A   Of course.
16      MR. GRIFFIN:  Okay.  Then I think we've
17  used all the time that we need to use.  I've tried to
18  get you out five minutes early.  We're going to do
19  that, and we will adjourn the deposition at this time.
20      MS. COLON-POL:  I have actually two
21  questions.  Two quick questions.
22          EXAMINATION
23  BY MS. COLON-POL:
24      Q   If you can turn to Exhibit Number 19.  I
25  just want to clear something for the record.  Exhibit
```

57 (Pages 222 - 225)

1   19, privilege log.

2          (Exhibit 19 was marked for

3          identification.)

4      A   I don't even know where that one is.  I have

5   a lot of documents.

6          MR. GRIFFIN:  You may not have that in

7   front of you since I don't.

8          THE WITNESS:  I have 18.  I don't have

9   19.

10         MR. GRIFFIN:  Would you like her to

11  look at that?

12         MS. COLON-POL:  Yes.

13         MR. GRIFFIN:  Okay.  There you go.

14  BY MS. COLON-POL:

15     Q   So, Ms. Zalman, when you were speaking

16  before regarding documentation, that there was no

17  documentation of communications regarding the decision

18  to terminate Mr. Hurta in March of 2022; do you

19  remember that that you said that?

20     A   Yes.

21     Q   And counsel confronted you with the fact

22  that there were some in January and why there were not

23  any in March of 2022?

24     A   Yes.

25     Q   This is Exhibit Number 19, which is a

Page 226

1   document that was prepared by our office as part of

2   the document production.  If you look at the first

3   column, it says, in the description, it says "Redacted

4   1/13/22 e-mail chain between Windy Morgan -- and

5   Dave Davis, in-house counsel, regarding termination of

6   Hurta"; do you see that?

7      A   Mm-hmm.

8      Q   And then the other four are redacted e-mail

9   chains between Windy Morgan, you, and Dave Davis

10  regarding the termination of Mr. Hurta.  So as you see

11  here, documents were actually produced -- I'm sorry.

12  There exists documents that were not produced, were

13  withheld because of attorney-client privilege.  But in

14  fact, there are e-mail communications regarding the

15  termination of Mr. Hurta prior to his termination in

16  March 2022; correct?

17     A   Correct.  Based on this.

18     Q   Yes.  And you were indeed part of those

19  e-mail communications; correct?

20     A   Correct.

21     Q   So there's actual records of the termination

22  or the decision to terminate Mr. Hurta; correct?

23     A   Correct.

24     Q   Okay.  My only other question is, it's been

25  a year and a half since Mr. Hurta's termination;

Page 227

1   correct?

2      A   That's true.  A little longer than that,

3   yes.

4      Q   Yes.  As of today, are you aware if

5   Mr. Hurta has been released to -- fully released from

6   his physician to return to work as a process operator?

7      A   To my knowledge, he has not been medically

8   released and is still on LTD.

9          MS. COLON-POL:  Okay.  Thank you.

10  Those are my only two questions.

11         MR. GRIFFIN:  Just one follow up and

12  I'll reserve.

13            EXAMINATION

14  BY MR. GRIFFIN:

15     Q   Given the question about if he produced to

16  you today a release to full duty -- well, let me ask

17  it this way.

18         Since ultimately, the court may consider

19  reinstatement or front pay as some sort of remedy,

20  from OQ's perspective, if he's able to work and has a

21  full release from the physician to work the process

22  operator's job, to perform all the essential functions

23  of the job, is it feasible to do so given his

24  experience and given his qualifications?

25     A   Chad is welcome, even today, to qualify for

Page 228

1   any positions that we have available or open if he's

2   qualified and able to perform the role.

3      Q   In other words, if it comes down to the

4   judge has to choose between reinstatement or front

5   pay, that's not something OQ says is off the table or

6   infeasible?

7      A   Well, reinstatement to his position is -- is

8   not.  Now, if there's another open position in which

9   he's able to do the work and qualified for, he's

10  welcome to apply for it.

11     Q   But if the judge says reinstatement or front

12  pay, is it not feasible to have him work as an

13  operator, a process operator out there?

14     A   Reinstatement's not -- not feasible.

15     Q   Okay.  Why not?

16     A   Well, again, to this day, he's still not

17  medically released to return.

18     Q   No, hear me out.  We started with the

19  prospect that at some point, the judge may say you

20  have a duty to reinstate him because he is able to

21  work full duty and he's got the release.  And

22  sometimes employers, and I represent employers too,

23  they say it's not feasible.  There's too much bad

24  blood.  Cause whatever problems.  Other times, they

25  say no; as long as he can do the job, he can perform

Page 229

58 (Pages 226 - 229)

1  the job.
2      Is there something -- does OQ say it's
3  infeasible for him to serve if reinstatement is on the
4  table?
5      A   Reinstatement to his exact previous position
6  is not feasible.
7      Q   And why not?
8      A   There's a few performance issues.  A lot of
9  bad blood that was the operators in the control room
10  and him.  He didn't get along with everybody.
11     Q   Okay.  So not feasible?  Okay.
12     A   Not for the process operator position, but
13  again, he's welcome to apply for any of the positions
14  that he's qualified for.
15     Q   Just not that one?
16     A   Not that one.
17     Q   Okay.  And that was the one he's been doing
18  for 20, 25 years?
19     A   That's true.
20        MR. GRIFFIN:  Okay.  I'll reserve the
21  rest of our questions.  Thank you.
22        THE VIDEOGRAPHER:  This now ends video
23  four.  Kristina Zalman.  Off the record at 4:02.
24        (Signature reserved.)
25  //

Page 230

---

1      (Whereupon, at 4:02 p.m., the
2      proceeding was concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 231

---

CERTIFICATE OF DEPOSITION OFFICER

1      I, KIMBERLY HOLTON, the officer before whom
2  the foregoing proceedings were taken, do hereby
3  certify that any witness(es) in the foregoing
4  proceedings, prior to testifying, were duly sworn;
5  that the proceedings were recorded by me and
6  thereafter reduced to typewriting by a qualified
7  transcriptionist; that said digital audio recording of
8  said proceedings are a true and accurate record to the
9  best of my knowledge, skills, and ability; that I am
10  neither counsel for, related to, nor employed by any
11  of the parties to the action in which this was taken;
12  and, further, that I am not a relative or employee of
13  any counsel or attorney employed by the parties
14  hereto, nor finan............. .......... ed in the
15  outcome of this

                    KIMBERLY HOLTON
17              Notary Public in and for the
18                    State of Texas
19
20
21  [X] Review of the transcript was requested.
22
23
24
25

Page 232

---

CERTIFICATE OF TRANSCRIBER

1      I, SIOBHAN MACKEY, do hereby certify that
2  this transcript was prepared from the digital audio
3  recording of the foregoing proceeding, that said
4  transcript is a true and accurate record of the
5  proceedings to the best of my knowledge, skills, and
6  ability; that I am neither counsel for, related to,
7  nor employed by any of the parties to the action in
8  which this was taken; and, further, that I am not a
9  relative or employee of any counsel or attorney
10  employed by the parties hereto, nor financially or
11  otherwise interested in the outcome of this action.
12
13
14
                    SIOBHAN MACKEY
16
17
18
19
20
21
22
23
24
25

Page 233

59 (Pages 230 - 233)

1  Hurta, Chad W. v. OQ Chemicals Corporation
2  Kristina Zalman , Corp Rep Job No. 6304444
3         E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Kristina Zalman , Corp Rep            Date
25
                                          Page 234

1  yanice.colonpol@meaderslaw.com
2         December 28, 2023
3  RE: Hurta, Chad W. v. OQ Chemicals Corporation
4  DEPOSITION OF: Kristina Zalman , Corp Rep 6304447
5      The above-referenced witness transcript is
6  available for read and sign.
7      Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10 on the attached Errata Sheet.
11     The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18         Yours,
19         Veritext Legal Solutions
20
21
22
23
24
25
                                          Page 236

1  Hurta, Chad W. v. OQ Chemicals Corporation
2  Kristina Zalman , Corp Rep 6304447
3      ACKNOWLEDGEMENT OF DEPONENT
4    I, Kristina Zalman , Corp Rep, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Kristina Zalman , Corp Rep            Date
13 *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15     _____ DAY OF _____, 20___.
16
17
18     _____
19     NOTARY PUBLIC
20
21
22
23
24
25
                                          Page 235

60 (Pages 234 - 236)

[& - 2022]

| & | |
|---|---|
| **&** 1:16 2:4,12 7:16 | |

| **0** | |
|---|---|
| **0001** 52:9 | |
| **00113** 1:8 7:14 | |
| **00166** 52:9 | |
| **0160** 197:20 | |
| **01666** 197:20 | |

| **1** | |
|---|---|
| **1** 3:9,20 13:13 | |
| 13:14 14:8,20 | |
| 21:4,7,15,16 | |
| 26:23 27:1 | |
| 30:20 35:2 | |
| 48:3,8,9,17,19 | |
| 49:7,10,24 | |
| 178:21,24 | |
| 179:7,14 180:2 | |
| 180:8,13 | |
| 182:21 183:5 | |
| 200:12,16,19 | |
| 200:21 213:10 | |
| **1/13/22** 227:4 | |
| **1/18/22** 5:14 | |
| **10** 3:23 199:4,7 | |
| 211:19 | |
| **10,000** 108:12 | |
| 108:21 | |
| **100** 175:18,23 | |
| 199:2 | |
| **10:02** 1:15 7:7 | |
| **10th** 75:15 | |
| 78:12 79:7,9 | |

89:25 90:8
94:9 126:17
127:16 173:20
**11** 4:3 199:10
199:15
**11:31** 77:8
**11:52** 77:12
**12** 4:5 9:20
199:12,15
**13** 1:14 4:6 7:7
199:18,21
221:2
**13th** 78:3,6
79:10 223:1
**14** 4:8 6:4
199:24 200:2
**14th** 46:9 59:18
65:19 96:22
97:4 126:10
127:17 129:16
132:23 186:14
186:18 216:19
223:17 224:12
225:8
**15** 4:10 49:22
211:19
**16** 4:11
**17** 4:12 152:12
**171** 4:17
**18** 4:13 22:10
22:11 154:22
179:24 201:20
201:23 226:8
**189** 5:20

**19** 4:15 22:10
46:16 152:17
225:24 226:1,2
226:9,25
**190** 17:18
**197** 3:15,16 5:6
**198** 3:18
**1986** 9:20
**199** 3:20,22,24
4:4,5,7
**19th** 191:11
**1:02** 132:10
**1:15** 90:17
**1:51** 132:14
**1st** 190:13

| **2** | |
|---|---|
| **2** 1:17 2:13 | |
| 3:11,22 4:7 | |
| 7:16 13:13 | |
| 14:8,22,22 | |
| 21:4,8,13,14,15 | |
| 21:16 32:9 | |
| 47:13 48:5,6 | |
| 48:17,18 49:10 | |
| 49:24 50:19,24 | |
| 51:10 175:17 | |
| 178:22 180:21 | |
| 182:21 183:5 | |
| 200:22 | |
| **20** 4:16 44:11 | |
| 171:11,13,16 | |
| 171:17,25 | |
| 230:18 235:15 | |
| **200** 4:9 | |

**2005** 12:14
**2007** 179:24
**2009** 12:21
**201** 4:14
**2010** 12:10
13:4 179:17
**2014** 14:6
19:11 20:20,24
21:1
**2017** 21:9,12,21
37:2,7,10
154:22
**2017/2018**
179:21
**2018** 21:23,23
104:12 114:2
114:10,19
115:19,22
117:6,8,21
153:19 179:15
**2018/2019**
156:11
**2019** 22:18
117:18 211:9
211:10,16,25
**2020** 15:11
16:3 23:1
32:15 113:3
198:17
**2021** 83:13
**2022** 4:9 23:4
23:13,14 37:11
46:9,25 49:16
62:21 63:2
65:5,19 66:9

Page 1

**[2022 – 7th]**

69:16 70:7
73:10,16 74:20
76:20 80:6
85:25 87:18
120:18 132:17
136:25 137:24
140:5,7,12
179:15 198:20
200:1 203:15
223:18 226:18
226:23 227:16
**2023**   1:14 7:8
58:14 113:3
198:13,15
223:2 236:2
**203**   2:5
**21**   4:18 87:4,5
87:10 88:9
202:16
**218**   4:22
**219**   4:25
**22**   4:21 6:5
25:11,13 47:9
49:14 65:19
67:11 77:20
83:10,14 147:5
190:14 202:15
217:16 218:2
**220**   6:4,5
**221**   6:6
**225**   3:4
**226**   4:15
**228**   3:5
**23**   4:23

**24**   4:24 219:7
219:10
**24/7**   129:5
**24944**   232:16
**25**   5:3 6:6
45:15 176:4
195:16 211:23
230:18
**250**   188:22
189:6 191:16
216:15
**26**   5:4 184:21
198:13
**27**   3:10 5:5
196:16 197:1
**27935**   233:14
**28**   5:7 196:21
196:21 236:2
**29**   5:8 196:21
196:21

| 3 |
| --- |

**3**   3:13,24 49:10
51:6 56:4,5,7
56:10 60:23
**3/10/22**   5:11
**30**   1:12 5:9
45:14 93:23
94:1 182:4
208:12 211:7
212:12
**31**   5:11
**32**   5:12 212:18
**33**   5:13
**34**   5:15

**35**   5:16 45:14
**36**   5:18 48:9,24
49:4
**361-573-5500**
2:8
**37**   5:20 189:14
189:16,19
**3:22**   201:13
**3:23**   1:8 7:14
**3:24**   201:17
**3:52**   222:21

| 4 |
| --- |

**4**   3:14 48:25
49:6 56:5,7
57:5 58:3
222:19
**40**   47:15,25
**4000**   190:17
**44**   49:11
**47**   47:16
**480**   213:15
**4:02**   230:23
231:1

| 5 |
| --- |

**5**   3:15 197:4,8
216:16,16
**50**   163:19
165:5,7 167:15
176:4,9 195:11
**500**   214:23
**51**   3:12
**56**   3:13,14

| 6 |
| --- |

**6**   1:12 3:16
197:11,14,25
213:14 214:22
**6/19/22**   190:13
**6/30/22**   5:4
**6/6/22**   190:12
**60**   188:20
189:2 208:13
**6304447**   1:20
234:2 235:2
236:4
**65**   18:24
**6974**   191:16
**6974.69**   191:10
**6th**   141:4
191:11

| 7 |
| --- |

**7**   3:17 47:14,25
198:4,6
**7000**   190:17
191:10,19
**716**   5:15
**718**   88:3
**723**   87:22
90:16 91:14,17
**724**   87:21 88:3
**75**   165:5
194:23
**77056**   1:18
2:14 7:17
**77901**   2:6
**7th**   74:19 87:18
90:17 91:18
97:4 105:6

Page 2

[7th - accrue]

129:16 140:12
141:4

**8**

**8** 3:19 199:4,7
213:15 214:23
222:19
**80** 46:4,24
188:20
**800** 73:8
**832-993-6630**
2:16
**845** 1:17 2:13
7:16
**865** 80:4,13
**87** 4:20

**9**

**9** 3:3,21 59:7
199:4,7
**94** 5:10

**a**

**a&m** 12:6,19
13:1
**a.m.** 1:15 7:7
**ability** 38:19
84:17 147:24
148:24 150:18
194:23 213:5
232:10 233:7
**able** 18:16
35:13 40:13
58:16 69:1,7
69:19 70:9
73:6 77:14
94:22 95:18

101:22 102:5
106:13 107:4
114:12,25
115:24 117:3
118:21 119:5,7
121:12,20
122:15 123:25
126:19 128:8
132:16 145:19
148:5 153:3
154:4,18
155:12 156:2
157:6,12,13
159:15 160:14
161:19 163:24
166:16 167:22
169:8,16
175:22 180:22
203:10,19
208:3 209:10
213:20,25
214:4,10
216:21 221:12
221:12 228:20
229:2,9,20
**abnormal**
196:7
**above** 33:2
201:21 202:4
235:7 236:5
**absence** 59:9
**absent** 7:22
**abshier** 32:6,13
33:1,10,14,23
36:3 90:21,22

134:23,24
157:21 158:5
**absolutely**
125:18 193:23
212:11,16
**accept** 122:19
**acceptable**
122:24 166:7
**access** 67:3
68:16,18 73:11
81:1
**accommodate**
17:11 95:18
102:5 121:21
123:1 155:17
170:17 202:25
205:4 214:1
**accommodated**
118:13 153:25
154:11 160:7
202:12 205:1
**accommodati...**
102:14 112:9
112:11 113:16
118:24 121:14
122:8,10,20,21
123:5,10
144:11,21
152:8 153:22
154:17 155:3
156:5 160:11
160:15 170:15
172:12 213:7
218:5

**accommodati...**
99:11 113:13
113:25 114:1,4
114:5 115:22
117:15 123:3,8
123:21,24
124:5,5,13,16
124:18,24,25
129:22 130:12
130:13,19,24
130:25 131:1
131:12,18
150:7,11
154:25 156:8
156:13 157:4
158:4,13,21
170:11 171:2
172:14,23
205:12 208:18
217:20,23
218:1
**accomplished**
154:4
**accord** 220:18
**account** 70:22
71:13 72:10
80:8
**accountable**
169:2
**accrual** 97:8
100:5,13 126:5
129:24 132:17
**accrue** 72:16
72:24 100:17

[accrued - agree]

accrued 63:7
71:24 72:10,22
73:3,18 78:18
79:15 80:9,14
80:15 100:14
100:19 110:15
140:8 141:18
142:20 189:25
190:1 192:14
216:22
accuracy 236:8
accurate 59:9
61:6,12 91:17
186:9 232:9
233:5
accurately
60:10,24
199:24
accusing 39:14
39:17
achieved
196:24
acids 15:4
acknowledge...
235:3
acting 146:15
action 1:7 7:13
232:12,16
233:8,12
actions 221:3
active 146:22
actively 47:11
activity 139:12
actual 33:5
89:6 157:22

183:11 215:25
227:21
actually 28:10
43:24 57:8
80:16 91:2
96:21 98:11
99:4 121:24
125:7 127:18
141:9 153:11
153:12 168:25
169:3 172:17
177:10 190:23
191:3,4 200:9
215:6 225:20
227:11
adam 212:2
add 49:5
107:19 132:24
171:24
added 49:19
183:8 205:2,6
205:13,18
adding 218:6
addition 17:23
21:4 46:15
84:13 188:9
223:22
additional 20:4
35:3 49:5,9
60:13,18 63:7
67:10 71:21
72:16 80:15
94:20 97:10
122:25 131:16
174:21 200:10

200:16 204:19
206:5
additionally
7:22
additions 235:6
address 27:5
30:2,20 31:12
34:9 35:1,12
35:19 36:16
38:2 64:10
68:5 73:3
130:17 156:24
211:7,22
212:10,15
adequate 30:17
adequately
72:2 79:24
adherence
193:2
adhering 171:1
adjourn 225:19
admin 14:1
administer
7:20
administrative
124:7 127:3
admission 5:7
admit 214:25
admits 111:24
112:4 129:10
admitted 96:25
adverse 38:13
149:13
advisable
196:10

advocate 84:23
advocated 84:6
advocating
85:4,5
affect 148:24
affected 196:13
affirm 155:1,2
affirmative
219:8,17,21
220:21 221:5
221:22,24
afflicts 174:19
afford 108:8
afforded 158:4
afternoon
217:21 219:6
agenda 68:22
agents 14:13
ages 26:11
ago 27:19 29:5
48:22 99:20
127:24 161:10
agree 7:24
17:13 59:7
60:4,8 76:15
76:19 85:21
87:3 91:15,16
100:7,18 103:2
106:3 110:1
121:8 123:24
125:10 142:5
160:6 187:5
203:21 206:8
206:23 207:3
216:14 217:7

Page 4

[agreed - anymore]

**agreed** 125:16 138:20 161:15
**agreements** 236:14
**agrees** 74:14,19 113:12,17 157:22 171:6
**ahead** 80:22 114:7 209:7 214:2
**albeit** 47:12
**alfaro** 1:16 2:12 7:16
**align** 127:4
**alleged** 220:10 220:11 222:7
**allen** 21:5 22:18
**allocation** 23:23
**allotment** 100:16
**allotted** 236:15
**allow** 40:17 95:25 104:16 128:16,22 129:16 150:8 161:11 170:12 196:11
**allowed** 67:10 84:1 92:20 95:12 104:9 113:25 114:3 116:11 117:2 150:17 151:5

151:22 153:1 154:17 155:2 155:15 156:5 158:25 159:10 159:21 202:13 214:20
**allowing** 84:23 120:2 155:17 215:11
**allows** 187:22
**alluded** 126:24
**altered** 114:20
**alternative** 59:14 122:16 123:15 129:21 129:24 205:22
**alternatives** 130:8,10,21 131:23
**amended** 3:9 51:4,7
**america** 17:4 20:6,8,11,12
**amount** 67:2 122:14 140:10 191:17 192:13
**amsterdam** 16:21
**analysis** 216:4 217:1
**anderson** 212:2
**andy** 213:5,8,9 213:14
**announced** 15:12

**answer** 4:24 6:2 10:8,15,16 10:17,19 27:18 38:12 44:6,24 46:22 50:25 51:16 52:1,12 52:20 53:4,8 54:2 59:4,10 64:2 66:14,25 70:9 79:8 80:20 81:18 82:5 98:22 99:3,20 102:11 106:22 107:8,9 107:16 109:5 115:14 116:23 118:5 126:5,7 126:13,15 127:23 128:11 130:1 135:9 137:1,25 140:22 142:8 142:23 143:1 144:15,24,25 145:2 146:7 152:16 153:16 156:2,16,18,25 157:1,3,12 158:7 160:4 162:12 166:12 166:15 168:19 168:21 170:6 183:19 184:11 189:5,5 191:1 191:13,20

198:19 210:15 212:17 219:1 219:13,21,24 220:3,15,23 221:6 222:1,10 225:11
**answer's** 73:24 98:2 121:5
**answered** 11:1 40:4 51:4 53:3 59:8 81:12,14 107:13 140:3 142:13 146:3,3 172:9 184:8,11 185:13 200:7 204:8
**answering** 10:1 10:21
**answers** 4:21 5:7 33:18,19 50:24 66:22 71:10 217:16 217:25
**anybody** 29:14 130:11 134:16 148:3 149:17 164:16,22 174:9 181:17 182:2 208:7 209:19
**anybody's** 202:20
**anymore** 151:12

Veritext Legal Solutions
800-336-4000

[anytime - asked]

| | | | |
|---|---|---|---|
| **anytime** 27:24 | **appreciation** 44:17 | 27:16 29:4 | 48:14,16 82:6 |
| **anyway** 223:2 | **approach** 162:16 | 30:5 46:4 | 159:10 160:4 |
| **apart** 31:10 | **appropriate** | 49:12 77:8,12 | 178:18 |
| **apologize** 18:7 | 90:23 91:9,23 | 132:10,14 | **argue** 131:17 |
| 44:22 46:18 | 92:12,15,18,19 | 188:22 201:17 | **argued** 184:7 |
| 85:12 91:22 | 92:25 95:21 | **archived** | **arguing** 124:11 |
| 113:11 122:11 | 121:3 170:15 | 195:14 | 162:6 210:6 |
| 132:25 172:10 | **appropriately** | **area** 4:7 13:13 | 225:7 |
| 204:4 | 119:2 | 13:13,13 14:8 | **argument** |
| **apparent** 165:3 | **approval** 3:16 | 14:8,20,20,22 | 138:15 |
| **apparently** | 49:4 99:12 | 14:22 19:6 | **arguments** |
| 128:18 | **approvals** | 21:4,4,7,8,13 | 210:9 |
| **appear** 89:9 | 114:5 135:16 | 21:14,15,15,16 | **array** 117:4 |
| **appears** 90:5 | 135:17 | 21:16 22:1,21 | 154:18 |
| 90:16 91:12 | **approve** 99:8 | 32:9 47:13 | **articulate** 83:1 |
| **appended** | 117:19 127:13 | 48:3,4,4,6,8,9 | **asked** 23:10 |
| 235:7 | **approved** 49:3 | 48:12,17,17,18 | 29:9,10 35:15 |
| **applicable** 8:3 | 97:10 98:19 | 48:19 49:7,24 | 36:11 39:18 |
| 199:19 221:22 | 99:8 101:9 | 49:24 98:15 | 40:3 51:15 |
| 236:7,14 | 106:10,24 | 115:22 129:11 | 53:3 60:23 |
| **applied** 19:7 | 107:10 110:16 | 142:20 147:11 | 68:22 78:3 |
| 69:22 218:25 | 124:6 141:3,16 | 147:19 166:10 | 81:11,14 91:22 |
| **applies** 184:3 | 142:14 143:23 | 177:4,4,8 | 92:12 95:5 |
| **apply** 18:16 | 150:2 161:21 | 178:18,21,22 | 101:22 102:24 |
| 23:2 165:7 | 165:25 197:13 | 178:24 179:7 | 103:18 107:12 |
| 229:10 230:13 | 217:4 225:9 | 179:14 180:2,8 | 112:8 113:11 |
| **appointed** | **approximate** | 180:13,21 | 113:13 128:7 |
| 16:14 | 27:23 191:17 | 181:17,21 | 130:16,25 |
| **appreciate** | **approximately** | 182:17,21,21 | 131:18 132:24 |
| 25:20 45:6 | 12:3 14:4 | 183:5,5 199:20 | 133:6 135:22 |
| 47:10 82:1 | 17:18 18:21,24 | 200:5,12,16,18 | 138:23,25 |
| 91:4 119:20 | 19:1 21:2 | 200:21,22 | 140:16 141:7 |
| 172:11 | 22:23 23:12 | 213:10 | 146:2,13 |
| **appreciates** | | **areas** 13:12 | 150:24 151:19 |
| 43:24 | | 14:8,19 48:1 | 153:21 156:12 |

[asked - aware]

| | | | |
|---|---|---|---|
| 156:17 162:13 | 207:22 209:6,8 | 216:15 | **authorized** |
| 166:6 172:10 | **assigned** 7:5 | **assumption** | 7:20 57:25 |
| 173:14,15,18 | 13:11 147:18 | 78:13 111:17 | 59:1 89:22 |
| 173:23 204:3,7 | 194:15 206:3 | 111:19 | 95:17,19 96:12 |
| 210:10,14 | **assigning** | **atkins** 200:13 | 96:16 98:18 |
| 217:19 225:4 | 168:22 | **attached** | 106:3 216:7 |
| **asking** 10:1,19 | **assignment** | 236:10,12 | **authorizing** |
| 28:13 29:12 | 3:20,22,24 | **attachments** | 96:20 |
| 36:6 38:4 | 85:8 101:15 | 34:12 | **automated** |
| 42:21 44:16 | 102:20,22,25 | **attempted** | 162:15,24 |
| 45:23 46:1 | 103:15 107:3 | 10:15 184:11 | **automatically** |
| 52:10,19 62:9 | 112:12,14 | **attempting** | 217:9 |
| 63:1 64:10,12 | 113:17 124:9 | 47:23 | **availability** |
| 64:15 66:12 | 124:10 126:16 | **attendance** | 23:8 146:21 |
| 72:2,21 85:12 | 127:3 128:7 | 8:10 | **available** 18:14 |
| 85:14 90:1,6 | 146:22 199:5 | **attention** 42:18 | 19:6 59:15 |
| 103:6 122:7 | 201:1,6 205:22 | 52:14 | 80:19 101:15 |
| 124:3 127:24 | 206:5 | **attorney** 8:13 | 102:21 107:2 |
| 130:16 144:8 | **assignments** | 8:16 219:14 | 128:24 129:1,9 |
| 144:18 148:13 | 206:2 | 220:15,24 | 130:2,7 172:24 |
| 149:17 152:18 | **assist** 147:19 | 222:1 227:13 | 205:23 229:1 |
| 154:24 155:24 | 148:18 161:18 | 232:14 233:10 | 236:6 |
| 155:25 157:8,9 | 166:7 167:22 | **attritions** 47:20 | **avoid** 28:13 |
| 159:19 169:21 | 169:22 | 49:6,19 | 29:12 |
| 173:21 219:6 | **assistive** 123:19 | **audible** 10:8 | **award** 4:13 |
| **asks** 172:12 | **associate** 14:2 | 74:7 | 201:20 202:3 |
| **assertive** 39:11 | **associated** | **audio** 232:8 | **aware** 29:8 |
| 39:12,18,19 | 133:23 176:19 | 233:3 | 50:12,15 62:12 |
| 40:3 | **assume** 20:19 | **august** 49:16 | 110:22 124:23 |
| **assessment** | 111:17 150:4 | **authority** 24:7 | 151:19 152:18 |
| 104:20 113:21 | 152:16 | 25:18 41:11 | 152:19,19,22 |
| 115:1 116:14 | **assumed** 21:23 | 106:7 148:3 | 154:19 156:8 |
| 119:4,21 120:1 | 22:2 29:1 | 156:11 | 156:20 195:17 |
| 121:2 126:2 | **assuming** | **authorize** 96:7 | 217:6 228:4 |
| 146:20 195:13 | 212:23 216:14 | 121:3 | |

**awareness**
80:25

**b**

**b** 1:12 3:7 4:1
5:1 40:25
69:15
**bachelor's** 13:2
**back** 11:21
18:25 22:25
41:16 56:1,15
58:13 61:15
62:4,13,14,20
63:6,13,23
64:16 65:25
66:23 67:13,16
68:3 69:14
70:1,6,14,22,23
71:3,11,13,17
71:20,25 72:9
72:25 75:21,24
77:10 80:8
82:10,21 84:5
94:5 108:25
109:2 111:6
112:12 114:15
115:7 118:10
118:19 119:6
125:5 126:13
126:24 132:7
132:12 136:11
136:21 138:13
139:18,19,20
142:10 145:6
145:13,22
146:1,14 147:5

150:13,23,24
151:23 152:8
152:12,14,14
152:21,24
157:6 175:23
185:5 186:11
196:21,22
197:25 198:16
201:15 202:12
215:20 216:8
218:12 224:3
**backfill** 49:16
50:10 142:20
200:12,15
221:15
**backfilled**
49:18 211:13
**background**
11:15,25
**backside**
158:21
**backwards**
82:19
**bad** 74:21
118:7 120:7
165:6 175:9
196:22 223:9
223:11 229:23
230:9
**balance** 196:12
**ballpark** 27:23
47:7 49:22
**bank** 26:2,2
69:19 70:7
100:19 140:13

187:8 190:1
191:17 208:24
**barre** 61:11
74:16 87:9
111:3,10
**barred** 220:10
220:18
**bars** 221:23
**base** 189:1
**based** 16:9
68:21 78:11
79:9 82:20
100:6,20
104:21 115:2
116:6 141:17
175:24 191:8
220:15,23
222:1,12
227:17
**basic** 191:15
**basically** 14:15
194:17
**basing** 79:8
**basis** 67:16
176:22 218:7
219:6,14,22
220:12,12,21
221:5,24 222:5
222:8
**bates** 5:15
87:24 88:2,3
90:16 91:13
**bathroom** 77:3
**bay** 4:7 14:9
16:22 17:1,6

17:14,17 19:17
20:1,2,8 50:15
55:21 178:17
183:22 202:6
211:8,17
**becoming**
183:15
**beef** 93:1
**began** 41:25
72:24 91:18
**beginning** 8:11
78:7 82:19
100:16 170:17
190:12
**behalf** 2:2,10
26:22
**behavior** 38:13
**belabor** 192:12
**belief** 89:16
190:21 198:25
198:25
**believe** 21:10
53:25 64:19
89:17 94:4
103:11 132:24
135:14,15
151:24 155:23
158:19 160:25
190:9 199:2
202:16
**believed** 214:10
**believes** 194:23
**beneficial**
203:12,13

**[benefit - business]**

**benefit**  71:6
112:23
**benjamin**
211:14
**best**  10:11 19:9
29:23 40:17
106:22 107:8
107:16 142:23
163:7 167:10
189:4 232:10
233:6
**betsy**  58:4,9,18
60:5 75:20
76:4 97:23
98:5
**better**  10:3
37:14 175:14
204:15
**beyond**  64:14
185:6 201:21
202:4
**big**  14:13
185:20
**birth**  9:18
**bishop**  16:25
20:5,7 25:1,6,7
**bit**  11:15,25
13:6 14:7 27:5
37:13 47:19
88:22 106:21
147:9 157:20
165:12 175:25
192:19
**biweekly**
190:24

**blame**  219:4
**blaming**  219:2
**blanket**  104:23
**blood**  229:24
230:9
**blue**  93:10
**board**  16:13,13
16:15 83:6,12
83:16,22 84:2
84:17,24 85:4
95:5,19,25
98:11,25 99:7
99:14,16 101:4
101:25 102:1,6
102:8,15 103:4
103:10,16,23
104:9,17,18
112:25 113:1,2
113:16 114:13
114:25 115:19
116:11,17
117:10,12,25
118:2,13,21
119:1,22 120:2
120:9 121:4
124:6 125:5
129:2,12
148:20 149:2
149:23 150:6
150:17,25
151:5,8,12,14
151:16,22,22
151:25,25
152:7,13,20
153:1,2,3,13,15

153:22 154:1,2
154:12,17
155:3,18 156:6
157:10 161:22
161:24 162:7
162:16,21,25
163:4,7,12,17
178:13 179:1,8
179:13 180:3
180:12,21,23
181:4,9,13
182:17 193:15
193:22 202:13
202:18,21,21
203:1,9,12,14
205:1,6 207:24
208:4,5,12,25
209:21 210:3
210:19
**boards**  104:13
181:15 203:8
**bobby**  182:3
**bobby's**  182:3
**boilers**  14:24
**bones**  14:7
**bonus**  108:6,8
108:11,16,20
108:23
**book**  194:3
**books**  57:2
**boot**  158:1,6,7
158:15,25,25
159:4,10,13,16
159:19,22,24
160:1

**border**  125:1
**born**  11:15
12:1,2
**bothering**
148:21,22
**bottom**  88:2
**brad**  155:21
156:5
**braided**  176:17
**breaching**
168:13
**break**  11:2
66:15 68:25,25
80:11,17 82:13
82:22 87:16
110:6
**bring**  38:1
145:25
**brittany**  65:16
**broad**  205:14
**broke**  82:22
**brought**  82:12
145:20,22
**buck**  126:11,20
**budgeted**  47:2
47:3,14,14
48:9 49:3
**building**  14:1,2
**bulk**  16:10
**bunch**  51:15
84:13
**business**  14:14
20:14 37:25
47:24 60:19
107:14 128:8

Veritext Legal Solutions
800-336-4000

[business - chad]

146:10,23
206:13 207:14
207:14 221:4
221:14
**businesses** 16:5
170:25
**butanol** 13:17
14:21
**buy** 122:25

**c**

**c** 2:1 7:1 16:11
40:25
**cable** 176:12
**caboose** 15:15
**calendar** 66:1,2
**call** 13:13 14:1
14:20 17:7,9
39:6,12,12
42:10 51:24
69:4 133:24
136:13 148:2
160:24 166:19
166:20 171:15
184:10,16
194:3
**called** 9:7 55:5
151:13 166:21
219:21
**calling** 70:14
**calls** 85:20
219:8
**campo** 26:5
**cancer** 175:5,6
175:7

**candidate** 19:9
**candidates**
55:15
**candidly** 110:5
**capabilities**
164:19
**capability**
168:24 181:11
**capacity** 32:16
55:4
**captured** 93:9
113:4
**care** 93:18
100:24
**career** 14:5
43:25 45:7
201:5
**carries** 164:5
**carry** 163:19
163:24 164:9
176:4
**case** 7:11 29:21
34:18,22 41:18
50:21 73:8
86:14 96:19
152:23 177:12
189:22 199:14
217:7,11 224:1
**cases** 51:1
122:25 168:5
217:24
**categories**
173:8,10
**categorize**
192:25

**category** 222:8
**cause** 38:16
55:17 72:25
73:23 75:3
89:13 100:15
120:20 128:7
138:13 146:22
184:22 190:4
212:6,7 229:24
**caused** 62:20
**causes** 117:3
175:12
**celanese** 17:24
17:25 195:15
**center** 161:25
162:14,20,20
162:21
**ceo** 16:11,12
**certain** 67:2
122:23 131:5
**certainly** 11:5
69:10 155:5
167:2
**certificate**
232:1 233:1
**certifications**
5:6 196:18,24
197:3
**certified** 7:25
236:16
**certify** 232:4
233:2
**ch** 90:18
**chad** 1:5 2:2,19
7:10 8:13 35:8

36:18,20,21
37:4,5,7,16
38:1,2,9,10,11
39:17 42:21
43:17 44:9
45:8,14,18,20
46:6 49:13
52:7 57:16
59:2,10,18
60:7 61:9 63:3
64:11,20,23
65:4,11,23
66:8 67:23
70:17 71:5
73:17 74:6,23
75:14,15 76:20
77:19 78:6
82:24 83:5,12
83:13,21 84:1
84:23 86:17
87:2,7,17 88:6
88:10,14 89:2
89:5,11,15
90:6,8,11,20,23
91:9 93:16
94:6,14,14,18
95:4,17 96:20
97:6 100:4,10
100:18,22
105:17,22
106:17 107:25
108:6,7,21,25
109:11,22
111:10,24
112:4,8 113:12

[chad - claim]

| | | | |
|---|---|---|---|
| 117:9,10,24 | 228:25 234:1 | **changes** 22:12 | **childhood** 12:4 |
| 125:3,15,19,24 | 235:1 236:3 | 37:15 114:24 | **children** 26:9 |
| 126:6,15 | **chad's** 43:24 | 235:6 236:9 | **choice** 92:21 |
| 127:10 128:5 | 45:6 49:15 | **changing** | 105:17 125:6 |
| 129:20 130:11 | 56:6 77:16 | 176:21 | **choose** 73:22 |
| 131:12,23 | 78:5 86:14,23 | **characteristics** | 161:5 179:2 |
| 132:18 140:18 | 90:1 93:14 | 223:8 | 229:4 |
| 141:24 145:4 | 119:22 147:11 | **charge** 19:12 | **chooses** 92:20 |
| 146:16 147:4,7 | 167:19 171:8 | **chart** 4:6 | **chose** 92:25 |
| 150:23 151:11 | 177:4,14 | **chase** 204:9 | 146:23 206:14 |
| 151:12 152:17 | 184:15 198:24 | **chavez** 157:16 | 207:1 |
| 160:19 167:19 | 199:20 222:12 | 211:4 | **chris** 45:21 |
| 167:19 172:7 | **chain** 19:20 | **check** 95:10 | 119:9,9,12,16 |
| 173:4,14,19 | 24:4,5,14 | 112:3 168:8 | 119:18,19 |
| 174:4,18 | 74:24 87:13 | 169:11 186:2 | 153:5,6,8,8,11 |
| 178:18 179:6 | 91:2 223:5 | 191:23 196:8 | 154:16,24 |
| 180:22 181:11 | 227:4 | **checked** 187:2 | 155:2,17 182:1 |
| 182:9,17 184:8 | **chains** 227:9 | **chemical** 13:4 | 211:4 |
| 184:16 185:17 | **chair** 27:7 95:2 | 26:22 172:16 | **christmas** |
| 187:8 188:24 | 129:7 | **chemicals** 1:8 | 200:11 |
| 196:24 197:6 | **chance** 30:6 | 1:13 2:10 7:11 | **chronology** |
| 197:12 198:2 | **change** 20:19 | 8:17 9:22 12:9 | 61:8 74:4 79:3 |
| 199:5 200:25 | 20:22 21:21 | 12:11 13:25 | 87:3 94:5 |
| 201:4,20 202:4 | 75:9,9 76:14 | 14:9,12,16 | **circa** 179:20 |
| 202:12,21 | 77:1 114:11 | 29:2 213:10 | **city** 4:7 14:10 |
| 203:10 204:10 | 115:13 116:5,9 | 234:1 235:1 | 16:22 17:1,7 |
| 204:13 206:2,9 | 116:13 176:9 | 236:3 | 17:14,17 19:18 |
| 207:24 208:3 | 196:4 201:9 | **chemist** 12:11 | 20:1,2,8,16 |
| 208:11 210:17 | 234:4,7,10,13 | 13:4,7 19:1 | 50:15 55:21 |
| 210:19 211:11 | 234:16,19 | **chemistry** 13:2 | 178:17 183:22 |
| 216:7,23 | **changed** 32:13 | **chemists** 13:11 | 202:6 211:8,17 |
| 217:19,23 | 32:15 46:5 | **chicken** 203:21 | **civil** 1:7 7:13 |
| 218:9 219:4 | 115:15,19 | 218:14 | **claim** 3:14 66:8 |
| 220:13 221:9 | 137:15 | **child** 37:21 | 97:16 |
| 223:3 225:11 | | | |

Page 11

[claiming - communicated]

| | | | |
|---|---|---|---|
| **claiming** 220:12 | 151:6 164:14 168:20 195:3 202:14 213:20 | 107:12 110:18 112:1 124:20 126:1 131:25 | 216:8 218:12 **comes** 39:5 70:23 176:20 |
| **claims** 219:9 220:18 | **close** 80:24 **closed** 105:5 | 132:4 136:16 137:8 143:6 | 191:16 205:10 229:3 |
| **clarify** 91:1 103:18 | 159:15,17,20 159:23,25 | 144:13 146:2 175:10 187:16 | **coming** 47:20 49:7 68:3 |
| **clarifying** 103:18 | 160:3 **clue** 173:18 | 188:4,16 203:24 204:7 | 80:24 **command** |
| **class** 12:19 **classified** | **coaching** 38:6 **coatings** 14:13 | 205:7 206:11 216:20 219:12 | 19:20 24:4,6 24:14 223:5 |
| 215:22 216:2 **classify** 170:3 | **cockrell** 211:14 **code** 42:24 | 219:16,24 220:5,14,22 | **commendation** 202:4 |
| **clean** 14:17 **clear** 18:7,8 | **coded** 190:23 191:21 192:11 | 221:6,25 222:10 225:20 | **comment** 125:17 155:7 |
| 39:14 45:22 47:10 65:3 | **codes** 67:18 **cognitive** | 225:23 226:12 226:14 228:9 | 173:17 **commercial** |
| 99:2 110:19 166:18 169:14 | 118:20 156:19 164:17 | **column** 227:3 **combination** | 20:15 22:19 23:22 |
| 225:25 **cleared** 214:21 | **cognitively** 165:10 | 183:25 **combined** | **commingled** 194:10 196:20 |
| 214:22 **clearing** 177:2 | **coincidence** 70:21 71:1,5,7 | 49:25 **come** 18:14 | **commission** 170:23 |
| **clearly** 215:18 **client** 219:13 | **coke** 14:16 **collaboration** | 21:3 23:22 38:1,2 39:15 | **committee** 16:12 |
| 219:14 220:15 220:24 221:25 | 219:1 **college** 12:6,6 | 41:12 58:12 61:15 63:6 | **common** 166:15 |
| 222:1 227:13 **climb** 102:4 | **colon** 2:11 3:4 8:15,16 11:17 | 64:18 82:2 83:5,8 84:9 | **communicate** 11:9 148:8 |
| 116:16 169:25 177:7 195:19 | 11:21 44:5,19 44:22 53:2 | 109:17 117:19 132:7 139:19 | 186:2 210:3 **communicated** |
| 196:1,12 **climbing** 62:3 | 56:18 60:12 76:21 77:5,23 | 139:20 151:8 151:13 164:22 | 67:18 71:15 75:6 94:24 |
| 84:2 101:23,23 120:3,3 147:23 | 81:11,15 84:8 102:16 104:10 | 169:20 175:22 200:14 212:25 | 108:10 135:12 152:10,23 |
| 148:16,25 | | | |

Page 12

[communicated - consider]

| | | | |
|---|---|---|---|
| 154:7 204:17 | 205:15,18 | 184:9,10 | 157:9 171:12 |
| 209:24 215:4,5 | 223:10 | **concerned** | 171:16 186:7 |
| **communicating** | **company's** | 120:9 | 187:19 196:17 |
| 72:7 90:12,24 | 26:22 41:19 | **concerning** | 196:23 197:5 |
| 91:9,20,23 | 156:25 188:7 | 3:19,21,23 | 199:11 201:19 |
| 92:16,19 | 207:17 | 4:13 201:20 | **confirmation** |
| 111:21 | **competent** | **concerns** 76:24 | 31:18 33:21 |
| **communication** | 106:15 129:11 | 85:8 199:4 | 63:20 64:19 |
| 3:18 4:11 5:9 | **complains** 99:7 | 202:3 | 67:8 185:8 |
| 5:11,12,15,16 | **complaint** 4:25 | **concise** 61:1,5 | **confirmed** |
| 5:18 33:17 | **complete** 10:18 | **concluded** | 28:10 63:2,16 |
| 78:11 82:20 | 209:6 235:8 | 231:2 | 87:17 95:12 |
| 85:16 94:3 | **completed** | **conclusion** | 187:17,20 |
| 135:21 143:8 | 167:5 209:8 | 175:9 | 200:23 |
| 143:13 186:16 | **completion** | **concrete** | **confirming** |
| 187:5 | 207:2 | 163:20,25 | 56:6 |
| **communicati...** | **compliance** | **condition** 89:6 | **confronted** |
| 29:13 31:8,11 | 193:3 | 172:23 174:18 | 226:21 |
| 85:15,20 86:2 | **complicated** | 174:22,25 | **confused** 164:2 |
| 135:5,6,9,16 | 164:6 | 196:7 207:5,12 | 197:23 |
| 137:9 138:5 | **comply** 40:16 | 208:17 | **confusing** |
| 217:21 226:17 | 160:7 173:24 | **conditions** 92:7 | 164:3 167:7 |
| 227:14,19 | **complying** | 209:3,17,18 | **congratulations** |
| **companies** | 39:15 | **condone** 149:8 | 26:19 |
| 15:16 | **comprised** 13:9 | **condoning** | **connection** |
| **company** 15:10 | 16:13 | 149:17 | 28:25 176:15 |
| 15:25 16:2,10 | **computer** | **conduct** 42:24 | 185:7 |
| 19:3 27:15 | 66:13,17,19 | 166:19,21,23 | **cons** 120:1 |
| 68:4,12,19 | 158:10 | **confirm** 31:23 | 125:25 |
| 71:6 127:12 | **concede** 206:1 | 46:16 57:1 | **consensus** |
| 128:16 144:19 | **conceivably** | 74:5 87:6 88:4 | 133:2 |
| 155:25 156:1,2 | 159:1 | 88:8 89:5 | **consequences** |
| 156:4,23 157:1 | **concern** 38:1 | 90:19 114:23 | 149:13 |
| 157:13 165:20 | 82:25 83:4 | 153:10 155:9 | **consider** 93:13 |
| 166:1 173:21 | 84:4 86:3 | 155:10 156:4 | 130:21 177:24 |

Veritext Legal Solutions
800-336-4000

[consider - correct]

| | | | |
|---|---|---|---|
| 178:13 194:19 228:18 | continues 71:18 | 162:20,21,25 163:12 210:19 230:9 | 236:4 |
| **consideration** 18:17 | **continuing** 39:20 | **controlling** 163:2 | **corporate** 1:12 28:11 29:18 52:19 111:22 198:18 |
| **considered** 124:14 136:20 | **continuity** 47:24 60:19 | **conversation** 31:15 33:24 | **corporation** 1:8,13 2:10 |
| **console** 83:6 | **contract** 17:25 18:8,12 158:17 | 75:16 94:9,18 95:7,8,15 96:9 | 7:11 8:17 234:1 235:1 236:3 |
| **constantly** 50:3 | **contracted** 18:6 | 97:13 106:1 108:5 109:15 | **corporations** 171:1 |
| **constitute** 8:7 | **contractor** 18:21 202:1 | 125:9,14,19 126:16,25 | **correct** 12:25 13:5 15:21 |
| **constrained** 208:19 | **contractor's** 202:5 | 127:24 141:23 142:3 173:20 | 25:19 26:18 31:24 33:3 |
| **consult** 174:9 208:7 210:21 | **contractors** 17:20,22 18:3 18:5 | 204:20,23 208:14,15,16 | 39:24 41:12 48:7 54:17 |
| **consulted** 31:24 208:1 | **contributions** 43:25 45:7,8 | **conversations** 28:14 31:13 | 58:19,20,23 62:16 67:19 |
| **consumption** 15:6,8 | **contributor** 208:17 | 37:24 70:17 75:14,17 83:11 | 70:2,3 71:14 74:22 90:9,10 |
| **cont'd** 4:1 5:1 6:1 | **control** 14:22 14:23 15:3 | 86:8,10,12,22 86:25 87:1 | 96:4,22 97:6 99:16 100:4 |
| **contacted** 27:14 151:18 | 36:22 45:23 46:13 47:18,19 | 94:10 96:20 101:11 110:2 | 101:4 105:18 110:17 111:11 |
| **contains** 171:14 | 49:17,20 83:12 83:16,20 84:2 | 127:19 129:19 | 111:25 121:10 123:8,23 |
| **contends** 194:22 | 99:16 102:2 103:10 104:17 | **cooling** 14:25 | 124:22 127:14 139:17 171:24 |
| **content** 30:22 | 104:18 113:1,2 114:13,25 | **cooperating** 148:15 | 178:23 186:5 199:18 216:5 |
| **contest** 11:1 112:14 182:14 | 115:18 116:11 116:15,19 | **copies** 56:20 | 227:16,17,19 227:20,22,23 |
| **context** 87:12 101:5 | 159:13 161:24 162:7,13,15,19 | **copy** 199:19 236:16 | 228:1 235:8 |
| **continue** 24:25 41:8 84:17 150:9 224:24 | | **corner** 88:2 | |
| **continued** 225:14 | | **corp** 234:2,24 235:2,4,12 | |

[correction - daylight]

correction
193:12
corrections
235:6
cost 31:18
counsel 8:11
9:11 11:17
28:20 29:2
30:23 86:13,20
131:25 134:2
172:18,20
201:8 226:21
227:5 232:11
232:14 233:7
233:10
count 134:7
counting
177:23
country 15:23
16:7
counts 57:10
couple 27:19
32:14 48:15,23
61:14,24 63:5
63:11,22 66:10
66:11,22 67:15
69:18 70:13,16
70:19 71:2,9
71:10,12,16
72:8,10,14,23
76:24 80:7
87:1 113:4
120:12 168:4
190:14

course 13:21
44:10,11 148:2
163:6 171:10
225:1,15
court 1:1 7:12
10:5,22 228:18
cover 46:15
coverage
118:20
coverall 104:23
covered 42:23
59:20 66:7
183:10 196:15
199:10 211:1,6
211:11,18
216:5
covering 46:12
covers 54:25
163:17 171:2
covid 158:9,11
158:17
coworker
201:21
coworkers
196:11 208:5
209:1
crazy 10:22
create 116:20
created 118:12
118:21 208:2
critical 60:14
106:14 194:17
221:14
criticality
194:20

criticize 213:12
criticizing
156:1 187:4
curable 174:24
current 197:6
currently 9:22
23:4 47:3
48:10,15 79:18
80:19
cut 24:1 85:13
123:16
cutting 46:19
cv 1:8 7:14

**d**

d 3:1 6:1 7:1
daily 176:22
193:5
damaged 181:7
damages
220:10,11,13
dan 2:20 7:19
data 13:19
195:10,18,21
date 1:14 7:7
9:18 27:23,25
46:9 59:2,24
60:16 61:22
63:11,12,14
64:11,13,22,23
65:6,11 66:13
68:10 78:1,9
82:14,17 98:12
117:8 121:18
187:8 190:1,13
192:15 198:13

199:1,2 204:18
211:13 221:11
234:24 235:12
dated 57:3
dates 35:10
63:9 64:5,20
64:24 66:18
68:11,23 82:17
198:15
dave 28:9 29:2
109:4,7,8
133:24,25
134:6 135:8
137:25 160:24
184:13,22
185:3,4 227:5
227:9
davis 28:15
29:2,6,13
133:25 134:6
227:5,9
day 13:21,21
40:9 45:18
74:20 78:6
89:5 90:18
94:9 111:2
127:18 129:5
139:13 152:9
166:15 174:1
176:23 179:6
185:14 210:15
218:19 229:16
235:15
daylight 103:11
103:14

Page 15

[days - deposition]

| days 39:16 | deal 39:9 | decisions 49:20 | definitive 60:16 |
|---|---|---|---|
| 61:14 63:5,7 | december 1:14 | 222:5,6 | definitively |
| 63:11,22 65:25 | 7:7 12:24 83:5 | decks 177:11 | 43:1 |
| 66:10,11,11,23 | 83:13,15 84:5 | declarations | degree 13:1 |
| 66:23 67:2,10 | 85:9 104:4 | 4:5 199:12 | delving 121:15 |
| 67:15,16,20 | 117:10,22 | declare 235:4 | demean 213:12 |
| 68:1,3,7 69:18 | 151:2,9 200:10 | decreases 47:8 | denied 43:8 |
| 69:23 70:5,6 | 202:16 203:9 | dee 25:8 | 79:15 124:12 |
| 70:13,16,19,22 | 236:2 | deemed 235:6 | 131:1,19 151:3 |
| 71:2,9,10,12,16 | decided 107:24 | defendant 1:9 | deny 86:22 |
| 71:21,23 72:9 | 113:22 127:14 | 2:10 8:16 | 95:9 108:11,20 |
| 72:9,10,14,16 | 181:7 184:17 | 221:3 | 127:7 155:9,10 |
| 72:23,24 73:3 | 185:1 | defendant's | 157:9 204:14 |
| 78:8 80:8,14 | deciding 19:16 | 3:11 4:24 | depart 29:6 |
| 80:15,16 90:9 | decision 108:3 | defendants | department |
| 96:8,18,19,25 | 109:19 120:11 | 4:21 219:9 | 50:7 55:16 |
| 97:1 98:8 | 126:7,23 | defense 220:21 | 82:6 122:2 |
| 100:19 105:5 | 127:17 132:22 | 221:5,22,24 | 191:20 205:10 |
| 105:11,12,14 | 132:25 133:1 | defenses 219:8 | departure 29:7 |
| 105:22 106:2 | 133:10 134:17 | 219:9,17,21,23 | dependent |
| 106:10,24 | 134:21 135:2 | defer 155:19 | 65:23 |
| 107:10 110:14 | 135:10,23 | 156:20 158:8 | depending |
| 110:14,21 | 136:10,15,24 | 160:17 190:22 | 16:16 54:22 |
| 131:9,10 | 137:21,23 | 191:20 | depends 177:2 |
| 142:24 143:11 | 142:15,17 | deferring | deponent 11:18 |
| 143:16 145:24 | 146:9,25 | 156:15 | 235:3 |
| 151:9 158:19 | 160:18,22 | deficient | deposition 1:11 |
| 158:22 170:2 | 161:3 182:16 | 152:13 | 3:10 7:9 8:5 |
| 173:15,23 | 185:7 186:17 | defined 215:18 | 27:6,24 29:19 |
| 184:15 187:15 | 187:6 207:14 | 215:21 | 30:2,7,12,14 |
| 188:24 189:3 | 207:22 209:10 | definitely 69:3 | 34:16 68:20 |
| 189:25 208:12 | 221:15 224:3 | 176:24 194:10 | 73:13 82:3 |
| 208:13 216:7 | 225:2 226:17 | definition | 97:22 225:19 |
| dcs 83:20 | 227:22 | 122:7,20 | 232:1 236:4 |

[derivatives - discrepancy]

derivatives
  14:12 15:4
describe  14:8
  21:15 22:15
  37:8 40:9
  80:14 194:7
describes  58:21
describing  14:8
  104:24
description  3:8
  4:2 5:2 50:14
  50:17 51:7,14
  51:18 52:6,22
  52:23 53:11
  54:5,7,10,22,24
  55:8 182:22
  183:4,9,13
  184:3 192:21
  194:12 195:1
  213:3 227:3
descriptions
  51:18,23 53:16
  54:15,19
  212:18 215:24
designated
  26:21 43:12
  102:8 155:14
  155:25 179:20
  201:2
designed
  123:25
designee
  114:22 144:18
  155:14 156:21
  192:5 198:15

detail  43:11
  217:15
detailed  183:15
details  29:7
determine
  189:10 193:24
determined
  129:15 181:7
develop  84:18
  86:15
developmental
  23:24
developments
  13:24
deviations
  193:12
devices  123:19
diagnosed
  61:20 74:9,10
  74:16,20,21,24
  75:13 83:11
  86:24 87:8
  89:7 97:1
  140:12,19
  141:10 171:8
  207:25
diagnosis  4:20
  61:10 87:18
  91:13,19 105:6
  111:13 131:9
  154:6 173:15
  184:15
dialogue
  125:23

difference
  23:18 39:19
different  13:24
  21:18 39:10,21
  52:15 53:19
  55:2,17 71:10
  72:20 123:8,18
  168:20 176:18
  176:19 185:25
  194:4 217:22
differentiated
  183:17
difficulties
  208:2
dig  80:19 155:5
digging  78:20
  115:23 200:6
digital  232:8
  233:3
direct  18:22
  24:9,10,15
  68:16
directed  95:17
direction
  194:11
directions  41:6
directive  39:15
  40:16
directly  17:25
  29:21 31:25
  49:18 74:23
  166:8 168:23
  169:9
director  9:23
  23:11,17,19,20

  24:11,20 25:1
  25:16,17 32:12
  58:22,23,25
  126:22 133:20
directors  23:7
disabilities
  89:23 170:18
  171:3 205:5,17
  215:3
disability  3:14
  104:16 111:25
  113:12 149:25
  150:8 170:13
  172:12 184:25
  190:19
disabled
  205:17
disagree  60:4
  164:17 206:8
discipline  43:7
disciplines
  13:10
disclosures
  51:7
discord  38:17
discovered
  193:12 214:14
discoveries
  34:11
discovery  3:12
  31:1 34:18
  53:6 73:13
  79:22 160:13
discrepancy
  198:22

[discretion - due]

| | | | |
|---|---|---|---|
| **discretion** 97:12 **discuss** 173:17 206:2 208:25 209:3 **discussed** 84:10 103:9 104:2 109:15 112:10 120:13 207:23 217:21,23 222:13 **discussing** 109:5 128:4 172:22 185:21 **discussion** 5:13 109:4 120:6,19 133:18 136:5 161:3 182:15 185:10 206:4 210:18 **discussions** 30:10 96:1 101:14 112:15 137:2 204:11 206:5 210:5 **disease** 91:19 92:16 175:18 **disgruntled** 38:14 101:7,8 **dishonest** 43:17 44:3,18 **disorder** 64:21 **dispute** 125:13 141:12 | **disputes** 42:11 **disseminated** 82:6 **distance** 116:15 **distinction** 182:20 **distinguish** 21:18 179:13 **distribution** 113:7 **district** 1:1,2 7:12,12 **disturb** 202:19 **divided** 13:13 **division** 1:3 7:13 **doctor** 105:23 106:11,25 109:2 131:4 142:24 143:16 145:18,20 146:14 203:17 208:12,13 216:8 218:17 **doctor's** 143:17 145:13,16,25 204:5,16 207:5 **doctors** 121:10 **document** 4:8 4:13 30:4 31:4 51:17 54:14 55:3,5,9 56:9 58:6 89:14 97:19 135:2 136:17 137:3,4 | 137:5,6 169:5 171:22 172:17 198:1 227:1,2 **documentation** 99:1 106:25 118:11 119:25 120:6,10 121:1 136:9,14 137:21,22 139:8 147:1 186:23 194:16 226:16,17 **documented** 67:22 98:17,20 99:13,15 121:7 136:18,23 137:1,25 147:2 160:19 170:5 203:6 223:4 224:5 **documents** 3:19,21,23 31:3,7,10 34:8 34:17,21,25 51:2 52:9,11 53:18 54:4,6 55:19 69:14 73:2,9 80:4,13 80:18 82:12 104:15 115:17 118:1 135:15 136:24 184:14 185:12 192:9 192:13 194:6 195:6 223:10 | 226:5 227:11 227:12 **doffing** 159:2 **doing** 9:25 27:21 29:18 36:7 113:18 150:15 163:1 164:15 169:3 181:17 182:24 207:18 224:19 230:17 **domestic** 14:24 **dominant** 153:11 **donning** 159:2 **door** 95:2 186:20 **doubt** 37:5 95:14 160:10 **downstairs** 178:10 **downstream** 15:6,7 **drafted** 76:22 **drinks** 77:3 **drive** 10:22 **drives** 75:10 **drone** 16:9 **drones** 176:6 176:11 **drums** 176:20 **due** 39:7 46:18 46:19 47:20 48:11 49:7,20 62:4 63:12 |

Veritext Legal Solutions
800-336-4000

[due - employee]

68:2 71:11
83:18 86:3
102:6 106:18
107:14 128:7
135:7 136:2,21
142:19,21
211:3 221:14
**dug** 104:1
**duly** 9:7 232:5
**dumb** 177:20
187:21
**duration** 12:4
65:21 68:23
83:24 96:11,18
96:19 158:10
213:11
**duties** 161:11
161:16 166:16
170:9 205:9
211:3 215:13
216:1
**duty** 5:19 59:14
63:6 83:7 84:5
84:6 85:8 86:3
95:6,11,13,19
95:25 101:4,13
101:22 102:14
102:21 103:3
103:10 104:13
107:2,3 112:9
112:11 113:16
113:24 114:1
114:23 115:18
117:2 118:13
118:18,19

119:3 120:14
123:12 124:6
125:1,5,25
127:8,9,13,22
128:16,23,24
129:1,17
139:15,17
146:17,18,21
150:13,25
151:12 154:12
155:3,15 156:9
157:10 170:17
172:11,24
178:14,15
205:1,5 223:1
228:16 229:20
229:21

**e**

**e** 2:1,1 3:1,7 4:1
5:1 6:1 7:1,1
15:20 28:7
31:4 34:4,10
65:8,10,15
67:6,7 69:3
78:14 79:9
82:18 85:7,10
85:20 86:2,4
94:25 120:13
120:17 135:5,6
135:16,19
136:1,9 185:16
185:18 186:2,9
186:14 187:2
198:11,16
199:1 205:16

227:4,8,14,19
234:3,3,3
**earlier** 72:8
87:6 116:15
161:16 175:23
188:20 196:9
210:14 216:5
223:6,24
**early** 21:10
62:1 225:18
**earnings** 31:17
35:4
**easily** 66:18
**eddie** 160:16
211:4
**eeoc** 4:16 30:24
34:4 170:20
171:7,13,21
172:4,7,18
**effective**
153:14 164:19
193:11
**effectuated**
122:9 160:22
**efficiencies**
13:20
**efficient** 192:23
**effort** 167:16
215:15
**egg** 203:22
218:14
**eight** 213:18,19
**either** 17:10
28:14 42:4
65:15 76:6

83:18 88:14
112:17 113:18
113:23 115:21
115:22 122:22
125:13 128:4
138:18 153:7
178:25 195:23
200:23
**el** 26:5
**elevated** 213:23
**eleven** 49:19
212:8
**eligible** 65:18
97:7 100:4,8
188:10 216:21
**emergency**
39:6 40:11,18
41:21 42:4,22
43:7,14
**emphasize**
92:22
**employ** 17:23
**employed** 9:21
9:22 18:9
44:12 172:20
198:23 213:10
224:14 225:11
232:11,14
233:8,11
**employee** 5:13
59:5,6 80:24
92:6 93:15
97:11 98:8
108:15 115:25
119:5 121:17

[employee - evaluated]

| | | | |
|---|---|---|---|
| 123:1,6 144:2 | enable 121:24 | engineers | esquire 2:3,11 |
| 157:7 168:25 | 123:1,6 176:8 | 13:10 | essential 55:20 |
| 188:6,10,14 | 202:21 | ensure 84:15 | 104:22 115:3 |
| 202:5 209:4 | enabled 71:20 | 170:25 193:3 | 119:5 121:19 |
| 217:8 222:14 | 84:5 158:18 | 203:7 | 122:16 150:11 |
| 232:13 233:10 | encompass | entail 216:1 | 154:14 193:25 |
| employee's | 55:1 | entire 149:12 | 194:8,16,24 |
| 62:6 92:21 | encompasses | 171:20 203:20 | 195:7 203:19 |
| 205:9 208:17 | 50:1 | entitled 55:10 | 213:6 214:11 |
| employees | encompassing | 110:9 | 215:17 216:3 |
| 16:14 17:16,18 | 184:4 | environmental | 216:11 221:13 |
| 18:5,6,8,19,21 | encourage | 24:23 | 228:22 |
| 18:23 20:17 | 42:10 148:6 | equal 170:21 | essentially |
| 21:24 31:22 | endeavor 10:11 | 170:23 171:1 | 122:13 135:18 |
| 44:7 49:17 | 10:18,20 | equally 203:13 | establish 77:15 |
| 51:1 67:2 | ended 59:24 | equipment | established |
| 68:16 73:20 | 60:16 84:10 | 14:3 55:18 | 80:3,18 81:17 |
| 78:16 89:22 | 94:21 102:5 | 123:1,18 | 112:4 150:14 |
| 100:24 104:11 | 105:5 107:3 | equivalents | 150:15 161:9 |
| 108:14 112:24 | 139:24,24 | 22:21 | 163:14 164:13 |
| 115:20 163:10 | 175:19,20 | er 75:2 | 216:25 225:7 |
| 188:1 205:17 | 221:11 | eric 19:14,17 | esters 13:18 |
| 211:12 | ends 230:22 | errata 236:10 | 14:21 |
| employer | endurance 11:1 | 236:12,13 | estimate 45:15 |
| 124:19 172:11 | engage 13:19 | es 119:19 232:4 | etcetera 83:19 |
| employers 51:1 | 126:19 172:12 | escalate 39:2 | etiquette 10:2 |
| 229:22,22 | engaged 37:22 | 39:20 41:3 | europe 16:22 |
| employment | 99:19 172:21 | escalated 41:10 | evacuate |
| 12:9 18:17 | 210:24 | escalating 39:9 | 116:19 |
| 20:19 75:14 | engagement | 41:8 | evaluate 115:2 |
| 170:21,23 | 119:4 | escalation 83:9 | 205:21 |
| 171:1 197:7 | engineer 19:5 | especially | evaluated 62:7 |
| 217:9 222:6 | 21:8,13,14 | 223:8 | 107:1 130:13 |
| empower 42:13 | 36:23 | espericueta | 130:15 |
| | | 167:18 | |

Veritext Legal Solutions
800-336-4000

[evaluation - experts]

evaluation  3:15
  100:6 122:21
  197:6 207:21
event  50:9
  59:16 72:20
  165:19 170:10
  183:22
events  63:19
  70:1 74:5
eventually
  218:13
everybody
  193:4 230:10
evidence  73:9
  186:16
evidentiary  8:4
exact  18:20
  21:22 58:16
  61:22 63:17
  183:4 230:5
exactly  61:23
  92:2 96:24
  143:8
examination
  3:2 9:12,13
  225:22 228:13
examined  9:9
example  14:16
  35:8 38:17,25
  39:5 47:13
  73:16 113:3
  122:17 147:15
  147:20,22
  149:11 152:11
  164:10 166:8

181:6 183:12
  195:11 197:12
  198:5
examples  45:2
  45:13
except  129:6
exception
  166:5
exceptional
  202:8
excluding
  177:6
exclusively
  179:7
excuse  114:7
  117:19 131:25
  150:22 187:21
  201:8
execute  194:5
executing
  194:13
exhausted
  61:21 62:24
  63:4,16,19,20
  64:16,18 65:11
  65:14,17 67:6
  67:8 69:24,25
  71:16 72:13
  77:19 79:4
  80:6,24 94:19
  137:10 144:2
  145:15,15
exhausting
  59:21 70:17
  142:21

exhaustion
  59:8
exhibit  3:9,11
  3:13,14,15,16
  3:17,19,21,23
  4:3,5,6,8,10,11
  4:12,13,15,16
  4:18,21,23,24
  5:3,4,5,7,8,9,11
  5:12,13,15,16
  5:18,20 26:23
  27:1 30:20
  35:2 38:13
  50:19,24 51:10
  55:25 56:4,5,5
  56:7,7,10 57:5
  58:3 60:23
  87:4,5,10 88:9
  93:23 94:1
  100:2 171:11
  171:13,16,17
  171:25 189:14
  189:16,18
  196:16 197:1,4
  197:8,11,14,18
  197:25 198:4,6
  199:7,7,7,10,11
  199:15,15,18
  199:21,24
  200:2 201:20
  201:23 202:3
  217:15 218:2
  219:7,10 223:7
  225:24,25
  226:2,25

exhibited  223:3
exhibits  196:19
  199:4
existing  106:20
  150:1,2 170:11
  205:8,21
exists  24:4
  54:14 212:20
  227:12
expanded
  64:14
expansions
  23:6
expect  92:5
  100:20 148:6
expectation
  161:20 166:5
  169:19 170:2
  224:24
expectations
  51:25 195:2
expected  29:19
  30:1 44:8
  180:13 209:22
expense  60:18
experience
  45:18 144:15
  154:23 156:10
  163:24 182:10
  202:20 211:2
  228:24
experienced
  180:20
experts  174:10

[expired - fine]

expired  78:10
explain  82:5
  186:15 191:18
  198:21 205:18
explanation
  73:7 115:16
  191:9 202:11
explicitly
  195:24
explore  130:10
exposed  45:2
  73:12 144:16
  199:17 203:8
exposure
  156:10 202:20
expressed
  76:23,24
  200:13
extended  62:3
  101:23 108:20
  108:24 112:23
  140:22 143:9
extensive  120:3
  147:23 148:25
  151:6 164:14
  202:14 213:20
  213:23
extensively
  184:22
extent  83:23
  174:8
external  30:23
extrapolating
  82:18

extremely
  213:14
extremities
  75:3 174:6
  175:13

**f**

facet  163:5
facets  193:1,6,9
  194:7,8
facilitate
  123:25
facilities  16:19
  16:20
facility  13:12
  14:9,11,19
  16:24 17:8,12
  17:17 19:25
  20:1,2 186:19
fact  50:22
  56:23 109:10
  109:13 128:21
  141:14 151:16
  161:15 226:21
  227:14
factual  173:22
  219:22 220:12
  220:21 221:4
  221:23 222:4,8
factually  109:9
fail  137:6
failed  173:24
  217:3 220:11
fails  236:15
fair  27:21
  30:13 50:2

93:7 186:4
fairly  124:14
fairness  218:20
faith  124:18
  172:13
faithfully
  210:10
fall  23:4
family  12:2
  37:20 90:8
far  125:20
fast  81:21
fathers  26:15
fatty  15:4
fault  210:14
feasibility
  208:25 209:20
  210:4,19
feasible  228:23
  229:12,14,23
  230:6,11
february  4:9
  12:10,24 61:21
  62:1,24 64:16
  64:17 65:13
  67:11 199:25
feed  196:4
feedback  38:18
  97:13 139:4
feel  11:3 30:16
  35:21 41:1,22
  79:23 206:19
feelings  138:22
feels  147:24
  148:3 206:20

207:13
felt  35:1,11,18
  35:25 39:18
  76:2 83:4
  92:13 100:23
  106:23 107:9
field  174:10
  180:8 190:5
fifteen  49:23
fight  224:8,10
figure  189:9
figured  153:2
  154:1
file  43:6,9
  213:4
files  47:4 155:5
fill  60:19
  206:12
filled  22:24
final  133:1,11
financially
  232:15 233:11
find  53:13 56:2
  64:6,7 68:10
  76:12 115:24
  117:21 121:1
  154:4 155:12
  155:19 160:13
  160:15 163:21
  177:13 181:3
  189:25 213:25
fine  17:10 24:3
  27:24 28:3
  56:23 215:1,6

[finish - following]

**finish** 10:18,20
85:18 126:12
143:20 219:5
220:6
**finished** 10:14
10:15 142:14
220:2
**fire** 86:11
105:14 106:23
107:9,25 137:5
137:6,7,21
143:4,19
160:19 184:9
184:17 188:1,8
223:2,17,19
224:9 225:8
**fired** 43:17,19
45:18 64:12
73:5 97:1
104:25 105:2,7
105:11 106:9
108:13,22
109:25 110:14
110:16 111:2
111:10 117:9
121:8 131:8
133:25 140:4
141:15 142:6
142:12 143:22
144:10,20
146:19 179:7
180:17,25,25
187:9 188:15
190:15,20
191:12 192:15

206:9,24 207:4
211:8 212:13
212:13 216:18
216:24 217:3
217:11 218:16
219:3 223:18
223:21 224:13
224:19
**firing** 74:2
82:24 83:3
85:6,24 86:9
126:10,11
130:9 136:19
139:1,2,23
143:15 184:8
185:16 186:17
187:23 207:11
**first** 3:9 9:7
10:5 27:6
28:22 30:5,8
31:1 35:24
36:19,20,21,24
37:4 46:2
65:21 70:1,14
88:9,24,25
94:6,10,15
101:21 102:13
102:19,24
103:8 112:13
125:6 126:12
126:13 151:11
189:24 190:12
192:8 215:8
220:7 227:2

**fit** 163:18
164:15 170:8
**five** 26:12 75:8
77:2 146:4
177:7,8,12,14
189:3 213:19
216:17 221:21
225:18
**fixed** 208:4
**flasher** 177:18
**flavoring** 14:13
**flight** 102:4
177:24
**flights** 116:16
168:4 177:7,9
177:12,15
**floor** 168:8,9
**flurry** 139:12
**fml** 144:2
**fmla** 3:16,17
4:23 59:9,21
61:10,13,20,21
62:20,25 63:3
63:12,16,20,21
64:11,13 65:5
65:12,15,16,19
65:24 66:7,23
67:1,10,12,23
68:10,17,23
69:15,19,23
70:6,18,22
71:3,11,16
72:9,14,16,22
72:22,24 73:3
73:10,17,21,23

74:1 77:16,20
78:5,10 79:3
79:14 80:5,16
86:14 90:1,6
94:19,20
109:24 112:20
118:20 132:17
136:3,22
137:10 139:12
139:13 140:8
142:21 144:2,8
145:5,12,15
147:4 150:24
173:9 185:9,17
185:19 186:1,3
186:8,10,14
187:8 188:2,9
197:13 198:1
204:15,18
**focus** 23:9
118:21 210:7
**folks** 17:6
74:20 88:5
134:4 137:24
182:16
**follow** 30:12
31:2 50:22
149:5 193:4
194:18 208:23
217:5 228:11
**followed**
194:20
**following** 12:22
42:1 152:2
154:16 193:10

[following - gas]

212:18
**follows** 9:9
**foot** 158:6
160:8 213:15
213:17,18,19
214:22
**ford** 198:19,23
**foregoing**
232:3,4 233:4
235:5
**foresee** 49:6
**forever** 181:8
**forget** 96:18
117:23
**forgive** 141:8
**form** 44:5 53:2
58:19 59:2
60:12 76:21
83:8 84:8
102:16 104:10
110:18 112:1
124:20 126:1
136:16 137:8
143:6 144:13
175:10 178:15
187:16 188:4
188:12,16
190:4 203:24
205:7 206:11
216:20
**formal** 99:25
105:2 114:5
117:14 130:18
131:3 195:21
218:4,6,9

**forthright** 76:3
76:12
**fortunate** 108:7
**forty** 216:17
**forward** 86:15
108:3 113:23
133:3 135:20
137:13 138:20
142:22 143:21
146:10,24
161:3 206:14
207:22
**found** 116:7
**four** 11:19 12:7
14:4 19:1
46:14 48:10
49:9 58:15
78:8 91:2,6,7
96:19 98:2
105:12,14
110:21 134:4
147:17 177:7,8
190:18 201:16
227:8 230:23
**fourth** 90:2,5
91:2
**frame** 23:4,14
36:25 58:16
63:25 71:19,19
114:19 156:11
175:21
**fred** 19:25
22:20 24:11,12
24:21 27:9,14
28:8 29:15

97:11 133:12
133:22 134:10
161:2 184:13
224:5
**fred's** 136:12
**free** 11:3
**frequency**
176:24
**fresh** 109:11
**friend** 93:14
**front** 69:14
210:16 226:7
228:19 229:4
229:11
**full** 9:16,17
63:6,23 100:15
117:4 139:15
139:17,18
146:17 154:18
158:19 164:21
172:2 179:17
197:7 212:3
215:12 223:1
228:16,21
229:21
**fully** 36:15
47:22 48:20,23
50:6 61:15
70:20 119:7
145:5 161:20
162:14,24
179:21 228:5
**function** 13:8
13:18 58:15
122:22,23

123:2 146:22
154:13,14,14
154:15 162:1
181:10 194:24
205:21 213:6
**functions** 55:18
55:20 104:22
115:3 117:4
119:5 121:20
150:11 194:1,1
194:8,9 203:19
214:11 215:16
216:11,12
221:13 228:22
**fundamental**
198:9
**funneled** 42:12
**further** 152:12
232:13 233:9
**fussing** 122:3
183:21
**future** 109:2
224:19

**g**

**g** 7:1
**gain** 65:25
71:20
**gained** 65:25
**galveston** 1:3
7:13
**galvez** 5:12
32:4 33:10,11
36:4
**gas** 16:5

Page 24

[gather - going]

| | | | |
|---|---|---|---|
| **gather**  106:25 | **generalist** | **global**  16:20 | **going**  9:25 |
| **gauge**  167:25 | 31:15 32:2 | 55:1,14 183:16 | 10:18 27:4 |
| 168:8,20 | 114:18 192:2 | **go**  11:8,21 | 28:13 29:12 |
| 169:12 196:6 | **generates** | 14:12,14,16 | 31:6 38:4 |
| **gauges**  168:1 | 198:1 | 18:25 35:23 | 45:15 48:11 |
| **gaytan**  19:25 | **gentleman** | 47:4 51:24 | 50:19 56:4,23 |
| 20:13 22:20 | 139:2 | 53:13,16 77:2 | 68:5,22 74:5 |
| 24:5,11,12,15 | **gentlemen** | 77:3 80:22 | 75:9 78:21 |
| 27:11 29:15 | 83:25 | 82:10,21 87:23 | 80:19 84:12 |
| 133:12 | **gesturing**  178:1 | 88:3,12,16 | 85:17 89:4 |
| **gbs**  61:20 64:24 | **getting**  37:6 | 92:3 93:22 | 90:5 91:10 |
| 65:15 68:2 | 66:13 70:8 | 105:23 106:11 | 92:4 94:5 |
| 71:23 74:9,25 | 81:18,24 136:7 | 106:25 109:1 | 95:18,24 101:8 |
| 83:11 84:7,24 | 154:3 185:20 | 114:7 118:10 | 107:25 109:18 |
| 86:24 87:18 | **girls**  37:20 | 120:14 125:5 | 112:11 113:22 |
| 88:6 91:21 | **give**  10:8 29:19 | 126:13,24 | 127:5,13,22 |
| 94:16 97:1 | 39:1 45:8 58:5 | 129:25 132:6,7 | 128:16 129:16 |
| 111:2,25 112:5 | 64:4 72:2 | 132:21 133:21 | 142:10,18 |
| 113:12 119:23 | 82:15 130:17 | 138:7 139:15 | 143:16 150:13 |
| 121:4 140:12 | 157:6,15 | 145:13 146:1 | 156:14 158:16 |
| 140:19 141:10 | 187:25 192:21 | 152:12 154:10 | 161:20 165:19 |
| 141:25 171:9 | 203:23 204:4 | 157:6 159:25 | 167:10 174:7 |
| 174:2,3,6,11,17 | 205:16 | 160:4 165:11 | 177:25 178:10 |
| 174:24 175:3,7 | **given**  23:16 | 167:25 168:3,7 | 180:7 181:1,3 |
| 185:15 203:14 | 41:7 44:8 | 168:12 169:25 | 183:3 185:5 |
| 206:3 207:23 | 98:12,12 | 177:5,14 | 188:8,22 190:3 |
| 207:25 209:24 | 139:15 143:1 | 188:23 191:3 | 195:6 196:5,7 |
| 210:20 217:20 | 145:23 157:10 | 196:6,8 201:9 | 197:4,25 |
| 224:12 225:9 | 157:11 172:2 | 209:7 214:2,20 | 198:14 200:14 |
| **geffert**  156:18 | 197:6 228:15 | 217:15 218:21 | 202:4 210:12 |
| 157:2,14 | 228:23,24 | 222:20 226:13 | 216:9,12 |
| **general**  14:9 | 235:9 | **goals**  224:18 | 218:10 219:2 |
| 30:19 34:3 | **gives**  194:12 | **goes**  51:25 | 219:22 220:1 |
| 45:25 145:3 | **giving**  27:22 | 59:21 71:22 | 222:12,14 |
| 182:22 195:25 | 157:2 | 194:3,25 | 223:2,12,17,19 |

Page 25

**[going - gun]**

| | | | |
|---|---|---|---|
| 224:4,8,9,15 | 106:24 107:11 | 101:20 102:10 | 222:16 223:13 |
| 225:8,18 | 118:18,24 | 102:12,17 | 223:15 225:16 |
| **good** 7:4 8:12 | 124:12 141:17 | 103:20,22 | 226:6,10,13 |
| 8:15 9:15 | 144:11 152:8 | 107:5,7 108:17 | 228:11,14 |
| 10:10 17:7 | 157:4,7 178:16 | 108:19 109:6 | 230:20 |
| 26:4,19 27:22 | 187:14 213:7 | 115:5,11 116:1 | **grind** 193:6 |
| 66:20,20,20 | **granting** | 116:3,22,24 | **gross** 25:9 |
| 71:24 75:25 | 142:11 | 118:9 120:22 | 190:5 |
| 88:18 119:17 | **grants** 117:15 | 120:24 122:4,6 | **ground** 168:24 |
| 120:6 124:17 | **great** 11:14 | 124:21 128:1,3 | **group** 13:9 |
| 132:2 147:9 | 12:19 17:16 | 128:10,12 | 32:24,24 33:6 |
| 172:13 196:10 | 25:10 26:5 | 130:4,6 132:2 | 33:7 38:17 |
| 216:6,6,6 | 27:12 33:9 | 132:5,15 | 46:15 74:24 |
| 219:5 | 36:15 132:5 | 137:17,19 | 91:6 108:1 |
| **goods** 181:7 | 196:13 | 140:24 141:1 | 133:2 135:11 |
| **googled** 174:6 | **griffin** 2:3,4 3:3 | 143:10 144:5,7 | 174:19 184:20 |
| **gotten** 223:1 | 3:5 8:12,13 | 146:5,6 148:10 | 199:4 210:21 |
| **governed** 68:14 | 9:14 11:23,24 | 148:12 149:14 | **grow** 84:18 |
| 114:17 | 22:9 42:14,16 | 149:16 152:3,5 | **guarantee** 69:7 |
| **gps** 174:24 | 44:13,15,20 | 162:3,5,10,18 | **guess** 14:6 |
| **grace** 44:8 | 45:4 46:21,23 | 164:23 165:1 | 37:23 50:12 |
| **grades** 13:24 | 52:2,4 54:1,3 | 165:21,23 | 152:11 156:3 |
| **graduate** 12:13 | 54:13 56:21 | 167:9 168:16 | 180:7 187:12 |
| **graduated** 12:5 | 57:11,13 59:25 | 168:18 182:8 | 204:3 215:20 |
| 12:8,24 | 60:2,20,22 | 182:11,25 | **guidance** 38:5 |
| **grandmothers** | 61:16,18 64:1 | 183:2,18,20 | 137:11,13 |
| 26:17 | 64:3,25 65:2 | 201:10,18 | 143:25 191:8 |
| **grant** 39:8 | 72:4,6,17,19 | 203:25 206:16 | **guides** 194:14 |
| 40:14 106:4 | 77:1,13,24 | 206:18 208:20 | **guillain** 61:11 |
| 115:4 151:11 | 78:23 79:1,25 | 208:22 209:12 | 74:16 87:9 |
| 188:14 | 80:2 81:5,7,20 | 209:14 214:6,8 | 111:3,10 |
| **granted** 66:23 | 84:19,21 86:5 | 214:16,18 | **gun** 206:9,19 |
| 67:16 68:10,11 | 86:7 92:8,10 | 219:15,18,19 | 206:21,23 |
| 69:23 79:14 | 97:25 98:3,21 | 220:1,6,8,16 | 207:3,10,11,18 |
| 94:20 95:11 | 98:23 101:18 | 221:1,17 222:3 | 207:19 210:16 |

Page 26

[guns - hospital]

| | | | |
|---|---|---|---|
| **guns** 176:7 | 140:5 142:7 | 176:8 202:13 | **hire** 50:8 |
| **guys** 46:5 48:13 | 150:15 151:7 | **height** 214:1 | **hired** 49:13 |
| 49:13 68:8 | 151:17 180:16 | **heights** 196:13 | 172:17 211:8 |
| 91:24 110:16 | **happening** 75:4 | **held** 7:15 51:8 | 211:10,12,16 |
| 130:10 131:1 | **happens** | 52:22 53:20 | 211:25 213:9 |
| 145:25 197:12 | 133:13 198:5 | 147:3 | 214:9,9,19 |
| **h** | **happy** 38:20 | **help** 31:11 63:9 | **hires** 200:24 |
| **h** 3:7 4:1 5:1 | **hard** 11:19 | 67:11 77:15,18 | **hiring** 19:14 |
| 234:3 | 52:11 | 83:25 93:15 | 212:4 |
| **half** 12:7 102:3 | **harm** 143:3 | 166:10 167:2 | **historically** |
| 227:25 | **harmful** 167:17 | 202:23 203:11 | 103:25 |
| **hand** 9:4 77:22 | **harness** 213:25 | 215:2 | **histories** 68:17 |
| 88:2 94:14 | **harping** 187:3 | **helping** 25:20 | **history** 186:21 |
| 125:24 129:20 | **head** 10:9,9 | **hereto** 232:15 | 222:12 |
| 130:11 151:4 | 47:2 | 233:11 235:7 | **hmm** 50:5 |
| 153:12,14 | **headcount** 47:2 | **hesitant** 62:19 | 51:12 81:15 |
| 171:12 186:17 | 47:12,14,15 | 62:22 163:3 | 101:1 199:9 |
| 187:7 194:18 | 48:9 49:3,5,9 | 207:16 | 227:7 |
| **handful** 45:1 | **health** 24:23 | **hesitating** | **hold** 145:4 |
| **handing** 196:22 | **hear** 111:21 | 184:9 | **holds** 147:7 |
| **handle** 38:5 | 155:1 229:18 | **high** 12:5,5,13 | **holidays** 83:17 |
| 42:11 201:3 | **heard** 28:21 | 12:15,16 | **holton** 1:19 7:5 |
| **handled** 81:4 | 115:12 186:25 | 193:14,16 | 232:2,17 |
| **handrails** | **hearing** 8:19 | 194:12 | **home** 125:4,11 |
| 177:21 178:11 | 123:19 180:6 | **higher** 25:17 | 158:11,18 |
| **hands** 160:21 | 215:8 222:20 | 107:24 | **honest** 76:3,12 |
| **happen** 19:24 | **heart** 99:5 | **highest** 24:7 | **honestly** 23:23 |
| 60:17 127:5 | 114:14 157:23 | 41:11 177:4,5 | 27:18 57:17 |
| 143:19 208:14 | 158:5,8,14 | **highlights** | 63:14 139:3 |
| 208:15 217:2 | **heavy** 62:3 | 113:8 | **honor** 187:13 |
| **happened** | 101:24 120:3 | **hillbilly** 36:7 | **hoses** 176:7,13 |
| 43:13 63:11 | 147:23 148:16 | **hinder** 202:20 | 176:14,15,20 |
| 67:9 71:2 | 148:24 151:6 | **hip** 148:21 | 176:25 |
| 72:12 74:15 | 164:5,9,13 | 166:1 | **hospital** 87:8 |
| 95:24 109:9 | 166:2 176:1,7 | | 88:6 89:7 |

Page 27

[hospital - inclement]

90:25 96:8,25
105:13,15
109:12 112:6
145:24 185:16
**hospitalization**
68:1 71:23
**hospitalized**
111:14 140:11
**hourly** 191:15
**hours** 130:24
188:19,22
189:2,6 190:6
190:10 191:16
192:18 216:15
216:17 217:21
**house** 20:14
227:5
**housed** 13:25
66:25 83:21
103:12,14
**houston** 1:18
2:14 7:16
20:16 91:10
**hr** 31:15 32:2
39:2 43:9
51:20 53:15,16
54:24 55:14
58:10,12,22
68:13 69:4
70:9 75:18
76:5 95:21
100:7 109:17
114:17,18
115:15,24
117:20 122:1

131:7 133:5
137:11 155:19
156:7,15,20
157:5,15 158:8
160:14,17
182:22 183:16
186:20 190:22
191:20 192:2
205:11 217:6
219:1
**hr's** 47:4
121:15
**hsc** 24:22
**hse** 24:21,24
25:5,7
**human** 57:18
58:17 126:21
143:25 144:15
144:23 145:1,1
183:6,7 189:21
191:14 212:4
**hundred**
213:19
**hunt** 24:12,19
25:4 133:19
134:19,20
161:2
**hurta** 1:5 2:2
2:19 3:13,15
4:14,19 5:16
7:10 8:13,14
34:21,24 52:7
59:2 62:13
77:19 90:20
97:24 108:21

172:22 226:18
227:6,10,15,22
228:5 234:1
235:1 236:3
**hurta's** 5:5
227:25
**hurts** 168:7
**husband** 26:1
26:13
**hydrogen** 15:7
21:8 22:3,7
36:22 53:22
55:7

### i

**idea** 70:4,5
132:17 196:10
**ideal** 223:7
**ideally** 49:11
50:8
**identification**
27:2 51:11
56:8 87:11
94:2 171:18
189:17 197:2,9
197:15 198:7
199:8,16,22
200:3 201:24
218:3 219:11
226:3
**identify** 8:10
42:20 50:3
56:5,9 172:13
215:15
**illness** 35:9
68:2 83:18

92:17 175:8
**illnesses** 89:23
**illogical** 142:5
**image** 14:17
**impairment**
116:20
**impairments**
211:4
**implement**
121:16 130:14
**implemented**
18:5 185:11
**implications**
209:11
**important**
162:8 163:4
186:1 193:1,7
193:9
**improve** 13:19
224:24 225:1
**inability**
101:24 136:22
**inaccuracies**
61:3
**inappropriate**
104:16 149:21
**inch** 136:23
**incidences**
98:14
**incident** 42:4
116:18,21
118:22
**incidents** 65:22
**inclement** 39:7
40:12

[incline - internal]

incline  178:1,3
include  22:16
  172:3
included  155:7
includes  91:18
including
  172:24
inconsistency
  165:3
incorporate
  49:9
increase  47:11
  212:8
increased
  212:7
increases  31:19
  33:22 47:7
increasing  49:8
incurring
  60:18 106:19
  221:10
indefinitely
  84:16
independent
  15:25
indifferent
  124:4
individual
  51:22 104:19
  104:20 119:21
  165:20 208:16
individualized
  120:1 121:2
inevitably
  175:9

infeasible
  229:6 230:3
inform  92:6
information
  29:22 30:25
  31:17,20,23
  35:4,21 36:1
  43:10 53:5,6
  53:17 68:15
  69:2 70:8 72:1
  77:15 80:20
  106:13 117:16
  120:8 121:11
  146:16 174:21
  183:8 204:12
  207:5,12
informed  27:12
  28:7 35:8
  96:10 100:9
  112:5 126:3
  127:21 144:3
  174:3
informing  4:19
  100:8
informs  74:20
  74:23
initial  3:11
initials  90:15
  93:8
initiating  70:17
injured  148:22
  161:11 165:15
injuries  215:3
injury  62:13,15
  62:20 147:6

149:24 152:8
152:14,15,24
153:11,14,23
157:25 158:6
158:14 159:23
165:18 167:20
186:11
ink  14:14
input  210:22
inquiring
  185:18
insert  41:2
inside  98:16
  102:8 106:16
  129:13 149:9
  149:12 161:12
  178:25 179:18
  179:20,22
  183:23 193:13
insider  173:18
insight  62:5
  142:18 203:18
instance  83:5
  161:6 169:21
instances  38:11
  38:24 44:9
  70:14 115:24
  176:6
instruct  219:12
  220:3,4,14,22
instructed  6:2
insubordinate
  39:13,23 40:5
  44:4,18

insubordinati...
  43:20
insurance  4:5
  199:12
integrate  16:2
  16:4
integrating
  18:1
intended  8:2
intensive  102:2
intentionally
  64:9
interact  37:15
interaction
  23:22
interactive
  124:18 172:13
  172:22
interested
  232:15 233:12
interests  16:7
interface  37:9
interfere  159:2
interfering
  150:18
interim  22:16
  22:21 23:11
  58:22
intermediate
  19:7
intermediates
  14:20
internal  23:7
  30:23 55:16
  66:6 96:1

[internal - joe]

| | | j | 54:24 55:7,21 |
|---|---|---|---|
| 101:14 | **irrelevant** | | 57:7 94:16 |
| **internally** | 180:10 | **jackson** 211:14 | 96:3 102:6 |
| 30:10 84:10 | **irrespective** | **january** 61:21 | 117:4 120:9,9 |
| **interpret** 190:4 | 222:7 | 61:23 62:21,24 | 122:22,22,24 |
| **interpretation** | **isolate** 38:14 | 63:2 64:16,17 | 124:1,6,7 |
| 121:16 192:17 | **isolated** 41:18 | 65:13,19 66:9 | 142:11 148:1 |
| **interpreted** | 117:21 | 67:7,10 69:15 | 148:15 149:10 |
| 83:8 86:4 | **issue** 41:3 71:3 | 70:7,15,16 | 150:12,19 |
| **interpreting** | 71:12 88:13 | 73:10,16 77:20 | 151:25 154:13 |
| 148:7 | 110:7 112:16 | 78:12 79:5 | 154:15 166:5 |
| **interrogatories** | 117:3 127:8 | 80:6 132:17 | 167:6 170:13 |
| 4:22 | 130:17 142:10 | 136:1,8,18 | 172:24 173:8 |
| **interrogatory** | 150:23 151:21 | 137:4,11,16,22 | 178:13 182:22 |
| 217:25 | 152:6,20 | 138:13 139:12 | 183:4,8,13 |
| **interrupted** | 153:23 154:6 | 139:23 140:5,7 | 184:2 188:11 |
| 118:6 | 154:16 166:2 | 145:11 146:15 | 192:22 193:1,6 |
| **interview** 97:23 | 171:8 215:12 | 147:5 186:10 | 193:9,25 194:7 |
| **interviewed** | **issued** 45:1 | 202:14 204:6 | 194:8,11,15 |
| 19:8 | **issues** 13:22 | 204:10 224:4 | 195:1,7 197:6 |
| **introduced** | 42:8,11 44:9 | 226:22 | 202:8,21 |
| 36:20,21 | 62:4,6 101:23 | **jeremiah** 5:17 | 203:20 206:10 |
| **introduction** | 104:9 114:14 | 38:25 90:20 | 206:25 211:3 |
| 36:25 | 114:16 116:11 | 133:20 134:25 | 213:3,5,6 |
| **investigated** | 117:1,2,12 | 135:1,18 209:9 | 214:11 215:24 |
| 171:7 | 118:20 139:22 | 213:1 215:1,4 | 216:11 221:13 |
| **invoking** 164:8 | 147:4 150:18 | 215:5 | 228:22,23 |
| **involve** 177:14 | 152:22 154:13 | **job** 1:20 3:15 | 229:25 230:1 |
| **involved** 29:21 | 155:4 156:6 | 13:6 19:1 | 234:2 |
| 126:10 132:22 | 157:11 204:25 | 21:11 27:22 | **jobs** 102:9 |
| 133:10 135:23 | 222:13 223:3 | 32:13 50:16 | 106:16 149:12 |
| 165:12 | 223:23 230:8 | 51:7,13,17,18 | 164:16 179:18 |
| **involves** 121:25 | **it'll** 10:6 54:7 | 51:22 52:6,7 | 179:20,22 |
| 139:7 | **item** 51:6 | 52:21,23 53:11 | **joe** 167:18,19 |
| **involving** 51:1 | | 53:15 54:5,7 | |
| 161:7 | ' | 54:10,15,19,21 | |

[john - knowledge]

**john**  2:3 8:13
  160:12 198:19
  198:23 211:5
**jonthen**  157:18
  211:5
**jory**  212:2
**jr**  2:3
**jt**  90:18
**judge**  50:13,25
  52:5 229:4,11
  229:19
**judge's**  52:16
**judgment**
  199:14
**july**  188:21
  190:13 198:13
**jump**  206:21
  207:10
**jumped**  206:8
  206:19,23
  207:3,10,17,19
  210:16
**june**  188:21
  191:11,11
**jury**  30:19 58:4
  67:12 72:23
  78:1 83:1 84:1
  93:24 109:10
  111:9 120:25
  129:14 131:20
  139:6 144:10
  144:21 149:19
  149:20 178:9
  179:12 191:18
  193:24 194:6

196:23 203:11
208:24
**jwg**  2:7

**k**

**keep**  41:8 47:5
  56:2 66:12
  70:14 72:2,20
  79:13,15 81:2
  99:15,17
  148:23 185:23
  190:21
**keeps**  67:1,25
  78:16 148:14
  186:3
**kept**  39:9 183:9
**kevin**  24:12,19
  133:19 134:19
  134:20
**kid**  37:21
**kids**  11:22
  26:17 222:20
**kimberly**  1:19
  7:5 232:2,17
**kind**  15:12
  29:19 38:4,6
  38:14 44:2
  93:13 106:13
  116:19 119:25
  120:10 132:17
  136:9 142:18
  187:6 194:3
  197:25 200:24
  201:5 204:10
**kinds**  73:15
  164:16 217:22

**knaupp**  2:4
**knee**  99:5
  114:15 148:21
  154:16 164:12
  166:2 167:17
  168:7
**knew**  111:4,22
  128:9 140:15
  180:20,22
**know**  10:14,16
  11:11,22 20:11
  21:6 26:4
  27:15,19,24
  28:3,8,9 29:10
  29:17,20 35:16
  37:6,13,19,22
  37:22 38:3,3
  38:24 40:24
  42:2,25 46:10
  47:1 52:8,9,11
  53:6,9,10
  55:11 57:20
  58:5,15 61:22
  63:15,17,18
  64:21 65:7
  68:1 69:11
  75:21 78:5,15
  81:8,9,13 82:2
  83:7,18 84:12
  84:15 87:1,13
  89:12 94:17,18
  94:23 96:9,10
  100:12 101:6
  101:11,12,16
  106:1 108:23

108:24 109:14
113:8 116:4,8
121:18,19,23
125:14,20
128:18 130:19
133:4 135:13
136:11 137:2
138:19 140:14
144:21,22
146:12 153:20
155:16 156:2,4
159:9 160:9
162:13 165:10
174:2,16,17
184:19,20
189:5,6 190:3
192:17 193:8
194:5,19
195:10 198:17
198:18 200:5
200:10,12,13
200:15,20
204:19 206:22
212:7 218:13
218:25 222:19
224:5 226:4
**knowing**
  214:15
**knowledge**
  29:23 55:19,22
  79:22 84:9
  85:3 114:19
  172:1 173:25
  185:15 195:13
  195:15 215:14

Page 31

[knowledge - length]

217:6 218:12
228:7 232:10
233:6
**knowledgeable**
163:9
**known** 122:14
152:11 175:8
**knows** 62:14
104:8 111:1
116:25 117:5
124:17 181:12
**kristina** 1:12
7:10 9:6,17
77:7,11 132:9
132:13 201:13
201:16 230:23
234:2,24 235:2
235:4,12 236:4
**kumar** 22:24
**kyle** 25:9,25

**l**

**lab** 13:25 25:5
**labeled** 87:21
194:15 195:8
**labor** 102:2
**laboratory**
14:2 24:20
25:8
**ladies** 83:25
**language** 44:2
44:16 45:3
**lapeyrouse**
2:20 7:19
**large** 108:1,6,8
140:13,14

**largely** 174:24
**larger** 16:7
**largest** 16:23
17:2,4
**late** 114:9
**law** 219:8
**lawmgk.com**
2:7
**laws** 8:4
**lawsuit** 180:11
**lawyer** 134:7
**lawyers** 10:16
42:17 86:18
87:25 225:5
**layman** 192:16
**laypeople's**
21:15
**lead** 22:25 32:8
32:17,21 38:18
38:19 46:15
57:18 113:6
126:22 212:24
**leaders** 42:13
**leadership**
21:24 91:21
109:16 133:7
134:5 148:9
150:3 161:21
208:10 209:9
209:19 210:24
223:9
**leads** 32:24,24
33:6,7 208:1
208:11 209:20
210:18,22

**leak** 196:7
**learn** 94:13
165:12 174:24
**learned** 82:12
**leave** 3:16,17
29:9,10 42:5
49:21 59:24
60:14,15 61:10
62:17,25 63:3
64:13 65:5,12
68:10,11 69:25
71:11,12 73:10
73:16,18,21,21
74:1,6,9,15
75:5,25 79:3
80:5 96:4,7,8
96:13,14,21,21
97:7,9 100:5
101:9 105:18
105:18,25
106:10,18,24
107:10 108:9
109:1,23,24,24
110:6,10,15,16
110:17,19
112:17,17,17
112:20,20,20
112:21,21
123:10,11
124:7 125:4,6
125:11 126:5
139:13 140:8
140:13,18,21
140:23 141:9
141:16,19,24

142:11,12,14
142:16,25
143:4,8,17,24
144:2,3,12,20
145:5,9 147:8
150:24 172:25
173:9,9,10,11
185:9 187:8,14
187:23 188:1,2
188:7,9,11,14
188:24 190:1
197:13 198:1
198:16 200:11
204:15 206:10
206:25 216:7
216:24 217:4
217:11 221:10
225:10
**leaves** 50:9
**left** 10:5 57:19
59:6 139:6
188:2 210:13
**leg** 157:25
**legal** 27:14
29:1 82:6 83:9
109:16 122:1
126:21 133:18
133:22 136:12
172:17 217:6
236:19
**legitimate**
221:4
**length** 177:23
178:7

[letter - lose]

| | | | |
|---|---|---|---|
| **letter**  3:13 5:4 | 86:3 95:6,11 | **line**  6:3 41:7 | **long**  26:7 44:12 |
| 43:23 56:6,11 | 95:13,19,25 | 60:8 135:20 | 142:18 143:13 |
| 57:2,4,16,22,24 | 101:4,13,22 | 170:1 234:4,7 | 148:7 159:14 |
| 58:1 59:21 | 102:14,21 | 234:10,13,16 | 159:17 166:9 |
| 60:7,10 76:23 | 103:3,10 | 234:19 | 170:5 175:17 |
| 172:17 186:8 | 104:12 107:2,3 | **lineup**  165:11 | 205:1 215:6 |
| 188:19 222:23 | 112:9,11 | **linking**  119:12 | 229:25 |
| 223:19,22 | 113:16,24 | **list**  50:8 55:20 | **longer**  66:7 |
| **letters**  15:10 | 114:1,23 | 131:6 | 75:23 76:6 |
| 45:1 170:22 | 115:18 117:2 | **listed**  24:13 | 102:20 132:1 |
| **letting**  11:22 | 118:13,18,19 | **listen**  210:13 | 179:4 181:17 |
| 35:16 101:6 | 119:3 120:14 | **listening** | 198:20 228:2 |
| **level**  24:15 41:3 | 123:12 124:6 | 197:16 | **longhand**  88:1 |
| 42:8 140:15,23 | 125:1,5,25 | **lists**  59:13 | **look**  23:5 50:20 |
| 159:6 168:24 | 127:8,9,13,22 | **literally**  216:23 | 55:25 56:19,22 |
| 194:12 204:20 | 128:16,23,24 | **litigation**  80:5 | 58:3 68:7,9,9 |
| **levels**  32:12 | 129:1,17 | **little**  11:14,25 | 68:16 167:25 |
| 97:10 108:2 | 146:17,21 | 13:6 14:6,7 | 168:4,7,20 |
| 109:16 177:25 | 150:13,24 | 27:4 37:13 | 169:20 171:11 |
| 195:19 209:9 | 151:12 154:12 | 47:19 58:14 | 174:23 189:10 |
| **liable**  199:13 | 155:3,15 156:9 | 87:12 147:9 | 193:24 194:6 |
| **liberty**  2:5 | 157:10 172:24 | 157:20 167:7 | 194:22 196:16 |
| **lieu**  117:25 | 174:10 178:14 | 174:7 175:25 | 219:7 226:11 |
| **life**  122:9 175:8 | 178:15 205:1,5 | 192:19 228:2 | 227:2 |
| **lift**  122:13 | **liked**  93:16 | **living**  31:18 | **looked**  35:7 |
| 194:23 | **likely**  94:23 | **located**  20:1,2 | 110:23 188:20 |
| **lifting**  62:3 | 95:2 | **location**  1:16 | **looking**  38:22 |
| 84:2 101:24 | **likewise**  10:16 | 17:14 19:18,21 | 48:13 50:17 |
| 120:4 147:23 | 212:17 | 19:22 | 51:6 53:14 |
| 148:17,24 | **limitation** | **locations**  20:12 | 120:20 140:20 |
| 151:6 164:13 | 148:5 170:4 | 196:5 | 143:14 189:18 |
| 166:3 176:1 | 221:23 | **log**  4:15 113:5 | **looks**  56:12 |
| 195:11 202:14 | **limited**  117:3 | 113:6 158:10 | 57:3 90:7 |
| **light**  59:14 83:6 | 147:24 220:10 | 226:1 | **lose**  48:22 |
| 84:4,6 85:8 | | | |

[lot - march]

| | | | |
|---|---|---|---|
| **lot** 15:15 23:21 38:18 76:4 83:18 166:13 185:3,4 186:20 193:19 212:1,6 226:5 230:8 | 221:14 224:3 235:5 | 122:24 129:14 131:18,19 156:24 158:17 165:2,3 166:14 167:4 175:18 178:9 183:3 188:13 196:20 200:8 209:10 225:6 | **manager** 19:14 22:18 23:1,14 23:19 24:20,21 25:5,6,7,8,9,14 25:18 32:1,11 57:19,21 58:10 58:12,17,24 80:25 126:22 186:20 |
| **lots** 123:8 | **madeline** 212:2 | | |
| **lowest** 42:8 | **mail** 28:7 65:8 65:10,15 67:6 67:7 69:3 78:14 79:9 82:18 85:7 86:2,4 94:25 120:13,17 135:5,6,16,19 185:16,18 186:9 187:2 198:11,16 199:1 227:4,8 227:14,19 | | |
| **luck** 74:21 109:25 | | **maker** 132:25 133:1,10 | **managers** 21:3 22:22 |
| **luder** 211:14 | | **makers** 182:16 186:17 187:6 | **mandates** 150:2 |
| **lumberton** 12:3 12:16,17,18 | | **makes** 10:2 15:5 204:21 | **maneuvering** 169:23 |
| **lunch** 68:25 132:3,6 | | **making** 29:20 109:19 120:11 126:7 134:17 134:21 135:2 135:10,23 136:10,15,24 137:21,23 142:15 146:25 185:7 | **manned** 46:14 |
| **m** | **mails** 31:4 34:4 34:10 85:10,20 136:1,9 186:2 186:14 205:16 | | **manner** 8:5 |
| **ma** 90:18 | | | **mans** 55:17 |
| **ma'am** 8:23 9:1 9:19 20:25 138:24 182:6 | **maintained** 179:22 | | **manufacturing** 32:8,21,22,23 210:5,25 213:2 |
| **machinery** 153:13 | **maintenance** 18:13 23:11 24:19 169:20 | **managed** 16:6 51:19 53:15 | **march** 23:15 25:11,12,13 37:10 46:8,25 47:9 49:14 59:18 63:25 64:14,18 65:19 67:8 71:18 74:19 75:15 76:20 83:10,14 84:7 85:24 87:18 89:25 90:8,17 91:18 105:6 120:18 126:11 129:15 |
| **mackey** 233:2 233:15 | **major** 48:12 | **management** 19:22 67:3 122:1 126:9 127:14 144:16 151:15 184:16 223:9,12 224:16,22 225:13 | |
| **made** 108:2 110:22 113:20 126:2 127:17 139:24 142:9 142:17 146:9 156:8 158:14 160:11 170:15 172:7 180:10 202:24 205:12 207:14,21,22 215:15 220:17 | **make** 7:3 11:7 14:11,17 30:3 35:9 42:17 45:22 67:11 69:3 72:7 75:10 79:2 98:24 99:19,20 103:7 109:9 119:11 120:25 | | |

Veritext Legal Solutions
800-336-4000

[march - microscope]

| | | | |
|---|---|---|---|
| 129:16 132:23 | married 25:22 | 70:9 72:1 78:4 | 120:12 135:22 |
| 136:6,10,25 | 25:24 26:7,8 | 79:19 81:4 | 161:4 185:21 |
| 137:16,24 | materials 23:7 | 86:14 89:19,24 | members 126:9 |
| 140:11,12 | math 191:15 | 92:4,7 95:21 | memorized |
| 141:15 145:24 | matter 7:10 | 103:24 105:9 | 63:14 65:6 |
| 186:14,18 | 175:17 | 111:20,22 | memory 29:4 |
| 200:14 204:6 | maximum | 115:24 117:20 | 63:17,19,21 |
| 216:19 223:1 | 217:10 | 121:17 131:5 | 66:14 70:15 |
| 223:17 224:12 | meaders 1:16 | 143:23 144:12 | 71:17 73:6 |
| 225:8 226:18 | 2:12 7:16 | 146:14 147:8 | 83:22 94:8 |
| 226:23 227:16 | meaderslaw.c... | 148:9 154:7 | 97:12,19,20 |
| marek 2:4 | 2:15 236:1 | 155:19 156:7 | 100:11 139:7 |
| marginal 55:20 | mean 34:7 35:3 | 156:15,20 | 158:24 160:2 |
| 154:14 194:1,9 | 35:21 48:24 | 157:6,15 158:8 | 200:9,17 212:1 |
| 194:16 195:7 | 49:15 59:20 | 159:19 160:14 | mental 195:3 |
| 213:6 214:11 | 64:11 66:5 | 160:17 173:9 | mention 134:3 |
| 215:17 216:2,3 | 76:22 89:12,12 | 185:8 205:10 | mentioned |
| 216:12 | 93:12 105:12 | 207:11 208:17 | 47:25 63:10 |
| marie 9:17 | 107:1 133:2 | 209:3,17,18 | 81:3 123:14 |
| marissa 5:12 | 135:17 136:19 | medically | 127:2 133:22 |
| 32:4 33:14 | 146:20 165:25 | 61:14 63:22 | 152:25 153:20 |
| mark 211:5 | 170:23 189:12 | 71:6 72:14 | 176:11 190:9 |
| marked 27:1 | 194:2,25 | 84:11 94:21 | mentoring 38:6 |
| 51:10 56:7 | 205:13,20 | 111:5 203:17 | merit 31:18 |
| 87:10 94:1 | 207:13 212:23 | 207:7 218:11 | 33:21 |
| 171:17 189:11 | 222:17 | 228:7 229:17 | message 174:4 |
| 189:14,16 | means 8:6 | meeting 4:11 | messages 88:5 |
| 197:1,8,14 | 17:13 21:16 | 137:3 138:1,4 | met 37:4 |
| 198:6 199:8,15 | 66:7 81:14 | 138:6,8,12,19 | 120:20 136:12 |
| 199:21 200:2 | 194:18 205:19 | 139:4,8 161:7 | metrics 16:1 |
| 201:23 218:2 | meant 141:2 | 184:5,18,19 | mexico 20:15 |
| 219:10 226:2 | 221:2,18 222:4 | 185:23,25 | 58:10 |
| market 214:3 | meat 14:7 | meetings 30:22 | microscope |
| marl 16:21 | medical 62:6 | 37:17 85:21 | 88:1 |
| | 67:18 68:13,17 | 86:13,16,17,19 | |

[microsoft - need]

| | | | |
|---|---|---|---|
| **microsoft** 86:17 161:4 | 134:24 135:18 135:19 157:21 157:21 | 98:2,6 150:21 170:1 175:17 190:14 191:12 216:9,10,13 | **moving** 176:25 **multiple** 109:16 195:19 **muskat** 172:19 |
| **mid** 114:9 **middle** 106:10 106:23 107:10 142:16 144:20 | **mitigate** 220:11 **mitigated** 220:13 **mixed** 178:18 196:18 | **moot** 139:24 **morbidly** 213:13 **morgan** 5:10 57:7 75:18 76:6,15,16,19 82:22,23 84:23 85:23 86:1,8 86:23 94:3 97:23 133:5 227:4,9 | **n** |
| **midst** 180:7 **midway** 104:12 **migrate** 18:19 **mile** 102:3,4 **milton** 160:16 200:11 211:4 | **mm** 50:5 51:12 81:15 101:1 199:9 227:7 **modification** 211:3 | | **n** 2:1 3:1 4:10 4:11,12,23 5:3 5:4,7,8,11,12 5:14,15,17,19 6:1 7:1 |
| **mind** 39:5 115:7 196:19 197:24 198:14 | **modifications** 170:11 **modify** 150:7 | | **name** 7:4 8:15 9:16,17 15:10 19:25 21:5 28:21,22 32:3 32:4 54:6 76:16 89:6 119:8 133:23 182:5 |
| **mindy** 37:20 **mine** 56:22 95:2 | **moment** 14:6 31:7 50:22 109:19 | **morgan's** 57:15 **morning** 7:4 8:12,15 9:15 27:6 104:2 140:4 183:11 183:17 189:8 | |
| **minus** 28:1 **minute** 188:23 **minutes** 9:25 75:8 77:2 99:20 138:1,4 161:10 185:23 186:1 210:13 222:19 225:18 | **monday** 64:20 **monitor** 13:18 81:1 162:25 196:6 **monitored** 168:25 **monitoring** 163:2 193:11 | **mouth** 164:21 222:21 **move** 49:5 108:3 113:22 133:2 135:20 138:20 146:10 146:23 148:19 161:3 206:14 207:22 | **named** 134:6 202:7 208:8 **names** 24:16 25:3,5 112:19 133:9 154:10 170:22 211:15 211:24 |
| **missing** 35:18 **misspoke** 130:23 **misunderstood** 24:24 | **month** 28:2 29:5 47:5,5 62:1 108:12,21 149:12 | **moved** 12:2 142:22,22 143:21 | **nanjing** 16:21 **nature** 55:1 **necessarily** 41:17 85:10 |
| **mitch** 32:6 33:14 39:1 90:21,22 133:20 134:23 | **months** 22:23 23:12 27:19 58:15 61:10,20 61:24 65:23 | **moves** 65:25 | **necessary** 10:7 148:18 235:6 **necessity** 59:22 **need** 11:12 18:20 24:16 41:7,12 46:16 |

[need - object]

| | | | |
|---|---|---|---|
| 56:3 62:7 69:4 74:12 87:12 88:15 93:16 106:23 107:9 116:8 120:8 122:22 123:18 123:22 149:24 155:16 156:4 156:24 161:18 170:4 177:1 196:6,8 201:9 204:13 211:22 211:23 212:3 216:9 217:14 219:5 225:17 **needed** 13:20 23:8 31:17 35:1,3,12,19,25 36:8 38:7 40:13 41:22 60:18 106:15 116:12 139:14 142:20 145:13 145:16 147:20 167:24 177:1 180:18 204:19 206:12 211:2 **needs** 11:4 18:13 39:7 41:20 42:12 77:4 98:19 99:8 107:14 128:8 153:14 206:13 221:14 224:23 | **needville** 11:22 **neither** 189:13 232:11 233:7 **nerve** 161:25 162:21 **neurological** 74:22 174:18 **never** 117:18 162:20 209:16 217:19,25 **new** 13:24 21:3 42:1 58:14 200:24 **nice** 14:17 **nodding** 10:9 **non** 46:22 54:2 57:12 60:1,21 61:17 64:2 65:1 72:5 78:24 80:1 84:20 92:9 98:22 101:19 102:11 103:21 107:6 108:18 115:6 116:2,23 120:23 128:2 128:11 130:5 137:18 140:25 144:6 147:16 152:4 162:11 165:22 168:17 183:19 214:7 214:17 223:7 223:14 | **normal** 131:7 177:24 **normally** 56:14 98:15,25 130:14 149:4 149:22 159:11 **normals** 130:22 **north** 2:5 17:4 20:5,8,11,12 **notarize** 236:11 **notary** 7:20 232:18 235:13 235:19 **note** 145:16,25 236:9 **noted** 235:7 **notes** 143:17 204:5 **notice** 3:10 4:16 171:13 **noticing** 8:11 **notified** 80:23 87:7,17 **november** 23:14 30:8 **number** 3:20 3:22,24 5:15 7:13 18:20 35:2 46:5,16 47:1,3,8,16 49:22 50:19,24 51:6 58:3 59:7 78:14,15 87:4 87:5 88:2,9 90:16 91:14 | 93:23 106:2 112:12 131:24 171:11,13,16 189:14,19,25 196:16 212:12 217:15 219:7,7 220:9 221:2,21 222:5 225:24 226:25 **numbers** 49:2 52:14 87:24 88:3 **numbing** 75:3 174:5 **numbness** 175:12 **nurse** 89:18,19 |
| | | **o** | |
| | | **o** 7:1 15:17,20 **oath** 103:8 217:16 **oaths** 7:21 **oberhausen** 16:21 **obese** 213:13 **object** 42:14 44:13 46:21 52:2 54:1 57:11 59:25 60:20 61:16 64:1,25 72:4 72:17 78:23 79:25 81:5 83:2 84:19 86:5 92:8 | |

98:21 101:18 102:10 103:20 107:5 108:17 115:5 116:1,22 120:22 122:4 128:2,10 130:4 137:17 140:24 144:5 146:5 148:10 149:14 152:3 162:3,10 164:23 168:16 182:25 183:18 206:16 208:20 209:12 214:6 214:16 219:18 220:1

**objection** 7:22 44:5,19,23 53:2 60:12 76:21 81:11 84:8 102:16 104:10 107:12 110:18 112:1 124:20 126:1 136:16 137:8 143:6 144:13 146:2 165:21 175:10 187:16 188:4,16 203:24 204:7 205:7 206:11 216:20 223:13

**objections** 8:19 42:18 139:2

**objects** 164:5 176:3 195:11

**obviously** 25:4 101:14

**occasion** 111:6 151:4 203:1

**occasions** 117:23 203:2

**occur** 27:17 116:18

**occurred** 21:9 64:15 68:1,2 117:7 126:17 139:7

**occurrence** 144:17

**october** 9:20 21:10 36:25

**offense** 74:2

**offer** 122:19 131:20

**offered** 12:8 126:4 131:11

**office** 20:15,16 21:5 29:14 33:18 38:3 95:1,3 136:12 161:2 227:1

**officer** 232:1,2

**offices** 20:14

**official** 114:11 115:13

**oh** 26:6 56:17 57:6,10 81:14 100:2 114:7 214:2

**ohio** 12:2

**oil** 16:5

**okay** 8:21 10:13,22,25 11:9,14 12:19 12:22 13:1,3 15:18 16:18 17:1,6,12 18:25 19:20 20:3,10,18,22 21:20 22:4,12 24:19 25:3,10 25:15,20 26:4 26:5,16,19 27:12,16,21 28:3,6,12,21,25 29:3,6,11 30:16,19 31:2 31:14 32:5,19 33:9,16,23,25 34:3,16,20,25 35:11 36:11,15 36:18 37:8 40:7 41:14,24 43:3,5,12,16,22 44:2 45:5,10 46:17,21 48:3 48:8,19,21 49:24 50:2 52:16,18,25 54:1,21 55:13 55:25 56:19,24 57:10,22,25 58:3,7,18 59:16,25 60:10 61:3,8,16 62:19 63:9 66:3,8,20 67:5 67:9,20 69:6 69:25 70:4 71:1 72:21 73:1,7,15,20,25 74:4,11,13,14 74:19 75:1,8 76:2,5,8,11,14 76:18,25 77:5 77:18 78:9,19 78:23 80:13,22 81:5,8,8 82:10 82:16,21 83:1 85:1 87:3,20 88:8,12,16,17 88:21,23 89:4 89:9,18,20,25 90:11,15,23 91:12 92:23,23 93:1,4,8,17,19 94:5,12 95:16 95:23 96:2,6 96:12,17,24 97:2,6,21 98:4 98:7,10,21 100:2,9,13,22 103:2,7,13 104:6,14 105:16,16 106:3,6 107:21 108:25 109:18 109:20 110:13

[okay - operations]

| | | | |
|---|---|---|---|
| 110:23,25 | 157:8,16,25 | 197:11,17,22 | **one's** 17:10 |
| 111:6,9,24 | 158:3 159:8 | 199:3,10,18 | **ones** 18:9 55:16 |
| 112:3,25 | 160:6,12,16,18 | 200:7,23 | 68:14 155:22 |
| 113:11,15,24 | 160:23 161:9 | 202:17,23 | 200:16 210:15 |
| 114:22 115:16 | 161:15 162:3 | 204:3,24 206:1 | **ongoing** 23:5 |
| 117:11,16 | 162:10,19 | 206:16 207:20 | **open** 4:8 23:2 |
| 118:8,23 | 164:3 166:6 | 208:9,20 210:1 | 34:13,14 59:24 |
| 119:11,15,17 | 167:14,18,23 | 210:23 212:5 | 60:16 83:15,20 |
| 120:22 121:6,8 | 168:3,6 170:10 | 212:12 213:2,4 | 84:10 94:21 |
| 121:8,13 | 170:20 171:6 | 213:12 214:25 | 102:5 105:3 |
| 122:15 123:3,7 | 171:11,20 | 215:9,19 216:6 | 107:3 129:25 |
| 123:14,24 | 172:2,9,16,21 | 216:23 217:14 | 151:24 157:23 |
| 124:3,24 | 173:2,4,13 | 218:20,24 | 161:3 175:19 |
| 125:13 127:7 | 174:1,9,13,16 | 219:5,5,15 | 175:20 199:25 |
| 129:5,9,14,19 | 174:23 175:4 | 220:5 221:21 | 200:4 201:1 |
| 131:11,24 | 175:16,25 | 224:17 225:16 | 202:18 203:3,8 |
| 132:4 133:14 | 176:16 177:8 | 226:13 227:24 | 205:24 221:11 |
| 133:16 134:3,7 | 177:17 178:13 | 228:9 229:15 | 229:1,8 |
| 134:22,24 | 178:17 179:5 | 230:11,11,17 | **opening** 200:18 |
| 135:1 136:18 | 179:12 180:6 | 230:20 | 200:20 |
| 137:14 138:2,7 | 180:16,24 | **old** 12:3 198:21 | **operate** 163:12 |
| 138:10 139:6 | 181:12,16 | **oman** 15:14,23 | 169:18 |
| 139:11,22 | 182:2,12,15,19 | 16:7,8,13,15 | **operating** |
| 140:3,7 141:12 | 182:25 183:7 | **onboard** 58:16 | 153:12 181:13 |
| 141:15,18,21 | 184:2,5 185:1 | 181:5 | **operation** |
| 143:3 144:5 | 185:5 186:6,22 | **onboarded** | 116:21 192:23 |
| 145:8,11,23 | 187:3,12,19,21 | 213:21 214:13 | **operational** |
| 147:3,9,21 | 187:25 188:11 | 214:14 | 13:12 115:22 |
| 148:10,19 | 188:13,18 | **onboarding** | 179:21 199:19 |
| 149:7,18 | 189:23 192:1,7 | 201:3 | **operations** 9:23 |
| 150:13,21 | 192:10,19,24 | **once** 12:8 20:4 | 13:8,19 19:4 |
| 152:2,19,25 | 193:17,20,24 | 37:16 66:22 | 19:23 20:6 |
| 153:17 154:8 | 194:21 195:9 | 67:25 71:22 | 21:3,25 22:18 |
| 154:21 155:21 | 195:18,25 | 116:9 153:2 | 22:22 23:1,10 |
| 155:24 156:17 | 196:16 197:4 | 213:21 214:13 | 23:13,16,18,19 |

Page 39

Veritext Legal Solutions
800-336-4000

[operations - oq]

| | | | |
|---|---|---|---|
| 23:20,21 24:11 | 168:6 169:7,8 | 156:9 157:4 | **opposition** |
| 25:14,16 31:25 | 180:21 181:4,9 | 161:16 164:15 | 82:23 86:4 |
| 32:9,11 45:25 | 181:13 182:4 | 166:7,16 169:4 | 138:13,16,25 |
| 47:12 49:4 | 182:17 183:13 | 169:12 176:3 | 184:7,10 |
| 50:7 53:19,25 | 184:2 192:20 | 176:22 177:5 | **ops** 4:7 126:22 |
| 55:15 82:9 | 192:25 193:25 | 177:14 178:21 | **option** 126:18 |
| 91:20 114:20 | 196:25 199:25 | 178:21,25 | 141:20 216:18 |
| 121:17 133:7 | 202:19 203:20 | 179:7,13,14 | **options** 112:10 |
| 134:5 150:1 | 207:24 209:21 | 180:2,8,13,18 | 113:21 126:3 |
| 161:1,25 | 209:22 212:19 | 182:20,21 | **oq** 1:8,13 2:10 |
| 162:22 166:19 | 212:21,22 | 183:5,23,24,25 | 4:5,19 7:11 |
| 166:21,24 | 213:9 214:5 | 193:21 195:11 | 8:16 9:22 12:9 |
| 210:24 | 215:9,11,16 | 195:19 196:1 | 12:11,23 13:4 |
| **operator** 4:9 | 221:13 228:6 | 196:11 208:1 | 14:9 15:9,10 |
| 36:23 45:24 | 229:13,13 | 208:10 209:20 | 15:15,22 16:6 |
| 47:22 50:8,11 | 230:12 | 210:3,4,18,22 | 16:18,18,20 |
| 50:14 51:14,19 | **operator's** | 211:7,9,16,24 | 17:7,14,18 |
| 52:24 53:11,23 | 228:22 | 212:13,19,21 | 18:5,23 20:12 |
| 54:5,7,11,20,22 | **operators** | 215:2,6,11 | 20:23 21:21 |
| 54:25 55:7,17 | 32:20,25 33:5 | 230:9 | 26:22 27:8 |
| 55:21 99:4 | 33:8 45:11,17 | **opportunities** | 28:25 29:2 |
| 103:16,24 | 46:2,2,20,25 | 38:23 206:7 | 31:11 34:5,17 |
| 117:4,24 | 47:8 48:8,13 | **opportunity** | 36:15 37:3 |
| 118:17,23 | 49:13 50:3 | 12:9 21:6 | 40:18 41:11 |
| 119:13 120:15 | 84:13 98:11,14 | 22:19 23:16,24 | 42:5 43:16,23 |
| 121:22 128:25 | 98:24 102:6,7 | 30:9 139:16 | 43:24,25 44:3 |
| 129:2,7 147:14 | 104:8 114:1,12 | 145:23 170:21 | 44:16 45:5,6,7 |
| 147:24,25 | 114:24 115:18 | 170:23 172:2,5 | 45:18 50:2,12 |
| 148:16,20,23 | 117:1,11,18 | 204:5 | 50:13,14 51:4 |
| 149:1,4,11,22 | 118:2 129:8,10 | **opposed** 10:8 | 51:8 52:5,19 |
| 153:1,15,21 | 129:10 147:11 | 76:19 85:24 | 52:20 54:16 |
| 159:5,7,9,9 | 147:22 148:14 | 86:9 118:2 | 56:6 59:7 |
| 163:4,5,15 | 148:20 149:2 | 133:5 138:11 | 60:11 62:2,12 |
| 164:4,11 165:7 | 149:21 150:5 | 178:2 | 62:14,19 63:12 |
| 165:14 166:1,2 | 150:14,16 | | 65:3,18 66:8 |

67:9 70:5 73:7
73:9,25 74:5
74:14,19,20
75:17 76:6,15
76:19,19 77:18
79:13,15,20
80:4,22 81:9
82:23 83:2
85:24 86:9
87:7,17 88:2,5
88:12,25 89:5
89:9 90:7 91:8
94:6 95:9,23
96:6 98:7,10
99:1,9,15
100:23 103:2,8
104:8,15
105:21 106:9
106:25 108:11
108:20 109:2
111:1,10,24
112:4,5,19
113:11,17,17
113:25 114:12
115:16 116:4,8
116:25 117:5
117:11,25
120:11 121:3
121:14 122:18
123:3,7 124:17
125:10,24
129:9,15,20,21
130:11,16
131:11,20
135:10 137:23
139:2,14,16
140:17 141:12
141:22 143:22
144:9,18,25
145:4 147:3,22
150:6 152:13
152:19 153:2
153:10 154:21
155:1,25
156:17 157:22
160:6 161:10
163:3 165:24
168:9 170:7,10
170:16 171:6
171:14,21,22
171:24 172:2,6
172:10,16,17
172:21 173:14
173:23 174:2,9
174:13,16
176:3 178:13
180:25 181:7
182:19 186:15
187:13,22,25
188:2 189:7
191:9,18
194:22 195:9
196:25 197:5
198:1,15
199:12 202:9
202:11 203:12
204:14,24
205:2,4,6,13
206:1,8,22
207:3,25
208:24 210:16
211:1 213:10
214:10,25
215:9,15
216:18 217:1
218:21 220:12
229:5 230:2
234:1 235:1
236:3
**oq's** 4:16 43:12
59:4 60:24
69:25 86:16
106:22 107:8
114:22 116:9
122:7,19
128:22 132:22
152:18 155:16
169:11 171:14
193:8 194:16
198:25 202:25
213:16 220:21
223:16 228:20
**oral** 86:8,10,22
**order** 23:8
30:21 34:9
35:1,19 56:2
60:19 73:22
109:1 112:13
143:12 165:12
189:2
**organic** 15:1
**organization**
15:16 18:19
32:7 42:9
49:21 50:9
57:20 58:13
59:23 60:15,17
75:23 97:10
106:15 107:24
108:2 149:13
182:13 198:20
223:11
**organizational**
4:6
**organizations**
45:9
**original** 4:25
138:12
**originally** 30:7
30:14 71:2
**originated** 4:18
**otto** 200:13
**ought** 124:13
**outcome** 39:22
42:3 120:15
138:5,19
232:16 233:12
**outline** 195:2
**outlined** 146:11
**outlines** 183:13
**outside** 55:6,6
55:7 98:16,25
99:6 102:8
106:16 117:13
117:25 129:11
129:13,23
130:21 131:13
147:11 149:3,5
149:9,23 150:6
150:16 163:1

[outside - people]

164:10,11
165:13 167:2
169:15 179:1
179:13,18,20
179:22 180:9
180:14 183:12
183:24 193:13
206:4 208:6,7
209:22 210:4
**overall**   23:20
**overarching**
51:18 53:23
55:23
**overlay**   47:23
**overruled**
107:23
**overtime**   46:13
60:18 106:19
106:21 142:19
190:16,17,20
190:25 191:10
191:22 205:16
221:10
**overview**
194:12
**own**   11:3 15:24
17:24 18:2,3
37:8 55:16
131:12,21
139:7 163:1
174:23 217:18
**ownership**
21:18
**owning**   122:1
205:10

**owns**   55:14
**oxea**   4:23 15:19
**oxo**   14:12

**p**

**p**   2:1,1 7:1
**p.m.**   11:19
90:17 231:1
**page**   3:2,8 4:2,5
5:2 6:3 10:4
51:6 56:16,24
87:21 88:9,13
88:16,19,21,24
88:25 89:4
90:2 165:4
190:12 196:20
199:12 234:4,7
234:10,13,16
234:19
**pages**   73:8 80:4
80:14 236:12
**paid**   73:23
108:11 189:6
190:5,10,23
191:21 192:11
**pains**   186:6
**paints**   14:12
**pair**   147:13
**paired**   147:14
**pairs**   147:11
**pancreatic**
175:5,5
**paper**   160:21
**paperwork**
3:17 197:12
198:1 204:19

**paramedic**
89:21
**pardon**   28:17
**parent**   15:16
**parents**   26:14
**part**   13:9 14:13
37:25 73:12,13
97:21 120:11
134:21 171:2
193:5 197:19
199:13 224:21
227:1,18
**partially**   151:3
**participate**
108:14 126:23
**participated**
86:12 133:14
133:17 134:17
160:20
**participating**
160:25 161:1
**particular**
217:8,11
**parties**   7:23
50:25 232:12
232:14 233:8
233:11
**partner**   17:24
**partners**
196:11
**party**   79:18
172:20
**passed**   26:15
**past**   144:4
154:23 199:6

**path**   86:15
137:13 222:12
223:12
**patients**   174:11
174:19,25
175:16,22
**pawn**   167:6
**pay**   5:20 42:18
52:13 184:21
190:5,12,13,13
190:16,17
199:13 228:19
229:5,12
**paycheck**
188:21
**payment**
220:19
**payroll**   5:8
189:21 191:7
191:14 192:2
**pays**   188:21
**people**   16:6
20:15 31:11
33:1 35:25
38:20 77:3
83:18 90:23
91:2,6,8
107:23 108:1
123:18,21
129:20 133:10
133:16 134:5
135:11 139:7
151:13 157:10
160:19 161:1
163:7,11 171:3

Veritext Legal Solutions
800-336-4000

[people - plaintiff]

175:2 181:19
200:25 208:8
209:4 211:23
212:1 217:2
**percent** 45:15
175:18,23
199:2
**perception**
121:16 138:23
138:24
**perfect** 11:14
44:8 201:10
**perfectly** 27:23
28:1
**perform** 40:19
40:20 119:5
148:1 154:18
213:5 214:5,10
216:10 221:12
228:22 229:2
229:25
**performance**
38:18 44:10
151:21 152:7
152:20,22
215:12 222:18
223:4,4,12,23
224:15,21,22
225:12 230:8
**performed** 14:3
104:21
**period** 64:6
75:12,12
142:12 158:12
174:2 179:14

179:24 180:2
190:12,13
191:11 201:7
208:4,12
212:14 217:11
**periodically**
38:2
**periods** 38:11
77:15 110:20
**permanent**
18:18
**permanently**
49:5
**permission**
197:22
**permitted** 8:2
159:12 196:10
216:24
**person** 19:17
19:22 25:5
27:7 31:24
32:5 33:13,15
41:20 57:6
58:18 75:18
76:2,5 85:21
89:22 94:25
119:12 125:21
133:5 150:8
163:18 164:5
168:24 181:8
186:3 188:8
**person's**
194:13
**personal** 37:24
49:20

**personally**
30:23 38:24
45:1 138:4
**personnel** 18:2
18:14 24:13
37:15,18 43:6
43:9 49:4,9,11
114:19 155:8
156:10 203:4
213:4
**personnel's**
154:6
**perspective**
38:8 41:19
59:4 70:21
106:12 202:25
228:20
**persuade** 40:17
**petrochemical**
163:12
**ph** 65:16
156:18 157:2
157:14 182:3,7
182:8 200:11
200:13 211:14
**phone** 33:13,14
64:23 75:15
85:20 94:6,15
94:25 136:13
184:16
**phrases** 86:1
**phrasing**
180:15
**physical** 21:17
104:9 114:14

114:16 116:10
116:19 117:1,2
117:12 148:5
150:17 153:23
155:4,18 156:6
157:11 164:21
165:9 195:3
204:25 211:3
215:12
**physically**
102:1 163:18
166:4 169:16
191:3
**physician**
228:6,21
**pick** 11:22
222:20 224:8
**picking** 224:10
**piece** 40:23
101:17 105:8
160:20
**pieces** 195:2
**pitts** 212:2
**place** 42:7
49:16 59:15
81:3 95:15
106:1 127:20
149:3 177:13
190:4 193:18
204:20
**places** 44:16
113:4 178:10
**plaintiff** 1:6 2:2
2:19 8:14,14
51:8 52:7,22

Page 43

[plaintiff - position]

222:6
plaintiff's 3:9
 4:21,24 220:10
 220:18 222:7
plaintiffs 219:8
planned 30:7
planning 24:1
plant 17:7,13
 21:17 40:12
 45:12 46:3,25
 50:15 54:23
 55:21 118:12
 119:13 125:7
 159:11 160:1
 161:23 162:22
 163:12 178:17
 183:22 201:22
 202:5 211:8,17
plant's 129:5
 153:13
plants 20:7,10
 47:8
played 132:23
 223:25
please 7:3 8:10
 8:21 9:3,15
 22:15 115:14
 119:24
plenty 188:6
plug 190:25
 191:2
plunkett 212:2
plus 28:1 47:25
 48:10,25 73:8
 212:7,8

point 40:21
 61:13 64:17
 78:14 82:2
 91:1 121:13
 129:19 138:16
 152:14 158:22
 163:22 174:6
 190:8 191:18
 194:11 203:17
 212:10 216:22
 229:19
pointed 84:1
points 29:22
pol 2:11 3:4
 8:15,16 11:17
 11:21 44:5,19
 44:22 53:2
 56:18 60:12
 76:21 77:5,23
 81:11,15 84:8
 102:16 104:10
 107:12 110:18
 112:1 124:20
 126:1 131:25
 132:4 136:16
 137:8 143:6
 144:13 146:2
 175:10 187:16
 188:4,16
 203:24 204:7
 205:7 206:11
 216:20 219:12
 219:16,24
 220:5,14,22
 221:6,25

222:10 225:20
 225:23 226:12
 226:14 228:9
policies 4:10
 41:25 114:20
 114:23,24
 116:10 147:10
 148:13,14
 149:18,19
 150:8 167:21
 170:7,12 193:2
 193:10 217:2
policy 4:23
 40:14 42:5,21
 42:24 43:2
 74:1,15,17
 104:14 114:11
 114:17 115:13
 115:15,18
 116:5,13
 148:25 150:1,4
 161:12,14
 166:1 168:9
 184:21 185:6
 185:10 203:6
 204:24
pool 155:7
 208:8
populate 191:4
populated
 191:7
population
 16:10 47:18
 106:20 202:20
 209:4,11

portion 54:2
 64:2 101:19
 116:23 128:11
 183:19
portions
 122:23
pose 55:15
position 4:3,8
 19:5,8,8 21:24
 22:23 23:2,3
 23:14 25:11
 30:24 32:20
 34:4 35:5
 38:21 40:23
 46:20 49:15
 50:11,14 51:8
 52:22,23 53:12
 54:25 83:15,19
 86:16 103:12
 103:14 104:7
 104:23 106:14
 113:7 120:15
 121:20 123:15
 128:22,25
 130:14 142:21
 151:24 155:16
 159:5 163:1,3
 164:18 165:13
 167:2 168:14
 169:11,15
 171:15 172:18
 183:15 193:8
 194:2 199:25
 200:4 202:18
 202:19 203:3,8

[position - problem]

| | | | |
|---|---|---|---|
| 206:13 207:24 | pound 163:19 | prepare 68:5 | 37:6 58:9 |
| 212:18 213:16 | pounds 165:5,6 | prepared 27:5 | 61:13 72:13 |
| 215:16 221:13 | 165:8 167:16 | 30:20 34:5 | 75:2 103:12,14 |
| 221:16 222:25 | 176:5,10 | 36:15 64:4,8 | 117:7 118:17 |
| 223:16 229:7,8 | 194:23 195:12 | 65:4 68:21 | 135:14,15 |
| 230:5,12 | 195:16 213:15 | 73:2 227:1 | 137:12 143:2 |
| positions 18:14 | 213:19 214:23 | 233:3 | 146:9,10 155:6 |
| 18:16 46:14 | pox 15:5 21:8 | presence | 163:14 166:6 |
| 51:23 53:20,24 | 22:3,5 36:22 | 133:19 | 181:10 183:10 |
| 54:15 55:2 | 53:22 55:6,7 | present 2:18 | 187:20 209:24 |
| 83:20 99:18 | 177:10 | 86:18 109:4 | 211:18 222:13 |
| 104:24 129:24 | ppe 159:2 | 139:16 177:3 | primarily |
| 147:17 149:10 | 213:22 214:4 | 211:9,10,17,25 | 13:14 162:25 |
| 162:9 205:24 | 214:13 | presented | primary 201:3 |
| 212:19 229:1 | practice 42:9 | 80:21 118:1 | print 14:16 |
| 230:13 | 42:10 150:2 | 147:5 | printing 14:14 |
| possess 55:11 | 184:21 185:11 | presenting | prior 30:12 |
| possesses 55:13 | 185:20 203:6 | 139:25 | 37:7 78:8 |
| possibility | precise 78:9 | preserve 42:19 | 80:17 117:21 |
| 116:17 | precisely 25:11 | pretty 48:12 | 136:5 156:19 |
| possible 42:9 | 59:7 165:14 | 70:18 83:17 | 187:17 207:1 |
| 78:22 127:10 | prefer 17:11 | 142:5 176:7,8 | 227:15 232:5 |
| 128:19 175:2 | pregnancy | 185:20 205:14 | priority 69:5 |
| 175:13 | 114:14 149:25 | prevent 149:11 | privilege 4:15 |
| post 50:17 | 153:23 170:18 | prevented | 135:7 219:14 |
| posted 51:20 | 171:3 204:25 | 153:12 | 220:15,24 |
| potential 35:4 | pregnant 205:5 | prevents | 222:2 226:1 |
| 130:12 172:14 | prematurely | 215:12 | 227:13 |
| 206:2 | 207:18 | previous 62:13 | probably 23:14 |
| potentially | premises 159:1 | 106:20 146:23 | 49:22 69:1 |
| 38:22 42:3 | prep 64:6 73:13 | 147:8 153:7 | 98:6 177:11,12 |
| 49:10 65:24 | preparation | 195:14 210:8 | 181:12 212:9 |
| 116:20 143:14 | 34:6,16,19 | 230:5 | problem 69:9 |
| 165:19 201:2 | 97:22 158:16 | previously | 88:25 99:5,5,6 |
| 205:23 211:21 | | 15:19 31:25 | 123:17 130:9 |

Veritext Legal Solutions
800-336-4000

[problem - protected]

| | | | |
|---|---|---|---|
| 132:21 164:12 | 99:12 120:14 | 79:21 80:4 | **progressions** |
| 164:12 183:21 | 121:22,25 | 89:13 94:4 | 51:24 |
| 198:4 215:7 | 124:18 126:10 | 115:17 118:16 | **project** 23:5,9 |
| **problems** 44:10 | 128:25 131:7 | 119:10 135:13 | 103:9 |
| 62:14 63:13 | 134:21 135:11 | 135:14,15 | **projects** 13:20 |
| 67:13 69:15 | 135:23 136:10 | 153:9 155:6,11 | 13:23 23:22 |
| 114:15,15,15 | 136:15,23,24 | 155:22,24 | **prolonged** |
| 118:1,11 | 137:5,6,23 | 157:5 189:8,22 | 101:24 |
| 136:21 145:6 | 143:18,20 | 214:3 227:11 | **promise** 189:13 |
| 155:18 208:3 | 153:15 156:8 | 227:12 228:15 | **promotion** |
| 229:24 | 157:4 159:5,6 | **product** 13:24 | 20:19 |
| **procedural** 8:3 | 160:4 163:5 | 147:20 166:9 | **pronouncing** |
| **procedure** 4:12 | 164:8 172:13 | 169:22 196:4 | 8:22 |
| **procedures** | 172:22 178:20 | **production** 5:3 | **propanol** 13:17 |
| 4:10 41:25 | 178:21 179:19 | 13:14 16:23,25 | 14:21 179:19 |
| 193:2,11 | 180:2 182:20 | 19:5 21:7,9,13 | **proper** 213:22 |
| 194:17 | 182:21 183:23 | 21:14,19 36:23 | **properly** 169:4 |
| **proceed** 9:11 | 183:24 184:2 | 154:4 186:13 | 220:13 |
| **proceeding** 7:6 | 192:19 193:21 | 227:2 | **propose** 131:22 |
| 7:15,18 8:1 | 193:25 195:19 | **proficiency** | **proposed** 99:22 |
| 231:2 233:4 | 196:1 203:20 | 84:15 | 103:3 213:7 |
| **proceedings** | 205:8 210:22 | **proficient** | **pros** 120:1 |
| 232:3,5,6,9 | 212:20 214:5 | 148:16 163:9 | 125:25 |
| 233:6 | 215:16 219:1 | 203:7 | **prospect** |
| **process** 15:1 | 228:6,21 | **profit** 108:14 | 229:19 |
| 18:1,18 32:20 | 229:13 230:12 | **profitability** | **prosperity** 26:2 |
| 32:25 41:16 | **processes** 100:7 | 16:1 | 26:5 |
| 45:11,24 46:2 | 114:21 | **prognosis** | **protect** 129:22 |
| 50:7,14 51:14 | **procure** 213:25 | 109:2 174:11 | **protected** |
| 51:19 52:24 | **produce** 117:20 | 207:6 | 60:14 62:17 |
| 53:11,15,23 | 121:7 145:19 | **progress** 175:9 | 71:13 72:16 |
| 54:5,7,10,20,22 | 207:5 218:8 | **progression** | 73:4 86:13,18 |
| 54:25 55:21 | **produced** 7:25 | 102:6 156:23 | 86:21 96:3 |
| 68:3,14 84:13 | 34:18,21,23 | 194:3,14 | 112:16,21 |
| 84:17 98:11 | 43:6 51:6 73:9 | | 142:11 172:24 |

Page 46

[protected - rapidly]

173:8,11 185:9
187:13 188:11
206:10,25
216:7 222:8
**protocol** 92:3
**provide** 14:15
33:19,25 58:13
59:6 69:1
173:16
**provided** 30:1
33:21 36:12
100:1 174:4
**provision** 217:8
**public** 232:18
235:19
**pull** 47:4 69:8
**pulled** 154:20
154:22 184:20
189:21
**pulling** 66:13
**punished**
215:10
**purification**
177:19
**purpose** 123:4
143:15 153:18
196:3
**pursue** 126:4
**put** 14:7 53:9
53:10 68:21
70:6,22 71:13
72:9 80:8
87:25 93:12
119:3,6 153:25
164:20 184:9

185:2 187:12
196:18
**puts** 22:20
138:13
**putting** 222:21

**q**

**q3** 19:10
**q4** 19:10
**qualifications**
228:24
**qualified** 18:15
45:24 46:20
47:22,22 48:13
50:3 59:9
84:15 104:17
106:15 113:8
147:19 163:15
166:9 181:15
181:16 205:25
229:2,9 230:14
232:7
**qualify** 228:25
**quarter** 136:23
**quarters** 102:3
**question** 10:7,8
10:14,17,19,21
11:2,7 31:9,16
31:21 35:4,14
35:15 36:9
40:3,7,15
41:16 42:20
45:22,25 46:1
46:24 52:8,15
52:16 53:8
57:14,15 58:9

59:5,6,8 60:3
61:19 71:4,8
76:11,18 81:9
81:25 82:1
84:22 85:18
87:15 90:4
92:11 106:22
107:17 115:7
115:12,14
116:4 118:5,10
126:13,20
133:6,9,9
137:20 144:14
144:24,25
145:2 146:3,13
149:5,18 152:6
153:21 155:1
156:3,18
158:13 159:8,9
160:5,12
162:17 163:22
164:2,3,8
166:12 168:6
168:19 173:22
177:20 179:25
185:5,25 188:5
193:20 195:16
198:9 202:2,10
204:4 205:14
209:15,17,18
209:23 210:7,8
210:13 216:1
220:2,4,20,23
221:7 222:1
223:16 225:4

227:24 228:15
**questions** 6:2
10:1 11:12,18
28:13 35:22
50:25 51:3,15
80:20 145:4
187:22 210:14
217:16 219:13
219:16,25
220:7 225:21
225:21 228:10
230:21
**quick** 174:7
225:21
**quickly** 33:18
**quite** 16:4
38:19 45:8
47:20 101:16
106:21 165:12
168:5 182:13

**r**

**r** 2:1 7:1 234:3
234:3
**raise** 9:3
**raised** 11:16
12:1
**ramirez** 28:24
**ran** 64:11 65:4
71:2,11 72:9
72:22,24 78:10
78:14 79:3
139:13
**range** 175:20
**rapidly** 70:18

Page 47

[rate - recovered]

| | | | |
|---|---|---|---|
| **rate** 190:6 | 60:5 62:2 | **received** 39:3 | 201:9,13,14,16 |
| 191:16 | 64:12 87:23 | 108:6,7,15 | 225:25 230:23 |
| **rather** 125:4 | 111:1 113:12 | 130:18 131:5 | 232:9 233:5 |
| 175:9 | 148:4 222:22 | 132:19 | **recorded** 7:19 |
| **raw** 23:7 | 223:18 234:6,9 | **receives** 121:17 | 161:4,6 232:6 |
| **raymond** 25:7 | 234:12,15,18 | **receiving** 105:2 | **recording** 7:25 |
| **reached** 137:11 | 234:21 | **recent** 23:15 | 232:8 233:4 |
| **reaching** 94:23 | **reasonable** | **recently** 84:14 | **records** 31:24 |
| **reaction** 101:3 | 168:10 172:23 | 102:7 | 68:4,18 70:8 |
| **read** 52:14 | 202:12,25 | **recites** 60:24 | 73:11 77:18 |
| 56:12 87:25 | **reasoning** | **recognition** | 79:13,16 81:10 |
| 88:15 115:9 | 60:24 61:4 | 201:25 | 81:19,24 82:4 |
| 175:2,24 | **reasons** 59:11 | **recognizes** | 85:12,14 90:7 |
| 198:14 225:5,6 | 59:12 60:6,11 | 170:10 | 90:12 98:7,10 |
| 235:5 236:6,8 | 68:6 126:18 | **recollect** 125:9 | 99:9,12,15 |
| **reading** 78:13 | 146:10,23 | 128:14 138:10 | 104:1,11 |
| 115:7 169:12 | 207:14 221:4 | 151:18 | 111:20 112:25 |
| 175:12 | 223:20,21 | **recollection** | 113:2,10 114:4 |
| **ready** 58:7 | 224:6 | 27:19 85:1 | 114:9 115:23 |
| **real** 41:3 122:8 | **reassign** 168:14 | 102:23 138:8 | 116:6 117:6,21 |
| 222:22 | **reassigned** | 159:3 203:9 | 118:16 119:21 |
| **realigned** 136:5 | 209:21 | 204:9 | 131:24 132:19 |
| **really** 16:9 37:6 | **rebranded** | **recommend** | 138:3 139:10 |
| 37:23 40:8,8 | 15:11 | 129:21 135:20 | 140:20 150:20 |
| 41:16,17,22 | **recall** 63:19 | **record** 7:2,6,23 | 155:6,12,13 |
| 73:2 77:25 | 92:11 94:18 | 8:10 10:10 | 156:11 157:5 |
| 122:15 137:15 | 95:7,8 96:10 | 42:19 65:3 | 160:15 185:24 |
| 141:2 203:18 | 127:9,11 | 77:2,7,9,11 | 187:10 188:23 |
| 212:3 | 138:18 142:1 | 78:16 80:3 | 189:7,7,20 |
| **realm** 22:19 | 153:7 158:20 | 84:25 115:9,20 | 204:13 218:8 |
| 121:15 | 175:11 184:12 | 117:14 119:10 | 227:21 |
| **realms** 195:23 | 185:12 200:17 | 132:6,10,11,13 | **recover** 175:3 |
| **reason** 11:2 | 204:12 | 147:2 153:8 | **recovered** |
| 41:2 47:17 | **receive** 36:13 | 154:5,5,19,24 | 84:24 119:22 |
| 48:10 59:6 | | 155:5,20 161:5 | 121:4 203:14 |

Page 48

[recovered - report]

| | | | |
|---|---|---|---|
| 210:20 | refresher 30:12 | 220:20 223:1 | 179:23 184:18 |
| recovering | refuse 124:4 | 228:16,21 | 184:23 200:21 |
| 96:14,15 97:8 | regained 120:2 | 229:21 | 226:19 |
| 141:25 160:8 | regarding 4:3 | released 61:15 | remotely |
| recovery | 5:18 26:23 | 63:5,23 70:20 | 158:11 160:25 |
| 175:18 | 88:6 206:6 | 70:25 71:7 | 161:1 |
| recruit 55:15 | 219:16 226:16 | 72:14 84:11 | removed |
| recruiting | 226:17 227:5 | 94:21 105:10 | 118:19 119:6 |
| 51:21 | 227:10,14 | 111:5 203:17 | 153:17 |
| recruitment | regards 31:16 | 207:8 218:11 | removing |
| 50:4 | 68:23 | 228:5,5,8 | 176:6 |
| recruits 50:18 | regular 190:17 | 229:17 | rep 28:11 68:4 |
| recurrent | reinstate 128:8 | relevant 30:25 | 111:22 173:21 |
| 62:14 | 229:20 | 64:7 179:5 | 198:18 234:2 |
| redacted 227:3 | reinstatement | relief 113:5 | 234:24 235:2,4 |
| 227:8 | 228:19 229:4,7 | relieved 63:5 | 235:12 236:4 |
| reduced 232:7 | 229:11 230:3,5 | relocating | repeat 90:4 |
| reference 53:24 | reinstatement's | 182:16 | 119:24 |
| referenced | 229:14 | relying 97:18 | repeatedly |
| 53:25 166:8 | reiterated | remain 18:6 | 217:19 |
| 198:16 236:5 | 128:14,15 | remedy 228:19 | rephrase 31:9 |
| referencing | related 26:1 | remember | 35:17 68:8 |
| 40:23 50:4 | 156:22 232:11 | 21:22 28:6 | 150:22 184:6 |
| 53:18 105:8 | 233:7 | 57:17 58:11 | rephrased |
| 204:10 | relates 114:12 | 70:18 85:3,5 | 209:23 |
| referred 82:16 | 114:24 116:10 | 86:10 94:4 | rephrasing |
| 87:6 | relation 152:23 | 95:1,8 97:15 | 11:12 |
| referring 63:10 | relationship | 103:19 105:21 | replace 29:2 |
| 65:10 87:16 | 15:22 32:19 | 105:22 106:2 | 169:20 181:1 |
| refinery 16:5 | 37:9 38:6 | 110:2 112:13 | report 24:10 |
| reflect 60:10 | relative 232:13 | 119:18 127:24 | 32:22 95:4 |
| 199:24 | 233:10 | 128:4,6,17,20 | 105:24 108:25 |
| reflecting 4:8 | release 139:15 | 139:4 140:16 | 109:2 146:14 |
| refresh 158:24 | 139:16,18,25 | 153:6 158:2 | 204:16 |
| | 143:12 145:13 | 160:1,22 | |

[reported - responsible]

| | | | |
|---|---|---|---|
| **reported** 1:19<br>16:16,16 22:2<br>165:18 170:3<br>**reporter** 7:3,4<br>7:5 8:18,25 9:2<br>9:10 10:5,22<br>22:5,8 54:8,12<br>115:8,9 118:4<br>118:8 166:22<br>166:25 182:5<br>**reporting**<br>166:6<br>**reports** 15:25<br>16:12 24:9,10<br>24:12,21 25:2<br>67:3 100:22<br>**repository**<br>68:15 212:3<br>**represent**<br>27:15 135:25<br>189:23 217:15<br>229:22<br>**representation**<br>61:1,5<br>**representative**<br>1:12 29:18,24<br>43:12 50:12<br>52:20 68:19<br>70:12 83:2<br>**reprimand**<br>43:7<br>**reprimanded**<br>215:10<br>**request** 36:13<br>40:25 43:7 | 53:16 69:3<br>78:21 95:18<br>102:14,19<br>115:21,25<br>117:14 119:22<br>120:4 124:25<br>151:1 154:4<br>160:13 203:1<br>218:4,9<br>**requested**<br>40:11 58:12<br>82:8 115:10,21<br>124:6 143:25<br>218:1 232:21<br>**requesting** 38:4<br>**requests** 5:7<br>99:11 103:5<br>114:4 130:18<br>150:7 156:13<br>158:21<br>**require** 116:18<br>159:6<br>**required** 41:17<br>51:2,2 79:13<br>91:25 92:6,13<br>93:6 99:15<br>109:5 158:15<br>159:23 162:2,7<br>168:11 171:6<br>194:5 214:4<br>235:13<br>**requirement**<br>40:22 41:8<br>164:18 | **requirements**<br>51:25 55:23<br>102:7 169:17<br>195:1,3,4<br>215:21,25<br>**requires** 50:25<br>**requiring**<br>158:1,6 160:7<br>203:4<br>**rescheduled**<br>30:11<br>**rescue** 116:21<br>201:21 202:5<br>**researched**<br>174:15<br>**reserve** 228:12<br>230:20<br>**reserved**<br>230:24<br>**resign** 76:8<br>**resigned** 29:8<br>76:10<br>**resolve** 42:8<br>**resolved** 42:12<br>**resource** 12:11<br>**resources**<br>23:23 57:18<br>58:17 126:21<br>144:1,15,24<br>145:1 183:6,7<br>189:22 191:14<br>212:4<br>**respect** 59:2<br>69:12 76:4<br>147:5 158:25 | 161:7 185:14<br>199:13 222:6<br>**respective**<br>166:10<br>**respond** 35:22<br>53:5 159:6<br>171:7,14 172:5<br>174:25 190:22<br>**responded**<br>79:24 107:20<br>210:11<br>**respondents**<br>4:3<br>**response** 4:17<br>34:11 36:9<br>38:12,25 39:1<br>39:3,4,10,21<br>41:1,5 52:15<br>52:16 74:7<br>92:14 122:11<br>157:3,15<br>162:23 171:14<br>171:21<br>**responses** 3:11<br>5:3<br>**responsibilities**<br>21:21 22:13<br>53:21 105:20<br>161:19 168:15<br>183:12 194:4<br>**responsibility**<br>21:4,23 22:2<br>29:1 152:17<br>**responsible**<br>19:24 20:5,9 |

[responsible - right]

| | | | |
|---|---|---|---|
| 20:11,13,17 | 137:18 140:25 | **resume**  14:5 | 34:13,14 35:1 |
| 21:25 23:20 | 148:11 149:15 | 102:20 156:22 | 35:5 42:23 |
| 32:8,23,24 | 162:4,11 | 203:19 | 86:14 100:1 |
| 55:3 57:23 | 164:24 183:1 | **resumed**  23:13 | 114:21 117:19 |
| 79:18 81:2 | 206:17 208:21 | **retaliation** | 121:23 130:20 |
| 82:9 114:18 | 209:13 214:7 | 145:8 | 131:7 150:10 |
| 117:17 121:24 | **rest**  151:19 | **retired**  58:11 | 156:12 170:4 |
| 133:12 160:2 | 230:21 | 58:24 75:21,22 | 170:14 175:16 |
| 167:1,4 168:12 | **restricted**  5:19 | **retirement** | 184:14 205:11 |
| 168:23 169:2,9 | 62:3 83:7 | 75:24 200:14 | 207:8 223:5 |
| 169:15,16 | 159:18 205:9 | **retirements** | 224:22 232:21 |
| 183:14 186:5 | **restricting** | 47:21 48:11 | **reviewed**  30:24 |
| 193:19 | 84:17 | **retract** 202:9 | 30:25 31:4,7 |
| **responsive** | **restriction** | **retrieve**  77:14 | 34:5,6,9,10,17 |
| 42:15 46:22 | 151:6 214:13 | **retrieved**  65:9 | 34:20 35:7 |
| 54:2,18 57:12 | 214:15 | **retrospect** | 43:9 44:25 |
| 61:17 64:2 | **restrictions** | 206:21 | 62:7 185:6 |
| 65:1 78:24 | 62:7 63:6,24 | **return**  4:12 | **reviewing** |
| 98:22 101:19 | 70:24,25 84:3 | 63:23 70:20 | 31:10 43:1 |
| 102:11 103:21 | 84:12 99:22,24 | 84:11 92:5 | **right**  8:22 9:4 |
| 116:2,23 | 99:25 103:17 | 94:22 101:16 | 9:18,21,24 |
| 120:23 128:2 | 103:24 104:22 | 105:4,10 | 14:5 18:11 |
| 128:11 130:5 | 105:1,3 115:2 | 106:13 107:4 | 19:12 21:20 |
| 144:6 152:4 | 121:9,18,19,25 | 111:5 119:7 | 25:17 26:9,13 |
| 165:22 168:17 | 130:19 131:3 | 121:12 123:6 | 26:16 27:4 |
| 183:19 214:17 | 136:3 139:24 | 124:7 143:12 | 28:1 29:25 |
| 223:14 | 140:1 151:23 | 145:16 217:3 | 33:10 34:20 |
| **responsiveness** | 170:14 202:14 | 221:12 228:6 | 35:10 36:4 |
| 44:14 52:3 | 203:23 204:5 | 229:17 236:12 | 40:15 49:12 |
| 60:1,21 72:5 | 205:11 218:11 | **returned**  25:15 | 55:18 61:24 |
| 72:18 80:1 | 218:15 | 71:17 72:15,15 | 62:10 64:10,15 |
| 81:6 84:20 | **restructuring** | 140:2 217:10 | 67:13 69:16 |
| 86:6 92:9 | 48:12 49:7 | **reveal**  43:6 | 75:5 76:15,16 |
| 107:6 108:18 | 180:10 | **review**  30:6,9 | 77:16 79:3 |
| 115:6 122:5 | | 30:17,21 31:3 | 80:11 82:7,21 |

Page 51

[right - safely]

| | | | |
|---|---|---|---|
| 82:24 84:6 | 170:16,18 | 29:16 32:7 | **roughly** 47:21 |
| 88:2 89:18 | 171:4,9 172:25 | 58:21 59:15,22 | **routinely** 37:14 |
| 91:14 95:1,9 | 173:6,11 | 60:14,19 80:23 | **rubber** 176:18 |
| 96:2,12,17 | 175:22,23 | 106:7 132:23 | **rule** 147:3,21 |
| 98:8 100:18 | 178:8 180:16 | 164:21 168:12 | 150:5,14 160:8 |
| 101:8,9 103:17 | 180:18,21 | 168:22 169:10 | 161:10 165:16 |
| 104:3,6,25 | 181:1,4,6,9,14 | 182:24 205:21 | 168:9 |
| 105:1,7,13,16 | 181:18 182:21 | 214:5 223:25 | **rules** 8:4 |
| 105:25 107:16 | 183:25 185:22 | 229:2 | 147:10 149:21 |
| 107:21,23,25 | 189:4,5 190:7 | **roles** 20:22 | 167:21 170:12 |
| 108:12 109:25 | 190:11 191:6 | 22:16,21 52:1 | 193:5 217:17 |
| 110:5,7,13 | 192:10 194:21 | 53:21 98:15 | 236:14 |
| 111:3 112:12 | 195:5 196:13 | 105:19 161:21 | **run** 49:11 61:9 |
| 117:5,9 119:12 | 199:3 204:24 | 183:12 | 61:13,19 63:3 |
| 123:10,19 | 207:16 211:5 | **rolling** 63:8 | 64:13 65:21 |
| 124:4,8 125:16 | 211:20 212:10 | 65:22 66:1 | 67:12,24 78:6 |
| 125:17,23 | 213:4 214:12 | 67:16 | 80:10 106:16 |
| 126:8 127:5,21 | 215:25 216:16 | **room** 14:23 | 136:3 140:7 |
| 129:3,7,12,17 | 218:17,21 | 15:3 36:19,22 | 176:7 206:10 |
| 130:1 131:1,8 | 219:2 221:21 | 46:14 47:18,19 | 206:24 |
| 131:9 134:8 | 223:24 224:2,8 | 49:18 83:21 | **running** 46:11 |
| 137:4 138:8 | 224:20,22 | 102:2 116:15 | 47:13 48:10 |
| 139:9,11,22 | 225:5 | 116:19 134:6 | 129:6 145:12 |
| 140:3,9,16 | **risk** 158:17 | 134:20 159:13 | 152:13 204:15 |
| 141:15,16,22 | 165:17 | 230:9 | **ryan** 58:4,9,18 |
| 142:10 143:3 | **riverway** 1:17 | **rooms** 14:23 | 59:7 60:5 |
| 143:15,22 | 2:13 7:16 | 49:20 | 75:20,20 97:24 |
| 145:9,14 147:1 | **rob** 156:18 | **rotate** 102:8 | 97:25 |
| 150:4,9,19,21 | **robert** 200:11 | 113:9 129:13 | |

| | | | |
|---|---|---|---|
| 150:25 151:7 | **rohem** 18:1 | 149:9 150:5 | **s** |
| 151:10 152:25 | **rojas** 213:5,8,9 | 180:8 203:7 | **s** 2:1 3:7 4:1 5:1 |
| 153:3 160:18 | 213:14 | 208:3 | 7:1 234:3 |
| 161:12,22 | **role** 14:3 19:2 | **rotated** 179:17 | **sack** 163:19,24 |
| 164:10,16 | 19:10 21:1,8,9 | **rough** 122:17 | **safe** 192:23 |
| 165:9 170:13 | 23:3,11 28:9 | | **safely** 148:4 |

Page 52

[safety - sent]

| safety 24:23 | 229:5,11 | 204:14,17 | 227:10 |
|---|---|---|---|
| 116:20 118:22 | scale 14:11 | search 213:24 | seeing 89:10 |
| 163:4 193:1,14 | 193:14 | searched 73:14 | 93:8 189:24 |
| salary 190:18 | scenario | second 10:13 | 190:11 192:9 |
| salute 15:13 | 196:14 | 30:8 56:16,24 | seem 187:21 |
| satisfaction | schedule | 58:5 65:22 | seems 89:1 |
| 220:19 | 190:24 | 88:12,19,21 | 141:21 |
| save 97:15 | scheduled | 89:4 103:2,3 | seen 30:3,4 |
| 110:4 142:2,6 | 83:19 86:12 | 115:8 126:20 | 34:23 37:5 |
| saw 35:24 | 149:4,23 | 160:4 164:7 | 50:22 51:17 |
| 89:13 186:9 | 150:16 | 168:8 180:15 | 79:23 111:20 |
| 205:16 | scheduling | 202:10 210:2 | 136:8 187:5 |
| saying 10:6 | 113:7 | secondary | 189:8,12 |
| 27:22 40:4 | school 12:5,5 | 116:20 119:4 | sees 142:24 |
| 135:19 141:4 | 12:13,15,16 | 165:19 190:8 | 169:8 |
| 155:10 162:7 | science 13:10 | section 75:11 | selected 19:9 |
| 169:24 178:4 | scope 45:22 | 219:21 | 23:3 27:7,15 |
| 186:8 214:19 | 64:14 | secure 213:22 | selection 19:13 |
| 218:7 | screenshot 91:3 | see 26:23 51:3 | send 57:23,25 |
| says 43:24 55:3 | script 180:1 | 51:9 52:14 | 138:5 186:7 |
| 60:5 70:19 | sean 3:18 62:10 | 57:8 68:7 87:4 | sending 90:11 |
| 77:19 85:7 | 62:11 63:15 | 89:25 90:15 | senior 45:11,13 |
| 86:11 89:15 | 65:14,16 67:1 | 91:13 97:18 | 45:20 147:14 |
| 97:19 99:20 | 67:25 70:19 | 100:5,25 | sense 11:7 |
| 103:8 113:25 | 71:21 72:1 | 106:25 118:15 | 29:20 166:16 |
| 116:4,8 128:18 | 78:3,15,16,20 | 120:5 121:1 | 188:14 204:21 |
| 148:20 149:1 | 79:9,19 80:19 | 135:25 136:7 | 206:9,23 207:4 |
| 150:5 165:14 | 87:14,14 88:10 | 137:20 149:20 | 210:17 |
| 168:6,9 172:16 | 88:14 89:10,13 | 153:10 169:5 | sensitive 163:4 |
| 172:21 185:17 | 89:14,16,17,18 | 170:6,14 | 193:1 |
| 188:20 189:2 | 89:19 90:12 | 185:16,17 | sent 34:12 |
| 190:5,5,12 | 117:19 132:19 | 190:4,8 192:17 | 43:23 57:16,22 |
| 191:10 217:8 | 185:18 186:2,5 | 194:22 198:15 | 89:5 90:7 |
| 220:9 221:3 | 186:16 187:1,7 | 205:11 210:6 | 198:11 217:16 |
| 222:5 227:3,3 | 198:11 204:12 | 221:21 227:6 | |

[sentence - site]

| | | | |
|---|---|---|---|
| **sentence** 192:21 210:2 | **several** 24:10 117:1 120:20 126:9 177:11 191:12 216:12 | **she'd** 108:5 | 131:2 177:10 177:19 |
| **senthil** 22:24 | | **shed** 174:10 | **sidebar** 146:5 219:18 220:2 |
| **separate** 14:1 14:22 | | **sheet** 91:13 236:10 | **sight** 206:14 |
| **sequence** 63:18 103:6 | **severance** 21:17 | **shift** 33:7 36:23 37:14 40:19,19 46:11 113:5 147:25 148:21 203:4 212:23 | **sign** 59:2 236:6 236:11 |
| **sequenced** 51:16 | **severe** 175:14 | | **signature** 230:24 232:16 233:14 |
| **serve** 73:6 230:3 | **severed** 16:4 | | **signed** 56:14 57:3,6,8,14 58:19 84:14 102:7 145:20 217:17 236:17 |
| | **sfa** 21:8 22:3,7 36:22 53:22 55:6 151:24 167:2 177:16 177:17 183:13 202:22 203:9 | **shifts** 38:15 83:23 | |
| **serves** 29:4 63:22 70:15 71:17 83:22 94:8 97:13 100:11 160:3 | | **short** 46:10 106:18 184:25 190:18 206:13 213:11 221:9 | |
| | | **shoulder** 99:5 164:12 165:6 165:16 166:1 167:17,20 | **significance** 49:2 |
| **service** 4:13 18:12 201:21 | **shaking** 10:9 | | **similar** 38:15 144:1,16 |
| | **share** 14:6 19:21 28:12,22 50:20 58:4 101:25 102:13 108:5 125:3 149:20 151:10 | **show** 40:16,18 50:19 56:4 74:6,8 99:9 160:21 195:10 195:18 197:4 | **simple** 165:11 187:13 |
| **services** 15:2 | | | **single** 150:19 |
| **set** 30:14 31:1 53:6 79:23 136:23 190:24 224:18 | | | **siobhan** 233:2 233:15 |
| | | **showed** 38:15 | **sir** 10:12 25:16 27:3 221:20 |
| **sets** 51:4 149:10 | **shared** 13:3 29:15 50:13 62:8,9 72:8,12 80:7,11 82:23 96:2 101:21 109:10,13 110:5 111:12 125:8 128:15 139:14 151:11 186:1 215:1 | **showing** 118:1 | |
| **settlement** 220:19 | | **shutdown** 129:6,8 193:18 193:21 | **sit** 27:7 70:4,5 73:1 |
| **seven** 37:3 96:24 97:1 105:5,11 131:9 131:10 135:1 158:19 173:14 173:23 174:1 184:15 185:14 | | | **site** 13:11 16:23 16:23 17:4,19 17:21,22,24 18:2 24:8 25:1 25:6,7 89:19 89:24 158:23 164:1 192:23 |
| | | **shutdowns** 176:23,24 | |
| | **shareholder** 15:24 16:7,12 | **sic** 207:23 | |
| | | **sick** 71:5 | |
| | **sharing** 52:13 108:15 | **side** 19:7 37:23 105:10 130:11 | |

Veritext Legal Solutions
800-336-4000

[site's - staircases]

| | | | |
|---|---|---|---|
| **site's** 185:20 | **smart** 142:7 | **southern** 1:2 | **speculating** |
| **sitting** 70:11 | **solutions** | 7:12 | 70:10 95:14 |
| **situation** 38:3 | 236:19 | **speak** 27:8 | 139:5 204:22 |
| 40:12 83:9,17 | **solve** 210:8 | 97:23 138:17 | 224:17 |
| 87:7 88:6 | **solvents** 14:13 | **speaking** 108:4 | **speculation** |
| 90:13,24 94:7 | 14:15 | 226:15 | 151:20 |
| 94:15 144:1,9 | **solving** 130:9 | **special** 3:19,21 | **speculative** |
| 146:18 167:11 | **somebody** 50:9 | 3:23 101:15 | 71:4 |
| 169:17 | 84:16 98:15,16 | 102:20,24 | **spelled** 195:24 |
| **situations** 11:4 | 122:16,23 | 103:9,15 107:2 | **spend** 20:4 |
| **six** 22:23 26:8 | 147:13 153:25 | 112:12,14 | 195:11 |
| 47:18 96:8,18 | 165:4 167:6,11 | 113:17 124:9 | **spoke** 32:5 |
| 98:2 105:22 | 167:14 168:15 | 124:10 126:16 | 94:15 |
| 106:10,24 | 169:22 181:3,5 | 128:6 146:21 | **spokesperson** |
| 107:10 110:14 | 198:12 | 163:23 199:5 | 37:17 |
| 134:24 137:23 | **somebody's** | 201:1,6 206:4 | **spot** 93:13 |
| 139:6 142:24 | 165:6 | **specialist** 22:1 | 177:5 |
| 143:11,16 | **soon** 78:22 | 22:1,3 159:4 | **spring** 203:14 |
| 160:19 161:7 | **sorry** 8:22 22:5 | 192:3 | **staff** 40:13 |
| 170:1,1,2 | 24:1 26:16 | **specific** 27:20 | 51:23 84:18 |
| 177:12,14 | 48:4 54:9 | 45:23 49:15 | 106:15 147:17 |
| 182:16 184:14 | 80:22 90:4 | 53:19,21 55:22 | **staffed** 46:10 |
| 184:19,24 | 114:8 118:4 | 113:20 182:23 | 48:20,23 50:7 |
| 185:1 187:14 | 123:16 128:1 | 183:16 194:14 | 55:2 183:15 |
| 213:17,18,19 | 137:14 156:14 | **specifically** | 206:13 221:9 |
| 216:7 220:9 | 197:16,23 | 23:6 46:11 | **staffing** 17:25 |
| **skills** 232:10 | 209:7 214:2 | 49:8 51:22 | 18:18 39:7 |
| 233:6 | 227:11 | 68:23 95:5 | 46:13 47:14 |
| **slab** 177:2 | **sort** 10:2,3 68:6 | 113:5 147:12 | 83:17 84:16 |
| **slip** 17:12 | 190:18 203:21 | 174:18 | 106:18 209:10 |
| **small** 87:25 | 228:19 | **specifics** 55:2 | 212:6 |
| 174:19 186:19 | **sought** 68:11 | 59:22 82:15 | **stainless** |
| **smaller** 16:24 | 79:14 | **speculate** 116:6 | 176:17 |
| 176:9 184:20 | **sounds** 17:16 | 191:13 | **staircases** |
| | 189:2 | | 195:20 |

Page 55

[stairs - suggested]

| | | | |
|---|---|---|---|
| **stairs** 102:4 116:16 168:4,7 177:7,15,21 178:5 | **stated** 38:21 62:23 64:12 72:13 116:9 146:9 161:18 167:7 175:11 210:2,21 217:19 222:23 223:18,21 | **std** 73:23 118:20 119:6 184:20,25 185:2,6,10 190:5 218:13 218:21,23 | **strong** 86:4 138:18,21 |
| **stamina** 167:15 | | | **stuff** 71:23 |
| **stamp** 90:16 | | | **subject** 84:22 96:3 121:2 |
| **stamped** 52:9 | | | **subjective** 207:13 |
| **stamps** 35:7 | | **steam** 176:13 177:1 | **submit** 172:3 172:18 |
| **stand** 15:9 172:6 | **statement** 4:4 7:3 30:24 31:5 34:4 35:5 45:6 65:20 74:11 91:15 99:2 110:1,12 126:12 142:8 154:3 163:21 169:6 171:15 172:18 220:17 222:9 | **steel** 160:3 176:17 | **submitted** 171:21,23,25 205:9 |
| **standalone** 16:2 | | **stenographic** 8:6 | **subordinate** 32:10 |
| **standpoint** 37:12 82:11 107:1 139:3 169:1 192:16 205:20 206:12 | | **step** 23:10 | **subscribed** 235:14 |
| | | **steps** 178:2,3,5 | **subsequent** 135:22 |
| | | **stint** 22:22 44:11 | **subsequently** 63:4,21 118:18 221:15 |
| **stands** 24:22 | | **stipulation** 8:7 | **substantial** 47:7 100:19 |
| **start** 10:17,21 11:18 36:18 38:22 68:3 105:23 118:10 219:20 | **statements** 55:23 101:6 153:7 172:6 | **stock** 74:6,8 | **substantially** 59:17 60:2 |
| | | **stop** 11:19 126:11,21 148:2 | **substitute** 56:23 |
| | **states** 1:1 7:12 | **stopped** 210:5 | **succeed** 170:13 |
| **started** 12:10 13:4 15:16 19:2 36:24 119:3 204:11 229:18 | **stating** 65:14 65:16 67:6 218:10 | **straight** 33:1 | **successful** 69:11 124:1 |
| | | **strategy** 23:21 | |
| | **station** 12:6 | **street** 2:5 163:11 164:22 | **succession** 24:1 |
| | **status** 78:4,5,18 86:14 | **strength** 120:3 165:5,6,8,9 | **successor** 29:14 |
| **starting** 71:25 89:2 | | **stretch** 187:4 | **suggested** 129:21 130:8 131:12 |
| | **statutes** 221:22 | **string** 4:18 89:10 90:17,19 91:12,18 93:10 120:17 | |
| **starts** 71:20 72:16 183:15 | **stay** 37:14 88:21 165:4 179:23 203:7 | | |
| **state** 7:21 9:15 232:19 | **stayed** 12:4 159:14 | **strings** 87:6 | |

Page 56

[suggestion - talk]

| | | 158:20 | t |
|---|---|---|---|
| suggestion | supposed 51:5 | survivors 175:6 | |
| 130:16 | 79:15 90:14 | svatek 211:5 | t 3:7 4:1 5:1 |
| suggestions | 123:4 124:17 | swap 98:15,18 | 194:20 234:3,3 |
| 131:21 | sure 14:17 | 147:22 161:16 | table 229:5 |
| suit 180:7 | 22:17 24:18 | 161:20 166:9 | 230:4 |
| suite 1:17 2:13 | 26:20 28:2,5 | 166:16 169:22 | take 7:6 11:2 |
| 7:16 16:11 | 29:17 30:3 | swapping | 50:20 55:25 |
| sultan 15:13 | 35:9 45:22 | 161:11 176:21 | 58:17 65:24 |
| summary 5:20 | 49:1 50:16 | swaps 98:16 | 73:20,22 78:17 |
| supervisor | 57:3 62:25 | 147:20 196:4 | 93:9 97:12 |
| 32:22,23 33:4 | 67:12 68:13 | swear 8:19 | 108:8 110:3,9 |
| 33:7 39:22 | 72:7 75:10 | sweeney 25:7 | 138:4 141:19 |
| 40:24 98:19 | 78:3 79:2 | switch 149:1 | 156:10 167:15 |
| 113:9 126:22 | 80:17 89:1 | 215:11 | 171:11 175:16 |
| 210:5,25 | 98:24 99:19,21 | switching | 188:10 196:16 |
| 212:23 213:1,3 | 101:5 103:8,25 | 215:2 | 197:22 208:24 |
| 215:9 | 109:9 115:8 | sworn 7:23 9:7 | 216:12 |
| supervisors | 119:11 120:25 | 217:24 232:5 | taken 7:10 8:5 |
| 35:9 208:19 | 123:20 127:1 | 235:14 | 21:3 22:19 |
| 212:19,21,22 | 129:14 131:18 | symptoms | 67:20,23 68:18 |
| supplied 29:21 | 131:20 133:18 | 175:15 209:25 | 71:25 110:6 |
| 31:1,19 43:10 | 140:20 156:25 | syndrome | 186:6 192:14 |
| 79:23 81:17 | 158:17 163:16 | 61:11 64:24 | 221:3 222:7 |
| 87:14 | 165:2,4 166:14 | 74:16,22 87:9 | 232:3,12 233:9 |
| supplies 204:12 | 167:4 176:2 | 91:21 111:3,11 | takes 22:10 |
| supply 15:2 | 178:9 183:3 | syngas 15:6 | 47:21 163:14 |
| 53:4,17 | 196:20 198:10 | synthetic 15:4 | 164:4 165:5,8 |
| support 13:8 | 198:12 200:8 | system 42:7 | 169:12 |
| 13:21 58:13 | 204:20,22 | 189:21 190:24 | talk 9:24 21:15 |
| 213:24 224:7 | 224:25 225:6 | 193:11 | 30:22 31:6 |
| supported | surfaces 213:23 | systems 15:1 | 35:25 61:8 |
| 221:3 | surgery 62:13 | 81:3 193:18 | 66:21 73:15 |
| supporting | 62:14 152:21 | | 89:23 94:6,10 |
| 13:16 19:6 | 157:23 158:5,8 | | 109:18 113:24 |
| 135:21 | 158:14,16,18 | | 116:25 120:21 |

Page 57

[talk - termination]

124:18 126:6,8
126:17 132:6
175:25 188:18
192:19 223:9
**talked** 28:8
29:20 34:3
64:23 82:17
98:1,5 109:14
127:2,7 128:17
131:13,14
147:9 173:4,5
196:9,13 203:5
209:16,19
216:8 218:15
223:5,5 224:4
**talking** 17:14
40:8 52:10
72:20 81:21
85:10,15 97:11
100:13 101:2
102:23 104:4
109:7,8 113:1
113:15 127:9
128:6 130:7,8
130:24 131:2
144:8 148:7
155:13,14
168:22 169:18
169:24 170:9
174:17 176:10
178:8 179:23
185:3,3 193:5
206:6 223:11
**talks** 31:21
53:20 182:23

224:6,23
**tall** 213:14
**tally** 47:5
**tape** 76:14 77:2
**tapes** 75:9
**targeted** 225:4
**task** 122:22
148:1 150:19
167:3 168:14
194:14
**tasked** 169:10
**tasks** 154:18
177:3 193:25
194:4,15 195:7
215:2,11
**taxing** 106:19
**taylor** 25:8
**team** 4:7 38:19
81:1 118:17
122:1 149:22
199:19 208:10
209:19 223:7
**team's** 161:7
**teams** 4:11
33:17,22 86:16
86:17,19
160:24 161:4
**teamwork**
161:17 164:14
165:24 166:11
166:13,15
167:5 168:13
169:24
**technical** 12:11
13:9 24:20

**telephone** 28:7
**tell** 9:8 11:8,14
11:25 13:6
27:25 29:15
30:19 48:24
62:19,22 65:4
65:11 69:4
77:18 78:1,2
91:17 92:1,2,4
93:24 95:17,20
96:13 105:17
125:18 141:21
142:13 144:9
154:5 156:3
157:22 159:20
163:3 186:6
192:13 193:7
198:22 206:20
206:21 207:16
211:2,23
217:18 221:25
222:21
**telling** 52:5
155:11 179:12
184:16
**tells** 89:14
113:6
**temporarily**
49:8
**temporary**
47:12,15
**ten** 49:22 77:2
108:12 158:19
**tenure** 45:16
47:19 100:20

154:25 181:20
182:13
**term** 110:21
122:20 148:7
184:25 190:18
**termed** 187:17
216:25
**terminal** 175:7
**terminate**
132:22 136:21
185:7 207:1,15
221:15 222:18
226:18 227:22
**terminated**
37:10 43:13
45:10 46:6
59:10,19 60:11
76:9 80:10
96:22 99:21,23
107:14 121:11
127:18 131:10
136:2 144:3
179:25 188:25
203:22 204:2
210:17 217:9
**terminating**
43:23 49:13
60:24 76:19
83:13
**termination**
3:13 5:13
44:21 45:1
46:9 56:6,11
57:2,4 59:21
60:5,7 64:22

[termination - tim]

| | | | |
|---|---|---|---|
| 68:6 86:24 | **texas**  1:2 7:13 | 59:20 68:7 | **thinking**  73:1 |
| 108:3 126:8 | 7:17,21 12:3,6 | 101:21 102:24 | 133:7 177:16 |
| 133:3 135:20 | 16:25 232:19 | 103:3,9 167:25 | **thinks**  141:23 |
| 136:6 142:15 | **text**  4:18 74:24 | 212:12,13 | **third**  88:19,20 |
| 142:22 146:15 | 87:6,13,15 | **things**  10:3 | 90:20 112:16 |
| 146:24 171:8 | 88:5 91:6,7,7 | 34:11 35:6,25 | 122:18 168:9 |
| 172:7 173:15 | 91:17 93:10 | 37:19 38:1 | 172:20 |
| 189:1 190:2 | 100:3 174:4 | 39:20 51:5 | **thought**  18:4 |
| 198:24 203:16 | **texts**  88:9 | 81:2 92:6,17 | 36:8 70:11 |
| 206:15 222:14 | 110:23 | 162:6 186:20 | 72:11,22 |
| 222:22 223:25 | **thank**  8:18,18 | 192:24 195:14 | 128:13 136:1 |
| 227:5,10,15,15 | 9:2,10 11:23 | 207:18 222:23 | 136:19,19 |
| 227:21,25 | 12:12 22:8 | 224:23 | 140:17 141:7 |
| **terminations** | 24:24 25:10 | **think**  13:3 18:7 | 164:8 186:10 |
| 31:22 49:21 | 35:16 46:1 | 25:3,4 28:1 | 195:5 198:17 |
| 135:24 | 47:6 52:13 | 35:14 44:7,9 | 200:10 207:17 |
| **terms**  13:14 | 54:12 56:25 | 44:10,17 55:9 | **three**  13:16 |
| 19:20 21:16 | 69:12 91:4 | 55:11 60:3 | 21:2 26:12 |
| 23:6,25 24:14 | 93:21 97:25 | 61:1,5,7 81:16 | 32:16 47:21 |
| 37:6 45:11 | 119:17,20 | 87:21 96:18 | 58:15 78:8 |
| 46:13 47:6 | 124:10 136:4 | 97:15 103:8 | 90:9,19 91:8 |
| 50:4,11 51:17 | 146:8 166:25 | 104:19,19 | 91:24 98:6 |
| 68:17 75:25 | 189:15 196:22 | 105:21 112:4 | 102:3 105:24 |
| 80:21,23 91:25 | 201:11 228:9 | 120:17 127:4 | 105:25 113:13 |
| 93:22 114:20 | 230:21 | 127:16,23 | 124:11,13,24 |
| 116:14 130:21 | **theorize**  110:2 | 132:2,5 133:22 | 132:13 134:4 |
| 133:7 175:14 | **theorized** | 140:3 141:2 | 163:15 190:5 |
| 175:19,20 | 109:22 | 161:9,15 | 190:14 201:12 |
| 177:23 215:21 | **therapy**  174:25 | 163:21 164:13 | 216:9 217:22 |
| **testified**  9:9 | **thick**  136:23 | 172:9 185:14 | 222:5 |
| 191:24 | **thiemer**  119:9 | 196:20 200:7 | **tied**  197:18 |
| **testify**  26:22 | 119:16 153:5,8 | 200:18,23 | **tight**  83:17 |
| **testifying**  232:5 | 153:11 | 210:7,16 | **till**  142:24 |
| **testimony** | **thing**  11:6 | 212:17,20 | **tim**  21:5 22:18 |
| 235:8 236:8 | 17:13 31:2 | 225:7,16 | |

Page 59

[time - topics]

| time 1:15 7:7 | 180:2,4,17 | tingles 75:3 | told 11:18 26:6 |
|---|---|---|---|
| 8:9 11:1 13:17 | 185:15 189:24 | tingling 174:5 | 41:11 72:23 |
| 15:14 20:4 | 190:23 191:8 | 175:12 | 78:21 85:23 |
| 21:22 23:4,8 | 191:11 192:8 | tipps 5:17 33:2 | 86:9 95:9,24 |
| 23:14 25:14 | 195:10 198:23 | 33:4 90:20 | 100:10 101:3 |
| 29:25 30:17 | 201:7,10,16 | 134:25 135:1 | 102:18 109:13 |
| 32:15 35:7 | 203:16,18 | 213:1 215:1 | 113:17 127:4 |
| 36:25 37:13,19 | 207:7 208:4,12 | title 21:11 54:4 | 127:12 141:11 |
| 38:10 41:15 | 212:14 213:21 | 57:7,15 | 145:12 170:22 |
| 44:21 45:10 | 214:10,19 | titles 24:17 | 204:14 212:25 |
| 46:12 47:3 | 215:8 216:6 | today 9:25 23:5 | 218:21,21 |
| 48:22 58:16,21 | 221:9,23 | 27:8 30:2 | 223:24 |
| 59:1 63:23,25 | 225:17,19 | 31:12 34:6,19 | took 12:9 21:12 |
| 64:6,17 71:18 | 236:15 | 35:12 36:16 | 49:16 73:10 |
| 71:19 73:16 | timecard 191:4 | 52:20 65:4 | 91:3 95:15 |
| 74:8 75:12,13 | 191:7 | 97:22 141:21 | 106:1 110:13 |
| 77:8,11,15 | timeframe 67:7 | 144:25 148:21 | 110:19,20 |
| 86:23 88:16 | 236:7 | 148:22 154:21 | 204:20 |
| 93:15 94:20 | timeline 105:3 | 155:9 161:16 | top 19:21 24:5 |
| 98:12 106:17 | times 10:13 | 174:16 189:24 | 42:13 45:14 |
| 109:11 110:20 | 16:15 35:15 | 191:24 192:5 | 47:1 89:2 |
| 114:19 122:14 | 38:7,16 42:17 | 196:9 198:23 | 90:16 169:25 |
| 122:18 132:2,5 | 99:16 120:20 | 223:24 228:4 | topic 68:6 |
| 132:10,13 | 146:4 157:18 | 228:16,25 | 114:22 192:5 |
| 133:20,21 | 179:5 211:5 | today's 7:7 | 211:1,7,22 |
| 134:2 140:18 | 229:24 | toe 159:17,20 | 212:9,12 |
| 141:9,16,18 | timestamp 89:2 | 159:25 160:3,4 | topics 26:23 |
| 153:25 156:11 | 198:12 | toed 159:15,23 | 27:5 30:1,6,9 |
| 156:19 157:6 | timestamps | together 93:16 | 30:13,17,20 |
| 158:1,9,12,19 | 63:17 67:1 | 108:2 109:17 | 31:12 34:9 |
| 158:22 160:2 | 68:24 72:2 | 136:11 164:15 | 35:2,12,20,24 |
| 161:23 174:1 | 82:14,16 | 166:17 185:21 | 36:16 82:3 |
| 175:1,13,21 | 198:22 | 186:21 196:19 | 120:19 156:22 |
| 178:25 179:1 | timing 27:20 | 205:11 | 156:24 |
| 179:15,16,24 | 72:21 146:12 | | |

Page 60

[torque - twelve]

| | | | |
|---|---|---|---|
| torque 167:16 | transferred | 93:11 96:23 | truthfully 59:8 |
| totally 167:3 | 36:22 | 97:3,4,5 98:9 | 171:7 |
| toward 175:9 | transferring | 98:13 99:25 | try 13:19 16:2 |
| towards 223:23 | 21:7 | 103:5,23 105:1 | 28:13 29:12 |
| tower 169:25 | transition 19:1 | 105:9 107:21 | 42:8 56:1 |
| 196:12 | 19:4 | 110:12 117:7 | 69:10 78:22 |
| towers 177:6 | transitioned | 118:25 124:2 | 122:18 142:6 |
| 196:1 | 19:10 21:2 | 124:15,23 | 187:12 210:15 |
| track 65:22 | transpired | 127:6,14 129:4 | trying 39:6,9 |
| 67:1,25 81:2 | 136:8 | 129:18 130:3 | 39:20 41:9 |
| 99:17 186:3 | treated 111:18 | 131:11,22 | 47:11,13,15 |
| trail 120:13 | 111:23 | 133:4 138:9 | 51:16 54:18 |
| 222:15 224:15 | treatment | 139:10,21 | 60:4 66:3 78:2 |
| train 181:4,9 | 111:16 | 140:2 147:10 | 79:2 92:21 |
| 181:11 | treatments | 153:4,15 154:3 | 119:11 120:25 |
| trained 200:25 | 14:25 | 159:24 169:9 | 131:17,17 |
| trainees 200:24 | treats 206:3 | 171:5 173:2,3 | 160:13 164:20 |
| trainer 201:5 | tribute 15:12 | 178:12 179:3,4 | 168:14 179:25 |
| trainers 201:2 | tried 37:15 | 179:9,10,10,11 | 189:9 200:12 |
| training 5:5 | 190:21 225:17 | 180:5,15,19,23 | 200:15 212:8 |
| 84:14 89:21 | trouble 99:6 | 181:2,19 183:6 | turn 56:1 165:5 |
| 147:13 163:19 | troubleshooti... | 184:1 186:12 | 165:7,11,15 |
| 163:23 164:4 | 13:21 164:19 | 187:10 199:18 | 167:11,12,15 |
| 181:10 197:3 | true 17:5 24:7 | 204:1 214:24 | 225:24 |
| transcriber | 30:15 31:5 | 216:23 228:2 | turnaround |
| 233:1 | 36:2,5 39:25 | 230:19 232:9 | 23:12 |
| transcript 7:25 | 40:2,6 43:15 | 233:5 235:8 | turnarounds |
| 232:21 233:3,5 | 43:22 45:5 | truly 41:1 97:9 | 147:12,16 |
| 235:5,8 236:5 | 52:5,21 61:9 | 128:19 | turned 96:3 |
| 236:16 | 61:19 65:20 | trust 125:22 | turner 17:23 |
| transcriptionist | 69:17,21 72:25 | 169:4 | 18:10 |
| 232:8 | 74:23 77:17 | trustworthy | turning 57:5 |
| transfer 205:24 | 79:17 80:12 | 125:20 | 165:8 168:21 |
| 206:6 | 85:23 87:19 | truth 9:8,8,9 | twelve 63:8 |
| | 88:11 89:8 | | 65:23 66:2,2 |

Veritext Legal Solutions
800-336-4000

[twelve - use]

220:17
**twenty** 184:24
**twice** 69:25
**twisting** 209:2
**two** 13:11,12
14:19,22 21:24
23:12 31:13
32:12,12 35:15
48:22 49:17,18
51:3 71:1,9
77:11 78:15
79:8 83:23
98:6 112:12
113:15 130:24
132:9 151:8
156:25 158:22
169:12 177:24
178:19,20
179:19 185:4
185:11 196:19
211:12,15,15
216:10 225:20
225:21 228:10
**tx** 1:18 2:6,14
236:13
**type** 83:9 92:6
95:15 160:9
181:8 200:24
**types** 112:20
113:13 123:8
123:21 124:13
124:15,24
176:18
**typewriting**
232:7

**typically** 92:2
131:3

**u**

**ultimate** 19:15
**ultimately** 19:9
19:15 40:21
41:13,14 43:8
76:22 133:12
228:18
**umbrella** 15:15
**unable** 104:12
117:20 119:1
136:2 166:4
**unaware**
154:21
**undeniable**
45:9
**under** 8:3
24:15 31:25
103:8 217:16
217:17
**underneath**
15:16 16:11
**understand**
7:24 26:21
35:14 36:9
40:21 41:10,21
41:23 50:16
62:2,23,25
66:3,12 71:7
71:20 75:6
81:22,23,25
85:19 86:20
101:10 102:19
113:14 127:3

130:15 131:5
139:11 141:6
144:14,23
150:10,12
156:21 157:21
159:19 163:22
165:2 172:10
178:20,24
180:17 182:19
189:20 192:4,6
202:24 203:11
204:2,17 225:3
**understanding**
26:24 69:13,22
69:24 141:22
178:4 190:19
202:23,24
218:18
**understands**
67:12 75:17
95:23 109:10
111:9 123:7
129:15 131:20
140:17 150:6
178:9
**understood**
18:25 20:18
101:2 109:21
159:21 170:16
**undoubtedly**
147:18
**undue** 165:17
**unfortunate**
87:7,17

**unfortunately**
192:8
**unhappy**
100:23 101:12
**unit** 13:17,18
13:18 15:4,5,5
15:7 16:25
39:8 106:18
161:25 177:14
183:16 221:9
**united** 1:1 7:12
**units** 13:16
21:19 40:13
55:17 182:23
201:3
**university** 12:6
**unpaid** 96:7,14
96:21 97:7,9
100:5 105:18
105:25 108:9
110:19 112:17
112:20 126:4
140:21 173:9
**unprotected**
61:14 65:21
66:4,9 70:12
**unsafe** 41:2
**update** 78:4
**upset** 101:17
**urgent** 78:21
**use** 17:8,12
44:3 62:20
66:4,7 69:20
71:9 86:1
96:13,14,20

Page 62

[use - vocal]

| | | | |
|---|---|---|---|
| 97:14 105:17 | 96:7,13,21 | 167:12,15 | **vet** 106:2 |
| 105:24 109:22 | 97:7,11,14 | 168:21 169:5 | **viable** 50:10 |
| 109:23 141:24 | 98:7 100:14,14 | 169:17,23 | 126:3,18 |
| 142:1 158:25 | 100:19 105:18 | 176:11 | **vice** 37:20 |
| 187:22 216:21 | 105:24 109:23 | **valves** 167:12 | 167:20 |
| 225:17 | 109:24 110:3,6 | 176:9,21 | **victoria** 2:6 |
| **used** 15:6,19 | 110:9,11,14,15 | **varieties** | **video** 7:18 77:7 |
| 39:23 63:12 | 110:15,20 | 112:21 | 77:11 132:9,13 |
| 69:15 70:6 | 112:17,20 | **various** 29:22 | 201:9,12,16 |
| 72:11 73:4,17 | 129:23 140:8 | 108:1 | 230:22 |
| 80:9,15,16 | 140:13,15,18 | **vasek** 119:9,12 | **videographer** |
| 100:24 110:11 | 140:21 141:9 | 153:8 154:16 | 2:20 7:2 75:9 |
| 162:20 225:17 | 141:19,24 | 154:24 155:2 | 77:6,10 132:8 |
| 236:16 | 142:2,6 143:23 | 155:17,21 | 132:12 201:8 |
| **uses** 8:2 | 144:12 173:10 | 156:5 157:13 | 201:11,15 |
| **using** 40:5 71:6 | 187:22 188:1,7 | 181:24,25 | 230:22 |
| 97:7 145:9 | 188:7,10,14,15 | 211:4 | **view** 71:4,5 |
| **utilities** 14:23 | 188:19,22,24 | **vaseks** 157:1 | 122:11 |
| 21:25 47:18 | 189:10,25 | **vendors** 213:24 | **viewed** 92:13 |
| **utility** 22:1 | 190:1,9 191:17 | **verbal** 33:24 | **vigilant** 50:3 |
| **utilize** 18:13 | 192:14 216:15 | 137:2 | **violate** 74:17 |
| 74:1 96:7 | 216:22 | **verbally** 186:21 | 165:25 |
| 159:22 | **vacations** 83:19 | **verbiage** 66:6 | **violated** 42:5 |
| **utilized** 145:5 | **vaguely** 158:2 | **verify** 169:8 | 42:21 |
| **utmost** 194:20 | **val** 157:16 | 236:8 | **violating** 74:14 |
| | 211:4 | **veritext** 7:6,19 | 165:16 |
| **v** | **validate** 115:1 | 236:12,19 | **violation** 73:25 |
| **v** 1:7 234:1 | 125:12,15 | **veritext.com.** | **virginia** 28:16 |
| 235:1 236:3 | 168:25 | 236:13 | 28:18,19,20,23 |
| **vacancies** | **valuation** | **versa** 37:20 | 28:24 |
| 48:15,17,19 | 108:23 | 167:20 | **vision** 23:22 |
| **vacation** 39:6 | **value** 205:2,6 | **versed** 209:9 | **visit** 109:1 |
| 40:11,18 41:21 | 205:13,17 | **version** 70:1 | **visits** 33:9 |
| 42:22 43:8,14 | **valve** 165:5,7,8 | **versus** 183:16 | **vocal** 37:16 |
| 73:18,21,22 | 165:12,15 | | |
| 74:6,9,15 75:4 | | | |

Page 63

[voiced - windy]

| | | | |
|---|---|---|---|
| **voiced** 84:4 | 178:9 184:10 | 80:25 107:22 | 109:1 207:24 |
| **volumes** 13:15 | 186:7 188:18 | 117:19 125:2 | **weeks** 30:14 |
| **vote** 160:20 | 192:12 193:8 | 125:14 138:18 | 48:22,23 170:2 |
| **vp** 19:23 | 200:8 206:21 | 148:22 151:15 | 184:21,24 |
| 126:22 | 206:22 208:23 | 167:7 180:15 | 216:16,17,17 |
| **vs** 7:11 | 211:7 217:18 | 180:16 187:13 | **weighed** 213:15 |

**w**

| | | | |
|---|---|---|---|
| **w** 1:5 2:2,3,19 | 220:3 224:11 | 189:4 195:8 | 214:23 |
| 7:10 234:1 | 225:25 | 196:1 200:23 | **weight** 214:1 |
| 235:1 236:3 | **wanted** 31:22 | 202:3 213:12 | **weights** 176:19 |
| **wait** 142:14,24 | 35:5 39:4,16 | 213:13 223:9 | **welcome** 11:5 |
| 143:18,20 | 40:4,8,9,19,20 | 225:5 228:17 | 18:15 97:12 |
| 164:7,7 | 97:15 99:19 | **ways** 130:9 | 189:10 228:25 |
| **waiting** 143:4 | 101:25 103:7 | **we've** 49:19,19 | 229:10 230:13 |
| **walk** 102:3,3 | 105:22 109:1 | 75:8 79:24 | **wenglar** 3:18 |
| 163:11 | 110:4 125:5,7 | 80:3 81:16 | 62:10 79:9,19 |
| **walkways** | 125:10,11 | 110:23 111:19 | 82:18 |
| 159:14 | 142:2 151:13 | 112:4 130:24 | **went** 12:5,22 |
| **want** 10:3 | 172:3 174:14 | 131:13 144:1 | 43:11 115:23 |
| 24:13 26:23 | 179:8 180:3 | 150:13,15 | 116:14 118:19 |
| 27:25 29:15 | 185:2 224:11 | 187:5,17,20 | 146:20 158:19 |
| 40:24 56:1 | 225:6 | 196:13,15,15 | 179:19 184:22 |
| 65:3 72:7 | **wanting** 93:2 | 199:10 211:1,6 | 208:10 218:13 |
| 75:10 77:21 | **wants** 10:10 | 212:7 216:25 | 225:12 |
| 91:15,16,16 | 99:6 144:22 | 218:14 221:8 | **wide** 175:20 |
| 92:25 95:16 | 193:4 | 225:7,16 | **wikipedia** |
| 97:14 98:24 | **warrant** 41:18 | **wear** 158:15 | 174:7,23 |
| 109:9,22 110:3 | 41:20 | 159:10 | **wilson** 160:12 |
| 126:24 129:14 | **waste** 15:1 | **weather** 39:7 | 160:15 211:5 |
| 131:19 141:24 | **wastewater** | 40:12 | **window** 185:15 |
| 142:1 144:21 | 14:25 | **wednesday** | **windy** 5:10 |
| 154:10 156:3 | **water** 14:24,25 | 1:14 | 57:7,15 75:18 |
| 157:20 163:7,9 | **way** 11:8 35:23 | **week** 20:5 30:8 | 76:6,15,16,19 |
| 165:2,3 166:14 | 41:9 42:4 | 37:16 48:20,21 | 82:22,23 84:1 |
| 166:18 175:6 | 47:23 62:23 | 75:12 78:7 | 84:23 85:3,23 |
| | 75:11 79:12 | 82:19 105:6 | 86:1,8,11,11,23 |

[windy - work]

| | | | |
|---|---|---|---|
| 86:25 94:3,8 | **withdrawn** | 164:20 166:14 | 123:12 124:19 |
| 94:11,14,17 | 138:25 | 175:4 179:6 | 125:1,4,5,6,11 |
| 95:9,16,17,24 | **withdrew** | 181:12 184:8 | 127:8,22 |
| 96:6 97:6,14 | 138:15 | 187:25 188:13 | 128:16,22 |
| 97:16,23 98:2 | **withheld** 135:7 | 202:2 207:25 | 129:11,17 |
| 100:3,6 101:2 | 227:13 | 208:9 209:2 | 136:2 139:15 |
| 101:11,21 | **withholding** | 217:19 222:21 | 139:19,20,25 |
| 102:13,18,23 | 64:9 | 224:17 229:3 | 140:2 143:13 |
| 105:16 107:22 | **witness** 7:23,24 | **work** 4:12 10:3 | 145:14,17 |
| 107:23 108:4 | 8:20 9:7 11:20 | 12:23 17:6 | 146:1,17,17 |
| 108:25 109:10 | 22:7 44:7,25 | 32:23,24 33:6 | 147:11,15 |
| 109:13 110:3 | 54:10 56:19 | 33:7 38:17 | 148:2 149:2,3 |
| 112:18 125:3,8 | 77:21 81:13,16 | 39:16 40:16,22 | 149:4,10,22,23 |
| 125:15,16,17 | 98:1 109:3 | 41:12,15 46:15 | 149:23 150:9 |
| 125:18,22 | 118:6 143:7 | 46:20 61:15 | 150:16,17,24 |
| 126:4,6 128:18 | 162:12 166:23 | 62:15,18 63:23 | 151:5,8,14,15 |
| 129:23 133:5 | 167:1 182:7,9 | 68:2 70:20,23 | 151:22 153:1,3 |
| 134:6,14 138:3 | 220:3,14,23 | 71:17,18 72:15 | 154:2,12,17 |
| 138:10,17,25 | 221:8 222:11 | 72:15,25 78:18 | 155:17 156:5,9 |
| 140:22 141:3 | 226:8 232:4 | 84:1,11,23 | 158:11,18 |
| 141:17,23 | 236:5,7,9,11,15 | 85:4 92:5 94:7 | 160:10 161:12 |
| 142:4,11 | **wondering** | 94:22 95:5,6 | 164:14 166:17 |
| 151:10 173:5 | 186:15 205:18 | 95:12,19,25 | 169:3 172:24 |
| 173:13,17 | **word** 17:8,8 | 99:7 101:3,4 | 176:23 177:3,5 |
| 185:3,4 187:14 | 39:23 40:5 | 101:22,25 | 178:25 179:1,7 |
| 191:8 216:8 | 66:4 71:9,24 | 102:14 104:9 | 180:3,9,13,21 |
| 217:24 223:10 | 72:11 124:8 | 104:12,17,18 | 180:22 181:4,9 |
| 227:4,9 | 162:20 207:13 | 105:4,10 | 188:15 202:13 |
| **windy'd** 83:11 | 218:6 | 106:14 111:2 | 202:21 203:1 |
| **windy's** 95:1 | **words** 18:22 | 114:13,25 | 203:12,14 |
| 138:23 139:4 | 33:25 37:8 | 116:11 117:2 | 205:5 208:5,5 |
| 184:7,15 | 43:16 62:12 | 118:13,21 | 208:11 209:21 |
| **wished** 37:22 | 67:11,23 73:20 | 119:1,7,22 | 209:22 210:21 |
| **withdraw** | 96:24 118:23 | 120:2 121:4,12 | 214:20 217:4 |
| 139:1 | 120:5 141:7 | 122:15 123:6 | 217:10 218:12 |

Page 65

221:12 224:13
224:23 225:14
228:6,20,21
229:9,12,21
**worked** 13:23
21:1 37:3 83:6
83:22 93:16
103:23 104:7
117:10,12,24
118:2 151:14
151:25 191:10
203:10 208:11
**worker** 41:21
104:16 118:12
119:8 123:25
124:19 143:23
144:10,19
161:11,11
164:10 170:12
172:11
**workers** 44:17
116:10 154:11
155:15 159:22
170:17 178:10
187:22 204:25
205:4 211:2
212:13,25
215:2
**workgroup**
113:6 212:24
**working** 17:20
17:22 81:18,24
98:11,14,16,16
98:25 99:17
102:1 103:3

113:2,6,9,16
116:17 117:12
117:25 118:2
125:7,25
127:13 129:10
147:25 149:11
151:12 152:7
152:20 153:22
154:12 155:3
158:22 161:22
164:11 165:18
166:17 170:8
183:23,24
190:20 193:15
199:5 205:1
208:3,25
210:19 213:23
223:23 225:11
**works** 10:24
11:10 17:15
63:24 122:8
132:7
**world** 14:11
**worst** 177:12
**would've** 57:23
190:21
**wright** 19:14
19:17
**write** 169:19
**writing** 28:10
33:20 34:1
63:15 138:14
148:25
**written** 8:7
31:7 51:8,13

88:1 104:14
121:9 147:21
149:19 150:14
161:10,12
169:1 182:20
187:5 210:9
**wrong** 41:2,6
90:11 92:2
124:4 159:20
159:21 189:5
199:1,2 224:19
**wrote** 59:18
60:6 87:23
99:21

**x**

**x** 3:1,7 4:1 5:1
6:1 15:20
232:21

**y**

**y'all** 60:6 83:2
139:1 145:12
185:2 218:21
**yanice** 2:11
8:16 28:10,14
77:21 118:17
**yanice's** 29:14
197:21
**yanice.colon...**
2:15 236:1
**yeah** 56:22,22
62:12 74:12
90:5 112:11
136:11 151:15
178:3 188:6

190:16 196:21
205:4 212:11
214:22 216:16
216:17
**year** 12:3,12,20
12:22 23:13,15
37:1 44:11
57:18 58:11,14
66:1 100:16
106:20,21
127:24 174:20
179:3,22 180:6
182:4 197:7
227:25
**years** 12:7 14:4
19:2 21:2 26:8
32:14,16 37:3
45:14 47:21
49:10 117:24
163:15 175:18
230:18
**young** 181:9

**z**

**zalman** 1:12
5:9 7:10 8:21
8:22,24,24,25
9:1,3,6,17
25:25 39:23
77:7,11,14
132:9,13,16
196:19 197:11
201:13,16,19
226:15 230:23
234:2,24 235:2
235:4,12 236:4

**[zalmans - zemanek]**

**zalmans**  26:1,4
   26:5
**zemanek**  182:3
   182:7,8

Veritext Legal Solutions
800-336-4000

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness;  Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.